UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DAVID C. LETTIERI,

                         Plaintiff,

          v.

RANDALL E. GARVER; MICHAEL                                    3:23-CV-1099
HOUTEWATER; JENULLE BRIGUAL;                                  (GTS/ML)
PAUL E. BONINNO; ERIC SCMIDIT;
STATE TROOPER; STATE TROOPER
JOHN DOE; FEDERAL BUREAU OF
INVESTIGATION; LEON BROWN;
BROOME COUNTY SHERIFF; BENJAMIN
HURTING; DAVID GASKU; KAREN
MUTSON; BROOME COUNTY HUMANE
SOCIETY; FBI DOE #1; FBI DOE #2; FBI
DOE #3; FBI DOE #4; FBI DOE #5; FBI DOE
#6; FBI DOE #7; FBI DOE #8; BROOME CNTY.
SHERIFF DOE #1; BROOME CNTY. SHERIFF
DOE #2; BRUDLEY GUINESS; and WYOMING
COUNTY SHERIFFS,

                         Defendants.
_____

APPEARANCES:                                                 OF COUNSEL:


DAVID C. LETTIERI
   *Pro Se* Plaintiff
Devens Federal Medical Center
Post Office Box 879
Ayer, Massachusetts 01432

MIROSLAV LOVRIC, United States Magistrate Judge


## REPORT and RECOMMENDATION

          The Clerk has sent a *pro se* amended complaint in the above captioned action filed by

David Lettieri ("Plaintiff") to the Court for review.  (Dkt. No. 21.)  For the reasons discussed

below, I recommend that Plaintiff's Amended Complaint be dismissed in part without leave to amend and accepted in part for filing.  (Dkt. No. 21.)

## I.    BACKGROUND

Construed as liberally[1] as possible, Plaintiff's Amended Complaint appears to allege that his civil rights were violated by Defendants Randall E. Garver, Michael Houtewater, Jenulle Brigual, Paul E. Boninno, Eric Scmidit, State Trooper, State Trooper John Doe, Federal Bureau of Investigation, Leon Brown, Broome County Sheriff, Benjamin Harting, David Gasku, Karen Mutson, Broome County Humane Society, FBI Doe #1, FBI Doe #2, FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Brudley Guiness, and Wyoming County Sheriffs[2] (collectively "Defendants").  (*See generally* Dkt. No. 21.)

More specifically, Plaintiff alleges that on November 5, 2024,[3] a group of law enforcement agents conducted an illegal search and seizure at his property in Harpursville, New

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2]    The Clerk of the Court is directed to add to the caption Defendants Randall E. Garver, Michael Houtewater, Jenulle Brigual, Paul E. Boninno, Eric Scmidit, State Trooper, State Trooper John Doe, Leon Brown, Broome County Sheriff, Benjamin Harting, David Gasku, Karen Mutson, Broome County Humane Society, FBI Doe #1, FBI Doe #2, FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Brudley Guiness, and Wyoming County Sheriffs.

[3]    Based on the allegations contained in the Complaint, it is presumed that Plaintiff intended to allege that the events at issue occurred on November 5, 2020.  (Dkt. No. 1 at 5; *see also* Dkt. No. 21, Attach. 7 at 1 [alleging that "[o]n November 5, 2020 the FBI never had a warrant to search the plaintiff's sheds in which the phone that was se[i]zed."]; Dkt. No. 21, Attach. 8 at 1 [alleging that "[o]n November 5, 2020 the Federal Bureau of Investigation had [an] unlawful search and se[ized] a cell phone from the plaintiff['s] shed in which there was no warrant for such."].)

York.  (Dkt. No. 21 at 4.)  Plaintiff alleges that his shed was searched but that there was no search warrant for that area of the property and, at the time of the search, he was detained so the contents of the shed could not have posed a risk to the agents.  (*Id.*)  Plaintiff alleges that a cell phone was taken from the shed during the search.  (*Id.*)

In his "Support abuse of process" document attached to the Amended Complaint, Plaintiff alleges that Defendant Garver stated that he did an investigation of the premises in advance of the search, which "shows an abuse of process."  (Dkt. No. 21, Attach. 1 at 1.)

In his "Support to 1983" document attached to the Amended Complaint, Plaintiff alleges that the Broome County Humane Society is considered a state actor "because of state law with animals" (Dkt. No. 21, Attach. 2 at 1-2), and Defendant federal agents were "clothed with state law" and "with discovery [Plaintiff] will show a conspiracy that the federal agents and state agents had entered into."  (Dkt. No. 21, Attach. 2 at 2.)

In the "Support to conspiracy" document attached to the Amended Complaint, Plaintiff alleges that New York State troopers, Broome County sheriffs, and the Broome County Humane Society are state actors, and there was an "ample amount of proof that any agent knew what they [were] doing was wrong."  (Dkt. No. 21, Attach. 3 at 1-2.)

In the "Support to excessive force" document attached to the Amended Complaint, Plaintiff alleges that "David Gasku knows how the plaintiff gets when a law enforcement agent is involved" and that being present "with over a dozen people with handguns[,] the plaintiff [thought] he was getting robbed."  (Dkt. No. 21, Attach. 4 at 1.)

In the "Support to Failure to Intercede" document attached to the Amended Complaint, Plaintiff alleges that "[e]very single agent had to examine the search warrant.  If there was one in which the shed wasn't on because [Defendant] Garver was ordering after taking the phone out of

the shed to search all of them."  (Dkt. No. 21, Attach. 5 at 1.)  Plaintiff alleges that by following

Defendant Garver's orders, "it shows that all state and federal agents did not care about

constitutional rights."  (Dkt. No. 21, Attach. 5 at 2.)

In the "Support to failure to train and sup[ervise]" document attached to the Amended

Complaint Plaintiff alleges that "to search and se[ize] a place in which [they] had no authority to

do so makes a problem for training and supervising since [Defendant] Garver did order such."

(Dkt. No. 21, Attach. 6 at 2.)

In the "Fed. Rule 41(g)" document attached to the Amended Complaint, Plaintiff alleges

that because "the phone was unlawfully se[ized] the plaintiff is entitled to it back without

question by law."  (Dkt. No. 21, Attach. 7 at 2.)

In the "Support to Fourth Amendment violation" document attached to the Amended

Complaint, Plaintiff alleges that the Federal Bureau of Investigation unlawfully searched his

shed without a warrant and seized his cell phone.  (Dkt. No. 41, Attach. 8 at 1.)  Plaintiff alleges

that he was in handcuffs, the sheds were closed and locked, and thus, a search warrant was

required but law enforcement did not have a search warrant to conduct the shed searches.  (*Id*. at

1-2.)

In the "Monell claim" document attached to the Amended Complaint, Plaintiff alleges

that "[t]he fact that the sheds were searched without even attempting to get a warrant first shows

a step outside a procedure that agents would have to follow."  (Dkt. No. 21, Attach. 9 at 1-2.)

Plaintiff alleges that the unlawful seizure of his phone violated his established Fourth

Amendment constitutional rights.  (*Id*. at 2.)

In the "Recusal Lawyers" document attached to the Amended Complaint, Plaintiff asserts

that he "moves to recus[e] the Department of Justice as any legal representation to the defendants

on such case" because (1) he cannot sue the United States government and thus, "the agency cant cover any liab[ility] for such matters of the civil rights violations," and (2) Plaintiff "will want to press charges in which requires a non-conflict from the Department of Justice."  (Dkt. No. 21, Attach. 10 at 1.)

Based on these factual allegations, Plaintiff appears to assert the following nine claims: (1) a claim of abuse of process pursuant to New York law against Defendant Garver; (2) a claim pursuant to 42 U.S.C. § 1983; (3) a claim of conspiracy pursuant to 42 U.S.C. § 1983; (4) a claim of excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983; (5) a claim of failure to intercede pursuant to 42 U.S.C. § 1983; (6) a claim of failure to train and supervise pursuant to 42 U.S.C. § 1983; (7) a claim for return of property pursuant to Fed. R. Crim. P. 41(g); (8) a claim of unlawful search pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (9) a *Monell* claim pursuant to 42 U.S.C. § 1983.  (*See generally* Dkt. No. 21.)

As relief, Plaintiff seeks return of the phone and suppression of any evidence obtained from the phone, $1,000,000 in damages, and a restructuring of policies.  (Dkt. No. 21 at 5.)

## II.    LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

Because Plaintiff is proceeding *in forma pauperis*, his Amended Complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B).  The legal standard governing review of a pleading pursuant to 28 U.S.C. § 1915(e)(2)(B) was discussed at length in the Order and Report-Recommendation issued by the undersigned on December 15, 2023.  (Dkt. No.11 at 4-6.)

## III.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend it be dismissed in part and accepted in part for filing.

A.    **Claims Against Defendants Houtewater, Brigual, Boninno, Scmidit, State Trooper John Doe, Brown, Harting, Mutson, FBI Doe #1, FBI Doe #2, FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, and Guiness**

"It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Johnson v. Miller*, 20-CV-622, 2020 WL 4346896, at *9 (N.D.N.Y. Jul. 29, 2020) (Kahn, J.) (internal quotation marks and citations omitted). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a[n] . . . official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that the

fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'" *Tangreti*, 983 F.3d at 618. The Second Circuit explained that, "'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Here, Plaintiff names individual Defendants Houtewater, Brigual, Boninno, Scmidit, State Trooper John Doe, Brown, Harting, Mutson, FBI Doe #1, FBI Doe #2, FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, and Guiness, but the Amended Complaint lacks any allegations of wrongdoing by these officials. (*See generally* Dkt. No. 21.) Indeed, these individuals are listed in the caption and list of defendants (Dkt. No. 21 at 1-3; Dkt. No. 21, Attach. 11 at 1-4) but the body of the Amended Complaint does not allege any facts related to these individuals. "[A] complaint cannot be maintained against a defendant who is listed in the caption, but against whom no facts are alleged in the body of the complaint." *Guarneri v. Schenectady City Police*, 21-CV-0496, 2021 WL 5508276, at *2 (N.D.N.Y. Sept. 14, 2021) (Hummel, M.J.) (citing *Taylor v. City of New York*, 953 F. Supp. 95, 98-99 (S.D.N.Y. 1997)).

As a result, I recommend that Plaintiff's claims against Defendants Houtewater, Brigual, Boninno, Scmidit, State Trooper John Doe, Brown, Harting, Mutson, FBI Doe #1, FBI Doe #2,

FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County

Sheriff Doe #1, Broome County Sheriff Doe #2, and Guiness be dismissed.

### B.    Claims Against Defendant Garver[4]

The Amended Complaint alleges that Defendant Garver stated that he investigated

Plaintiff's property and ordered the search of the sheds without a warrant.  (Dkt. No. 21, Attach.

1 at 1; Dkt. No. 21, Attach. 5 at 1; Dkt. No. 21, Attach. 6 at 2.)

### 1.    Abuse of Process

In New York, "a malicious abuse-of-process claim lies against a defendant who (1)

employs regularly issued legal process to compel performance or forbearance of some act (2)

with intent to do harm without excuse of justification, and (3) in order to obtain a collateral

objective that is outside the legitimate ends of the process."  *Cook v. Sheldon,* 41 F.3d 73, 80 (2d

Cir. 1994).  Malicious abuse of criminal process also supports liability under § 1983.  *Cook*, 41

F.3d at 80.

In order to state a claim for abuse of process, a plaintiff must establish that the defendants

had an improper *purpose* in instigating the action.  *See Dean v. Kochendorfer,* 237 N.Y. 384, 143

N.E. 229 (1924) (distinguishing between improper motive and improper purpose and concluding

that improper purpose is necessary to make out an abuse-of-process claim—improper motive is

---

[4]    To the extent that the Amended Complaint asserts any claims against Defendant Garver in his official capacity, I recommend that they be dismissed.  "As a general matter, a litigant may not sue the United States or any of its agencies in federal court unless the United States has waived its sovereign immunity."  *Williams v. MDC Brooklyn/FBOP*, 24-CV-7682, 2024 WL 5077626, at *2 (E.D.N.Y. Dec. 11, 2024) (citing *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."); *FDIC v. Meyer*, 510 U.S. 471, 483-86 (1994) (*Bivens* does not imply cause of action against the federal government or its agencies)).

not enough).  Accordingly, to state a claim for abuse of criminal process, a plaintiff must claim that the defendant(s) aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.

The Amended Complaint fails to allege facts plausibly suggesting that Defendant Garver (or any of Defendants) had an improper purpose in instigating the criminal action against him. As a result, I recommend that the New York abuse of process claim be dismissed.

### 2.     Claim Pursuant to 42 U.S.C. § 1983

Section 1983 "is not itself a source of substantive rights," but is a vehicle for vindicating federal rights embedded in the United States Constitution and federal statutes. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (holding that section 1983 "merely provides a method for vindicating federal rights elsewhere conferred, such as those conferred by § 1981.").

Thus, to the extent that Plaintiff attempts to assert a claim pursuant to 42 U.S.C. § 1983 without any additional federal right violated, I recommend that it be dismissed.

### 3.     Conspiracy

To adequately assert a conspiracy claim under § 1983 or *Bivens* a plaintiff must allege: (1) an agreement between two or more state actors or between a state actor and private actor; (2) to act in concert to inflict an unconstitutional injury on plaintiff; and (3) an overt act committed in furtherance of that goal causing damages. *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002); *Van Stuyvesant v. Crane*, 23-CV-4394, 2023 WL 4848404, at *9 (S.D.N.Y. June 27, 2023).

"[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are

properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325 (internal quotations and citation omitted); *see also Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the minds"); *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.").  "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.'" *Flores v. Levy*, 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (quoting *Twombly*, 550 U.S. at 554).

Plaintiff's Amended Complaint fails to assert any factual allegations plausibly alleging an agreement or conspiracy among Defendants.  (*See generally* Dkt. No. 21.)  Plaintiff's allegations, even when read with the utmost of special liberality, are impermissibly vague and conclusory to plausibly suggest a conspiracy.  Plaintiff alleges, with no factual support or causal connection, that as a result of his shed being searched, defendants conspired together to violate his constitutional rights.  (Dkt. No. 21, Attach. 3.)

Moreover, as set forth herein, I recommend dismissal of claims against all Defendants except Defendant Garver.  Plaintiff alleges that Defendant Garver directed the search of the shed. (Dkt. No. 21, Attach. 5 at 1; Dkt. No. 21, Attach. 6 at 2.)  Hence, based on Plaintiff's apparent theory of the case, Defendant Garver was the driving force behind the shed search, not a member of a group of individuals conspiring together to violate Plaintiff's constitutional rights.

As a result, I recommend that Plaintiff's conspiracy claim be dismissed.

###    4.    Excessive Force

"The Fourth Amendment protects a free citizen from excessive force in the course of an arrest or investigatory stop." *McDonald v. City of Troy*, 542 F. Supp. 3d 161, 168-69 (N.D.N.Y. 2021) (Hurd, J.) (citing *Cugini v. City of N. Y.*, 941 F.3d 604, 612 (2d Cir. 2019)). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "To succeed on a [Section] 1983 excessive force claim, a plaintiff must show that the defendant's use of force was 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Malarczyk v. Lovgren*, 19-CV-0042, 2022 WL 374271, at *9 (N.D.N.Y. Feb. 8, 2022) (Hurd, J.) (quoting *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 491 (N.D.N.Y. 2017) (Hurd, J.)). The objective reasonableness inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d. at 491.

Factors the court should consider when making this assessment include "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396). However, the court should be "careful to evaluate the record 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[;]' . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396-97).

Plaintiff fails to allege any facts plausibly suggesting that Defendant Garver used excessive (or any) force against him.  (Dkt. No. 21, Attach. 4 at 1; *see generally* Dkt. No. 21.)  Plaintiff alleges solely that Defendant Gasku "knows how the plaintiff gets when a law enforcement agent is involved."  (Dkt. No. 21, Attach. 4 at 1.)  This allegation does not allege that Defendant Garver—or any other law enforcement agent—used excessive force against Plaintiff.

As a result, I recommend that Plaintiff's excessive force claim against Defendant Garver be dismissed.

### 5.    Failure to Intercede/Intervene

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  However, "[a] failure to intervene claim is a derivative claim that must be predicated upon a viable § 1983 claim" against another individual.  *Chepilko v. Henry*, 722 F. Supp. 3d 329, 347 (S.D.N.Y. 2024).  Although the undersigned recommends that a response be required to Plaintiff's unlawful search claim against Defendant Garver, this Report and Recommendation also recommends dismissal of Plaintiff's claims against all other Defendants.  Hence, to the extent that the assigned District Judge adopts this Report and Recommendation, there are no remaining viable § 1983 claims against another individual from which Defendant Garver could be held liable for failing to intervene.

As a result, I recommend that Plaintiff's failure to intercede/intervene claim be dismissed for failure to state a claim upon which relief may be granted.

### 6.    Failure to Train

A municipality may be held liable if a plaintiff can assert that a policy or custom of that municipality caused the constitutional violation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978).  "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff."  *Moran v. Cnty. of Suffolk*, 11-CV-3704, 2015 WL 1321685, at *9 (E.D.N.Y. Mar. 24, 2015) (citing *Parker v. City of Long Beach*, 563 F. App'x 39 (2d Cir. 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014) (failure to train or supervise); *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality)).

"Naked boilerplate allegations against a city are not sufficient to demonstrate a custom, practice or policy of conducting unlawful arrests."  *Brown v. City of New York*, 12-CV-3146, 2014 WL 5089748, at *9, n.12 (S.D.N.Y. Sept. 30, 2014); *see Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (holding that for a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations" that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy).

There is no indication that any individual may be held liable for failure to train. However, construing Plaintiff's Amended Complaint liberally, he essentially alleges that because his shed was searched, there must be a problem with training and supervising. (Dkt. No. 21, Attach. 6 at 2.) These naked assertions are insufficient to plausibly allege municipal liability. Plaintiff's allegation of a discrete incident, during which an officer or individual employed by the government did not act properly is insufficient to plausibly allege municipal liability.

As a result, I recommend that any failure to train claim against Defendant Garver be dismissed.

### 7.        Return of Property Pursuant to Fed. R. Crim. P. 41(g)

"[T]here is an extensive body of law relating to the proper characterization of Rule 41(g) motions. It bears emphasis that Rule 41(g) is a rule of *criminal* procedure; it is not a rule that relates to the processing of *civil* cases." *Allen v. Grist Mill Capital LLC*, 88 F.4th 383, 394 (2d Cir. 2023).

However, "[w]here no criminal proceedings against the movant are pending or have transpired, a motion for the return of property is treated as a civil equitable proceeding." *Mora v. United States*, 955 F.2d 156, 158 (2d Cir. 19920 (internal quotation marks, citation, and alterations omitted). "Jurisdiction under Rule 41 is to be exercised with great restraint and caution." *De Almeida v. United States*, 459 F.3d 377, 382 (2d Cir. 2006).

Based on the allegations contained in the Amended Complaint, it appears that Plaintiff's criminal proceeding is still pending because he seeks the return of his phone and the suppression of any evidence contained on the phone. (Dkt. No. 21 at 5.) As a result, I recommend that Plaintiff's claim pursuant to Fed. R. Crim. P. 41(g) be dismissed.

### 8.    Unlawful Search

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It "applies in the civil context as well" as the criminal. *Sodal v. Cook Cnty.*, 506 U.S. 56, 57 (1992) (collecting cases).

The New York State Appellative Division, Fourth Department has held that "[t]he search of the shed at defendant's residence exceeded the scope of the search warrant which authorized a search of the residence." *People v. Caruso*, 174 A.D.2d 1051, 1051 (N.Y. App. Div. 4th Dep't 1991).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment search and seizure claim against Defendant Garver.

### 9.    *Monell* Claim

A *Monell* claim is one against a municipality. *Monell*, 436 U.S. at 692-94. As a result, to the extent that Plaintiff attempts to assert a *Monell* claim against Defendant Garver (or any other individual defendant), I recommend that it be dismissed for failure to state a claim upon which relief may be granted. Moreover, to the extent that the Amended Complaint is construed as asserting any claims against Defendant Garver in his official capacity, I recommend that they be dismissed for the reasons set forth in note 4.

### C.    Claims Against Defendant Gasku

The entirety of Plaintiff's allegations against Defendant Gasku are that he "knows how the plaintiff gets when a law enforcement agent is involved." (Dkt. No. 21, Attach. 4 at 1.) This allegation is insufficient to allege Defendant Gasku's personal involvement in any constitutional deprivation. As a result, I recommend that Plaintiff's claims against Defendant Gasku be dismissed.

### D.    Claims Against Defendant FBI

As set forth in the undersigned's Order and Report-Recommendation dated December 15, 2023, "[a]s a federal agency, Defendant [FBI] cannot be liable under *Bivens*." (Dkt. No. 11 at 7.) As a result, I recommend that any claims against Defendant FBI be dismissed for failure to state a claim upon which relief may be granted.

### E.    Claims Against Defendant New York State Police

New York State is immune from suits pursuant to 42 U.S.C. § 1983 seeking either legal or equitable relief, under the Eleventh Amendment. *Papasan v. Allain,* 478 U.S. 265, 276 (1986); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98-100 (1984); *see Ognibene v. Niagara Cnty. Sheriff's Dep't*, 03-CV-0678, 2003 WL 24243989, at *3 (W.D.N.Y. Dec. 1, 2003) ("To the extent the plaintiff names various state courts as defendants and seeks either legal or equitable relief against them under § 1983, they are immune from such suit under the Eleventh Amendment."). The Eleventh Amendment's immunity extends to the New York State Police as an agency of the State of New York. *See, e.g., Riley v. Cuomo*, 17-CV-1631, 2018 WL 1832929, *4 (E.D.N.Y. Apr. 16, 2018) (holding that the New York State Police, as a division in the executive department of the State, is immune from claims under § 1983); *Finkelman v. New York State Police*, 06-CV-8705, 2007 WL 4145456, *3 (S.D.N.Y. Nov. 15,

2007) (holding that the Eleventh Amendment barred the plaintiff's suit seeking monetary damages under § 1983 against New York State Police).

As a result, I recommend that any claims against Defendant New York State Police be dismissed.

### F.    Claims Against Defendant Broome County Sheriff

Under law of the State of New York, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington v. County of Sullivan,* 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999). "[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail,* 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of Nassau*, 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown,* 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.").

As a result, I recommend that Plaintiff's claims against Defendant Broome County Sheriff's Department be dismissed because it is not an entity that is amenable to suit. *See Dudley v. Hochul*, 24-CV-0048, 2024 WL 1906594, at *9 (N.D.N.Y. May 1, 2024) (Lovric, M.J.) (recommending dismissal of claims against the Onondaga County Sheriff because it was "not an entity amenable to suit."), *report and recommendation adopted*, 2024 WL 2399913 (N.D.N.Y. May 23, 2024) (Hurd, J.); *Taranto v. Putnam Cnty*., 21-CV-2455, 2023 WL 6318280, at *15

(S.D.N.Y. Sept. 28, 2023) (dismissing claims against the defendant Putnam County Sheriff's Office because it was "not a suable entity.").

Moreover, as set forth above in Part III.B.6. of this Report and Recommendation, a municipality may be held liable if a plaintiff can assert that a policy or custom of that municipality caused the constitutional violation. *Monell*, 436 U.S. at 692-94. Defendant Broome County Sheriff is included on the "List of Defendants" attached to the Amended Complaint. (Dkt. No. 21, Attach. 11 at 2.) However, there are no allegations of wrongdoing in the body (or its attachments) of the Amended Complaint against Defendant Broome County Sheriff's Department or its employees. (*See generally* Dkt. No. 21.)

As a result, I recommend that Plaintiff's claims against Defendant Broome County Sheriff be dismissed.

### G.     Claims Against Defendant Broome County Humane Society

Even assuming for purposes of this review that Defendant Broome County Humane Society is a state actor for purposes of claims pursuant to 42 U.S.C. § 1983,[5] the Amended Complaint contains are no allegations of wrongdoing in the body (or other attachments) of the Complaint against Defendant Broome County Humane Society or its employees. (*See generally* Dkt. No. 21.) As a result, I recommend that Plaintiff's claims against Defendant Broome County Humane Society be dismissed.

---

[5]     *See Fabrikant v. French*, 691 F.3d 193, 208 (2d Cir. Aug. 16, 2012) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)) (concluding that the "SPCA defendants were not acting in a private capacity, but were exercising 'powers traditionally exclusively reserved to the State.'").

## IV.     OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[6]

In this instance, I conclude that any further amendments to Plaintiff's Amended Complaint would be futile. Plaintiff has already amended the complaint once as of right pursuant to Fed. R. Civ. P. 15(a)(1). Any additional amendments to Plaintiff's Amended Complaint are not likely to be productive. As a result, I recommend that all claims in Plaintiff's Amended Complaint—except the unlawful search claim against Defendant Garver—be

---

[6]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

dismissed without leave to amend. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.' "); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

As a result, I recommend that all claims in Plaintiff's Amended Complaint be dismissed except the unlawful search claim against Defendant Garver.

## V.    MOTION TO RECUSE

Plaintiff's motion to recuse the Department of Justice (Dkt. No. 21, Attach. 10) is denied as premature. At this juncture, the Department of Justice has not appeared in this action and thus, Plaintiff has no basis for seeking its recusal.

**ACCORDINGLY**, it is

**ORDERED** that the Clerk of the Court amend the caption of the case to add Defendants Randall E. Garver, Michael Houtewater, Jenulle Brigual, Paul E. Boninno, Eric Scmidit, State Trooper, State Trooper John Doe, Leon Brown, Broome County Sheriff, Benjamin Harting, David Gasku, Karen Mutson, Broome County Humane Society, FBI Doe #1, FBI Doe #2, FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Brudley Guiness, and Wyoming County Sheriffs; and it is further

**ORDERED** that Plaintiff's motion to recuse the Department of Justice (Dkt. No. 21, Attach. 10) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT PREJUDICE AND WITHOUT LEAVE TO REPLEAD** pursuant to 28 U.S.C. § 1915(e)(2)(B), Plaintiff's Amended Complaint (Dkt. No. 21) to the extent that it asserts (1) claims against Defendants Houtewater, Brigual, Boninno, Scmidit, State Trooper, State Trooper John Doe, Federal Bureau of Investigation, Brown, Broome County Sheriff, Harting, Gasku, Mutson, Broome County Humane Society, FBI Doe #1, FBI Doe #2, FBI Doe #3, FBI Doe #4, FBI Doe #5, FBI Doe #6, FBI Doe #7, FBI Doe #8, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Guiness, and Wyoming County Sheriffs; (2) all claims against Defendant Garver in his official capacity; and (3) the following eight claims against Defendant Garver in his individual capacity (a) a claim of abuse of process pursuant to New York law, (b) a claim pursuant to 42 U.S.C. § 1983 (without any accompanying federal statute or amendment), (c) a claim of conspiracy pursuant to 42 U.S.C. § 1983, (d) a claim of excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983, (e) a claim of failure to intercede/intervene, (f) a claim of failure to train and supervise pursuant to 42 U.S.C. § 1983, (g) a claim for return of property pursuant to Fed. R. Crim. P. 41(g), and (h) a *Monell* claim pursuant to 42 U.S.C. § 1983; and it is further respectfully

**RECOMMENDED** that a response be required to Plaintiff's Amended Complaint to the extent that it asserts claims against Defendant Garver in his individual capacity alleging unlawful search pursuant to the Fourth Amendment; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[7]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: April  29, 2025
          Binghamton, New York

_____
Miroslav Lovric
U.S. Magistrate Judge

---

[7]       The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8]       If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 23 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

2020 WL 4346896
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Angelo D. JOHNSON, Plaintiff,
v.
C. MILLER, et al., Defendants.

9:20-CV-0622 (LEK/ATB)
|
Signed 07/29/2020

**Attorneys and Law Firms**

Angelo D. Johnson, Romulus, NY, pro se.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Angelo D. Johnson raising claims pursuant to 42 U.S.C. § 1983. Dkt. No. 2 ("Complaint"). [1] Plaintiff, who is incarcerated at Five Points Correctional Facility ("Five Points C.F."), has not paid the filing fee for this action.

Plaintiff asserts claims against the following defendants: Great Meadow Correctional Facility ("Great Meadow C.F.") Superintendent C. Miller; Great Meadow C.F. First Deputy Superintendent Mrs. McIntosh; Great Meadow C.F. Deputy Superintendent G. Caron; Great Meadow C.F. Assistant Deputy Superintendent M. Collins; Great Meadow C.F. Lieutenant G. Murphy; Great Meadow C.F. Sergeant Gilles; Great Meadow C.F. Correction Officer P. Boule; Great Meadow C.F. Correction Officer Rich; Great Meadow C.F. Correction Officer Papa; Great Meadow C.F. Correction Officer John Doe #1; Great Meadow C.F. Correction Officer John Doe #2; Great Meadow C.F. Correction Officer Jane Doe #3; New York State Department of Corrections and Community Supervision ("DOCCS") Dr. Goe; DOCCS Dr. Karandy; DOCCS Physician Assistant Nesmith; DOCCS Nurse Rocque; DOCCS Nurse Christy; DOCCS Dr. John Morley; DOCCS Regional Health Administrator Mary Tandy-Walters; DOCCS Nurse J. Perez; DOCCS Nurse Jane Doe; and Five Points C.F. Superintendent Tomas (collectively, "Defendants"). Id. at 1, 3–9.

**II. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**

Under 28 U.S.C. § 1915, when a plaintiff seeks to proceed in forma pauperis, "... the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." § 1915(e)(2)(B). [2] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint before the court permits the plaintiff to proceed with an action in forma pauperis. See id.

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." § 1915A; see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (stating that § 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both §§ 1915 and 1915A are available to evaluate prisoner pro se complaints).

**\*2** A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Id. at

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 24 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (internal quotation marks and alterations omitted).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted) (emphasis in original).

### B. Summary of the Complaint

Plaintiff alleges that wrongdoing occurred while he was in DOCCS custody, including while he was incarcerated at Great Meadow C.F. and Five Points C.F. See generally Compl. The following facts arising out of Plaintiff's incarceration at these facilities are alleged in Plaintiff's Complaint. [3]

#### 1. Plaintiff's Medical Conditions

Plaintiff suffers from a number of medical conditions, including "chronic type 1 and 2 acute migraines," chronic sinus infections, high blood pressure, glaucoma, a corneal defect, rheumatoid arthritis, a severe tear in his shoulder, two pinched and severed nerves in his lower neck and back, tears in his right meniscus, depression, post-traumatic stress disorder, personality disorder, hepatitis C, and seizures. Compl. at 10–11. At unidentified times, Plaintiff has been diagnosed with depression, anxiety, post-traumatic stress disorder, and personality disorder. Id. at 10. Plaintiff has attempted suicide on at least four occasions and was placed in a mental health hospital for 30 days in 2006 after one such attempt. Id.

#### 2. Medical Care at Great Meadow C.F.

Plaintiff was transferred to Great Meadow C.F. on October 29, 2018. Compl. at 15–16. Upon arriving at Great Meadow C.F., Plaintiff was seen by Defendant Rocque for an "initial medical assessment." Id. at 15. Rocque "wantonly stripped ... plaintiff of all his prior necessary ... medication that was [prescribed by] a physician," including pain medication for pinched nerves and medication for migraine headaches, despite "knowing that such actions would subject ... plaintiff to severe pain." Id. at 16. The discontinuation of Plaintiff's medications disregarded "prior recommendations" by specialists. Id. As a result, Plaintiff was in "severe pain" following his arrival at Great Meadow C.F. Id.

On November 1, 2018, Plaintiff was seen by Goe. Id. at 16. During the visit, Plaintiff attempted to explain his medical concerns and "serious chronic issues[,]" but Goe "maliciously ... stated" that Plaintiff has "to[o] many issues" and, "despite ... seeing plaintiff in severe pain and witnessing [his] serious incapacitated condition of limited mobility[,]" failed to order Plaintiff migraine or pain medication. Id. at 16–18.

**\*3** On or about November 16, 2018, Plaintiff was seen by Nesmith. Id. at 17. Nesmith "maliciously and sadistically refused to hear" about Plaintiff's medical conditions and concerns and instead advised Plaintiff that he has to choose "one issue" that he thinks deserves serious attention. Id. Plaintiff then "attempted to voice[ ] his concern" about his migraine medication, but Nesmith cut him off "mid-sentence." Id at 17–18. Following the visit, Plaintiff remained without his previously prescribed medication. Id. at 18.

On or about November 21, 2018, Plaintiff was again seen by Nesmith, who "repeated the same behavior and reckless conduct" by "not rendering ... needed ... medical care and treatment[,]" despite witnessing Plaintiff in "severe" pain and listening to Plaintiff attempt to "speak[ ] about his medical ... issues[.]" Id. at 18.

Plaintiff filed administrative complaints regarding the medical treatment he received in November 2018, including a complaint with the DOCCS Chief Medical Officer, Morley, on November 20, 2018. Id. at 18. Plaintiff also filed a grievance on November 25, 2018, regarding Goe's inadequate medical treatment. Id.

On or about December 5, 2018, Plaintiff was seen by Karandy. Id. at 19. During the appointment, Karandy "went over all [of] plaintiff's serious chronic medical issues" and "admitted" that he did not "understand" why Plaintiff's migraine medication was discontinued. Id. Karandy also told Plaintiff that he

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 25 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

would "immediately ... get [Plaintiff] needed treatment" for his pinched nerves. Id. at 20.

Karandy, however, only ordered a "partial" month supply of Plaintiff's migraine medication, which was not sufficient to treat Plaintiff's medical needs. Id. at 19. In addition, Karandy failed to order pain medication for Plaintiff's pinched nerves and other physical ailments. Id. at 20.

Later that month, Plaintiff filed three sick call slips "for issues of pinch[ed] nerves and right knee [pain]" in which he detailed "how [his] conditions [were] causing severe pain and agony[.]" Id.

On December 14, 2018, Plaintiff "received a detailed response[ ] letter from defendant [Regional Health Services Administrator] Mary Tandy-Walters ... that showed full awareness of plaintiff's situation but deliberately and maliciously failed to remedy plaintiff's underlying conditions[.]" Id. at 23. [4]

On January 11 and January 16, 2019, Plaintiff filed "formal complaint letters" with Miller and DOCCS Commissioner Anthony Annucci, regarding inadequate medical treatment related to his pinched nerves, right knee complications, and "eyecare[.]" Id. at 20. On February 5, 2019, Plaintiff received "a detailed response[ ] letter" from Morley, who "allowed plaintiff's providers to recklessly and maliciously delay[ ] and ... withhold[ ] necessary adequate pain medications [and] depriv[e] [Plaintiff of] needed [physical] therapy[,]" despite knowing about Plaintiff's "serious medical needs." Id. at 24–25.

**\*4** Sometime in January or February 2019, Plaintiff attended his first session with a physical therapist. Id. at 21. The physical therapist advised Plaintiff that he had "placed orders of physical therapy" beginning in early December 2018. Id. However, as a result of Goe and Karandy's failure to follow up on these orders, Plaintiff's physical therapy was delayed. Id.

During Plaintiff's second physical therapy session, which occurred sometime in January or February 2019, the physical therapist advised Plaintiff that he "has a serious condition[,]" explained that his "limited mobility is due to the lack[ ] of treatment and care[,]" and advised that his "severe pain" could only be "eas[ed] by meds and continual adequate therapy[.]" Id. at 21–22.

On or about February 14, 2019, Plaintiff was seen by Goe, who once again denied Plaintiff pain medication for his pinched nerves and right knee, despite witnessing Plaintiff in "a serious chronic painful state[.]" Id. at 22.

On or about February 25, 2019, Plaintiff was transported to Coxsackie Correctional Facility to see an orthopedic specialist regarding his right knee. Id. at 23. The specialist ordered an MRI, but no pain medication or physical therapy. Id.

On or about March 29, 2019, Plaintiff submitted a letter to Karandy regarding inadequate medical care he was receiving for his right knee and pain associated with his pinched nerves. Id. at 25. On or about May 17, 2019, Plaintiff was seen by Goe, who continued to deny him "adequate pain medications" and "treatment" for his "chronic medical conditions[,]" despite again witnessing Plaintiff "in a state of excruciating pain[.]" Id.

In June and July 2019, Plaintiff continued to submit sick call slips for "ongoing severe pain to [his] right knee and two pinch[ed] nerves." Id. at 26. In September 2019, Plaintiff submitted three more sick call slips for "ongoing severe pain that is ... causing great agony mentally." Id.

In October or November 2019, Plaintiff was seen by an orthopedic specialist at Coxsackie Correctional Facility. Id. at 26. During the appointment, Plaintiff received a cortisone shot in his right knee. Id. The specialist told Plaintiff that the shot was typically "only good for 3 to 6 months[,]" and sometimes less, and that he should therefore "let [his] provider know when the pain becomes very severe again[ ] so [he] can receive another shot." Id. The specialist also advised Plaintiff that he had "put in many follow-ups" for further evaluation after Plaintiff had received an MRI. Id.

### 3. Use-of-Force Incident at Great Meadow C.F. and Subsequent Restrictive Confinement

On or about June 17, 2019, while in the recreation yard, Plaintiff became dizzy and passed out. Compl. at 28. When Plaintiff regained consciousness, he was en route to the medical department. Id. Upon arriving at the infirmary, Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3 threw Plaintiff on the infirmary table. Id. Gilles then "aggressively question[ed]" Plaintiff and accused him of being "high on K2," a synthetic cannabinoid Id. Plaintiff "respectfully

denied" the accusation and attempted to compose himself to avoid having a seizure. Id. at 29.

While Plaintiff's hands and feet were in restraints, Nesmith put a "very harmful concoction on his gloved hands and viciously cover[ed] [Plaintiff's] mouth and nose" while applying pressure. Id. at 29. Simultaneously, Gilles ordered his subordinates to "hold plaintiff's arms and legs down[.]" Id. The substance that Nesmith placed on Plaintiff's mouth caused him "extreme pain[.]" Id.

**5** After Plaintiff was unsuccessful in his effort to struggle out of the hold, Nesmith "stopped and let up, while laughing[.]" Id. at 30. "Plaintiff immediately start[ed] yelling[,] ... 'they are trying to kill me back here.' " Id. In response, Gilles ordered "the C.O. defendants ... to tighten up the handcuffs[,]" which "caused [Plaintiff's] circulation to be cut[ ] of[f] and extreme pain to [his] hands." Id. Nesmith then "again tried to viciously suff[o]cate ... plaintiff" with the "harmful concoction on his hands." Id.

Eventually, Nesmith removed his hands from Plaintiff's face. Id. at 30. Gilles then ordered the correction officers in the room to lift Plaintiff up and bring him to the second floor of the medical department. Id. at 30. While en route to the second floor, Plaintiff's wrists remained tightly handcuffed and his arms were "maliciously extended backwards[,]" which caused him "excruciating pain." Id. at 31.

Upon arriving at the second floor, Plaintiff was taken to an observation room, and Gilles ordered the other escorting officers to remove Plaintiff's restraints. Id. at 31. After the restraints were removed, Gilles ordered Plaintiff to strip. Id. Plaintiff removed all of his clothes except his underwear then asked Gilles if he would remove all the other officers from the room. Id. Gilles "grew indignant" and ordered the correction officers in the room to assault Plaintiff, which they did. Id.

Following the assault, Plaintiff was placed back in restraints and forced onto a mattress, face down. Id. at 32. One of the officers then removed Plaintiff's underwear and Plaintiff was held in a compromised position while Gilles conducted a body cavity search. Id. Thereafter, the officials in the room took turns mocking Plaintiff while he remained naked on the mattress. Id. at 32–33. Plaintiff's handcuffs were then tightened at the direction of Gilles, and the officials left the room. Id. at 33.

The next day, Plaintiff was cleared by a medical professional and returned to his cell block, but "unlawfully" placed on "punitive Adseg. keeplock[.]" Id. at 35.

On or about June 23, 2019, Plaintiff attended a disciplinary hearing before Correction Lieutenant Murphy. Id. at 35. Before the hearing began, Murphy encouraged Plaintiff to plead guilty in exchange for a sentence of 60 days of keeplock confinement and advised Plaintiff that, if he did not plead guilty, he would be found guilty and sentenced to more than 60 days of confinement in the special housing unit ("SHU"). Id. Plaintiff refused to plead guilty, and Murphy responded, "have it your way[.]" Id.

Murphy began the hearing by reading Plaintiff's "alleged misbehavior report charges to ... [him]." Id. at 35. Plaintiff objected because he had not been served with a misbehavior report or provided assistance preparing for the hearing. Id. at 35–36. Plaintiff then identified on the record the witnesses he desired to call and cross-examine. Id. at 36. Murphy adjourned the hearing in light of Plaintiff's objection. Id.

On or about July 1, 2019, Plaintiff was brought back to the "hearing room" with Murphy, and the disciplinary hearing resumed. Id. at 36. At some point after the hearing commenced, Murphy ordered an unidentified correction official to escort Plaintiff back to his cell. Id. Plaintiff was removed from the hearing room before he was able to call any witnesses or cross-examine adverse witnesses. Id. Thereafter, Murphy falsely represented on the record that Plaintiff did not want to participate in the hearing. Id. at 37.

**6** On or about July 9, 2019, Gilles and another unidentified official escorted Plaintiff from his cell to SHU "per his Tier 3 hearing outcome." Id. Plaintiff never received a copy of Murphy's written disciplinary disposition. Id.

After Plaintiff arrived at SHU, he was seen by Rocque and "asked medical questions[.]" Id. at 38. Plaintiff informed Rocque that he did not have any of his "carry on meds for his seizures, high blood pres[s]ure, chronic ... migrains [sic], chronic sinus [issues], [or] glaucoma," and also did not have a contact case or contact solution. Id. Rocque advised Plaintiff that he would receive his medication later in the day. Id.

Plaintiff's SHU cell was "extremely unduly hot" and had no ventilation. Id. at 38. As a result of the "extreme heat, inadequate ventilation, and ... cigaret[te] smoke that ... flooded plaintiff's cell[,]" he experienced a "serious acute

migrain[e]" and "became dizzy." Id. at 39. The next day, Plaintiff suffered a seizure. Id.

Following the seizure, Plaintiff was taken to the medical department at Great Meadow C.F., where Gilles ordered unidentified officials to hold his arms and legs down while Nesmith and Christy "prepare[d] something." Id. at 39. While Plaintiff was held down and in restraints, Nesmith again covered his mouth and nose with "that very very harmful concoction on his hands[,]" which caused Plaintiff's lips to burn "severely." Id.

After "a while," Nesmith stopped covering Plaintiff's mouth. Id. at 39. Christy then "proceeded to do the same" while Gilles repeatedly referred to Plaintiff, an African-American man, as a "monkey." Id.

The next day, Plaintiff was discharged from the medical facility without any treatment for the injury to his lips. Id. at 41. The burn on Plaintiff's lips caused him severe pain for three days, hindering his ability to eat and drink during this time. Id.

Plaintiff was kept in SHU under "inhuman living conditions[,]" forced to shower in "dirty ... stalls" and fed "insufficient food" from "dirty trays[.]" Id. at 41–42. Plaintiff repeatedly complained about the conditions of his confinement to Miller, McIntosh, Collins, and Caron when these officials made their weekly rounds within SHU. Id. at 42. Plaintiff also complained to these officials about his visibly "agonizing state" from the assaults against him, and "inadequate medical treatment" for his physical ailments, yet they failed to remedy "the daily constitutional violations." Id.

On July 15, 2019, Plaintiff received a portion of Murphy's written disciplinary disposition, which indicated that he was sentenced to 75 days of SHU confinement beginning on July 2, 2019, and would lose 120 days of packages, commissary, and telephone privileges. Id. at 42–43. Plaintiff was not credited for the "Adseg confinement" he served between June 17 and July 1, 2019. Id.

Sometime in "late July, 2019," Plaintiff was transported to Coxsackie Correctional Facility, where he was seen by an orthopedic specialist and given a cortisone shot for the "excruciating pain" in his left shoulder that he had experienced daily since June 17, 2019, when he was "brutally assaulted." Id. at 43. Goe and Karandy failed to treat Plaintiff's

left shoulder following the assault on June 17, 2019, despite knowing about Plaintiff's medical needs. Id. at 43–44.

**\*7** Collins and Caron refused to grant Plaintiff "time cuts" provided for in the "reform[ed] SHU laws pass[ed] in 2016." Id. at 43. As a result, Plaintiff served his entire SHU sentence. Id.

### 4. Transfer to Five Points C.F.

On or about January 16, 2020, Plaintiff was told to pack up his property because he was being transferred. Compl. at 44. After Plaintiff packed "four draft bags" of property, an unidentified official ordered him to carry the bags out of his cell. Id. Plaintiff was unable to do so because of his pinched nerves and right knee condition. Id.

While Plaintiff was "in the draft room being processed [for his] transfer[,]" Correction Sergeant Cook told Plaintiff that based on "all the ... complaints" he filed against officers, and his refusal to carry his property bags, he should not be surprised if his property did not make it to the next location. Id. at 44. Thereafter, Plaintiff witnessed officials load inmate property bags onto a transport bus and return his property bags back to the facility. Id.

On January 17, 2020, Plaintiff arrived at Auburn Correctional Facility, where he was incarcerated for five days. Id. at 44. Upon his arrival, Plaintiff was told that his pain medications were lost and the medical department could not do anything for him. Id. Plaintiff was denied a shower, access to hot water, toothpaste, and a tooth brush, and was forced to sleep in a cold cell without "sufficient sheets and blankets." Id. at 44–45.

On or about January 21, 2020, Plaintiff was transferred to Five Points C.F. Id. at 45. Upon arriving at Five Points C.F., Plaintiff was placed in SHU, despite having completed his prior disciplinary sentence on January 16, 2020. Id. at 47. Plaintiff was not initially told why he was confined in the SHU. Id. at 48.

Following his arrival at Five Points C.F., Plaintiff was seen by Nurse Jane Doe for "his initial medical intake." Id. at 45. Plaintiff informed her that his medications and contact solution were lost in transit and detailed his medical conditions that require medication and treatment. Id. Nurse Jane Doe declined to provide Plaintiff with contact solution or any medications. Id. at 45–46.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 28 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

On or about January 27, 2020, Plaintiff received a written disciplinary disposition based on a disciplinary hearing that occurred at Great Meadow C.F. on January 10, 2020. Id. at 48. The disciplinary hearing was conducted by Collins and resulted in a finding of guilt on one or more of the unidentified disciplinary charges and a sentence of 30 days of SHU confinement. Id. Plaintiff was never given an opportunity to attend this hearing, which was conducted without his knowledge or consent. Id.

On February 9, 2020, another disciplinary hearing was held by Collins at Great Meadow C.F., once again in Plaintiff's absence and without his knowledge or consent. Id. at 48. At the conclusion of the hearing, Collins found Plaintiff guilty of one or more of the unidentified disciplinary charges and sentenced him to 54 days of SHU confinement. Id.

Between January and March, 2020, Plaintiff was denied medical treatment by Perez, which Tomas failed to remedy despite witnessing Plaintiff in severe pain. Id. at 9, 46–47.

### 5. Plaintiff's Claims Based on Events that Occurred at Great Meadow C.F.

**\*8** Liberally construed, the Complaint asserts the following claims based on events that occurred at Great Meadow C.F. against various defendants in their individual and official capacities: [5] (1) Eighth Amendment medical indifference claims against Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Boule, Rich, Papa, Doe #1, Doe #2, Doe #3, Miller, McIntosh, Collins, and Caron; (2) Eighth Amendment excessive force and failure-to-intervene claims against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, Doe #3, Nesmith, and Christy; (3) an Eighth Amendment sexual abuse claim against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3; (4) a Fourth Amendment unlawful search claim against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3; (5) an Eighth Amendment conditions-of-confinement claim against Miller, McIntosh, Collins, and Caron; (6) Fourteenth Amendment due process claims against Murphy and Collins; and (7) a Fourteenth Amendment equal protection claim against Gilles. [6]

Plaintiff seeks injunctive and monetary relief. Compl. at 49–50. For a complete statement of Plaintiff's claims, reference is made to the Complaint.

### C. Severance and Transfer of Claims Arising at Five Points C.F.

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." Cain v. New York State Bd. of Elections, 630 F. Supp. 221, 225–26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." Id. at 225.

Here, the claims arising out of Plaintiff's incarceration at Five Points C.F. are more appropriately heard in the Western District of New York, where that facility is located. See 28 U.S.C. § 112(d). [7] Those claims are separate and distinct from the claims arising out of Plaintiff's incarceration at Great Meadow C.F. and will require different witnesses and documentary proof. The remainder of the factors do not weigh against severance. Thus, pursuant to Fed. R. Civ. P. 21 and 28 U.S.C. § 1404(a), [8] the claims that arose while Plaintiff was incarcerated at Five Points C.F., in the Western District of New York, along with the Defendants associated with those claims, are severed from this action and transferred to the Western District of New York.

**\*9** This District will retain jurisdiction over the claims that arose while Plaintiff was incarcerated at Great Meadow C.F., and the Court therefore reviews the sufficiency of those claims below. The Court takes no position regarding the sufficiency of the claims that have been severed and will be transferred to the Western District of New York, leaving that determination to the Western District of New York.

### D. Sufficiency of Plaintiff's Remaining Claims

"42 U.S.C. § 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. See Polk Cty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501.

Rather, supervisory personnel may be considered "personally involved" in an alleged constitutional violation only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) were grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was

occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [9]

### 1. Official Capacity Claims

The Eleventh Amendment has long been construed as barring lawsuits against states in federal court, under the fundamental principle of sovereign immunity. U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); Hans v. Louisiana, 134 U.S. 1, 10–21 (1890); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. Gollomp v. Spitzer, 568 F.3d 355, 365–66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through § 1983, see Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in Plaintiff's Complaint. See generally Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38–40 (2d Cir. 1977); Dawkins v. State of New York, No. 93-CV-1298, 1996 WL 156764, at *2 (N.D.N.Y. 1996).

**\*10** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 169 (1985) (explaining that a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); Severino v. Negron, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities.")

Accordingly, to the extent that Plaintiff seeks monetary damages under § 1983 against any named defendant remaining in this action in his or her official capacity, such claims are dismissed with prejudice pursuant to §§ 1915(e)(2)(B) and 1915A(b) as barred by the Eleventh Amendment.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 30 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

### 2. Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the Eighth Amendment's protection from the imposition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 102, 104 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and that is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Id.; see also Whitley v. Albers, 475 U.S. 312, 319 (1986) (citing Estelle). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." Chance, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail, a plaintiff must demonstrate a violation sufficiently serious, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind." Chance, 143 F.3d at 702 (internal quotation marks and citations omitted). That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; see also Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (with respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness' ").

Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. See Banks v. No. 8932 Corr. Officer, No. 11-CV-8359, 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was

prescribed."); see also Estelle, 429 U.S. at 104–05 (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

**\*11** At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, [10] Plaintiff has alleged sufficient facts to warrant a response to his medical indifference claims. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 3. Excessive Force and Failure-to-Intervene Claims

The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." Blyden, 186 F.3d at 262–63 (internal quotations omitted) (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)). [11]

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 832). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001); see also Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers); Terebesi v. Torreso, 764 F.3d 217, 244 (2d Cir. 2014) ("[I]nsofar as the raid plan included the use of substantial and violent force, the plaintiff alleged facts suggesting that every defendant had the opportunity to intervene. Whether some of the defendants were in fact unable to intercede in particular uses of force, either because they were not involved in the planning process, or because of the manner, place, and timing of their deployment in the raid itself, is properly a question for a jury.").

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court

finds that Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 4. Sexual Abuse Claim

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997). "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." Crawford v. Cuomo, 796 F.3d 252, 256–57 (2d Cir. 2015).

**\*12** Once again mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Eighth Amendment sexual abuse claim also requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 5. Unlawful Search Claim

The Supreme Court has upheld the practice of conducting visual body-cavity searches of pre-trial detainees following contact visits, finding that the Fourth Amendment does not require probable cause for correction officials to conduct such searches; instead, such searches are subject to a reasonableness standard. Bell v. Wolfish, 441 U.S. 520, 558–60 (1979); see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 330 (2012) (holding that arrestees who are committed to the general population of a detention center may be subject to a close visual inspection while undressed). The Second Circuit and district courts within the Circuit have also upheld routine random strip searches, including body-cavity inspections, performed on prison inmates. See Covino v. Patrissi, 967 F.2d 73, 76–80 (2d Cir. 1992); see also Hurley v. Ward, 584 F.2d 609, 612 (2d Cir. 1978) (reversing portion of injunction prohibiting strip searches of prison inmates); Castro-Sanchez v. N.Y. State Dep't of Corr. Servs., No. 10-CV-8314, 2011 WL 6057837, at \*9 (S.D.N.Y. Dec. 6, 2011) ("Routine random strip searches of inmates, including body cavity inspections, do not violate

the Fourth Amendment."). Assessing the reasonableness of a strip search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559.

An inmate bears the burden of showing that a search was unreasonable, Shabazz v. Pico, 994 F. Supp. 460, 473 (S.D.N.Y. 1998), so at the pleading stage, a plaintiff must "plead facts sufficient to give rise to a plausible inference" that the search he challenges was unreasonable under the standards described above. Simmons v. Cripps, No. 12-CV-1061, 2013 WL 1290268, at \*21 (S.D.N.Y. Feb. 15, 2013), report and recommendation adopted by 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013).

At this very early stage of the proceeding, the Court finds that Plaintiff has alleged sufficient facts to warrant a response to his Fourth Amendment unlawful search claim. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 6. Conditions-of-Confinement Claims

The Second Circuit, in addressing the rights protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell, 441 U.S. 520; Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. See Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985); see also Jolly, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 303–04 (1991).

**\*13** "When a plaintiff alleges multiple unconstitutional conditions of confinement, the court may aggregate the effect of all of the conditions, 'but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 32 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (quoting Wilson, 501 U.S. at 304). "Each condition 'must be measured by its severity and duration, not the resulting injury,' and the conditions are not subject to 'a bright-line durational or severity threshold.' " Van Hoven v. City of New York, No. 16-CV-2080, 2018 WL 5914858, at *7 (S.D.N.Y. Aug. 21, 2018) (quoting Darnell v. Pineiro, 849 F.3d 17, 32 (2d Cir. 2017)), report and recommendation adopted by 2018 WL 4417842 (S.D.N.Y. Sept. 17, 2018).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Eighth Amendment conditions-of-confinement claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 7. Due Process Claims

To successfully state a claim under § 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. Shakur v. Selsky, 391 F.3d 106, 118 (2d Cir. 2004) (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under Sandin. The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under Sandin. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citing Sealey v. Giltner, 197 F.3d 578, 589–90 (2d Cir. 1999)). [12] The "atypicality" inquiry under Sandin is normally a question of law. Colon, 215 F.3d at 230–31; Sealey, 197 F.3d at 585. In making that determination, the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. Id.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include: advance written notice of the charges; a fair and impartial hearing officer; a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence; and a written statement of the evidence upon which the hearing officer relied in making his determination. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." Id. (citing Superintendent v. Hill, 472 U.S. 445, 455 (1985)).

**\*14** Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Fourteenth Amendment due process claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 8. Equal Protection Claim

The Equal Protection Clause requires that the government treat all similarly situated people alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609–10 (2d Cir. 1980)). To state a viable claim for denial of equal protection, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, a plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003).

"[V]erbal harassment or profanity alone, unaccompanied by an injury[,] no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable

Case 3:23-cv-01099-GTS-ML   Document 32   Filed 04/29/25   Page 33 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F. Supp. 460, 474 (S.D.N.Y. 1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F. Supp. 757, 763 (S.D.N.Y. 1995)).

However, "[c]ourts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." *Ali v. Connick,* 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015); see also *Cole v. Fischer,* 379 F. App'x 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little trouble concluding that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination on the basis of race and religion."); cf. *Abuhouran v. Acker,* No. 04-CV-2265, 2005 WL 1532496, at *4–5 (E.D. Pa. June 29, 2005) (denying dismissal of an Equal Protection claim where an Arab-American inmate alleged that the defendant officer mocked the plaintiff because of his "name, accent, and religion," called him "a little terrorist," and subjected him to harassing conduct and unfavorable treatment).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Fourteenth Amendment equal protection claim against Gilles requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

**III. CONCLUSION**

 **\*15**  Accordingly, it is hereby:

**ORDERED**, that the claims arising out of Plaintiff's confinement at Five Points Correctional Facility are severed and transferred to the Western District of New York; and it is further

**ORDERED**, that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED**, that Defendants Perez, Tomas, and Nurse Jane Doe are **TERMINATED** from this action; and it is further

**ORDERED**, that the following claims asserted against the defendants remaining in the action before this Court in their individual capacities **SURVIVE** sua sponte review and require a response: (1) Plaintiff's Eighth Amendment medical indifference claims against Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Correction Officer John Doe #1, Correction Officer John Doe #2, Correction Officer Jane Doe #3, Miller, McIntosh, Collins, and Caron; (2) Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against Defendants Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Correction Officer John Doe #1, Correction Officer John Doe #2, Correction Officer Jane Doe #3, Nesmith, and Christy; (3) Plaintiff's Eighth Amendment sexual abuse claim against Defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3; (4) Plaintiff's Fourth Amendment unlawful search claim against Defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3; (5) Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendants Miller, McIntosh, Collins, and Caron; (6) Plaintiff's Fourteenth Amendment due process claims against Defendants Murphy and Collins; and (7) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Gilles; and it is further

**ORDERED**, that Plaintiff's official capacity claims against the defendants remaining in the action before this Court are **DISMISSED with prejudice** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) as barred by the Eleventh Amendment and for failure to state a claim upon which relief may be granted; [13] and it is further

**ORDERED**, that upon receipt from Plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Miller, McIntosh, Collins, and Caron. [14] The Clerk shall also forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

 **\*16  ORDERED**, that Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 34 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

Officer Boule, Correction Officer Rich, Correction Officer Papa, Miller, McIntosh, Collins, and Caron, or their counsel, respond to the Complaint as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that Plaintiff must take reasonable steps to ascertain the identities of Defendants Correction Officer John Doe #1, Correction Officer John Doe #2, and Correction Officer Jane Doe #3 and, when identified, seek to amend the Complaint to add these individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; Plaintiff's failure to do so will result in the dismissal of this action**; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on Plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4346896

---

## Footnotes

1    This action was originally commenced in the Southern District of New York. By Order filed May 14, 2020, the Honorable Colleen McMahon of the Southern District of New York granted Plaintiff's application to proceed in forma pauperis. Dkt. No. 4. By Order filed June 3, 2020, the Honorable Kenneth M. Karas of the Southern District of New York severed and transferred Plaintiff's claims arising out of his incarceration at Great Meadow Correctional Facility and Five Points Correctional Facility to the Northern District of New York. Dkt. No. 6.

2    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." See Neitzke v. Williams, 490 U.S. 319, 325 (1989).

3    Page numbers cited herein refer to those generated by the Court's electronic filing system ("ECF").

4    Plaintiff also alleges that on January 15, 2020, he received a response from the Central Office Review Committee ("CORC") regarding one of his grievances, which indicated that the Division of Health Services had conducted an investigation into Plaintiff's concerns about his medical treatment and found that he was receiving appropriate medical care and had been properly weaned off Neurontin, the pain medication prescribed to Plaintiff before his transfer to Great Meadow C.F. Compl. at 24. Plaintiff further alleges that CORC's statements are false because Tandy-Walters knew—on an unidentified date before January 15, 2020—that he was not receiving treatment for his right knee, medication for his migraine headaches, or adequate eyecare, and was not weaned off Neurontin, but was instead taken off that medication "cold turkey[.]" Id.

5    Because Plaintiff has not named any officials from Auburn Correctional Facility as defendants, the Court does not construe the complaint to assert any claims based on Plaintiff's incarceration at that facility. Moreover, because Plaintiff's claims based on events that occurred during his confinement at Five Points C.F. are

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 35 of 183

Johnson v. Miller, Not Reported in Fed. Supp. (2020)

severed and transferred to the Western District of New York, as discussed below, the Court leaves the determination of those claims for the Western District of New York.

6    As noted, Plaintiff alleges that Collins and Caron refused to grant him "time cuts" provided for in the "reform[ed] SHU laws pass[ed] in 2016." Compl. at 43. Although some courts have recognized a potential Eighth Amendment claim based on alleged excessive SHU confinement, see Peoples v. Annucci, No. 11-CV-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 2, 2012), neither Collins nor Caron is alleged to have been responsible for the duration of Plaintiff's SHU confinement. Moreover, the Complaint is devoid of any allegations which plausibly suggest that either of these Defendants refused to reduce Plaintiff's SHU confinement period out of deliberate indifference to his health or safety. For these reasons, the Court does not construe the Complaint to assert an Eighth Amendment claim against either of these officials based on Plaintiff's SHU confinement.

7    Five Points C.F. is located in Seneca County.

8    "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all the parties have consented." 28 U.S.C. § 1404(a). Under 28 U.S.C. § 1391(b), "[a] civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

9    The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of Iqbal on Colon because the complaint "did not adequately plead the Warden's personal involvement even under Colon"). For purposes of this Decision and Order, the Court assumes that all five categories under Colon remain valid.

10    See, e.g., Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008).

11    In this regard, while "a de minimis use of force will rarely suffice to state a constitutional claim," Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321–22); see also Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).

12    A New York state inmate confined in SHU is placed in a solitary confinement cell for 23 hours a day. The inmate may exercise in the yard for one hour each day, is limited to two showers a week, and may not work or attend programming. See Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000); N.Y. COMP. CODES R. & REGS., tit. 7, §§ 304.1–.14.

13    Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. See Gomez, 171 F.3d at 796. However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Pucci v. Brown, 423 F. App'x 77, 78 (2d Cir. 2011).

14      Summonses will not issue for the "Doe" defendants because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Kinch v. Artuz, Not Reported in F.Supp. (1997)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 37 of 183

1997 WL 576038

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Danilo KINCH, Plaintiff,

v.

Superintendent C. ARTUZ; Deputy Superintendent
D. Bliden; Rabbi M. Chill, Defendants.

No. 97 CIV. 2419 (LAP).

|

Sept. 15, 1997.

*MEMORANDUM AND ORDER*

PRESKA, District J.

**\*1** Plaintiff, a prisoner currently an inmate in the custody of the Green Haven Correctional Facility ("Green Haven"), brings this *pro se* action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Rabbi M. Chill ("Rabbi Chill") denied plaintiff access to Jewish Sabbath Services provided at Green Haven as well as the right to participate in the kosher food program at Green Haven. Defendant Superintendent C. Artuz ("Artuz") and defendant Deputy Superintendent D. Bliden ("Bliden") have moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure. For the reasons that follow, defendants' motion to dismiss is granted.

*BACKGROUND*

Kinch is currently an inmate at Green Haven. (Complaint ("Compl.") at 2). Artuz and Bliden are employed by the New York State Department of Correctional Services ("DOCS") as Superintendent and Deputy Superintendent for Programs at Green Haven, respectively. (Compl. at 3).

Plaintiff alleges that Rabbi Chill discriminated against plaintiff in violation of DOCS' Directive 4202. (*Id.*). Directive 4202 provides as follows:

> Resident Chaplains are responsible for pastoral care for the entire inmate population and for staff. They also provide spiritual guidance, religious activities and volunteers, ongoing pastoral counseling, and religious education for particular faith groups. Chaplains report directly to the Deputy Superintendent for Program Services, but as situations warrant, may consult directly with the superintendent.

Plaintiff claims that he attempted to attend Sabbath Services but was denied the right to attend because he is a Black Hebrew Israelite. (*Id.*). Plaintiff further alleges that on September 6, 1996, Rabbi Chill informed plaintiff that Hebrew Israelites could not participate in the kosher food program at Green Haven. (*Id.* at 3-a). Two days later plaintiff made a written request for an interview with Rabbi Chill. (*Id.*). Rabbi Chill responded to plaintiff's request with a request for documentation verifying plaintiff's affiliation with the Jewish faith. Plaintiff subsequently provided Rabbi Chill with a letter from a rabbi outside of DOCS by the name of Simeon Ben Israel verifying that plaintiff was in fact a Jew/Hebrew. (*Id.*). Plaintiff claims that although Rabbi Chill acknowledged receipt of this verification, Rabbi Chill continued to deny plaintiff access to the kosher food program. (*Id.*). Nowhere in the body of the complaint does plaintiff allege that either Artuz or Bliden played any role whatsoever in the denial of religious services.

*DISCUSSION*

I. Standard Applicable to A Motion to Dismiss

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993); *see City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n.2 (1977) (both referring to "well-pleaded allegations"). "'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom. Cortec Indus., Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *quoted by Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *accord Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994). "The latter principle is to be applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir. 1991).

**\*2** Furthermore, because Mr. Kinch filed this action *pro se,* I must judge his pleadings by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, *reh'g denied,* 405 U.S. 948 (1972); *accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [the *pro se* party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); *Hanlin v. Mitchelson,* 794 F.2d 834, 838-39 (2d Cir. 1986) (citing *Haines* to support the principle that *pro se* pleadings are given a liberal construction); *see Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988) (referring to the "special solicitude" afforded *pro se* litigants when confronted with motions for summary judgment).

Nevertheless, proceeding *pro se* does not altogether relieve Mr. Kinch from the usual pleading requirements. *See Lee v. Coughlin,* 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a "*pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991), *reh'g granted on other grounds,* 914 F. Supp. 1004 (S.D.N.Y. 1996); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080 (PKL), 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("The work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion ineffectual."); *Stinson v. Sheriff's Dep't,* 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Applying these standards to plaintiff's complaint, I find that plaintiff has not stated a claim upon which relief may be granted.

II. Section 1983 Claim Requirement of Personal Involvement

Kinch has sued under 42 U.S.C. § 1983. According to this provision,

[e]very person who, under any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Under section 1983, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978) (citations omitted)). Furthermore, the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control. *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). Although both Artuz's and Bliden's names appear in the caption of the complaint, the complaint contains no allegations with respect to Artuz or Bliden. Nowhere in the complaint does plaintiff suggest that either of these two defendants was personally involved in the alleged deprivation of plaintiff's rights. Nor does the complaint suggest that defendants were grossly negligent in managing their subordinates who caused the alleged constitutional violation or that they created a policy or custom permitting the alleged violation to occur.

**\*3** Plaintiff does assert in his memorandum that he wrote Bliden on October 14, 1996 and again on November 18, 1996 "to have him correct the on going discriminatory practices of Rabbi Chill." (Plaintiff's Memorandum in Support of Opposition to Motion to Dismiss at 1, 4). Plaintiff also asserts in his memorandum that he "made no direct claim as to Artuz and Bliden's involvement because their function, responsibilities, authorities, and duties are covered under

Kinch v. Artuz, Not Reported in F.Supp. (1997)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 39 of 183

the Department of Correctional Services directives. Even if these allegations had been contained in plaintiff's complaint and thus could properly be considered as part of plaintiff's pleadings, such allegations would be insufficient to withstand a motion to dismiss.

With respect to plaintiff's first argument, even if a letter complaining of discrimination were sufficient to plead a claim under § 1983, plaintiff has not even alleged that any such letter was sent to Artuz. Thus, regardless of the significance of plaintiff's letter, plaintiff has not alleged any involvement whatsoever on behalf of Artuz. Furthermore, even if the letter had been sent or forwarded to Artuz, sending a letter to a supervisory official does not amount to the level of personal involvement necessary to state a claim under § 1983, because

> ... it is well established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegation made therein is insufficient to hold that official liable for the alleged violations.

*Greenwaldt v. Coughlin,* 1995 WL 232736, *4 (S.D.N.Y. 1995); *see also Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1110 (S.D.N.Y. 1997) (citing *Candelaria v. Coughlin,* 787 F. Supp. 368, 373 (S.D.N.Y. 1992), *aff'd,* 979 F.2d 845 (2d Cir. 1992); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989)).

Plaintiff's second argument is directly contrary to the holdings of *Monell* and its progeny. *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978); *accord City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S. Ct. 915 (1988); *see also Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir. 1997); *Champion v. Artuz,* 76 F.3d 483, 486-87 (2d Cir. 1996); *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995). Plaintiff argues that Artuz and Bliden are liable by virtue of their supervisory position with respect to Rabbi Chill. In *Monell,* however, the Supreme Court stated unequivocally that a plaintiff may not rely on the doctrine of *respondeat superior* to impose liability on a supervisory official in a § 1983 action. *Monell,* 436 U.S. at 691, 98 S. Ct. at 2036. Accordingly, plaintiff's motion with respect to defendants Artuz and Bliden must be dismissed.

### CONCLUSION

For the reasons set forth above, the motion of defendants Artuz and Bliden to dismiss plaintiff's claims against them is granted.

SO ORDERED:

Dated: New York, New York
 **\*4** September 10, 1997

**All Citations**

Not Reported in F.Supp., 1997 WL 576038

---

**End of Document**                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 40 of 183

Guarneri v. Schenectady City Police, Not Reported in Fed. Supp. (2021)

KeyCite Yellow Flag - Negative Treatment
Report and Recommendation Adopted as Modified by *Guarneri v. Schenectady City Police*, N.D.N.Y., October 20, 2021

2021 WL 5508276
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph GUARNERI, Plaintiff,

v.

SCHENECTADY CITY POLICE, et al., Defendants.

1:21-CV-0496 (LEK/CFH)
|
Signed 09/14/2021

**Attorneys and Law Firms**

Joseph Guarneri, 354 Edison Ave., Schenectady, New York 12305, Plaintiff pro se.

**REPORT-RECOMMENDATION & ORDER**

Christian F. Hummel, United States Magistrate Judge

**\*1** Plaintiff pro se Joseph Guarneri purported to commence this action on April 29, 2021, with the filing of a complaint and motion for leave to proceed in forma pauperis ("IFP"). See Dkt. Nos. 1 ("Compl"), 2. The Court administratively closed the case for failure to comply with the filing fee requirement. See Dkt. No. 4. On May 4, 2021, plaintiff filed an amended complaint and new motion for leave to proceed IFP. See Dkt. Nos. 5 ("Am. Compl."), 6. The Court administratively reopened the case on May 5, 2021. See Dkt. No. 7. [1]

The Court has reviewed plaintiff's application for leave to proceed in forma pauperis and concludes that he financially qualifies for in forma pauperis relief for purposes of filing. [2] Accordingly, the Court must review plaintiff's complaint pursuant to 28 U.S.C. § 1915 to determine whether it may proceed.

**I. Initial Review**

**A. Legal Standards**

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action. Where the plaintiff is proceeding pro se, the court must consider the claims "liberally" and "interpret them 'to raise the strongest arguments that they suggest.' " Cold Stone Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir. 2010) (summary order) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). A pro se litigant's pleadings are held to a less strict standard than those drafted by an attorney. See Fed. Express Corp. v. Holowecki, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, pro se litigants are held to a lesser pleading standard than other parties."). Because plaintiff is proceeding pro se, the Court construes his pleadings "to raise the strongest arguments that they suggest." See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006) (per curiam) (internal quotation marks omitted). However, this "does not exempt a [pro se litigant] from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983).

**\*2** Pleading guidelines are set forth in the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 41 of 183

Guarneri v. Schenectady City Police, Not Reported in Fed. Supp. (2021)

(1) a short and plain statement of the grounds for the court's jurisdiction ...;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

Further, Rule 10 of the Federal Rules provides:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with these pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### B. Complaint

Plaintiff's amended complaint is completed on a form complaint for civil rights violations pursuant to 42 U.S.C. § 1983. See Dkt. No. 5. Plaintiff's complaint states that defendants committed excessive force on April 24, 2021 at 12:00 PM. See id. at 3. He provides that he sustained unspecified injuries to his neck, low back, and right shoulder. See id. at 4. Plaintiff's demand for relief states: "$500,000." Id. at 5.

Plaintiff's complaint contains no facts and no other information beyond that set forth in the above paragraph. Plaintiff's complaint does not provide any context for his allegations of excessive force or injury. Plaintiff does not explain the context surrounding how defendants came to use excessive force against him, such as whether it was pursuant to a traffic stop, an arrest, or within a different context. Further, the Court is unable to discern from the complaint how each of the named defendants in the complaint were personally involved in use of excessive force against him. "[I]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Indeed, a complaint cannot be maintained against a defendant who is listed in the caption, but against whom no facts are alleged in the body of the complaint. See Taylor v. City of New York, 953 F. Supp. 95 (S.D.N.Y. 1997) (quoting Thomas v. Beth Israel Hosp., Inc., 710 F. Supp. 935, 942 (S.D.N.Y. 1989)). Plaintiff's amended complaint is wholly lacking in discernable facts or claims, the undersigned cannot conclude that it has stated "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see dkt. no. 5. In sum, plaintiff fails to plead in a discernable manner how the specific defendants violated his constitutional rights.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 42 of 183

Guarneri v. Schenectady City Police, Not Reported in Fed. Supp. (2021)

**\*3** The Court also observes that plaintiff indicates on his form complaint that he intends to sue each of the named individual defendants, Miss. Flavin and Mr. Czub, in their individual and official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). "New York State has not consented to suit in federal court." Abrahams v. Appellate Div. of Supreme Court, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (citing Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir. 1977)). Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979). "[C]laims against a government employee in his official capacity are treated as claims against the municipality," and, thus, cannot stand under the Eleventh Amendment. Id. Accordingly, it is recommended that all official capacity claims against defendants Flavin and Czub be dismissed with prejudice as barred by the Eleventh Amendment.

As plaintiff is proceeding pro se, in light of the special solicitude due, it is recommended that plaintiff be provided with an opportunity to amend his amended complaint in order to provide sufficient factual support for his allegations and an explanation of how each defendant was personally involved in the alleged violation of his constitutional rights. Plaintiff is advised that if the District Judge permits him to file a second amended complaint, it will supersede and replace the amended complaint in its entirety.

## II. Conclusion

Wherefore, for the reasons set forth herein, it is hereby

**ORDERED,** that plaintiff's Motion for Leave to Proceed IFP, Dkt. No. 6, is **GRANTED** *for the purpose of filing only;* and it is

**RECOMMENDED**, that plaintiff's amended complaint, Dkt. No. 5, be **DISMISSED without prejudice and with opportunity to amend**, except that plaintiff's claims against defendants Flavin and Czub in their official capacities be **DISMISSED with prejudice**; and it is further

**RECOMMENDED**, that, if the District Judge permits plaintiff an opportunity to amend after reviewing this Report-Recommendation & Order, and plaintiff fails to file a second amended complaint within the time frame the District Judge provides, this case be **DISMISSED** without further order of the Court.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [3]

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5508276

## Footnotes

1    Plaintiff also filed a letter dated May 2, 2021 and entered May 4, 2021, addressed to the "Court Clerk," stating, "[t]his is cost me money for certified mail because you want to play games with my mail. It will not happen again period." Dkt. No. 8. It is entirely unclear what plaintiff is referring to in this letter. However, to the extent plaintiff is complaining about sending the Court certified mail, he is referred to the Court's Local Rules of Practice, which was provided to him when he commenced this action. See Dkt. No. 9. All parties are required

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 43 of 183

Guarneri v. Schenectady City Police, Not Reported in Fed. Supp. (2021)

to comply with the Court's local rules of practice, regardless of whether they are represented or proceeding pro se.

2    Plaintiff is advised that he is still required to pay any costs and fees he may incur in this matter, including, but not limited to, copying fees, witness fees, and mailing expenses.

3    If you are proceeding <u>pro se</u> and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. <u>Id.</u> § 6(a)(1)(c).

---

**End of Document**                                                                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 44 of 183

2023 WL 4848404
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Curtis VAN STUYVESANT, Plaintiff,

v.

Melissa An CRANE, Justice of the Supreme Court,
County of New York, Civil Term, et al., Defendants.

1:23-CV-4394 (LTS)
|
Signed July 27, 2023

**Attorneys and Law Firms**

Curtis Van Stuyvesant, Corona, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District
Judge:

**\*1** Plaintiff Curtis Van Stuyvesant, of Corona, Queens
County, New York, who is appearing *pro se*, filed this action
against 29 defendants seeking damages as well as declaratory
and injunctive relief. [1] Plaintiff purports to assert claims
under 42 U.S.C. §§ 1983, 1985, and 1986; the Rehabilitation
Act; the Americans with Disabilities Act; the Religious
Freedom Restoration Act; *Bivens v. Six Unknown Named
Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); the
Federal Tort Claims Act ("FTCA"); claims of violations of
federal criminal law under 18 U.S.C. §§ 241, 242, 245, and
249, as well as under the Racketeer Influenced and Corrupt
Organizations Act; and civil claims under state law.

The 29 named defendants include Justices of the New
York Supreme Court, New York County; those judges' law
clerks; the current Clerk of the New York Supreme Court,
Appellate Division, First Department ("First Department");
the current Clerk of the United States Court of Appeals for
the Second Circuit (Defendant Catherine O'Hagan Wolfe);
current and former New York County District Attorneys
and a former New York County Assistant District Attorney
(including Defendants Cyrus Vance, Jr., Alvin Bragg, and
Hillary Hassler); private attorneys; two unidentified New
York City Police Officers; the Commissioner of the New
York City Department of Health & Mental Hygiene ("DHMH");
the Executive Deputy Commissioner of DHMH's Division of

Mental Hygiene; the DMMH General Counsel; the DHMH
Acting Chief Equity and Strategy Officer; a former Chief
Administrative Judge of the New York Supreme Court, New
York County, Criminal Division; an Administrative Justice
of the New York Supreme Court, New York County, Civil
Division; the Presiding Justice of the First Department; the
Chief Administrative Judge of the Courts of New York State;
the New York State Attorney General; the New York State
Governor; and the City of New York.

By order dated May 25, 2023, the Court granted Plaintiff's
request to proceed *in forma pauperis* ("IFP"), that is, without
prepayment of fees. For the reasons discussed below, the
Court dismisses this action, but grants Plaintiff 60 days' leave
to replead the specified claims under federal law, as well as
associated claims under state law, in an amended complaint.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion of
the complaint, that is frivolous or malicious, fails to state a
claim on which relief may be granted, or seeks monetary relief
from a defendant who is immune from such relief. [2] 28 U.S.C.
§ 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.,*
141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss
a complaint when the Court lacks subject matter jurisdiction
of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

**\*2** While the law mandates dismissal on any of these
grounds, the Court is obliged to construe *pro se* pleadings
liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009),
and interpret them to raise the "strongest [claims] that they
*suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471,
474 (2d Cir. 2006) (internal quotation marks and citations
omitted, emphasis in original). But the "special solicitude"
in *pro se* cases, *id.* at 475, has its limits – to state a claim,
*pro se* pleadings still must comply with Rule 8 of the Federal
Rules of Civil Procedure, which requires a complaint to make
a short and plain statement showing that the pleader is entitled
to relief.

Rule 8 requires a complaint to include enough facts to state
a claim for relief "that is plausible on its face." *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is
facially plausible if the plaintiff pleads enough factual detail
to allow the Court to draw the inference that the defendant
is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009). In reviewing the complaint, the Court

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 45 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

must accept all well-pleaded factual allegations as true. *Id.* But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Id.* (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.* at 679.


## BACKGROUND

Plaintiff's 262-page complaint, which includes various attachments, focuses in large part on certain individuals Plaintiff deems responsible for his state court conviction and sentence, his unsuccessful state court appeal and post-conviction collateral litigation, and his unsuccessful attempt at federal *habeas corpus* relief. Taken together, the Court views the statements in the complaint as an attempt to hold others to account for Plaintiff's unsuccessful litigation.[3] (*E.g.*, ECF 1, at 1-16.) The complaint is replete with vulgar, anti-Semitic, and misogynistic references that the Court will not repeat here, as they are not material to any legal claim or theory.

**\*3** In light of Plaintiff's assertions in the section of his complaint in which he states his causes of action (ECF 1, at 236-58), the Court construes the complaint as asserting claims of federal constitutional violations and conspiracy under 42 U.S.C. § 1983 and *Bivens*, claims of conspiracy under 42 U.S.C. § 1985, associated claims under 42 U.S.C. § 1986, claims under the FTCA, claims of violations of federal criminal law, and claims under state law.

Plaintiff references many individuals in the complaint who are not named as defendants. He also seeks the criminal prosecution of at least some of the named defendants, accusing them of corruption and other malfeasance. (*Id.* at 185-209.) Plaintiff further seems to assert civil claims on behalf of another person, someone named Trevor Whittingham.[4] (*Id.* at 212-17.) Finally, Plaintiff seeks to assert claims arising from an incident, which allegedly occurred on or about March 24, 2023, in which two New York City police officers, as well as employees of the DHMH, visited Plaintiff, at his home, in Queens County, and threatened him with confinement in a psychiatric hospital. (*See id.* at 217, 234-44.) Plaintiff asserts that this incident occurred after he sent written communications to at least

some of the named defendants apparently accusing them of corruption and other malfeasance.


## DISCUSSION

### A. Claims brought on behalf of Trevor Whittingham

To the extent that Plaintiff asserts claims on behalf of Trevor Whittingham, the Court must dismiss those claims. The statute governing appearances in federal court, 28 U.S.C. § 1654, "allow[s] two types of representation: 'that by an attorney admitted to the practice of law by a governmental regulatory body, and that by a person representing himself.' " *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007) (quoting *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308 (2d Cir. 1991)). A person who is not admitted to practice as a lawyer cannot bring suit on behalf of another person. *See Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010); *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 92 (2d Cir. 2008); *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998).

Plaintiff, who seems to allege that he is admitted to the bars of foreign jurisdictions, does not allege that he is admitted to the bar of this court or of another federal or state court, or that he has been admitted to this court *pro hac vice*. Accordingly, to the extent that Plaintiff asserts claims on behalf of Trevor Whittingham, the Court dismisses those claims without prejudice.


### B. Private prosecution

The Court must dismiss Plaintiff's claims in which he seeks the criminal investigation and prosecution of any of the defendants.[5] Plaintiff cannot initiate a prosecution in this court because "the decision to prosecute is solely within the discretion of the prosecutor." *Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981). Neither Plaintiff nor the Court can direct prosecutors to initiate a criminal proceeding against the defendants because prosecutors possess discretionary authority to bring criminal actions and they are "immune from control or interference by citizen or court...." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972). Accordingly, because Plaintiff lacks standing to cause the criminal prosecution of others, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 618-19 (1973), the Court dismisses, for lack of subject matter jurisdiction, any claims in which Plaintiff seeks the criminal investigation and prosecution of any the defendants, *see* Fed. R. Civ. P. 12(h)(3); *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) ("If [a] plaintiff[ ]

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 46 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

lack[s] Article III standing, a [federal] court has no subject matter jurisdiction to hear [his] claim.") (internal quotation marks and citation omitted).

## C. Challenge to conviction

**\*4**  The Court construes Plaintiff's complaint, in part, as asserting claims of constitutional violations, under 42 U.S.C. § 1983, in which Plaintiff, who is no longer in custody pursuant to his state court judgment of conviction, seeks declaratory relief that essentially challenges that conviction.

To the extent that Plaintiff seeks declaratory relief in an effort to challenge his state court conviction, the *Rooker-Feldman* doctrine requires the dismissal of such claims for relief because they challenge the final orders and judgments of the state courts as to Plaintiff's conviction, direct appeal of that conviction, and as to his state court post-conviction collateral litigation. Under the *Rooker-Feldman* doctrine, a federal district court lacks authority to review a final state court order or judgment where the plaintiff seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 644 n.3 (2002) ("The *Rooker-Feldman* doctrine ... recognizes that 28 U.S.C. § 1331[,] [the statute granting federal district courts' federal question jurisdiction,] is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments ...."); *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021) (The *Rooker-Feldman* doctrine "bars federal district courts from hearing cases that in effect are appeals from state court judgments, because the Supreme Court [of the United States] is the only federal court with jurisdiction over such cases." (citing 28 U.S.C. § 1257))); *Kropelnicki v. Siegel*, 290 F.3d 118, 128 (2d Cir. 2002) ("The [*Rooker-Feldman*] doctrine reflects the principle set forth in 28 U.S.C. § 1257 that the Supreme Court [of the United States] is the only federal court that has jurisdiction to review state court judgments, unless otherwise provided by Congress, *see, e.g.*, 28 U.S.C. § 2254 (habeas corpus review).") (citation omitted). The *Rooker-Feldman* doctrine "precludes a United States district court from exercising subject-matter jurisdiction ...." *Exxon Mobil Corp.*, 544 U.S. at 291. This includes when a plaintiff seeks relief that invites a federal district court to reject or overturn a final decision of a state court as to a post-conviction collateral motion, *see Armstrong v. Lebowitz*, 17 F. App'x 55, 56 (2d Cir. 2001) (summary order); *Strauss v. Dwyer*, No. 1:21-CV-0414, 2021

WL 3635167, at \*3-4 (N.D.N.Y. Aug. 17, 2021), *report & recommendation adopted*, 2021 WL 4502279 (N.D.N.Y. Oct. 1, 2021); *Clemmons v. Albany Cnty. Dist. Attorney's Office*, No. 1:16-CV-0884, 2016 WL 5717265, at \*1 (N.D.N.Y. Sept. 29, 2016).

District court review of claims is barred under the *Rooker-Feldman* doctrine when four requirements are met: (1) the plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a final state court order or judgment; (3) the plaintiff invites district court review and rejection of the final state court order or judgment; and (4) the final state court order or judgment was rendered before the district court proceedings commenced. *Dorce*, 2 F.4th at 101 (internal quotation marks and citation omitted).

**\*5**  In seeking declaratory relief with regard to his state court conviction, direct appeal of that conviction, and his state court post-conviction collateral litigation, Plaintiff challenges the state courts' final decisions as to such state court litigation. The *Rooker-Feldman* doctrine bars this Court from reviewing such challenges. The Court therefore dismisses Plaintiff's claims for declaratory relief that essentially challenge his state court conviction, under the *Rooker-Feldman* doctrine, for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3); *Exxon Mobil Corp.*, 544 U.S. at 291.

## D. Prosecutorial immunity

To the extent that Plaintiff asserts claims for damages under 42 U.S.C. § 1983 against former New York County District Attorney Cyrus Vance, Jr., current New York County District Attorney Bragg, and/or former New York County Assistant District Attorney Hillary Hassler, arising from the decision to criminally prosecute Plaintiff, their actual prosecution of him, their litigation on behalf of the State of New York with respect to Plaintiff's direct appeal of his state court conviction, and as to the State's opposition to his state court post-conviction collateral motion(s), the Court dismisses such claims under the doctrine of prosecutorial immunity. Under this doctrine, prosecutors are absolutely immune from civil suits for damages for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are " 'intimately associated with the judicial phase of the criminal process.' " *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 47 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

the actor who performed it") (internal quotation marks and citations omitted). This includes immunity from suit for damages as to a prosecutor's work on a direct appeal of a criminal conviction and as to defending a conviction from collateral attack. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 122 (2d Cir. 2009); *Buari v. City of New York*, 530 F. Supp. 3d 356, 381 (S.D.N.Y. 2021) ("The actions of [the prosecutors] ... in connection with the Second 440.10 Motion are protected by absolute immunity because they were 'performed in defending a conviction from collateral attack.' " (quoting *Warney, 587 F.3d at 122*)). In addition, under this doctrine, prosecutors are absolutely immune from suit for acts that may be administrative obligations, but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 70-72 (2d Cir. 2019) (holding that prosecutors' direction as to where a criminal defendant would be arraigned was in preparation for a court proceeding in which the prosecutors were acting as advocates, and they were therefore shielded by absolute immunity (citing, *inter alia, Van de Kamp*)).

Here, Plaintiff's claims against former District Attorney Vance, current District Attorney Bragg, and former Assistant District Attorney Hassler are based, in part, on actions within the scope of their former or current official duties and are, in part, associated with the decision to criminally prosecute Plaintiff, their actual prosecution of him, their defense of Plaintiff's conviction on direct appeal, and their opposition to his state court post-conviction collateral motion(s). Accordingly, the Court dismisses such claims under Section 1983 because they seek monetary relief against defendants who are immune from such relief, *see* 28 U.S.C. § 1915(e)(2)(b)(iii), and, consequently, are frivolous, *see* § 1915(e)(2)(B)(i); *Collazo v. Pagano*, 656 F. 3d 131, 134 (2d Cir. 2011) (holding that a claim against a prosecutor dismissed under the doctrine of prosecutorial immunity is frivolous under § 1915(e)(2)(B)(i)).

## E. Claims under the FTCA

**\*6** The Court must dismiss Plaintiff's claims for damages against Second Circuit Clerk of Court Catherine O'Hagan Wolfe in her official capacity under the doctrine of sovereign immunity. This doctrine bars federal courts from hearing all suits against the federal government, federal agencies, and federal officers sued in their official capacities except where sovereign immunity has been waived. *E.g.*, *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal

officers in their official capacities is essentially a suit against the United States, such suits are ... barred under the doctrine of sovereign immunity, unless such immunity is waived.").

The FTCA provides for a waiver of sovereign immunity for certain claims for damages arising from the tortious conduct of federal officers or employees acting within the scope of their office or employment. *See* 28 U.S.C. §§ 1346(b)(1), 2680. "The proper defendant in an FTCA claim is the United States, not individual federal employees or agencies." *Holliday v. Augustine*, No. 3:14-CV-0855, 2015 WL 136545, at \*1 (D. Conn. Jan. 9, 2015). The Court therefore dismisses Plaintiff's claims under the FTCA against Defendant O'Hagan Wolfe, *see* § 1915(e)(2)(B)(iii), and construes Plaintiff's those claims as brought against the United States of America. [6]

A plaintiff must comply with the FTCA's procedural requirements before a federal court can entertain his claim. *See Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999), *abrogated on other grounds*, *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015). Before bringing a damages claim in a federal district court under the FTCA, a claimant must first exhaust his administrative remedies by filing a claim for damages with the appropriate federal government entity and must receive a final written determination. *See* 28 U.S.C. § 2675(a). Such an administrative claim must be in writing, specify the amount of damages sought, and be filed within two years of the claim's accrual. 28 U.S.C. §§ 2401(b), 2675(a). A claimant may thereafter challenge the Government's final denial in a federal district court by filing an action within six months after the date of the mailing of the notice of final denial by the federal entity. *See* § 2401(b). If no written final determination is made by the appropriate federal entity within six months of the date of the claimant's filing of the administrative claim, the claimant may then bring an FTCA action in a federal district court. *See* § 2675(a). While this exhaustion requirement is jurisdictional and cannot be waived, *see Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005), "the FTCA's time bars are nonjurisdictional and subject to equitable tolling," *Kwai Fun Wong, 575 U.S. at 420*.

**\*7** Inasmuch as Plaintiff asserts, under the FTCA, damages claims, including claims of conspiracy, against the United States of America, arising from Defendant O'Hagan Wolfe's conduct or omissions as the Second Circuit Clerk of Court, he has not alleged facts demonstrating that he filed an administrative claim under the FTCA with a federal governmental entity for damages and received a final written

Case 3:23-cv-01099-GTS-ML   Document 32   Filed 04/29/25   Page 48 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

determination before bringing this action, nor has he alleged facts showing that it has been more than six months since he has filed such an administrative claim. The Court therefore dismisses Plaintiff's claims under the FTCA against the United States of America under the doctrine of sovereign immunity, for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see* § 1915(e)(2)(B)(iii).

**F. Claims under Sections 1983, 1985, and 1986 against the City of New York**

Plaintiff has failed to state a claim under 42 U.S.C. § 1983 against the City of New York. When a plaintiff sues a municipality, such as the City of New York, under Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978))); *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). Thus, to state a claim under Section 1983 against a municipality, the plaintiff must allege facts showing: (1) the existence of a municipal policy, custom, or practice; and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted). In addition, with respect to claims of conspiracy brought against a municipality under 42 U.S.C. § 1985 or associated claims brought against a municipality under 42 U.S.C. § 1986, a policy, custom, or practice of the municipality must be the basis for such claims. *See Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979) (claims under Section 1985); *Komatsu v. City of New York*, No. 1:20-CV-6510, 2020 WL 8641274, at *5 (S.D.N.Y. Oct. 22, 2020) (claims under Sections 1983 and 1986), *aff'd sub nom.*, *Komatsu v. Cubesmart*, No. 20-3676, 2021 WL 6060603 (2d Cir. Dec. 20, 2021) (summary order).

Plaintiff alleges that the City of New York:

> has an official policy of not question[ing] the motive[s] of prosecutors, judges, [c]ourt clerks and

> [of] ... weaponizing New York City [p]olice officers as [its] Gestapo in their personal vendetta to terrorize and intimidate anyone or [any] dissent, ... such as Plaintiff in retaliation for exposing [its] official public corruption and misconduct.

(ECF 1, at 254.) He also alleges that the City of New York:

> has a custom or practice that is not written or formally adopted but that is persuasive ... [in which] ... [p]olice [o]fficers and ... [DHMH] agents ... ignore probable cause when dispatched by prosecutors, judges, court clerks and court personal to forcibly remov[e] individuals from their homes for involuntary psychiatric mandatory observation confinement without either a court order or psychiatric order.

(*Id.*)

Plaintiff's claims under Section 1983 against the City of New York fail for two reasons. First, Plaintiff's allegations as to the existence of a custom, policy, or practice of the City of New York are conclusory; they lack specific factual detail. *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (a "general and conclusory allegation that there was ... such a [discriminatory municipal] policy" fails to state a claim against a municipality under Section 1983). Second, the complaint does not allege that any such custom, policy, or practice of the City of New York actually caused a violation of Plaintiff's federal constitutional rights.

**\*8** Plaintiff seems to assert claims, under Section 1983, that the City of New York violated his First Amendment rights, after he had sent written communications to at least some of the defendants, when it retaliated against him for those communications by sending, to his home, in Queens County, on or about March 24, 2023, two unidentified police officers and DHMH employees who threatened him with involuntary hospitalization. To state a First Amendment retaliation claim under Section 1983, a plaintiff must allege facts showing that:

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 49 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

"(i) he has an interest protected by the First Amendment, (ii) the defendant's actions were motivated by or substantially caused by the plaintiff's exercise of that right, and (iii) the defendant's action effectively chilled the exercise of the plaintiff's First Amendment rights." *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998) (citations omitted).

The Court assumes, for the purpose of this order, that Plaintiff's written communications were protected by the First Amendment. Plaintiff does not allege that he was ever involuntarily hospitalized, but he does allege that, as a result of the threats of involuntary hospitalization, he was compelled to withdraw a then-pending Section 440.10 motion challenging his state court conviction and a criminal complaint that he had filed, as well as cease his anti-corruption advocacy. Thus, the Court assumes, for the purpose of this order, that the alleged threats of hospitalization chilled the exercise of his First Amendment rights. Yet, Plaintiff does not allege any facts suggesting that an action by the City of New York pursuant to any of its policies, customs, or practices was "motivated by or [was] substantially caused by [his] exercise of" his First Amendment rights. *Id.*

Accordingly, because Plaintiff has failed to allege facts sufficient to state a claim under Section 1983 against the City of New York, the Court dismisses these claims for failure to state a claim on which relief may be granted. *See* 1915(e)(2)(B)(ii). In light of Plaintiff's *pro se* status, however, the Court grants Plaintiff leave to replead these claims in an amended complaint.

## G. Claims of under 42 U.S.C. §§ 1983, 1985, and *Bivens*, and associated claims under 42 U.S.C. § 1986, against the individual defendants

### 1. Personal involvement
To state a claim under 42 U.S.C. § 1983, a plaintiff must allege facts showing the individual defendants' direct and personal involvement in the alleged constitutional deprivation. *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation marks omitted). A defendant may not be held liable under Section 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat*

*superior*."). Rather, "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official...." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020).

This requirement is also applicable to claims brought under *Bivens*, as well as to claims under 42 U.S.C. §§ 1985 and 1986. [7] *See Toribio Abreu v. John Doe #1*, No. 22-CV-2445, 2022 WL 1597698, at *2 (S.D.N.Y. May 19, 2022) (*Bivens*); *Crichlow v. Comm'r of N.Y State D.O.C.S.*, No. 18-CV-3222, 2018 WL 11282729, at *2 (S.D.N.Y. Aug. 24, 2018) (Sections 1985 and 1986). "Conclusory allegations ... fail to satisfy *Tangreti's* requirement of personal involvement" as to claims under Section 1983. *Johnson v. State of Vermont*, No. 22-CV-0029, 2023 WL 3548801, at *23 (D. Vt. May 18, 2023). In addition, conclusory allegations of personal involvement do not state claims under *Bivens*, or under Sections 1985 and 1986, against individual defendants. *Moore v. Desposito*, No. 15-CV-4319, 2016 WL 4223967, at *4 (E.D.N.Y. Apr. 19, 2016) (Sections 1985 and 1986), *report & recommendation adopted*, (E.D.N.Y. Aug. 8, 2016); *Khan v. United States*, 271 F. Supp. 2d 409, 413 (E.D.N.Y. July 3, 2003) (*Bivens*); *see also Vazquez v. Parks*, No. 02-CV-1735, 2003 WL 1442087, at *9 (S.D.N.Y. Feb. 4, 2003) ("In order to survive a motion to dismiss, a plaintiff alleging a Section 1983 or a *Bivens* claim must set forth specific and detailed factual allegations of personal involvement as opposed to bald assertion[s] and conclusory terms.") (internal quotation marks and citation omitted, alteration in original), *aff'd*, 101 F. App'x 365 (2d Cir. 2004) (summary order).

**\*9** Plaintiff names many individuals as defendants, but asserts each of the individuals' personal involvement in the alleged constitutional violations only in a conclusory manner. He seems to allege that all, or nearly all, of the individual defendants conspired with each other to cause two New York City police officers and DHMH employees to visit him, at his home, in Queens County, and threaten him with involuntary hospitalization, in retaliation for his written communications to at least some of the individual defendants. He does not, however, allege facts showing how each individual defendant was personally and directly involved in the alleged conspiracy and/or constitutional violations. The Court therefore dismisses Plaintiff's claims against the individual defendants, under Sections 1983, 1985, 1986 and *Bivens*, for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii). In light of Plaintiff's *pro se* status, however, the Court grants Plaintiff leave to replead

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 50 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

these claims in an amended complaint in which he alleges facts sufficient to show the personal and direct involvement of the named individual defendants in the alleged conspiracy and/or constitutional violations; conclusory allegations will not suffice.

**2. Claims of conspiracy under Sections 1983, 1985, *Bivens*, and associated claims under Section 1986**

Plaintiff fails to allege facts sufficient to state claims of conspiracy under Section 1983, Section 1985, *Bivens*, and associated claims under Section 1986. To state a claim of conspiracy under Section 1983 or *Bivens*, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." [8] *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (Section 1983); *Powell v. United States*, No. 19-CV-11351, 2020 WL 5126392, at *9 (S.D.N.Y. Aug. 31, 2020) (quoting *Pangburn*, 200 F.3d at 72, in the *Bivens* context). [9] To state a claim of conspiracy under Section 1985(3), a plaintiff must allege facts suggesting the existence of: (1) a conspiracy; (2) for the purpose of depriving the plaintiff of the equal protection of the laws, or the equal privileges or immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of his right or privilege as a citizen of the United States. *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). "[T]he [Section 1985(3)] conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (internal quotation marks and citation omitted).

Vague and unsupported assertions of a claim of conspiracy, either under Section 1983, Section 1985, or *Bivens*, will not suffice to state a claim upon which relief can be granted. *See, e.g., Stoner v. Young Concert Artists, Inc.*, 626 F. App'x 293, 296 (2d Cir. 2015) (summary order); *Wang v. Miller*, 356 F. App'x 516, 517 (2d Cir. 2009) (summary order); *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003); *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990). A claim under Section 1986 is only valid "if there is a viable conspiracy claim under § 1985." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994).

Plaintiff's allegations about a conspiracy between the defendants are conclusory, vague, and without detail. Plaintiff alleges, with no factual support or causal connection, that as a result of his written communications to at least some of the defendants, the defendants conspired together to retaliate against him by sending two New York City police officers and DHMH employees to his home, in Queens County, on or about March 24, 2023, where they threatened him with involuntarily hospitalization. The Court therefore dismisses Plaintiff's claims of conspiracy under Section 1983, Section 1985, and *Bivens* for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii). Accordingly, the Court also dismisses Plaintiff's claims under Section 1986. *See id.* The Court grants Plaintiff leave to replead these claims in an amended complaint in which he alleges facts sufficient to state such claims.

**H. Leave to amend**

**\*10** District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a claim under 42 U.S.C. §§ 1983, 1985, 1986, or *Bivens*, the Court grants him 60 days' leave to assert, in an amended complaint, those claims, including his claims of conspiracy, in which the Court has granted him leave to replead, as well as any associated claims under state law. Plaintiff may not assert, in his amended complaint, any claims that the Court has dismissed herein in which Court has not granted him leave to replead.

Plaintiff's amended complaint may not exceed 20 pages; the Court imposes this page limitation because Plaintiff's original complaint falls far short of complying with Rule 8's requirement that a complaint consist of a short and plain statement of claim. *See* Fed. R. Civ. P. 8(a)(2). The Court also prohibits Plaintiff from using vulgar, profane, or offensive language, including any anti-Semitic or misogynistic language, in his amended complaint. If Plaintiff does not heed either of these restrictions, the Court will direct the Clerk of Court to enter judgment dismissing this action for failure to comply with this order. *See* Fed. R. Civ. P. 41(b); *Celli v. Cole*, 699 F. App'x 88, 89 (2d Cir. 2017) (summary order) ("Celli has shown brazen and profane resistance to the

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 51 of 183

District Court's instructions, demonstrating that further efforts to convince Celli to file a reasonable complaint would be futile and making dismissal of his complaint without further leave to amend appropriate.")

## CONCLUSION

The Court dismisses this action for the reasons set forth in this order, but grants Plaintiff 60 days' leave to assert, in an amended complaint, only those claims under federal law discussed above that the Court has granted him leave to replead, and any associated claims under state law.[10] If Plaintiff fails to file an amended complaint within the time allowed, or fails to show cause to excuse such failure, the Court will direct the Clerk of Court to enter judgment

dismissing this action; the judgment will dismiss Plaintiff's claims under federal law for the reasons set forth above, and it will state that the Court declines to consider, under its supplemental jurisdiction, Plaintiff's claims under state law, *see* 28 U.S.C. § 1367(c)(3).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4848404

---

## Footnotes

1   Plaintiff originally filed his complaint in the United States District Court for the Eastern District of New York. By order dated May 24, 2023, that court transferred this action to this court. *Van Stuyvesant v. Crane*, No. 23-CV-3633 (E.D.N.Y. May 24, 2023).

2   Plaintiff seeks, in part, as injunctive relief, "an order classifying [his] complaint ... as a non-prisoner civil rights complaint that is not restricted by the Prison Litigation Reform Act [("PLRA")]." (ECF 1, at 259.) With respect to that statute, the term "prisoner" refers to "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or [a] diversionary program." 28 U.S.C. § 1915(h). A litigant is considered to a be a prisoner under the PLRA if he fits that definition at the moment that he files his complaint. *See Gibson v. City Mun. of N.Y.*, 692 F.3d 198, 201 (2d Cir. 2012) (quoting *Harris v. City of New York*, 607 F.3d 18, 21-22 (2d Cir. 2010)). Because Plaintiff, who is a former prisoner, was no longer in custody at the time that he filed his complaint, he is not subject to the PLRA.

3   On July 6, 1999, Plaintiff was convicted, after a jury trial in the New York Supreme Court, New York County, of two counts of scheme to defraud in the first degree, four counts of grand larceny in the third degree, four counts of grand larceny in the fourth degree, two counts of attempted grand larceny in the third degree, and of practicing or appearing as an attorney-at-law without being admitted and registered; the court sentenced Plaintiff to an aggregate prison term of 10 to 20 years. *See People v. Van Stuyvesant*, 297 A.D.2d 559 (1st Dep't 2002). On September 19, 2002, the First Department affirmed Plaintiff's judgment of conviction as well as a January 12, 2000, decision of the trial court denying Plaintiff's motion to vacate his conviction brought under Section 440.10 of the New York Criminal Procedure Law. *Id.* The New York Court of Appeals denied leave to appeal on January 14, 2003. *People v. Van Stuyvesant*, 99 N.Y.2d 586 (2003). Plaintiff later sought federal *habeas corpus* relief from his conviction in this court under 28 U.S.C. § 2254. On September 7, 2007, the Honorable Lewis A. Kaplan of this court denied Plaintiff Section 2254 *habeas corpus* relief. *Van Stuyvesant v. Conway*, No. 03-CV-3856, 2007 WL 2584775 (S.D.N.Y. Sept. 7, 2007), *appeal dismissed*, No. 07-4467-pr (2d Cir. Jan. 4, 2008).

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 52 of 183

Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)

4   Plaintiff alleges that his:

only connection to Whittingham is through their mutual friendship with Mr. Chase who is also a British educated barrister and solicitor at law who controls a Real Estate Investment Firm [REIT] base[d] in Connecticut. Plaintiff does not have any financial stake in Whittingham['s] condominium development project. His involvement is simply as an amicus curia in furtherance of his private attorney general anti-public corruption activities exposing corruption, bribery, fraud, obstruction of justice, violation of honest service, bias, racism, bigotry, [and] xenophobia in New York State Unified Court System.

(ECF 1, at 216.)

5   Plaintiff accuses the defendants of violations of federal criminal law under 18 U.S.C. §§ 241, 242, 245, and 249, as well as under the Racketeer Influenced and Corrupt Organizations Act. (ECF 1, at 55.)

6   The focus of Plaintiff's claims against Defendant O'Hagan Wolfe appears to be her alleged actions that are not associated with Plaintiff's litigation in the Second Circuit. To the extent that he asserts claims for damages against her in her personal capacity under *Bivens*, arising from actions she has allegedly taken with regard to his litigation within the Second Circuit, however, those claims are dismissed under the doctrine of judicial immunity and, consequently, as frivolous. *See* § 1915(e)(2)(B)(i), (iii); *Pierre v. EDNY*, No. 18-CV-12193, 2019 WL 1988528, at *3 (S.D.N.Y. May 3, 2019) (judicial immunity "applies to government officials, including clerks of court and other court employees, for their acts that assist a judge in the performance of his or her judicial duties"), *appeal dismissed sub nom.*, *Pierre v. Irizarry*, No. 19-1567, 2019 WL 11671990 (2d Cir. Nov. 13, 2019), *cert. denied*, 140 S. Ct. 2728 (2020); *see also Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) (claims dismissed because of judicial immunity are frivolous for the purpose of the IFP statute, 28 U.S.C. § 1915).

7   To state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *See West v. Atkins*, 487 U.S. 42, 48-49 (1988). A plaintiff may seek damages, injunctive relief, and/or declaratory relief under Section 1983. A *Bivens* action, however, is a "judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights.... The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007). Among the other protections listed in 42 U.S.C. § 1985, the statute provides for a cause of action against those who conspire to violate a person's right to equal protection under the laws or a person's right to equal privileges and immunities under the laws. *See* 42 U.S.C. 1985(3). Section 1986 provides a remedy against individuals who "kn[ew] of and ha[d] the ability to aid in preventing a § 1985 conspiracy ... [and] decline[d] to take steps preventing that conspiracy ...." *Wahad v. FBI*, 813 F. Supp. 224, 232 (S.D.N.Y. 1993); *see* 42 U.S.C. § 1986.

8   For the purpose of a claim of conspiracy under *Bivens*, the defendants must be two or more federal officers or employees.

9   The Court assumes, for the purpose of this order, that a claim of conspiracy can still be pursued under *Bivens*. *But see Milton v. McClintic*, No. 22-CV-6077L, 2022 WL 4852825, at *2-3 (W.D.N.Y. Oct. 4, 2022) (noting that because, in *Egbert v. Boule*, 142 S. Ct. 1793, 1807 (2022), the Supreme Court of the United States held that there is no *Bivens* cause of action for First Amendment retaliation, there could be no claim of conspiracy under *Bivens* arising from such retaliation).

10  The Court will not consider any application for the Court to request *pro bono* counsel until after Plaintiff files an amended complaint.

**Van Stuyvesant v. Crane, Not Reported in Fed. Supp. (2023)**

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4394681

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Ramon FLORES, Plaintiff,

v.

Steve LEVY, Thomas J. Spota, III, Wilma
Peterson, Louis J. Ohlig, Edward Vitale, Douglas
M. O'connor, John A.Bray, Linda Kevins,
John Scarglato, Dana Brown, Defendants.

No. 07-CV-3753 (JFB)(WDW).
|
Sept. 23, 2008.

**Attorneys and Law Firms**

Ramon Flores, pro se.

Wilma Peterson, pro se.

Assistant Suffolk County Attorney Brian C. Mitchell,
Hauppauge, NY, for defendants Thomas J. Spota III, Linda
Kevins, John Scarglato, Dana Brown and Steve Levy.

Amy M. Monahan of L'Abbate, Balkan, Colavitta & Contini
LLP, Garden City, NY, for defendants Robert C. Mitchell,
Edward Vitale, and Douglas O'Connor.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

 **\*1** Plaintiff Ramon Flores ("plaintiff" or "Flores"), brings
this action against Suffolk County Executive Steve Levy
("Levy"), Suffolk County District Attorney Thomas J. Spota
III ("Spota"), Assistant District Attorneys Linda Kevins
("Kevins"), Dana Brown ("Brown"), and John Scarglato
("Scarglato") (collectively, "defendant prosecutors"), Suffolk
County Court Judge Louis J. Ohlig ("Judge Ohlig")
(collectively, "County Defendants"), Legal Aid Society
Attorneys Robert C. Mitchell ("Mitchell"), Edward "Ed"
Vitale ("Vitale"), and Douglas M. O'Connor ("O'Connor")
(collectively, "Legal Aid defendants"), John A. Bray, and
Wilma Peterson, alleging malicious prosecution, conspiracy
under 42 U.S.C. § 1983, and deliberate indifference, all
arising from defendant's prosecution.

Defendants moved to dismiss the claims pursuant to
Fed.R.Civ.P. 12(c). For the following reasons, defendants'
motions are granted.

I. BACKGROUND

A. Facts

The following facts are taken from the complaint and are not
findings of fact by the court. The Court assumes these facts to
be true for the purpose of deciding this motion and construes
them in the light most favorable to plaintiff, the non-moving
party.

On February 20, 2003, Flores was arrested in Suffolk County
and charged with one count of criminal assault in the second
degree and one count of criminal contempt in the first degree.
(Compl.¶ 1.) On February 25, 2003, an unidentified man came
to see Flores and told him it was not advisable that he testify
before the grand jury. (Compl.¶ 3.) The unidentified man
stated that he was not an attorney and that he could not answer
any additional questions. (Compl.¶ 3.) Later that afternoon,
plaintiff appeared before the court and was provided with
what he believed to be Legal Aid counsel. (Compl.¶ 4.)

On March 5, 2003, plaintiff was taken to the Suffolk County
Court and arraigned on indictment 493-03, which charged
plaintiff with: 3 counts of assault in the second degree, 2
counts of criminal contempt in the first degree, aggravated
contempt, and menacing. (Compl.¶ 4.) Plaintiff informed
the court that he still had no formal attorney of record.
(Compl.¶ 4A.) The Court appointed a Legal Aid attorney
to represent plaintiff. (Compl.¶ 4B.) After the arraignment,
plaintiff complained to Legal Aid attorney Douglas O'Connor
that plaintiff was not provided with an attorney at an earlier
stage. (Compl.¶ 4C.) O'Connor informed plaintiff that a
motion to dismiss would be filed on the grounds that plaintiff
was not afforded an opportunity to testify before the grand
jury, and that plaintiff was not provided counsel at the time
the grand jury was convened. (Compl.¶ 4C.)

On April 3, 2004, plaintiff returned to court and spoke to his
appointed Legal Aid attorney Edward Vitale. (Compl.¶ 5.)
Plaintiff reviewed the proposed motion to dismiss. (Compl.¶
5.) Plaintiff was unhappy that the motion did not raise the
issue of plaintiff's prior lack of representation. (Compl.¶
5.) Plaintiff ordered Vitale not to file the motion. (Compl.¶
5.) Vitale became angry with plaintiff and told plaintiff

he was "on his own." (Compl.¶ 5.) Plaintiff notified the Court that he was not satisfied with the motion. (Compl.¶ 5B.) Vitale requested that he be removed as counsel for plaintiff. (Compl.¶ 5B.) The Court granted Vitale's request and appointed John Bray as counsel. (Compl.¶ 5B.) Further, the court provided plaintiff with additional time to file his motion to dismiss, in order to allow his newly appointed counsel to review the motion. (Compl.5B.)

**\*2** On April 8, 2003, the court formally appointed Bray as counsel. The case was adjourned for second call so that plaintiff and Bray could confer. (Compl.¶ 6.) Plaintiff asked Bray to amend the motion to dismiss to include an affidavit, noting that plaintiff was not provided with counsel at the time of indictment. (Compl. ¶ 6A .) Bray refused to make the changes and argued with plaintiff. (Compl.¶ 6A.) No second call occurred and the case was adjourned until April 28, 2003. Thereafter, plaintiff notes that Bray refused to assist him and was not responsive to plaintiff's requests. (Compl.¶ 6B.) On April 18, 2003, plaintiff filed a motion to dismiss, asserting that he was not provided representation during a critical stage of the action. (Compl.¶ 6C.) On April 26, 2004, plaintiff received legal mail containing an order from Judge Ohlig, dismissing the indictment based upon a lack of legal counsel provided to plaintiff. (Compl.¶ 6D.)

On May 4, 2003, plaintiff filed three grievances with the Tenth Judicial District against O'Connor, Vitale, and Bray. (Compl. ¶ 7 .) Plaintiff accused the attorneys of failing to safeguard his rights, lying to him, and failing to provide competent assistance. (Compl.¶ 7.) In addition, plaintiff filed a grievance against Judge Ohlig alleging that he violated plaintiff's constitutional rights. (Compl.¶ 7.)

On May 5, 2003, plaintiff appeared in court to testify before a second grand jury. (Compl.¶ 8.) Plaintiff refused to testify before the grand jury because he did not trust Bray. (Compl.¶ 8.) Plaintiff informed the court of his objections to Bray's representation. (Compl.¶ 8A.) As a result of not testifying, plaintiff claims that he was unable to provide the mitigating defense of "Intoxication." (Compl.¶ 8B.)

On May 19, 2003, plaintiff was arraigned on the superseding indictment 111-03, which contained the same 7 counts as the original indictment, plus an additional count of assault in the first degree. (Compl.¶ 9.) Plaintiff alleges that the complainant testified before the grand jury that plaintiff had "knocked out her teeth" thereby implying that there was a loss of actual teeth, when, in fact, it was "broken bridge

work." (Compl.¶ 9Ai.) Plaintiff alleges that the prosecution knew this testimony was false because the medical records in the prosecution's possession indicated that it was broken bridge work and not a loss or break of actual teeth. (Compl.¶ 9Aii.) Plaintiff concludes that the additional first degree assault charge was added as a punitive tactic designed to silence and stop plaintiff from "asserting and continuing to petition for redress" of his constitutional right to counsel. (Compl.¶ 9B.)

In August of 2004, plaintiff was tried on the eight counts contained within the second indictment. (Compl.¶ 11.) Plaintiff alleges that, on August 4, 2004, on direct examination, Wilma Peterson falsely testified that plaintiff had knocked out her teeth. (Compl.¶ 13.) On August 5, 2004, Brown alluded to the fact that Ms. Peterson had the "knocked out teeth" repaired with bridge work. (Compl.¶ 14.) Plaintiff shouted out that the alleged injury was broken bridge work and not actually teeth. (Compl.¶ 14A.) The Court then asked Ms. Peterson whether plaintiff broke her teeth or bridge work. (Compl.¶ 14A.) Ms. Peterson responded that it was bridge work which was broken by plaintiff's actions. (Compl.¶ 14A.) The prosecution allegedly failed to elicit a recantation from Ms. Peterson as to her testimony that she lost actual teeth. (Compl.¶ 14B.)

**\*3** On September 2, 2004, after a trial on the charges in the indictment before the court without a jury, plaintiff was convicted of Assault in the Second Degree under Counts 3 and 4, Menacing in the Second Degree under Count 5, Aggravated Criminal Contempt under Count 6, and Criminal Contempt in the First Degree under Count 7. (Compl. at A-2.) Plaintiff was acquitted on the crime of Assault in the First Degree under Count 1, Assault in the Second Degree under Count 2, and Criminal Contempt in the First Degree under Count 8. (Compl. at A-2 and A-3.) The court noted that the basis for acquittal on the Assault in the First Degree charge was the prosecution's failure to establish "serious physical injury," especially in the absence of testimony by a medical expert regarding the victim's condition. *See* September 2, 2004 Decision (Attached to Compl. at A-3) ("While the photographs introduced into evidence by the People did establish that the victim did suffer considerable bruises and a knife wound, these injuries did not rise to the level of serious under the definition found in the Penal Law.").

B. Procedural History

On September 5, 2007, plaintiff filed this complaint alleging malicious prosecution, conspiracy, and deliberate indifference. On January 31, 2007, the Legal Aid defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). On February 1, 2008, the County Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). On May 2, 2008, *pro se* defendant Wilma Peterson filed an answer to the complaint. On May 27, 2008, plaintiff filed an opposition to defendants' motions to dismiss. On June 2, 2008, the Legal Aid defendants filed their reply brief. On June 6, 2008, the County defendants filed their reply brief. On June 22, 2008, Ms. Peterson moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b) (6). On September 2, 2008, plaintiff filed his opposition to Ms. Peterson's motion.

C. Defendant's Motion to Strike

On August 8, 2008, *pro se* plaintiff filed a motion to strike Ms. Peterson's motion to dismiss. In particular, plaintiff objected to the fact that he did not receive copies of certain exhibits that Peterson attempted to file under seal with her motion to dismiss, which the Court declined to accept for filing and returned to the defendant because they were unnecessary for purposes of deciding the motion to dismiss and would not be considered by the Court. For the reasons discussed below, plaintiff's request to strike the motion on such grounds is frivolous.

On July 22, 2008, in connection with her motion to dismiss, *pro se* defendant attempted to file certain exhibits that consisted of medical records, which she requested be placed under seal and not provided to plaintiff. The purpose of these exhibits was to corroborate Ms. Peterson's description in her affidavit of the injuries, which she testified resulted from plaintiff's assault on her, and to explain why she mistakenly described his broken bridge work as her bottom teeth:

> **\*4** The plaintiff did punch me in my mouth, and, as I relived my horrific ordeal during my testimony in front of a second Grand Jury, I mistakenly described my broken bridge work as my bottom teeth. However, I did not conspire with anyone to make any misleading statements. I was only trying to relate the horrible experience of the night the plaintiff assaulted me.

The medical documents the plaintiff made reference to which formed the basis of his complaint against me, also describes the extent of my injuries caused by the brutal acts he committed against me.

For more than three hours, during the plaintiff's assault on me, he repeatedly punched me all over my body, he stabbed me with a meat cleaver and a knife, he bit me on my body, spat in my face and pulled a significant amount of my hair out of my head. He hopped on my broken leg, of which, I was wearing a cast and stabbed my broken leg with a knife and a meat cleaver. Throughout the plaintiff's assault on me, he continuously threatened to cripple me, to blind me, to paralyze me and to kill me.

When the plaintiff punched me in my mouth, he hit me so hard that he indeed broke my bridge work in the bottom of my mouth which also cut a large gash inside my bottom lip and punctured a hole in my bottom lip. As to date, I continue to suffer from nerve damage in my bottom lip. I have a permanent two and a half inch scar inside my bottom lip and a scar outside of my bottom lip from the punctured hole.

I have bruises all over my body. I had to see an optometrist for treatment of trauma to my eye. I have permanent scars on my forehead, hands and left leg. I continue to suffer from nerve damage in my left leg where he stabbed me with a knife. The plaintiff kicked me, very hard, in my lower back, thus, exacerbating a prior injury to my lower back that the plaintiff was aware of before he assaulted me. I now have facet damage in my lower back. And I am in constant pain.

(Peterson Affidavit, at 2-3) (citations omitted).

On July 22, 2008, the Court issued an order declining to accept these medical exhibits because the Court, for purposes of a motion to dismiss under Rule 12(b)(6), must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). Thus, "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). Given this standard, the Court explained in the July 22 Order:

> In the instant case, under this standard, the Court may not consider these medical records in connection with the motion to dismiss; rather, the

Court will determine whether the allegations in the complaint state a legal claim against the defendant. In other words, consideration of these medical exhibits is unnecessary for purposes of deciding the motion. Therefore, the Court is declining to accept these exhibits at this time and the Clerk of the Court shall return them to plaintiff. Because Exhibits C-G are not being accepted or considered by the Court, her application to have the records sealed is moot and defendant need not serve such exhibits on defendant.

**\*5**  (July 22, 2008 Order, at 1-2.)

Although plaintiff contends in his motion to strike that he cannot reply to defendant's submission without such exhibits, that argument is frivolous. As noted above, the Court has assumed his allegations in the complaint to be true and has not considered these exhibits. In fact, that is the reason the Court declined to accept them. Moreover, none of the factual information contained in Ms. Peterson's affidavit, and recited above, is pertinent to the legal issues in the motion to dismiss. Specifically, the primary issues, as discussed *infra,* based upon the allegations in the complaint, are (1) whether the private actor defendants (namely, Ms. Peterson and plaintiff's court-appointed attorneys) can be sued under Section 1983, and (2) whether the prosecutors have absolute immunity. The nature and extent of Ms. Peterson's injuries, as well as any medical records corroborating such injuries, have no relevance to the consideration of these legal issues. There is no basis to require Ms. Peterson to supply these materials to plaintiff, and unnecessarily reveal private medical information, where the Court rejected them for filing because they have no relevance at the motion to dismiss stage in determining whether plaintiff has a plausible Section 1983 claim. Therefore, plaintiff's motion to strike the defendant's motion was denied on August 21, 2008, and he was directed to file his opposition by September 15, 2008, which plaintiff did do.

D. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic,* 127 S.Ct. at 1974. The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.*

Moreover, as the Second Circuit recently emphasized in *Sealed Plaintiff v. Sealed Defendant,* "[o]n occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.... This obligation entails, at the very least, a permissive application of the rules governing theform of pleadings.... This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated. Accordingly, the dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Sealed Plaintiff v. Sealed Defendant,* No. 06-1590-cv, 2008 U.S.App. LEXIS 17113, at \* 15-\* 16 (2d Cir. Aug. 12, 2008) (citations and quotation marks omitted); *see also Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (holding that when plaintiff is appearing *pro se,* the Court shall " 'construe [his complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' ") (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)); *accord Sharpe v. Conole,* 386 F.3d 483, 484 (2d Cir.2004).

**\*6**  Finally, in connection with a motion to dismiss under Rule 12(b) (6), as noted above, the Court may only consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis,* 421 F.3d at 100; *accord Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991). Here, plaintiff appended certain documents to his complaint and the Court has confined its review to the face of the complaint and the documents attached thereto by plaintiff.

II. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir.2003) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996) (false arrest) and citing Conway v. Vill. of Mount Kisco, 750 F.2d 205, 214 (2d Cir.1984) (malicious prosecution)).

A. The Legal Aid Attorneys and Ms. Peterson
Plaintiff asserts Section 1983 claims against (1) Ms. Peterson based upon her allegedly false testimony in connection with his criminal case; and (2) his Legal Aid Attorneys for their alleged failure to adequately represent him in connection with his initial indictment. As discussed below, the Section 1983 claims against these defendants fail as a matter of law because (1) none of these defendants are state actors; and (2) plaintiff's conclusory allegations of conspiracy between these defendants and state actors cannot withstand a motion to dismiss. [1]

(1) State Action Requirement

An individual acts under color of state law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Polk County v. Dodson, 454 U.S. 312, 317-38 (1981) (quoting United States v. Classic, 313 U.S. 299 (1941)). Thus, a deprivation of a federal statutory or Constitutional right is actionable under Section 1983 when such deprivation is caused "by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). Under this standard, "generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." West, 487 U.S. at 50.

*7 In the instant case, it is clear from the allegations of the complaint that neither Ms. Peterson who was the alleged victim of the assault that was the subject of plaintiff's criminal trial, nor the Legal Aid Attorneys who represented plaintiff in the pre-trial stage, are state actors. With respect to his Legal Aid Attorneys, it is axiomatic that a "public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." Polk County v. Dodson, 454 U.S. at 325; see also Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir.2000) ( "[A] legal aid society ordinarily is not a state actor amenable to suit under § 1983.") (citations omitted); Rodriguez v. Weprin, 116 F.3d 62, 65-66 (2d Cir.1997) (affirming dismissal of Section 1983 claim against court-appointed appellate attorney for alleged involvement in denial of speedy appeal and noting that "it is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983") (collecting cases); Housand v. Heiman, 594 F.2d 923, 924-25 (2d Cir.1979) ("[P]ublic defenders or court-appointed defense attorneys do not 'act under color of law.' "); Sanchez v. Gazzillo, No. 00-CV-6405 (JS)(MLO), 2001 U.S. Dist. LEXIS 7786, at * 17 (E.D.N.Y. June 5, 2001) (dismissing Section 1983 claim against plaintiff's Legal Aidattorneys). Similarly, with respect to Ms. Peterson, the fact that plaintiff alleges that she perjured herself as a witness at his trial does not transform her into a state actor. See, e.g., Elmasri v. England, 111 F.Supp.2d 212, 221 (E.D.N.Y.2000) ("[T]he mere fact that an individual testifies at a court proceeding does not render that person a state actor.") (citing Briscoe, 460 U.S. at 329-30); see also Mitchell v. Mid-Erie Counseling Service, No. 05-CV6169 CJS(P), 2005 WL 1579810, at *3 (W.D.N.Y. June 29, 2005) (" 'A witness testifying in a state court proceeding-even if [she] is a state employee who has perjured [herself]-has not acted under color of state law for purposes of § 1983.' ") (quoting McArthur v. Bell, 788 F.Supp. 706, 710 (E.D .N.Y.1992)).

Although these individuals are clearly not state actors, the Court recognizes that a private actor can be considered as acting under the color of state law for purposes of Section 1983 if the private actor was " 'a willful participant in joint activity with the State or its agents.' " See Ciambriello, 292 F.3d at 324 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)) (citation

omitted). This potential liability also applies to a court-appointed attorney where the attorney "conspires with a state official to violate the plaintiff's constitutional rights." *Fisk v. Letterman,* 401 F.Supp.2d 362, 378 (S.D.N.Y.2005). Thus, the Court will next examine plaintiff's conspiracy claim to determine whether the allegations are sufficient to survive a motion to dismiss.

### (2) Conspiracy Pursuant to § 1983

**\*8** The plaintiff alleges that "all of the defendants ... acted in collusion with the Suffolk County District Attorney's Office and thereby *UNDER COLOR OF STATE LAW* to violate my Federal and State 4th, 5th, 6th and 14th Amendment Constitutional Rights of The Accused." Specifically plaintiff alleges that the Legal Aid defendants conspired with the County Defendants, Bray, and Ms. Peterson to: (1) prevent him from testifying before a grand jury;

(2) deny him effective assistance of counsel; and charge him with additional, higher counts.

The mere use of the term "conspiracy" or "collusion" does not instantly transform a private actor into a state actor for purposes of Section 1983 and is clearly insufficient to satisfy Rule 12(b) (6) in connection with a Section 1983 conspiracy claim. *See Ciambriello,* 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."). Instead, "[i]n order to survive a motion to dismiss on a § 1983 conspiracy claim, the plaintiff must allege (1) an agreement between two or more state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Carmody v. City of New York,* No. 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 25308, at \*16 (S.D.N.Y. May 11, 2006) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-35 (2d Cir.2002)). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *See Ciambriello,* 292 F.3d at 325 (dismissing conspiracy allegations where they were found "strictly conclusory"); *see also Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983.") (citing *Ciambriello); Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.");

*Green v. Bartek,* No. 3:05-CV-1851, 2007 WL 4322780, at \*3 (D.Conn. Dec. 7, 2007) ("The Second Circuit has consistently held that a claim of conspiracy to violate civil rights requires more than general allegations.").

The need to guard against the use of conclusory allegations of conspiracy in the context of Section 1983 lawsuits against private actors is particularly compelling. If a plaintiff could overcome a motion to dismiss simply by alleging in a conclusory fashion a "conspiracy" between private actors and state actors, these private actors-including lawyers and witnesses-would be subjected to the substantial cost and disruption incurred by litigants in the discovery phase of these lawsuits, without any indication whatsoever that the plaintiff has a "plausible" conspiracy claim. As the Second Circuit has emphasized, these conspiracy claims are "so easily made and can precipitate such protracted proceedings with such disruption of governmental functions" that "detailed fact pleading is required to withstand a motion to dismiss" them. *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir.1981).

**\*9** As discussed below, the complaint does not contain any specific allegations supporting a "plausible" conspiracy claim involving these private actors and the County Defendants. *Pro se* plaintiff's complaint is nothing more than a compendium of conclusory, vague, and general allegations of a conspiracy to deprive him of constitutional rights. "Diffuse expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer v. Aronwald,* 567 F.2d 55, 533 (2d Cir.1997). Of course, the Court recognizes that "[a plaintiff is not required to list the place and date of defendant[']s meetings and the summary of their conversations when he pleads conspiracy, ... but the pleadings must present facts tending to show agreement and concerted action." *Fisk v. Letterman,* 401 F.Supp.2d 362, 376 (S.D.N.Y.2005) (report and recommendation), accepted in part, rejected by, in part, *Fisk v. Letterman,* 401 F.Supp.2d 362 (S.D.N.Y.2005) (citations and quotations omitted). As the Supreme Court recently articulated in *Bell Atlantic Corp. v. Twombly,* although a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be "enough to raise a right to relief above the speculative level." 127 S.Ct. at 1965.

### i. Wilma Peterson

Plaintiff alleges that Ms. Peterson participated in the malicious prosecution against him by providing false

testimony to the second grand jury and at trial that plaintiff had broke her bottom teeth. Moreover, plaintiff alleges that the defendant prosecutors were complicit in that perjury because the defendant prosecutors failed to correct the testimony. Nowhere in the complaint does plaintiff specifically assert that an explicit, or even implicit, agreement existed between Ms. Peterson and the defendant prosecutors to enter into a conspiracy. *See Ciambriello,* 292 F.3d at 324 (dismissing Section 1983 conspiracy claim because "[a]bsent from [plaintiff's] complaint are any factual allegations suggesting that [the private actor defendant] conspired with the County"). Plaintiff simply relies on vague and conclusory allegations to imply that Ms. Peterson conspired with the defendant prosecutors. The mere allegation that Ms. Peterson committed perjury regarding damage to her teeth, and the prosecutor's alleged failure to correct such testimony, is insufficient to support a conspiracy claim. *See, e.g .,* *Rzayeva v. United States,* 492 F.Supp.2d 60 (D.Conn.2007) ("Plaintiffs' vague and conclusory allegations against private 'conspirators' are entirely unclear, unsupported by facts, and insufficient to substantiate their claims."); *Fiske,* 401 F.Supp.2d at 377 ("Communications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor."); *see also Marion v. Groh,* 954 F.Supp. 39, 43 (D.Conn.1997) (dismissing Section 1983 claim against a private citizen who testified against plaintiff at criminal trial where plaintiff made only generalized conspiracy allegations). Accordingly, plaintiff's claims of conspiracy regarding Ms. Peterson must be dismissed.

### ii. Legal Aid Defendants

**\*10** Plaintiff alleges that the Legal Aid defendants engaged in numerous conspiracies with the other defendants which include: (1) denying plaintiff his right to counsel; (2) preventing plaintiff from testifying before the grand jury; (3) allowing the defendant prosecutors to "lift" the indictment into the county court; and (4) adding the additional charge of assault in the first degree to the indictment.

Viewing the allegations in the light most favorable to plaintiff, the Court finds that plaintiff has not alleged a conspiracy involving the Legal Aid defendants and any other named party. Plaintiff has failed to articulate any allegations that would suggest that these alleged failures in performance by his attorneys, even if accepted as true, could plausibly support a claim that the Legal Aid defendants were part of

a conspiracy with the County defendants. In fact, plaintiff failed to allege that Legal Aid defendants entered into an explicit or implicit agreement with any other named party to this lawsuit. Moreover, as the Second Circuit has noted, generalized allegations of conspiracy "ring especially hollow" where, as here, the parties alleged to be part of the same conspiracy have an "adversarial relationship." *Ciambriello,* 292 F.3d at 324. Given the complete absence of anything other than conclusory allegations of conspiracy, the Section 1983 claims against his Legal Aid attorneys cannot survive a motion to dismiss. *See also Green v. Bartek,* No. 3:05CV1851 (SRU), 2007 WL 4322780, at *3 (D.Conn. Dec. 7, 2007) (dismissing Section 1983 claim against plaintiff's appointed attorney in Family Court where, "[a]lthough [plaintiff] includes several statements regarding an alleged conspiracy, he includes no facts to support this claim"); *Williams v. Jurow,* No. 05 Civ. 6949(DAB), 2007 WL 5463418, at *12 (S.D.N.Y. June 29, 2007) ("Since plaintiff has alleged no facts that would, even if accepted as true, establish that the Legal Aid Defendants' conduct constituted state action, the constitutional claims against them should be dismissed.") (report and recommendation); *Brewster v. Nassau County,* 349 F.Supp.2d 540, 547 (E.D.N.Y.2004) (dismissing Section 1983 claim against Legal Aid Society where plaintiff alleged in a conclusory fashion that Legal Aid waived his rights and failed to adequately represent him in order to "benefit themselves and/or District Attorney," but did "not actually allege[ ] any facts indicating an agreement to act in concert to harm him"); *Hom v. Brennan,* 304 F.Supp.2d 374, 378-79 (E.D.N.Y.2004) (dismissing Section 1983 claim against supervising attorney with the Nassau-Suffolk Law Services because "plaintiff fails to allege with particularity what the alleged conspiracy is, the purpose of the conspiracy, who was involved in the conspiracy, the existence of an act in furtherance of the conspiracy, or that he was injured as a result of the conspiracy"); *Braxton v. Brown,* No. 96 CV 187, 1997 WL 43525, at *3 (E.D.N.Y. Jan. 28, 1997) ("Nothwithstanding the latitude afforded a *pro se* complaint, plaintiff fails to allege any facts supporting an inference that the Defense Attorney defendants colluded with the District Attorney defendants. While plaintiff's allegations might support a state law malpractice action against his former defense attorneys, they do not support a federal court's exercise of jurisdiction under Section 1983.").

**\*11** In sum, having failed to sufficiently allege a conspiracy cause of action between Ms. Peterson, the Legal Aid defendants, and any state actor, the Court dismisses the

Section 1983 claim against Ms. Peterson and the Legal Aid defendants. [2]

### (3) Other Defects in Claims against the Legal Aid Defendants

In addition to the legal defects discussed in detail above, there are a number of other grounds set forth by the Legal Aid defendants which independently require dismissal of plaintiff's claims against them as a matter of law.

First, although plaintiff claims that his constitutional rights were violated by the Legal Aid defendants because they failed to ensure his right to appear before the grand jury and testify, it is axiomatic that there is no constitutional right to testify before the grand jury. *See Burwell v. Superintendent of Fishkill Correctional Facility,* No. 06 Civ. 787(JFK), 2008 WL 2704319, at *8 (S.D.N.Y. July 10, 2008) ("[T]here is no federal constitutional right to testify before the grand jury. In fact, there is no federal right to a grand jury in state criminal prosecutions."); *Affser v. Murray,* No. 04 CV 2715, 2008 WL 2909367, at *7 (E.D.N.Y. July 28, 2008) ("[C]ounsel's alleged failure to secure petitioner's presence before the grand jury does not constitute ineffective assistance") (collecting cases). Thus, any claimed deprivation of such a right is not actionable under Section 1983. *See Frankos v. LaVallee,* 535 F.2d 1346, 1348 n. 3 (2d Cir.1976) ("The complaint alleges that appellees successfully conspired to prevent appellant from testifying at a grand jury investigation of the prison stabbing and that attorney Wylie was incompetent in handling plaintiff's request to testify there. Since one must allege deprivation of a constitutional right under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, and there is no claim that there is a constitutional right to testify at a grand jury proceeding, the judgment of dismissal of these claims for relief is affirmed for lack of subject matter jurisdiction.").

Second, plaintiff suffered no injury from these alleged deprivations because, as set forth in plaintiff's complaint, the court dismissed the initial indictment and a superseding indictment was presented to a second grand jury during which plaintiff had the opportunity to testify, but refused to do so. (Compl.¶¶ 6(D), 8.) To the extent that plaintiff complains about the charges presented to the second grand jury or about his criminal trial, it is clear that he has no plausible claim for any such allegations against the Legal Aid defendants because they were replaced as his attorneys prior to the presentation of the superseding indictment to the second grand jury.

Third, plaintiff was convicted of all of the charges that were the subject of the initial indictment, which he claimed was the result of ineffective and unconstitutional conduct by the Legal Aid defendants. According to the complaint, the additional higher count of assault in the first degree was only contained in the second grand jury, at a time when he was no longer represented by the Legal Aid defendants. (Compl.¶ 9.) Therefore, any malicious prosecution claims, including any malicious prosecution conspiracy, against the Legal Aid defendants related to the charges in the first indictment are barred by Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994). [3]

**\*12** Finally, even assuming *arguendo* that some Section 1983 claim could exist based solely on the alleged ineffective conduct by the Legal Aid defendants, it would be time-barred. With respect to Section 1983 and 1985 claims, federal courts generally apply the forum state's statute of limitations for personal injury claims, which is three years in the State of New York. *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) ( Section 1983), *cert. denied,* 538 U.S. 922 (2003); *Paige v. Police Dep't of Schenectady,* 264 F.3d 197, 199 n. 2 (2d Cir.2001) (Section 1985). Here, as set forth in the complaint, the Legal Aid defendants ceased representing plaintiff in April 2003. (Compl.¶ 6(D).) Because plaintiff commenced this action on September 5, 2007, more than three years after Legal Aid represented him, the claims against the Legal Aid defendants would be untimely even assuming they existed, which they do not for the other reasons outlined by the Court.

In sum, plaintiff does not have a plausible Section 1983 claim against the private actors-defendants Peterson, Mitchell, Vitale, O'Connor, and Bray-and such claims are dismissed as a matter of law under Rule 12(b)(6).

### B. Absolute Immunity

Plaintiff sues the various County Defendants-DA Spota and ADAs Kevins, Scarglato, and Brown-for allegedly improper conduct (1) in connection with his indictment in the grand jury by conspiring to deny him representation by counsel and to prevent him from testifying before the grand jury; and (2) in connection with his trial by eliciting perjured testimony from witnesses, including Ms. Peterson, and not correcting such testimony. Plaintiff asserts claims against these defendants for malicious prosecution, conspiracy to maliciously prosecute,

and "deliberate indifference" to the fact that his rights were being violated in the above-referenced manners.

Defendants argue that the Court should dismiss plaintiff's claims against DA Spota and ADAs Kevins, Scarglato, and Brown on the grounds of absolute immunity. As set forth below, the Court agrees. It is abundantly clear from a review of the conduct allegedly attributed to these prosecutors that all of the conduct was undertaken in their roles as Assistant District Attorneys (or in Mr. Spota's instance, as District Attorney) during the active prosecution of plaintiff and, thus, they are absolutely immune from a civil suit for damages under Section 1983.

"It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of New York,* 424 F.3d 231, 236 (2d Cir.2005) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 410, 431 (1976) (citation and quotation marks omitted)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.... This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.' " *Deronette v. City of New York,* No. 05-CV-5275, 2007 U.S. Dist. LEXIS 21766, at * 12 (E.D.N.Y. Mar. 27, 2007) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) and quoting *Imbler,* 424 U.S. at 419 n. 13). However, the Second Circuit has held that in the context of a motion to dismiss under Rule 12(b)(6), "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Hill v. City of New York,* 45 F.3d 653, 663 (2d Cir.1995).

**\*13** "In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill,* 45 F.3d at 660 (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct " 'intimately associated with the judicial phase of the criminal process.' " *Fielding v. Tollaksen,* No. 06-5393-cv, 2007 U.S.App. LEXIS 28939, at *3-*4 (2d Cir. Dec. 12, 2007) (quoting *Imbler,* 424 U.S. at 430); *Hill,* 45 F.3d at 661 (same).

In particular, "[s]uch immunity ... extends to acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Smith v. Bodak,* 147 F.3d 91, 94 (2d Cir.1998) (citation and quotation marks omitted). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill,* 45 F.3d at 661; *see also Carbajal v. County of Nassau,* 271 F.Supp.2d 415, 421 (E.D.N.Y.2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest-that is, when he performs functions normally associated with a police investigation-he loses his absolute protection from liability.").

Once a court determines that a prosecutor was acting as an advocate, "a defendant's motivation in performing such advocative functions as deciding to prosecute is irrelevant to the applicability of absolute immunity." *Shmueli,* 424 F.3d at 237 (quoting *Bernard,* 356 F.3d at 502); *see also Kleinman v. Multnomah Cty.,* No. 03-1723-KI, 2004 U.S. Dist. LEXIS 21466, at * 18 (D.Or. Oct. 15, 2004) ("The Ninth Circuit has interpreted *Imbler* to support absolute prosecutorial immunity even when a plaintiff alleges that the prosecutor went forward with a prosecution he believed not to be supported by probable cause.").

Plaintiff claims that defendant prosecutors maliciously commenced a criminal prosecution against plaintiff "through fraud and perjury" and "without probable cause to believe [he] committed the crime." *See* Compl. at 15. Specifically, plaintiff claims that the defendant prosecutors filed a second indictment with the additional charge of first degree assault, as punishment for plaintiff's protestations that he was denied his right to counsel. *See id.* Plaintiff further alleges that this additional charge was added as retribution due to plaintiff's grievances filed against the defendant prosecutors and Judge Ohlig. *See id.* In addition, plaintiff alleges that the defendant prosecutors knowingly elicited false testimony from Ms. Peterson in order to establish the necessary elements for first degree assault. (*See* Compl. at 16.)

**\*14** "It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false." *Urrego v. U.S.,* No. 00 CV 1203, 2005

WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (finding that a prosecutor is entitled to absolute immunity where he was alleged to have presented false evidence in order to obtain a superceding indictment) (citing *Buckley,* 509 U .S. 260; *Hill,* 45 F.3d at 662; *Bernard v. County of Suffolk,* 356 F.3d 495, 505 (2d Cir.2003)); *see also Storck v. Suffolk County Dep't of Social Servs.,* 62 F.Supp.2d 927, 943 (E.D.N.Y.1999) ("A prosecutor is also absolutely immune from charges alleging the withholding of exculpatory evidence from a grand jury and suppressing *Brady* material. An allegation of conspiracy to perform the foregoing acts does not change the conclusion that the acts are entitled to absolute immunity.") (citations omitted). "[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial." *Dory v. Ryan,* 999 F.2d 679 (2d Cir.1993), *as modified at* 25 F.3d 81, 83 (2d Cir.1994). In *Tellier v. Petrillo,* plaintiff alleged that the United States attorneys had "formed a conspiracy to fabricate a new charge, not contained in the original indictment" and had "conspired to present the fabricated evidence to a grand jury in order to obtain a superceding indictment." 133 F.3d 907 (2d Cir.1997.) The Second Circuit affirmed the dismissal of the complaint, noting that the presentation of a superceding indictment was protected by absolute immunity. *Id.* Further, the Second Circuit has specifically held that a prosecutor's determination of which offenses to charge also is protected by absolute immunity. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993).

It is clear that defendant prosecutors' decision to seek a second indictment with the additional charge of first degree assault, as well as any alleged attempt to elicit false testimony from a witness, would be protected by absolute immunity. Similarly, defendants are absolutely immune from suit for any of the wrongful acts alleged in the complaint by plaintiff related to his claim that they presented perjured testimony at trial. Finally, any claim that the prosecutors deprived plaintiff of his right to testify before the first grand jury is also within the ambit of absolute immunity. [4] *See, e.g., Phillips v. Eppolito,* No. 02 Civ. 5662(DLC), 2004 WL 540481, at *2 (S.D.N.Y. March 17, 2004) ("The Complaint asserts that [the ADA] failed to permit [plaintiff] to testify in front of the Grand Jury. The act of failing to permit [plaintiff] to testify before a Grand Jury falls within the scope of activities protected by the doctrine of absolute immunity. Therefore, the claim of malicious prosecution against [the ADA] must be dismissed."); *Braxton v. Brown,* No. 96 CV 187, 1997 WL

43525, at *2 (E.D.N.Y. Jan. 28, 1997) ("Plaintiff's complaint against the District Attorney defendants-that they denied him the right to testify before the Grand Jury-is based on their presentation of a case before the Grand Jury. It therefore falls within the scope of the prosecutors' absolute immunity.").

**\*15** Accordingly, plaintiff's claims against the defendants Spota, Kevins, Scarglato, and Brown are dismissed based on the doctrine of absolute immunity. [5]

### C. Deliberate Indifference

Defendants also move to dismiss the claim for "deliberate indifference" to the alleged violations of his constitutional rights. As a threshold matter, any attempt to assert such a claim against the District Attorney, or the Assistant District Attorneys or Judge Ohlig, must be dismissed based on the doctrine of absolute immunity as described *supra.* Similarly, any attempt to bring such a claim against the private actor defendants-Ms. Peterson, the Legal Aid defendants, or court-appointed attorney Bray-must be dismissed for the reasons outlined *supra.*

With respect to the only remaining defendant, County Executive Steve Levy, there is simply no plausible cause of action under Section 1983. To the extent plaintiff is attempting to sue Mr. Levy in his individual capacity, it is beyond cavil that the County Executive cannot be held responsible for the actions of the independently-elected District Attorney's decision to indict and prosecute a defendant. Similarly, to the extent that Mr. Levy is being sued in his official capacity in an attempt to allege some type of municipal liability against the County, that claim must also fail as a matter of law. A district attorney in New York State, when prosecuting a criminal matter, acts in a quasi-judicial manner and represents the State, not the County. Thus, a county cannot establish policy in connection with how a district attorney should prosecute New York State penal laws. Therefore, no municipal liability can arise from the District Attorney's decision to prosecute. In short, plaintiff has failed to articulate any plausible claim for municipal liability given his allegations in the complaint. Accordingly, the claim against the County Executive and any municipal liability claim must be dismissed as a matter of law.

### D. Leave to Replead

Although plaintiff has not requested leave to amend or replead his complaint, the Court has considered whether plaintiff should be given an opportunity to replead. The Second Circuit has emphasized that

> A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.

*Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quotations and citations omitted). Under Rule 15(a) of the Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, even under this liberal standard, this Court finds that any attempt to amend the pleading in this case would be futile. [6] As discussed in detail *supra,* it is clear from the complaint (as well as plaintiff's detailed submissions in opposition to the motion) that he does not have any possibility of asserting a plausible Section 1983 claim. This lawsuit is a blatant and frivolous attempt to sue private actors-such as the key prosecution witness (Ms. Peterson) and his court-appointed criminal defense attorneys-because he believes that they separately contributed to his indictment and conviction, even though such actors clearly do not have Section 1983 liability given the allegations in plaintiff's complaint. *See, e.g., Contes v. City of New York,* No. 99 Civ. 1597(SAS), 1999 WL 500140, at *11 (S.D.N.Y. July 14, 1999) ("It would be futile to grant leave to replead in this case. Without state action, which is lacking here, [plaintiff] cannot prevail on a claim pursuant to § 1983."). Similarly, plaintiff sues the District Attorney and ADAs even though their alleged wrongful conduct in the grand jury and at trial, which is described in the complaint, is clearly protected by absolute immunity. In essence, plaintiff is primarily seeking to re-litigate issues, via this civil lawsuit, that he unsuccessfully challenged on direct appeal in seeking to have his conviction overturned against parties who have no Section 1983 liability even if the facts alleged in his complaint are true. After carefully reviewing all of plaintiff's submissions, it is abundantly clear that no amendments can cure these pleading deficiencies and any attempt to replead would be futile. *See Cuoco,* 222 F.3d at 112 ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."); *see also Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999) (holding that if a plaintiff cannot demonstrate he is able to amend his complaint "in a manner which would survive dismissal, opportunity to replead is rightfully denied").

### III. CONCLUSION

**\*16** For the foregoing reasons, defendants' motions to dismiss plaintiff's claims are GRANTED in their entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4394681

---

### Footnotes

1   As a threshold matter, there is a substantial question as to whether plaintiff can proceed at all on a malicious prosecution claim for his acquitted counts because they were so closely intertwined with his counts of conviction and are both felonies. The Court recognizes that, in contrast to false arrest claims, the Second Circuit has noted that a conviction on one claim does not necessarily absolve liability under § 1983 for malicious prosecution as to other criminal charges which were resolved favorably to plaintiff. *See Janetka v.*

*Dabe,* 892 F.2d 187, 190 (2d Cir.1989) (holding that claim of malicious prosecution on charge of resisting arrest, of which plaintiff was acquitted, was not barred by his conviction for disorderly conduct); *see also Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir.1991) (highlighting "the need to separately analyze the charges claimed to have been maliciously prosecuted"). Thus, for the same reasons in this case, a conviction on assault in the second degree does not necessarily bar a malicious prosecution claim on assault in the first degree or attempted assault in the first degree; rather, the Court would analyze a number of factors, including the relative seriousness of the two offenses, "whether the elements of each charge are different, whether one charge is a lesser included offense of the other, and whether the alleged actions were directed at different people." *Pichardo v. N.Y. Police Dep't.,* No. 98-CV-429 (DLC), 1998 WL 812049, at *3 (S.D.N.Y. Nov. 18, 1998) (citing *Janetka,* 892 F.2d at 190); *see also Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 335-40 (E.D.N.Y.2006) (discussing factors). Analyzing the various factors in the instant case-including that both crimes are felonies (and thus are both serious crimes), and arose out of the same incident-the Court concludes that the existence of probable cause as to the counts of conviction should preclude a malicious prosecution claim on the acquitted counts. In fact, as the judge who presided over the bench trial noted, the basis for the acquittal on the assault in the first degree (despite the conviction for assault in the second degree) was the prosecution's failure to demonstrate serious injury. Thus, the acquitted charges are "so closely intertwined with the offense of conviction that there is no reasonable basis to conclude that the [dismissal of] these charges is sufficiently distinct to support a claim of malicious prosecution." *Pichardo,* 1998 WL 812049, at *4 (finding conviction on misdemeanor charge precluded malicious prosecution on felony assault count arising out of same incident). In any event, the Court finds that there are numerous other grounds for dismissal of the case, discussed in detail *infra.*

2    Defendant John A. Bray is the court-appointed attorney who replaced the Legal Aid defendants in defending plaintiff in his criminal case. (Compl.¶ 6.) Although defendant Bray has never appeared in this action (and it is unclear whether he was ever served), the Court dismisses the claims against him *sua sponte* because, like the Legal Aid defendants, he is not a state actor. Plaintiff has failed to state a cause of action under Section 1983 against him and plaintiff's claim against Bray, like the other claims in this case, is frivolous. *See, e.g., Liner v. Goord,* 196 F.3d 132, (2d Cir.1999) (holding that district court is authorized to "dismiss the complaint *sua sponte* if, among other things, the complaint is 'frivolous, malicious, or fails to states [sic] a claim upon which relief may be granted' ") (quoting 28 U.S.C. § 1915(a) & (b)(1)).

3    The Legal Aid defendants also note that the plaintiff appealed his conviction and raised all of the identical arguments he now asserts in this civil lawsuit regarding alleged defects in the indictment, malicious prosecution, and ineffective assistance of counsel. The Appellate Division, Second Department denied his appeal and found his arguments were without merit. *See People v. Flores,* 40 A.D. 876, 878 (2d Dep't 2007) ("The defendant's remaining contentions, including those raised in his supplemental pro se brief, that the indictment was defective, that he was maliciously prosecuted, and that he was deprived of the effective assistance of counsel, are without merit."). The Court of Appeals also denied Flores leave to appeal. *See People v. Flores,* 9 N.Y .3d 875 (2007).

4    To the extent that plaintiff is attempting to argue that absolute immunity should not apply because of some conspiracy between the County Defendants and private actors (such as the Legal Aid defendants and Ms. Peterson), that claim also fails for the reasons discussed in great detail in connection with the Legal Aid defendants and Ms. Peterson. Specifically, plaintiff alleges nothing more than conclusory allegations of conspiracy which are insufficient to survive a motion to dismiss.

5    Plaintiff also alleges that Judge Ohlig conspired with the Legal Aid defendants and the defendant prosecutors to maliciously prosecute the plaintiff. Although Judge Ohlig has failed to appear in the case, the Court, *sua sponte,* finds that Judge Ohlig is entitled to absolute immunity. "A judge defending against a section 1983 suit is entitled to absolute immunity from damages for actions performed in his judicial capacity." *Fields v.*

*Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990). Where a judge is acting in a judicial capacity, no liability exists even if the judicial action "was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 356-57 (1978). "[F]undamentally, since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *Dorman v. Higgins,* 821 F.2d 133, 139 (2d Cir.1987). Plaintiff alleges that the judge failed to rule on plaintiff's motion and back-dated his ruling. Any action taken by Judge Ohlig in connection with rendering a decision or acting upon plaintiff's motion is clearly within the judicial capacity of the court. Accordingly, Judge Ohlig is absolutely immune from suit and plaintiff's claims against Judge Ohlig are dismissed.

6    In reaching this determination, the Court has reviewed all of the plaintiff's submissions, including the documents that he attached to his opposition, all of which confirm the futility of any amendment as to the proposed federal claims.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 67 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

2022 WL 374271
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert MALARCZYK, Plaintiff,

v.

Trooper Eric P. LOVGREN, sued in both their
individual capacity and official capacity as a Trooper
with the New York State Police, Trooper Brian C.
DiPasquale, sued in both their individual capacity
and official capacity as a Trooper with the New York
State Police, and John Doe Officers 1-5, Their true
names and identities presently unknown, acting in both
their Official and Unofficial capacities, Defendants.

1:19-CV-42
|
Signed 02/08/2022

**Attorneys and Law Firms**

OF COUNSEL: THOMAS M. GAMBINO, ESQ., OFFICE
OF THOMAS M. GAMBINO & ASSOCIATES, P.C.,
Attorneys for Plaintiff, 222 Church Street, Poughkeepsie, NY
12601.

HON. LETITIA JAMES, New York State Attorney General,
OF COUNSEL: MARK G. MITCHELL, ESQ., Ass't
Attorney General, Attorneys for Defendants, The Capitol,
Albany, NY 12224.

**MEMORANDUM-DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 **\*1** On January 11, 2019, plaintiff Robert Malarczyk
("Malarczyk" or "plaintiff") filed this 42 U.S.C. § 1983
action against defendants New York State Police Trooper
Eric P. Lovgren ("Trooper Lovgren"), New York State
Police Trooper Brian C. DiPasquale ("Trooper DiPasquale"),
and John Doe Officers 1-5 (the "Does"). According to
the thirteen-count complaint, Trooper Lovgren and Trooper
DiPasquale (collectively "defendants") violated Malarczyk's
civil rights by, *inter alia*, conspiring to arrest him. Dkt. No. 1.

On May 20, 2021, defendants moved for summary judgment
under Federal Rule of Civil Procedure ("Rule") 56. Dkt.

No. 27. Plaintiff has opposed and cross-moved for summary
judgment in his own favor. Dkt. No. 29. The motions are fully
briefed and will be decided on the basis of the submissions
without oral argument.

**II. BACKGROUND**

On September 26, 2016, Trooper DiPasquale finished his shift
on duty as a New York State Trooper, clocked out, and left the
State Police barracks in his personal vehicle. *See* Defs.' Facts,
Dkt. No. 27-15 ¶ 1. As he drove westbound on State Route
299 in the Town of Lloyd, he saw a vehicle—a blue Mercury
Mountaineer—parked in a driveway close to the road. *Id.* ¶
2. According to Trooper DiPasquale, he saw the driver of
the blue Mercury make a gesture that "appeared to be him
possibly smoking a bowl" of marijuana. *Id.* ¶ 3.

Trooper DiPasquale pulled over to the side of the road to see
what the driver of the blue Mercury would do next. Defs.'
Facts ¶ 4. According to Trooper DiPasquale, the blue Mercury
pulled onto State Route 299, drove through "a steady red
light" without braking, and then turned abruptly onto New
Paltz Road "without signaling, crossing the center line[,] and
driving off the roadway onto a dirt patch before reentering the
roadway." *Id.* ¶¶ 5–6.

Although he was off duty, Trooper DiPasquale decided to
follow the blue Mercury because of its erratic behavior and
the possibility that the driver was intoxicated from recent drug
use. Defs.' Facts ¶ 7. Trooper DiPasquale also called 911 to
make a report. *Id.* According to Trooper DiPasquale, the blue
Mercury continued to drive in an erratic or dangerous manner
—he observed it cross over the center line multiple times. *Id.*
¶ 8. Eventually, after traveling some distance down the road,
the blue Mercury turned into a driveway on Tracy Road and
came to a stop. *Id.* ¶ 9.

Trooper DiPasquale parked his personal vehicle behind the
blue Mercury, got out, and approached on foot. Defs.' Facts
¶ 10. He observed a man—later identified as Malarczyk—
sitting in the driver's seat and a female in the front passenger
seat. *Id.* ¶ 11. Although Trooper DiPasquale did not recognize
plaintiff, he did know the passenger: Monika Giaculli. *Id.* ¶¶
12–13. As Trooper DiPasquale explains, he recognized Ms.
Giaculli because "he had responded to prior 911 calls at her
residence involving domestic disputes with her mother." *Id.*
¶ 13.

Trooper DiPasquale showed his State Police shield and
ID card, identified himself as a police officer, and asked

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 68 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

Malarczyk why he was driving erratically. Defs.' Facts ¶ 14. In response, plaintiff opened the driver's door and exited the blue Mercury. *Id.* ¶ 15. As plaintiff did so, "a beer can fell out of the driver's side door onto the ground." *Id.* "Beer spilled out of the can onto the driveway." *Id.* ¶ 16. "Plaintiff immediately picked up the can and threw it into the woods near a garbage can." *Id.* ¶ 17.

**\*2**  In the meantime, fellow New York State Trooper Lovgren had received a call through the 911 dispatcher about Trooper DiPasquale's report of an erratic vehicle. Defs.' Facts ¶ 18. Trooper Lovgren—who was on duty in full uniform and driving a marked police vehicle—responded to the call and arrived at the Tracy Road location at about 4:35 p.m. *Id.* ¶¶ 19–20.

Upon his arrival at the scene, Trooper Lovgren talked to Trooper DiPasquale. Defs.' Facts ¶ 21. Trooper DiPasquale described to Lovgren his observations, including the erratic behavior of the blue Mercury and that he saw a beer can fall out of the driver's door when Malarczyk exited the vehicle to speak with him. *Id.* Trooper DiPasquale also explained to Lovgren how plaintiff had tossed the beer can into the woods nearby. *Id.*

Next, Trooper Lovgren talked to Malarczyk. Defs.' Facts ¶ 22. Plaintiff identified himself and confirmed that he had just driven the blue Mercury from nearby New Paltz. *Id.* ¶ 23. According to Trooper Lovgren, plaintiff "had bloodshot, glassy eyes and the odor of alcohol on his breath." *Id.* ¶ 24. Trooper Lovgren also observed the beer can that plaintiff had thrown away nearby. *Id.* ¶ 27.

Based on the information he had received from Trooper DiPasquale and his own observations made at the scene, Trooper Lovgren asked Malarczyk to perform some field sobriety tests. Defs.' Facts ¶ 25. Plaintiff refused these requests. *Id.* ¶¶ 25–26. Trooper Lovgren handcuffed plaintiff and drove him to the police station. *Id.* ¶ 28.

At the police station, beginning at about 5:08 p.m., Trooper Lovgren asked Malarczyk on at least three occasions to submit to a chemical test to determine the alcohol and/or drug content of his blood and warned him that his refusal to participate in the test would result in the immediate suspension of his driver's license. *See* Defs.' Facts ¶¶ 29–32. Plaintiff refused each of these requests. *Id.* ¶ 32.

Thereafter, Malarczyk was transported to the Town of Lloyd Court where he was arraigned on four traffic charges: (1) driving while intoxicated; (2) passing a red light; (3) consumption or possession of alcoholic beverages in a motor vehicle; and (4) moving from a lane unsafely. Defs.' Facts ¶ 34. After the arraignment, plaintiff was released. *Id.* ¶ 35. He did not spend time in jail and he was not required to post bond. *Id.* ¶ 36.

On October 24, 2016, the New York State Department of Motor Vehicles ("DMV") held an administrative hearing to determine whether Malarczyk's driving privileges should be revoked as a result of, *inter alia*, his refusal to submit to the chemical test in connection with his arrest on suspicion of driving while intoxicated. Defs.' Facts ¶ 37.

Malarczyk, represented by attorney Daniel Miller, appeared at the DMV hearing. Defs.' Facts ¶ 38. Plaintiff chose not to testify. *Id.* ¶ 41. However, the administrative law judge ("ALJ") did hear testimony from Trooper Lovgren and Trooper DiPasquale about the traffic stop. *Id.* ¶ 39. Plaintiff's attorney also cross-examined both officers while they were under oath. *Id.* After considering the officers' testimony and other evidence, the ALJ revoked plaintiff's driving privileges. *Id.* ¶ 43.

On August 8, 2018, the traffic charges that remained pending against Malarczyk proceeded to a jury trial in the Town of Lloyd Justice Court. Defs.' Facts ¶ 50. Plaintiff was acquitted. *Id.* ¶ 53. This action followed.

### III. LEGAL STANDARD

**\*3**  The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

Case 3:23-cv-01099-GTS-ML   Document 32   Filed 04/29/25   Page 69 of 183

movant'] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up). "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*

## IV. DISCUSSION

Malarczyk's complaint enumerates thirteen different claims under federal and state law. Dkt. No. 1. Plaintiff asserts federal claims for conspiracy (Counts One and Seven), excessive force (Count Two), false arrest (Count Three), failure to intervene (Count Four), malicious prosecution (also Count Three), supervisory liability (also Count Four), violation of his right to free association (Counts Five and Six), and unlawful search of his person and property (also Counts Five and Six). *Id.* Plaintiff also asserts state law claims sounding in negligence (Count Eight), supervisory liability (Count Nine), assault and battery (Count Ten), false imprisonment (Count Eleven), a *prima facie* tort (Count Twelve), and defamation (Count Thirteen). Plaintiff demands $1 million in compensatory damages and more than $2 million in punitive damages. *Id.*

As an initial matter, however, there are four issues to be addressed.

### A. The Does

First, Malarczyk's claims against the Does must be dismissed. Although the complaint lists "John Doe Officers 1-5" as named defendants in this action, plaintiff "never identified or served" these Does before the close of discovery. Defs.' Mem., Dkt. No. 27-16 at 10 n.5. [1] Nor are these defendants mentioned in plaintiff's opposition and cross-motion. *See generally* Pl.'s Mem., Dkt. No. 29-1.

"Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of N.Y.*, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010).

That is precisely the scenario presented in this action. Accordingly, the Does will be dismissed without prejudice. *Kenney v. Clay*, 172 F. Supp. 3d 628, 642 (N.D.N.Y. 2016) ("John Does 1–5 are dismissed from the case for failure to prosecute, as plaintiff did not identify the John Doe defendants by the end of discovery.").

### B. Official-Capacity Claims under § 1983

*4 Second, Malarczyk's § 1983 official-capacity claims against Trooper Lovgren and Trooper DiPasquale must be dismissed. Although the complaint asserts claims for money damages against these two defendants "in both their individual capacity and their official capacity," it is beyond cavil that an official-capacity claim for money damages under § 1983 is barred by the Eleventh Amendment.

The reason is simple: "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Thus, an official-capacity § 1983 claim against either Trooper-defendant is really a § 1983 claim against New York State, or perhaps the New York State Police. *See id.* In either case, the real party in interest—the State or the State Police—would be immune from § 1983 claims for money damages in federal court. *See, e.g., Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 300 (N.D.N.Y. 2019) (explaining that Eleventh Amendment immunity bars § 1983 money damages claims against New York State and its constituent agencies).

The typical way to evade this immunity bar is to pursue a claim under *Ex parte Young*, which "permits a suit to proceed against an otherwise immune entity if a plaintiff names a state official in his or her official capacity provided the plaintiff (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 360 n.6 (N.D.N.Y. 2017) (cleaned up).

Although Malarczyk tries to invoke this exception in his opposition and cross-motion, the *ad damnum* clause of his complaint seeks only money damages, not injunctive relief, and his claims allege only completed harms, not ongoing ones. *Compare* Dkt. No. 1 at 16 (seeking money damages), *with* Pl.'s Mem. at 18–19 (citing *Ex parte Young*).

Malarczyk contends that defendants have waived their entitlement to this immunity defense by waiting until the close of discovery to raise it. Pl.'s Opp'n at 17–18. But as defendants correctly point out in reply, they pleaded sovereign immunity

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 70 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

in their answer. Dkt. No. 7 ¶ 24. Nothing more is required. Besides, a party's entitlement to sovereign immunity goes to subject matter jurisdiction, which is not waivable and may be raised at any time by a party or even *sua sponte* by the Court. *Morris*, 268 F. Supp. 3d at 359. Accordingly, the official-capacity § 1983 claims will be dismissed.

### C. Plaintiff's Failure to Comply with Local Rule 56.1

Third, the properly supported material facts set forth in defendants' Local Rule 56.1 Statement will be deemed admitted for the purpose of assessing whether their motion for summary judgment should be granted or denied.

Under this District's Local Rules, the party opposing summary judgment is obligated to file a response to the movant's Statement of Material Facts that "mirror[s] the movant's Statement ... by admitting and/or denying each of the movant's assertions" and, in the case of a denial, setting forth "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b) (2021 ed.).

Malarczyk's counsel did not comply with this Local Rule. [2] *See* Dkt. Nos. 29, 30. This is so even though his other filings demonstrate that he is clearly aware of its importance on summary judgment. *See* Dkt. No. 30 (labeling responsive submission as a "Rule 56.1 Statement" and referring generally to a non-movant's obligation to provide the Court with a "counter-statement of facts to Defendants' motion").

 **\*5** There is no excuse for this mistake. The party-driven procedure for identifying factual disputes that is memorialized in Local Rule 56.1 mirrors the summary judgment practice adopted by every single federal judicial district in the Second Circuit. *See Alke v. Adams*, 2018 WL 5297809, at *2 (N.D.N.Y. Oct. 25, 2018) (collecting citations to local rules).

And even assuming this omission started out as an oversight, defendants promptly pointed out the error in their reply filing. Defs.' Reply, Dkt. No. 31 at 3–4. Plaintiff left it unremedied. Accordingly, the properly supported facts set forth in defendants' Rule 56.1 Statement shall be deemed admitted for the purpose of assessing their motion for summary judgment. N.D.N.Y. L.R. 56.1(b) (permitting Court to "deem admitted any properly supported facts ... that the opposing party does not specifically controvert"); *see also* FED. R. CIV. P. 56(e)(2) (permitting same).

### D. The Facts Set Forth in Plaintiff's Rule 56.1 Statement

As mentioned *supra*, Malarczyk's counsel did submit a document entitled "Rule 56.1 Statement" that purports to serve as a "counter-statement of facts" in response to defendants' motion. Dkt. No. 30. Although this filing makes reference to a supporting "affidavit," plaintiff's "Rule 56.1 Statement" does not actually include any citations to such a document. [3] *See id.* No such "affidavit" has been filed on the Court's electronic docket in connection with this motion practice. *See* Dkt. Nos. 29, 30. And there is no mention of such an "affidavit" in plaintiff's attorney declaration, which describes the exhibits actually being submitted to the Court as part of this motion practice. *See generally* Gambino Decl., Dkt. No. 29-2. Accordingly, the citation-less portions of this "Rule 56.1 Statement" offered by plaintiff will be disregarded for the purpose of resolving this motion practice.

The second half of this "Rule 56.1 Statement" does include some paragraphs that are supported with references to *other* documents that have actually been filed as exhibits with the Court. *See* Pl.'s Facts ¶¶ 33, 36–37, 39–40, 42–45, 47–48. Defendants, for their part, have properly responded to this document in accordance with the Local Rules by admitting or denying each fact offered by plaintiff and, in the case of a denial, citing to relevant portions of the record. Defs.' Resp. to Pl.'s Facts, Dkt. No. 31-1.

Upon review, however, the facts offered by Malarczyk (the ones with citations, at least) turn out to be duplicative of defendants' offering or irrelevant to the issues in this case. For instance, plaintiff makes repeated references to Trooper DiPasquale's 911 call in which he stated to the dispatcher that he had observed plaintiff "lighting a bowl of marijuana" in his vehicle. Pl.'s Facts ¶ 33; *see also id.* ¶ 40.

This appears to be an attempt by Malarczyk to accuse Trooper DiPasquale of overstating his observations to the 911 dispatcher; *i.e.*, did DiPasquale tell the dispatcher that he definitively saw the driver of the blue Mercury engaged in the consumption of illegal drugs? All he *really* could have seen for sure was physical behavior by the driver consistent with the possible or likely consumption of illegal drugs. *See id.* ¶ 43 (characterizing Trooper DiPasquale's subsequent testimony as "contradictory").

 **\*6** But even assuming Malarczyk's encounter with law enforcement qualified as a *Terry* stop, that stop would not

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 71 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

have begun until Trooper DiPasquale parked his personal vehicle behind the blue Mercury in the Tracy Road driveway. At that point, the combined force of the Trooper's own direct observations—which included the possibility of illegal drug consumption paired with erratic driving and serial violations of the Vehicle & Traffic Law—were already more than sufficient to render it lawful at its inception. *See, e.g., United States v. Conley*, 342 F. Supp. 3d 247, 261 (D. Conn. 2018). ("[T]he standard for an investigatory stop of a vehicle requires reasonable suspicion, not probable cause or a preponderance of the evidence.").

Other facts offered by Malarczyk seem to contextualize the circumstances leading up to, and the ensuing consequences of, his arrest on September 26, 2016. However, these facts are also focused on matters that wind up being irrelevant to the issues in this case. For instance, plaintiff makes repeated references to defendants' interactions with Ms. Giaculli. Pl.'s Facts ¶¶ 37, 39.

But Ms. Giaculli is not a plaintiff in this action. And apart from his § 1983 conspiracy claim, Malarczyk has not articulated how defendants' conduct vis-a-vis Ms. Giaculli is at all relevant to any of his federal claims, which involve alleged infringements of his own constitutional rights. [4] In short, the smattering of non-duplicative, relevant, properly supported facts offered by plaintiff will be considered as part of this motion practice to the extent that they do not specifically controvert the facts deemed admitted for the reasons set forth *supra*.

### E. **Defendants' Motion for Summary Judgment**

Defendants have moved for summary judgment on all of Malarczyk's various claims. According to defendants, plaintiff's § 1983 claims "are either barred by collateral estoppel or fail to support a triable issue of fact." Defs.' Mem. at 4. As for the state law claims, defendants contend that they are time-barred and meritless and that the Court should decline to exercise supplemental jurisdiction over them. *Id.*

#### 1. **False Arrest** (Count Three)

Malarczyk's complaint asserts a § 1983 false arrest claim, which is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

"To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the

plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Jackson v. City of N.Y.*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (citation omitted).

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (quoting *Simpson v. City of N.Y.*, 793 F.3d 259,2 65 (2d Cir. 2015)).

"A police officer has probable cause to arrest when he has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hulett*, 253 F. Supp. 3d at 494 (cleaned up). "The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.' " *Id.* (quoting *Yorzinski v. City of N.Y.*, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016)).

**\*7** As an initial matter, defendants contend that Malarczyk's § 1983 false arrest claim is barred by collateral estoppel. Defs.' Mem. at 12–13. As defendants explain, at the October 2016 DMV hearing the ALJ concluded that plaintiff's driving privileges should be revoked because, *inter alia*, Trooper Lovgren had reasonable grounds to believe that plaintiff was driving while under the influence (and that therefore Trooper Lovgren made a lawful arrest on that basis). *Id.* at 12.

"Under either federal law or New York State law, collateral estoppel, or issue preclusion, bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." *Cayuga Nation v. Tanner*, 448 F. Supp. 3d 217, 234 (N.D.N.Y. 2020) (quoting *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003)), *aff'd*, 6 F.4th 361 (2d Cir. 2021), *cert. denied sub nom., Tanner v. Cayuga Nation*, 2022 WL 89378 (2022) (mem.).

Collateral estoppel "applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Flaherty v. Lang*,

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 72 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

199 F.3d 607, 612 (2d Cir. 1999) (quoting *United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999)).

As relevant here, federal courts "give preclusive effect to a state agency's administrative findings if the state's courts would do the same." *Ferraro v. N.Y. City Dep't of Educ.*, 752 F. App'x 70, 73 (2d Cir. 2018) (summary order); *see also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) (characterizing it as "sound policy to apple principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity"). "New York courts give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005).

Upon review, the October 2016 DMV hearing conducted by the ALJ in accordance with New York Vehicle & Traffic Law ("VTL") § 1194 meets this requirement. Malarczyk, represented by attorney Daniel Miller, appeared at the hearing. Defs.' Facts ¶ 38. Plaintiff did not testify. *Id.* ¶ 41. However, the ALJ did hear testimony from Trooper Lovgren and Trooper DiPasquale about the traffic stop. *Id.* ¶ 39. Ultimately, the ALJ found that defendants had "reasonable grounds" to believe that Malarczyk had been driving unlawfully and that Trooper Lovgren's arrest was "lawful." *Id.* ¶ 43.

In response, Malarczyk contends that the findings of the ALJ at the DMV hearing should not have preclusive effect. Pl.'s Mem. at 11. In plaintiff's view, his later acquittal by a jury on the traffic charges in the Town of Lloyd Justice Court should override the preclusive effect of any quasi-judicial administrative determination. *Id.* According to plaintiff, the proper application of estoppel actually warrants summary judgment in his favor. *Id.*

Upon review, this argument must be rejected because it confuses the relevant estoppel question. "The validity of an arrest does not depend on an ultimate finding of guilt or innocence." *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 435 (S.D.N.Y. 2016); *see also Kandekore v. Comm'r of Motor Vehicles of State*, 1998 WL 150660, at *2 (S.D.N.Y. Mar. 31, 1998) ("[A] jury determination that an offense was not proven beyond a reasonable doubt does not, by itself, imply that an officer did not have a reasonable basis to believe that plaintiff committed the offense.").

**\*8** The relevant issue to be decided for purposes of collateral estoppel is whether probable cause existed for Trooper Lovgren to make an arrest, not whether Malarczyk was ultimately guilty of the one or more of the offenses for which he was charged and later tried. On that more limited issue, the Second Circuit has held that a hearing held pursuant to VTL § 1194 on the issue of probable cause "must be given preclusive effect" in a later § 1983 action. *Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 46 (2d Cir. 1985).

Even assuming otherwise, Malarczyk's § 1983 false arrest claim would still fail because the admitted facts establish probable cause. [5] Trooper DiPasquale directly observed plaintiff driving erratically; *i.e.*, he saw plaintiff drive through a "steady red light" without braking, turn abruptly "without signaling," "cross[ ] the center line" multiple times, and even "driv[e] off the roadway onto a dirt patch." Defs.' Facts ¶¶ 5–6, 8. Trooper DiPasquale also directly observed behavior consistent with drug and/or alcohol consumption; *i.e.*, he saw plaintiff make a gesture that "appeared to be him possibly smoking a bowl" of marijuana and later, saw an open can of beer spill out of the driver's door and onto the ground. *Id.* ¶¶ 3, 16.

Trooper DiPasquale shared all of this information with Trooper Lovgren when he arrived on the scene. Defs.' Facts ¶ 21. Trooper Lovgren was entitled to rely on this information in assessing probable cause. [6] *See, e.g.*, *Cordero v. City of N.Y.*, 282 F. Supp. 3d 549, 561 (E.D.N.Y. 2017) ("The fellow officer rule, also known as the collective knowledge doctrine, allows one officer to make an arrest based on an instruction or information passed from one officer to another."). Trooper Lovgren was also entitled to rely on his own direct observations, which included the fact that plaintiff confirmed he had just driven the blue Mercury from nearby New Paltz and that he "had bloodshot, glassy eyes and the odor of alcohol on his breath." *Id.* ¶¶ 23–24.

In short, Trooper Lovgren had probable cause to arrest Malarczyk for driving while intoxicated in violation of VTL § 1192(3). [7] *Macshane v. City of N.Y.*, 2015 WL 1298423, at *23 (E.D.N.Y. Mar. 23, 2015) (concluding probable cause existed on charge of driving while intoxicated where arresting officer knew plaintiff had been driving that evening and "smelled alcohol" on his breath). Accordingly, plaintiff's § 1983 false arrest claim must be dismissed.

**2. Excessive Force** (Count Two)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 73 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

**\*9** Malarczyk's complaint asserts a § 1983 excessive force claim. "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).

To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Id.*

This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy*, 634 F.3d at 96).

Thus, review of an excessive force claim is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).

"Importantly, a court must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up). "In so doing, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, or other exigent circumstances." *Id.*

Upon review, defendants are entitled to summary judgment on this claim. Malarczyk concedes that he was not "beaten" or otherwise injured by defendants. Pl.'s Mem. at 11. Instead, plaintiff argues that simply being "handcuffed, placed in a patrol vehicle and transported to a police barracks where he was chained to a bench" is sufficient to sustain this claim. *Id.* In plaintiff's view, the arrest itself was unlawful and therefore

any use of force to effect it—no matter how slight—was also unlawful. *Id.*

As discussed *supra*, probable cause existed to arrest Malarczyk for driving while intoxicated. So while it is "impermissible to use significant force against a restrained arrestee who is not actively resisting," *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020), it is also true that "the right to make an arrest accompanies with it the right to use some degree of physical coercion," *Moore v. Keller*, 498 F. Supp. 3d 335, 356 (N.D.N.Y. 2020) (cleaned up). In short, no reasonable jury could find in Malarczyk's favor on this excessive force claim. Accordingly, plaintiff's § 1983 excessive force claim must be dismissed.

### 3. **Malicious Prosecution** (Count Three)

**\*10** Malarczyk's complaint asserts a § 1983 malicious prosecution claim. "The elements of a § 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Moore*, 498 F. Supp. 3d at 357 (cleaned up).

As with false arrest claims, probable cause is a complete defense to a claim of malicious prosecution. *See, e.g.*, *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 536 (S.D.N.Y. 2015). Unlike false arrest claims, however, probable cause must be assessed for each offense charged. *Id.* "Additionally, probable cause is measured at the time of the judicial proceeding, not the time of the arrest, though if it existed at the time of the arrest it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Id. at 537* (cleaned up).

Upon review, defendants are entitled to summary judgment on this claim. The admitted facts establish that Trooper DiPasquale directly observed Malarczyk run a red light (in violation of VTL § 1111(d)(1)), cross the center line and drive in an erratic manner (in violation of VTL § 1128(a)), and possess and/or consume an alcoholic beverage inside of his vehicle (in violation of VTL § 1127(1)).

Trooper DiPasquale shared all of this with Trooper Lovgren, who was entitled to rely on information he received from a fellow officer. Trooper Lovgren also independently observed

Case 3:23-cv-01099-GTS-ML     Document 32     Filed 04/29/25     Page 74 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

that plaintiff "had bloodshot, glassy eyes and the odor of alcohol on his breath" and heard plaintiff admit to him that he had just been driving the vehicle (in violation of VTL § 1192(3)).

These facts—which are undisputed for the purpose of summary judgment—establish probable cause as to each charged offense at the time of arrest, which is presumed to continue to exist through the time of prosecution unless undermined by the discovery of some intervening fact. Although Malarczyk accuses defendants of giving false and/ or contradictory testimony that eventually led the jury to acquit him of these charges, Pl.'s Mem. 8–10, a favorable termination alone does not amount to the kind of "intervening fact" that defeats probable cause. Accordingly, plaintiff's § 1983 malicious prosecution claims will be dismissed.

### 4. First, Fifth, & Fourteenth Amendments (Counts Five and Six)

In Count Five, Malarczyk asserts a § 1983 claim alleging that defendants "deprived Plaintiff of his First and Fourteenth Amendment rights to freely associate with others and to be free from unlawful search and seizure of his personal property." Compl. ¶ 68. In Count Six, plaintiff substantially restates this claim, but with a reference to the Fifth Amendment. Id. ¶ 73.

### i. First Amendment

"The right to free association is 'a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.' " State Emp. Bargaining Agent Coal. v. Rowland, 718 F.3d 126, 132 (2d Cir. 2013) (quoting Shelton v. Tucker, 364 U.S. 479, 485–86 (1960)).

"The Supreme Court has recognized that the freedom of association takes two forms—the right to engage in 'expressive association[s]' and the right to 'associate with others in intimate relationships." Richardson-Holness v. Alexander, 161 F. Supp. 3d 170, 175 (E.D.N.Y. 2015) (quoting Adler v. Pataki, 185 F.3d 35, 42 (2d Cir. 1999)).

**\*11** "The right of expressive association, while not explicitly set forth in the First Amendment, has been deemed essential to preserving First Amendment freedoms of speech, assembly, and petition." Richardson-Holness, 161 F. Supp. 3d at 176. The freedom of intimate association, on the other hand, aims to protect "certain kinds of highly personal relationships from unwanted state interference." Id. (cleaned up).

Broadly construed, Malarczyk has attempted to state the former species of First Amendment claim: a violation of his right to engage in some kind of "expressive association." As plaintiff tries to explain, he has "clearly been denied [the right] to freely associate" because defendants' arrest led to the loss of his ability to "freely travel, work or associate, and den[ied] him of his liberty interest in his driver's license." Pl.'s Mem. at 15.

At the outset, this argument sounds more like a due process challenge to the revocation of Malarczyk's driving privileges than any kind of First Amendment "freedom of association" claim. The viability of plaintiff's claim based on the loss of his driving privileges will be discussed infra. As for plaintiff's "freedom of association" claim, it is clear that he has not marshaled evidence from which a reasonable jury could find in his favor.

First, the admitted facts establish that defendants acted on the basis of probable cause. Cf. Morgan v. Cty. of Nassau, 720 F. Supp 2d 229, 238 (E.D.N.Y. 2010) (holding that probable cause is a complete defense to a First Amendment retaliation claim). Second, aside from Malarczyk's generalized complaints about the collateral consequences of his arrest, there is no indication that plaintiff suffered any particular chill in his speech or expressive activity. Cf. Crown Heights Shomrim Volunteer Safety Patrol, Inc. v. City of N.Y., 2014 WL 4804869, at \*7 (E.D.N.Y. Sept. 25, 2014) (collecting cases dismissing First Amendment association claims where private plaintiffs failed to allege that their speech or association was chilled by defendants' conduct).

"It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall —but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989). Whatever kernel of expression might be found in the facts of this case, no reasonable jury could conclude that defendants violated a First Amendment right attached to it. Accordingly, this claim must be dismissed.

### ii. Fifth Amendment

As noted supra, Malarczyk has also invoked the Fifth Amendment in support of an alleged violation of his right to "be free from unlawful search and seizure of his personal

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 75 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

property." Compl. ¶ 68. Defendants contend that this claim must be dismissed because the Fifth Amendment only applies to the federal government. Defs.' Mem. at 21. In opposition, plaintiff argues that this § 1983 claim is viable because defendants arrested and questioned plaintiff without a *Miranda* warning. Pl.'s Mem. at 15.

Upon review, this claim must be dismissed. As an initial matter, "[t]he Due Process Clause of the Fifth Amendment applies only to actions by the United States government and federal employees." *Solomon v. City of Rochester*, 449 F. Supp. 3d 104, 113 (W.D.N.Y. 2020) (cleaned up). Plaintiff has sued state actors, not federal ones, so any § 1983 claim against them would depend on whether the federal protection plaintiff identifies has been incorporated through the Fourteenth Amendment.

 **\*12** Generally speaking, the Supreme Court has held that the Fourteenth Amendment "secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

And in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a person must be clearly informed of this right before a custodial interrogation. Indeed, *Miranda*'s so-called "exclusionary rule" is understood to "sweep[ ]more broadly" than the substantive protection afforded by the substantive Constitutional provision itself. *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985).

The problem for Malarczyk is that the Second Circuit has explicitly held that a plaintiff cannot sustain a § 1983 claim on this basis. "*Miranda* warnings are a procedural safeguard rather than a right explicitly stated in the Fifth Amendment." *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d Cir. 1995). "The remedy for a *Miranda* violation is the exclusion from evidence of any ensuing self-incriminating statements." *Id.* "The remedy is not a § 1983 action." *Id.* Accordingly, this claim must be dismissed.

### iii. Fourteenth Amendment

Broadly construed, Malarczyk's complaint asserts a due process challenge to the loss of his driving privileges. *See* Pl.'s Mem. at 15 (complaining about defendants' alleged misconduct at the administrative hearing).

The Due Process Clause of the Fourteenth Amendment protects procedural and substantive rights. [8] *Page v. Cuomo*, 478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020). "Procedural due process requires that 'a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " *Ceja v. Vacca*, 503 F. App'x 20, 22 (2d Cir. 2012) (summary order) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).

As relevant here, "[i]t is well established that a driver's license is a substantial property interest that may not be deprived without due process of law." *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 303 (N.D.N.Y. 2019) (quoting *Pringle v. Wolfe*, 88 N.Y.2d 426 (1996)); *see also Gudema v. Nassau Cty.*, 163 F.3d 717, 724 (2d Cir. 1998) (holding that a driver's license is a state-created privilege that cannot be revoked without procedural due process).

Importantly, however, "Article 78 of the New York Civil Practice Law, an amalgam of the common law writs of certiorari to review, mandamus, and prohibition," *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 881 (2d Cir. 1996), "provides the mechanism for challenging a specific decision of a state administrative agency," *Campo v. N.Y. City Emp. Ret. Sys.*, 843 F.2d 96, 101 (2d Cir. 1988).

 **\*13** Thus, "courts have repeatedly held that the availability of an Article 78 proceeding to challenge the allegedly unlawful or improper revocation or suspension of a driver's license, with or without pre-deprivation notice or a hearing, typically constitutes an adequate procedural remedy." *Forjone*, 414 F. Supp. 3d at 303–04.

There is no dispute that Malarczyk, represented by counsel, participated fully in the DMV's administrative hearing to determine whether or not his driving privileges should be revoked. To the extent plaintiff seeks to challenge the outcome of that proceeding, his remedy lies in state court. *See, e.g.*, *Rubin v. Swartz*, 2011 WL 2014838, at \*2 (E.D.N.Y. Mar. 18, 2011) (rejecting § 1983 procedural due process claim because "the proper forum for [plaintiff's] claim that Defendants unlawfully suspended his driver's license without notice is an Article 78 proceeding in New York State Supreme Court"). Accordingly, this claim must be dismissed.

### 5. Failure to Intervene (Count Four)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 76 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

Malarczyk's complaint asserts a § 1983 failure-to-intervene claim. [9] "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Jackson v. Tellado*, 295 F. Supp. 3d 164, 173–74 (E.D.N.Y. 2018).

However, "[a] plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying constitutional violation." *Kayo v. Mertz*, 531 F. Supp. 3d 774, 799 (S.D.N.Y. 2021). Because plaintiff's § 1983 claims for false arrest, excessive force, malicious prosecution, freedom of association, failure to give a *Miranda* warning, and procedural due process have been dismissed, plaintiff cannot sustain a claim under any "failure to intervene" theory. *Id.* Accordingly, this claim must be dismissed.

### 6. **Supervisory Liability** (Count Four)

Malarczyk's complaint asserts a § 1983 supervisory liability claim. "[A] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (cleaned up) (clarifying the "personal involvement" requirement that applies in the context of a § 1983 supervisory liability claim).

Upon review, this claim fails for the same reason set forth *supra*. Because Malarczyk's § 1983 claims for false arrest, excessive force, malicious prosecution, freedom of association, failure to give a *Miranda* warning, and procedural due process have been dismissed, he cannot sustain a claim for supervisory liability. *See, e.g., Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016) (summary order) ("Because there is no underlying constitutional violation, [the] supervisory liability claim also fails."). Accordingly, this claim must be dismissed.

### 7. **Conspiracy** (Counts One and Seven)

Malarczyk's complaint asserts a § 1983 conspiracy claim. [10] According to plaintiff, this claim is viable because defendants "communicated with each other, formed a plan, [and] unlawfully arrested the Plaintiff and caused damages to him." Pl.'s Mem. at 13. In plaintiff's view, Trooper DiPasquale only

followed plaintiff because he recognized Ms. Giaculli, who was dating one of DiPasquale's friends at the same time. *Id.*

**\*14** "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

Upon review, defendants are entitled to summary judgment on this claim. As an initial matter, under the "intracorporate conspiracy doctrine" employees of a single corporate entity are legally incapable of conspiring together. *See, e.g., Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013). This rule extends to § 1983 claims against police departments and law enforcement officers. *Towns v. Stannard*, 2017 WL 11476416, at *4 (N.D.N.Y. Dec. 20, 2017) (Sannes, J.).

Malarczyk cannot reasonably dispute that it is within the scope of their employment for New York State Police troopers to apprehend motorists who violate the VTL. Nor has he attempted to do so. Instead, plaintiff argues that defendants were motivated by an improper purpose unrelated to their work with the State Police. According to plaintiff, Trooper DiPasquale only followed plaintiff because he recognized Ms. Giaculli, who was dating one of Trooper DiPasquale's friends at the same time. Pl.'s Mem. at 13.

To be sure, there is an exception to the intracorporate conspiracy doctrine for cases in which "the alleged conspirators are motivated by an improper personal interest separate and apart from that of their principal." *Townes*, 2017 WL 11476416, at *5. This exception applies "where law enforcement allegedly exercises their official duties in unconstitutional ways in order to secure personal benefit." *Chamberlain*, 986 F. Supp. 2d at 388 (cleaned up).

However, this narrow exception does not save Malarczyk's claim. This is because, as defendants point out, plaintiff has attempted to sustain this conspiracy claim with nothing more than speculation about Trooper DiPasquale's personal motives. *See, e.g.,* Malarczyk Dep., Dkt. No. 27-2 at 87 ("I don't have facts. It's speculation."). "To survive a motion for summary judgment, a plaintiff's evidence of a § 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 77 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

plan." *Moroughan v. Cty. of Suffolk*, 514 F. Supp. 3d 479, 529 (E.D.N.Y. 2012) (citation omitted).

Even assuming otherwise, for reasons set forth *supra* Malarczyk has failed to establish an issue of fact as to any of his federal constitutional claims. In the absence of an underlying constitutional claim, plaintiff "cannot sustain a claim of conspiracy to violate those rights." *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000). Accordingly, this claim must be dismissed.

### 8. Supplemental Jurisdiction

Malarczyk's remaining claims arise under state law.[11] Federal courts "have supplemental jurisdiction over all other claims that are so related to claims [over which the court has] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In other words, "[t]he state and federal claims must derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 245 (2d Cir. 2011) (concluding same).

**\*15** As a general matter, "once it is determined that a supplemental claim is related to the claim within the court's original jurisdiction such that they form the same case or controversy, supplemental jurisdiction over the related claim is mandatory." *Catzin v. Thank You & Good Luck Corp.* 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).

However, a federal court may decline to exercise supplemental jurisdiction where "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." § 1367(c).

Importantly, though, even if one of the § 1367(c) categories apply, "a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated [by the Supreme Court] in *Gibbs*: economy, convenience, fairness, and comity." *Catzin*, 899 F.3d at 85 (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)).

"Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016). There are no exceptional circumstances presented in this case. Accordingly, plaintiff's state law claims will be dismissed without prejudice.

### V. CONCLUSION

Malarczyk's § 1983 claims must be dismissed because he failed to controvert important facts about his encounter with law enforcement. Even viewing the additional evidence offered by plaintiff in the light most favorable to him, he has failed to create a jury question on any of his constitutional claims. Because those federal claims will be dismissed before trial, the Court declines to exercise supplemental jurisdiction over plaintiff's pendent state law claims.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part;

2. Plaintiff's motion for summary judgment is DENIED;

3. John Doe Officers 1-5 are DISMISSED without prejudice as named defendants in this action;

4. Plaintiff's federal law claims (Counts One through Seven) against Trooper Eric P. Lovgren and Trooper Brian C. DiPasquale are DISMISSED WITH PREJUDICE; and

5. Plaintiff's state law claims (Counts Eight through Thirteen) against Trooper Eric P. Lovgren and Trooper Brian C. DiPasquale are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2022 WL 374271

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 78 of 183

Malarczyk v. Lovgren, Not Reported in Fed. Supp. (2022)

## Footnotes

1    Pagination corresponds to CM/ECF.

2    This is not just a *pro forma* requirement. *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019). "A proper response to a movant's statement of material facts streamlines the summary judgment analysis by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 320 (N.D.N.Y. 2021) (cleaned up). For some reason, though, litigants routinely fail to get this right. *See, e.g., id.* at 321 (deeming certain facts admitted where non-movant failed to comply with the Local Rule); *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 724–25 (same); *Frantti*, 414 F. Supp. 3d at 285 (same); *Carter v. Broome County*, 394 F. Supp. 3d 228, 238-39 (N.D.N.Y. 2019) (faulting both parties for injecting unnecessary confusion into the briefing).

3    Indeed, the entire first half of Malarczyk's "Rule 56.1 Statement" is devoid of *any* citations to record evidence. Pl.'s Facts ¶¶ 1–29.

4    To the extent that any of this information about Ms. Giaculli's involvement might relate to the § 1983 conspiracy claim, that will be discussed *infra.*

5    Plaintiff does not directly challenge the initial stop in the Tracy Road driveway. But as noted *supra*, Trooper DiPasquale's own observations would have justified a *Terry* stop, regardless of whether or not he observed the driver of the blue Mercury smoking marijuana or just behavior consistent with the activity.

6    Probable cause need not exist for the charge "actually invoked by the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004). Instead, an arrest is privileged "if there was probable cause to arrest ... for any single offense." *Marcavage v. City of N.Y.*, 689 F.3d 98, 109–10 (2d Cir. 2012).

7    Under New York law, "intoxication" is a degree of impairment "which is reached when the driver has voluntarily consumed alcohol to the extent that he is incapable of employing the physical and mental abilities which he is expected to possess in order to operate a vehicle as a reasonable and prudent driver." *People v. Cruz*, 48 N.Y.2d 419, 428 (1979).

8    To the extent Malarczyk's complaint might be understood to raise a *substantive* due process claim arising out of his arrest, that claim must be dismissed. Substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). The admitted facts fail to establish the kind of "outrageous" or "conscience-shocking" behavior necessary to sustain this claim. *See id.*

9    Plaintiff styles it as a failure to "intercede."

10   Malarczyk's complaint also asserts a § 1985 conspiracy claim. In his opposition memorandum, plaintiff has agreed to withdraw this § 1985 claim. Pl.'s Mem. at 14. Accordingly, that claim will be dismissed.

11   The basis for jurisdiction in this forum is federal-question, since the parties are non-diverse.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Villalobos v. Smith,  S.D.N.Y.,  July 12, 2022

2015 WL 1321685
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Michael MORAN, Plaintiff,
v.
COUNTY OF SUFFOLK and John
Doe, the person intended to be the police
officer who shot plaintiff, Defendants.

No. 11 Civ. 3704(PKC)(GRB).
|
Signed March 24, 2015.

**Attorneys and Law Firms**

Michael Caliguiri, Ralph G. Bell, Bauman & Kunkis, New
York, NY, for Plaintiff.

Arlene S. Zwilling, Hauppauge, NY, for Defendants.

### MEMORANDUM AND ORDER

PAMELA K. CHEN, District Judge.

**\*1** Plaintiff Michael Moran ("Plaintiff") initiated this
proceeding against defendants County of Suffolk (the
"County") and a John Doe police officer under 42 U.S.C.
§ 1983 alleging that the use of unreasonable deadly force
against him violated his rights under, *inter alia,* the Fourth
Amendment of the United States Constitution. (Dkt. 1
("Complaint" or "Compl.").) Plaintiff also asserts claims
under state law and common law, including claims for assault
and battery and negligence. Presently before the Court is the
County's motion for summary judgment. For the reasons set
forth below, the County's motion is granted and the case is
dismissed.

### BACKGROUND

#### I. Factual Background
Unless otherwise stated, the following facts are taken from
Plaintiff's Rule 56.1 Statement (Dkt. 23 ("Pl.St.")), and all

reasonable inferences are drawn in Plaintiff's favor as the non-
moving party. [1]  *See Terry v. Ashcroft,* 336 F.3d 128, 137 (2d
Cir.2003).

On August 4, 2010, at around 4:00 p.m., Plaintiff was waiting
for his girlfriend outside a Dunkin Donuts located in West
Babylon, New York. (Pl.St.¶ 3.) Plaintiff was sitting on a
bench and had with him a black fabric backpack containing
his laundry. (*Id.* ¶ 5.) Plaintiff observed two police cars enter
the Dunkin Donuts parking lot. (*Id.*¶ 4.) After a few moments,
Plaintiff picked up his backpack and walked to the entrance
of the Dunkin Donuts. (*Id.* ¶ 5.) From outside, Plaintiff saw
his girlfriend in handcuffs and struggling with police officers.
(*Id.* ¶ 6; Dkt. 21 (Declaration of Ralph G. Bell, dated Mar. 17,
2014 ("Bell Decl.")) Ex. A at 150–51, 154.)

Suffolk County Police Officers Robert Bodenmiller
("Bodenmiller"), Jennifer Price ("Price"), and Charles
Erdmann ("Erdmann") had gone to the Dunkin Donuts in
response to a call about an emotionally disturbed woman
in the vicinity. (Pl. St. ¶¶ 8, 11, 24; *see, e.g.,* Bell Decl.
Ex. B at 15–18.) Officers Bodenmiller and Price identified
Plaintiff's girlfriend as someone who matched the description
they were provided, and were in the process of detaining and
questioning her. (Bell Decl. Ex. B at 24–38.) At the time,
Bodenmiller and Price each had a baton, mace, a taser, and a
Glock semiautomatic handgun. (Pl.St.¶ 23.)

Plaintiff ran inside and stopped just inside the entrance and
dropped his backpack to the ground next to his left foot.
(*Id.* ¶¶ 7, 35–36; Bell Decl. Ex. A at 158–60.) [2]  Plaintiff
testified that Price, who was closest to him, approached him
and instructed him to "calm down." (Pl. St. ¶ 38; Bell Decl.
Ex. A at 161.) Bodenmiller "observed a dark colored object"
in Plaintiff's right hand. (Pl.St.¶ 8.) Bodenmiller did not see
Plaintiff point the object. (*Id.*¶ 9.) Nor did Plaintiff raise his
hands toward the officers or verbally threaten them. (*Id.* ¶¶
10, 12–14.) Bodenmiller saw Price turn towards Plaintiff, but
did not hear her say anything or see her raise her hands. (*Id.* ¶
15.) Bodenmiller further stated that Plaintiff did not lunge or
jump at Price. Price never requested Bodenmiller's assistance
or indicate to him that she felt threatened. (*Id.* ¶¶ 17–18.)

**\*2** Without saying anything to Plaintiff, Bodenmiller fired
two shots, aiming for Plaintiff's "center mass." (*Id.* ¶¶ 19–
20, 41.) Bodenmiller testified that he had been trained to fire
twice at the center mass of a subject when in close proximity,
and, "[i]f the threat does not stop" to take a third shot to the
head. (Bell Decl. Ex. B at 57–58.) Plaintiff was struck with

two bullets, one in the right index finger and one at the "rib line." (Pl.St.¶ 21.) Plaintiff heard "three pops" and felt pain in his stomach before falling to his knees and landing on his right side. (*Id.* ¶ 42.) No weapon or black object was ever found or recovered on or near Plaintiff's person following the shooting. (*Id.* ¶ 22.) Neither Price nor the third officer, Erdmann, drew their weapons during the incident. (*Id.* ¶¶ 17, 25.)

Two months after the shooting, Price issued Plaintiff a ticket for "obstructing governmental administration" at the instruction of one of her supervisors. (*Id.* ¶ 26.)

About a year after the shooting, on September 27, 2011, the Suffolk County Police Department issued a Department Directive regarding the "Use of Force–Use of Firearms and Deadly Physical Force" (hereinafter "Use of Force Directive" or "Directive"). (Bell Decl. Ex. H at 24–1.) The purpose of the Directive was to "establish[ ] the limits within which the use of deadly force, particularly the use of firearms, by members of the Suffolk County Police Department is permitted, and outlines certain situations in which the use of firearms, or other means of deadly force, is not permitted." (Pl. St. ¶¶ 28, 29; Bell Decl. Ex. H at 24–1.) Under the "Rules and Regulations" section of the Directive, "[a]n officer may discharge a firearm *only* in" specified situations, including "Confrontational Situations" defined as "[w]hen reasonable and necessary to defend an officer or another from what the officer reasonably believes to be the use, or imminent use, of deadly force." (Pl. St. ¶ 30; Bell Decl. Ex. H at 24–2 (emphasis in original).) The Use of Force Directive further provides that "[s]ince all possible combinations of circumstances cannot be envisioned ... a police officer may use deadly force as an emergency measure to avoid the imminent unlawful use of deadly force which is about to occur by reason of a situation occasioned or developed through no fault of the officer; and, which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability of avoiding such injury clearly outweighs the desirability of avoiding the conduct sought to be prevented by [the Directive's] Rules and Procedures." (Bell Decl. Ex. H at 24–4.)

Plaintiff alleges that Bodenmiller is the subject of another excessive force suit claiming that Bodenmiller wrongfully "utilized a shield to restrain" a prisoner, who subsequently died in police custody on May 6, 2011. (Bell Decl. Ex. B at 10–11; Pl. St. ¶ 27.)

## II. *Procedural History*

**\*3** Plaintiff commenced this action on August 1, 2011, naming as defendants the County and a John Doe as "the person intended to be the police officer who shot plaintiff." (Compl. at 1.) The County answered on August 16, 2011. (Dkt.3.) On September 6, 2011, Plaintiff submitted a letter to Magistrate Judge William. D. Wall requesting discovery regarding the identity of the police officer "in order that said individual may be correctly named and served in the lawsuit." (Dkt.4.) Following a pretrial conference, Judge Wall issued an order dated October 6, 2011 requiring that "[m]otions to join new parties or amend the pleadings" be filed by March 22, 2012 and that discovery be completed by June 14, 2012. (Dkt. 7–1 at 1.) On or around November 8, 2011, Plaintiff served a summons for John Doe "n/k/a Robert Bodenmiller"[3] via substitute service at the Suffolk County Police Department. (Dkt 8 at 2 (Proof of Service for John Doe).) Plaintiff did not, however, amend the Complaint to name Bodenmiller. Indeed, to this day, Plaintiff has not sought to amend the Complaint to name Bodenmiller as a defendant.

Thereafter, on June 20, 2012, Defendants furnished Plaintiffs with the Police Department's Internal Affairs file regarding the shooting, which indicated that Bodenmiller was the officer who shot Plaintiff. (*See* Dkt. 11; Bell Decl. Ex. H.) Plaintiff then deposed Bodenmiller on July 10, 2013. (Bell Decl. Ex. B.) On October 15, 2013, discovery concluded and the parties filed a joint proposed pretrial order that still indicated a "John Doe" on the caption. (Dkt. 16 at 1.) At a conference held on October 22, 2013, the Court granted the County leave to file its summary judgment motion.

## LEGAL STANDARD

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 173 (2d Cir.2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* Because Plaintiff, as the non-moving party, has the "burden of proof at trial" on his claim, the County's ability to satisfy this standard as to any "essential element" of a claim "necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett,* 477 U.S. 317,

322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and entitles the County to summary judgment.

In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry,* 336 F.3d at 137 (citation and quotation omitted). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quotations and citations omitted). That party must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty., New York,* 541 F.3d 464, 471 (2d Cir.2008) (quotations and citation omitted).

### DISCUSSION

**I. *Plaintiff's Claims against the John Doe Police Officer***
**\*4** The Court initially addresses the parties' dispute regarding which defendants are involved in this action. Plaintiff alleges that the John Doe police officer named in the Complaint, now known to be Bodenmiller, used excessive force in violation of Plaintiff's constitutional rights. (Compl.¶¶ 8, 14.) In response to the County's summary judgment motion, Plaintiff asserts that the case must proceed against the John Doe officer because no summary judgment motion was filed on behalf of the John Doe officer, "now known to be Bodenmiller." (Dkt. 22 ("Pl.Mem.") at 11). The County disputes Plaintiff's contention on the basis that Bodenmiller has not been and cannot now be made a party to this case. (Dkt. 24–8 ("Reply") at 3.) The Court agrees.

Although Bodenmiller indisputably is the officer who shot Plaintiff, Plaintiff did not amend the Complaint to substitute Bodenmiller as the John Doe Defendant prior to the expiration of the applicable statute of limitations, nor, for that matter, has he done so at any point in this litigation. Plaintiff's failure to timely amend the Complaint is fatal to his claims against the John Doe Defendant.

Section 1983 claims arising in New York have a statute of limitations of three years. *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004). Here, Plaintiff's claim accrued on August 4, 2010, and the limitations period expired on August 4, 2013. Plaintiff filed his Complaint on August 1, 2011, naming as defendants the County and "John Doe, the person intended to be the police officer who

shot plaintiff." (Compl. at 1.) Plaintiff's claim against the County is timely. As to the individual officer Defendant, the general rule is that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)). Substitutions of a party's name for John Doe, therefore, "may only be accomplished" if the amended pleading relates back to the date of the complaint under Federal Rule of Civil Procedure 15(c). *Aslanidis,* 7 F.3d at 1075. Since Plaintiff did not amend his Complaint to substitute Bodenmiller for the John Doe Defendant, Plaintiff's claims against Bodenmiller are timely only if he is permitted to file an amendment that "relates back" to the Complaint, filed on August 1, 2011. *See Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538, 541, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010) ("Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations."); *Laureano v. Goord,* No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at \*5 (S.D.N.Y. Aug. 31, 2007) ("When the statute of limitations would otherwise bar an amendment, Rule 15(c) allows the claim if it 'relates back' to the original complaint." (citing Fed.R.Civ.P. 15(c)(3)).

**\*5** Plaintiff's counsel has not attempted to substitute Bodenmiller either by moving to amend the Complaint, or by addressing the amendment issue in his opposition to the County's motion for summary judgment. Though it appears that Plaintiff would prefer the Court ignore the amendment issue, the Court considers *sua sponte* whether Plaintiff should be granted leave to file an amended complaint. The Court finds that he should not.

### A. Relation Back Under Rule 15(c)(1)(C)
Rule 15(a) instructs courts that "leave to amend [a complaint] 'shall be freely given when justice so requires.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citation omitted). Nevertheless, a motion to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies ..., or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery,* Inc., 551 F.3d 122, 126 (2d Cir.2006); *see Monahan v. N.Y.C. Dep't of Corr.* 214 F.3d 275, 283 (2d Cir.2000) (Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or

futility."). An amendment is futile if the claim to be added would be barred by the applicable statute of limitations. *Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000).

"Rule 15(c) (1)(C) provides the federal standards for relation back." *Hogan,* 738 F.3d at 517. Under Rule 15(c)(1)(C), an amendment to change the party against whom a claim is asserted will relate back only if all of the following specifications are met:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity,* the original action would have been brought against it; and ... [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Hogan,* 738 F.3d at 517 (quoting *Barrow v. Wethersfield Police Dep't.,* 66 F.3d 466, 468–69 (2d Cir.1995) (emphasis in Hogan); see Fed.R.Civ.P. 15(c)(1)(C)(i)-(ii).

With respect to what constitutes "mistaken identity" for purposes of permitting relation back under Rule 15(c), the Second Circuit in *Barrow* held that:

> Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly added defendants *were not named originally because the plaintiff did not know their identities* . Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning he identity of the parties (under certain circumstances), but not the failure to identify individual defendants when the plaintiff knows that such

defendants must be named cannot be characterized as a mistake.

**\*6** 66 F.3d at 470 (emphasis added). [4]

In other words, where a plaintiff is mistaken about the identity of the *proper party* to be sued, an amendment to name that party may relate back under Rule 15(c). *Id.* at 469. [5] However, where the plaintiff knows who the proper party is, just not by name, there is no mistake about identity that will permit relation back under Rule 15(c). *See Hogan,* 738 F.3d at 518 ("This Court's interpretation of Rule 15(c)(1) (C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistaken identity.' ") In that situation, any amendment to add the proper party's name, once determined, must be made within the statute of limitations. *See id.* at 517 (reiterating that " ' John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued").

Here, Plaintiff was not mistaken about the identity of the proper John Doe officer to sue; rather, he simply did not know the officer's name when he filed suit. In initiating this action, Plaintiff intended to sue the "police officer who shot plaintiff" on August 4, 2010. (Compl. at 1.) Plaintiff identified that officer as "John Doe" in the Complaint because he did not know Bodenmiller's name at the time, not because of any mistake regarding Bodenmiller's role in, or liability for, the shooting. Though Plaintiff was unaware of Bodenmiller's identity, he was not mistaken about the need to name Bodenmiller as a defendant. (*See* Dkt. 4 (Plaintiff's letter requesting discovery from the County regarding the John Doe's officer's identity, and indicating that the officer had to be "correctly named ... in the lawsuit")); *Barrow,* 66 F.3d at 470 (Rule 15(c) does not permit relation back where the "plaintiff knows that [the] defendant[ ] must be named"). Thus, Plaintiff's failure to name Bodenmiller in this suit does not constitute a mistake under Rule 15(c)(1)(C)(ii). *See Bender v. City of New York,* No. 14 Civ. 4386(LTS)(GWG), 2015 WL 524283, at *3–4 (S.D.N.Y. Feb. 10, 2015) (under *Barrow,* "[plaintiff] cannot satisfy Rule 15(c)(1)(C)(ii), as the John Doe defendants were unnamed because [plaintiff] did not know their names at the time she filed the complaint; rather, she first learned this information only when the named defendants made their initial disclosures"); *Ceara v. Deacon,* No. 13 Civ. 6023(KMK), 2014 WL 6674559, at *4 (S.D.N.Y. Nov.25, 2014) (plaintiff's reason for not serving officer within

the three year period—that he did not know the identity of the defendant-was insufficient to satisfy the mistake element of Rule 15(c)(1)(C)); *Vasconcellos v. City of New York,* No. 12 Civ. 8445(CM), 2014 WL 4961441, at *5–6 (S.D.N.Y. Oct.2, 2014) ("[u]nder a straightforward application of *Barrow,*" plaintiff's failure "to identify the Officer Defendants by name in her original suit because she did not know their identities" "cannot be characterized as a mistake" for purposes of Rule 15(c)); *Strada v. City of New York,* No. 11 Civ. 5735(MKB), 2014 WL 3490306, at *9 (E.D.N.Y. July 11, 2014) ("*Barrow* precludes this Court from finding that [p]laintiff's failure to amend the Complaint to name the individual officers was a mistake contemplated by Rule 15(c)."); *Ulloa v. City of New York,* No. 13 Civ. 5795(AKH), 2014 WL 1100226, at *2 (S.D.N.Y.Jan.6, 2014) ("a plaintiff's lack of knowledge as to the identity of John Doe defendants cannot be considered a 'mistake' (citation omitted)). Accordingly, Rule 15(c)(1)(C) does not provide a basis to allow Plaintiff to amend the Complaint to name Bodenmiller and relate the claims against him back to the date of the original Complaint.

**B. Relation Back Under Rule(c)(1)(A)**

**\*7** In addition to relation back under Rule 15(c), the Courts must examine the "controlling body of limitations law," and apply state law if it provides "a more forgiving principle of relation back than the one provided" by Rule 15(c). *Hogan,* 738 F.3d at 518 (quoting Fed.R.Civ.P. 15, Advisory Comm. Notes 1991); *see* Fed.R.Civ.P. 15(c)(1) (an amended pleading also relates back to an earlier pleading if "the law that provides the applicable statute of limitations allows relation back"). The Court will thus examine whether a claim against Bodenmiller would be timely under the relevant provisions of the New York Civil Practice Law and Rules ("CPLR").

1. *Section 203 of the CPLR*

A party may seek relation back for a previously unknown defendant under CPLR § 203(c), New York's general relation back statute. *Strada,* 2014 WL 3490306, at *6 (citing *Bumpus v. New York City Transit Auth.,* 66 A.D.3d 26, 883 N.Y.S.2d 99, 106 (App.Div.2009)). Under § 203, courts allow claims against a new defendant to "relate back to timely filed pleadings when (1) the new claim arose out of the same conduct, transaction or occurrence as the original allegations; (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new party knew or should have known that, but

for a mistake as to the identity of the proper parties, the action would have been brought against him as well." *JCG v. Ercole,* No. 11 Civ. 6844(CM)(JLC), 2014 WL 1630815, at *15 (S.D.N.Y. Apr. 24, 2014) (quoting *Fisher v. Cnty. of Nassau,* No. 10 Civ. 0677(JS)(ETB), 2011 WL 4899920, at *5 (E.D .N.Y. Oct. 13, 2011)), *report and recommendation adopted,* 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

Here, Plaintiff cannot avail himself of § 203 for the same reasons that Rule 15(c) does not apply. Plaintiff cannot establish the third prong of the test under § 203, which, like Rule 15(c), requires a mistake as to the identity of the proper party to be sued. As discussed above in the Rule 15(c) context, the failure to name a defendant whom the plaintiff knows must be named does not constitute a "mistake." "The third prong of § 203(c) 'employs the same standard as the federal rule.' " *Bender,* 2015 WL 524283, at *6 (quoting *Sloane v. Town of Greenburgh,* No. 01 Civ. 11551(MBM), 2005 WL 1837441, at *3 (S.D.N.Y. July 27, 2005)). Since Plaintiff cannot satisfy Rule 15(c)'s mistake element, he also cannot satisfy the third prong of § 203(c). Any claim against Bodenmiller therefore would not relate back to the date of the Complaint under CPLR § 203. *See, e.g., Strada,* 2014 WL 3490306, at *9.

2. *Section 1024 of the CPLR*

CPLR § 1024 allows "[a] party who is ignorant, ... of the name or identity of a person who may properly be made a party[ ][to] proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known[,] all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly." Under CPLR § 306–b, once a John Doe complaint is filed, a plaintiff must serve it on the correct defendant within 120 days after the commencement of the action.

**\*8** The Second Circuit recently held that CPLR § 1024 is more forgiving in relating back complaints compared to the federal standard under Rule 15(c). *See Hogan,* 738 F.3d at 518; *accord Ceara,* 2014 WL 6674559, at *5; *Strada,* 2014 WL 3490306, at *5. To invoke § 1024, a plaintiff must show that: (1) the plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name;" and (2) the plaintiff "describe[d] the John Doe party in such form as will fairly apprise the party that he is the intended defendant." *Hogan,* 738 F.3d at 519 (alteration, citations and internal quotation marks omitted). "Due diligence in this context requires that a plaintiff 'show

that he or she made timely efforts to identify the correct party before the statute of limitations expired .' " *Strada,* 2014 WL 3490306, at \*5 (quoting *Justin v. Orshan,* 14 A.D.3d 492, 788 N.Y.S.2d 407, 408 (N.Y.App.Div.2005)).

Plaintiff's inexplicable failure to amend the complaint—despite learning Bodenmiller's identity shortly after filing the Complaint—cannot satisfy the due diligence requirement of § 1024. Early in this litigation, Plaintiff sought discovery of the identity of the John Doe police officer so "that said individual may be correctly named and served[.]" (Dkt.4.) Plaintiff then served a summons for John Doe, "n/k/a Robert Bodenmiller[,]" at the Suffolk County Police Department on or about November 8, 2011 (*see* Dkt. 8 at 2)—several months before the March 22, 2012 court-imposed deadline for joining new parties or amending the Complaint, and almost two years before the expiration of the statute of limitations on August 4, 2013. Yet Plaintiff did not seek to amend the Complaint in the time between November 8, 2011 and August 4, 2013. Plaintiff still did not act to amend the Complaint after the County furnished an Internal Affairs report on June 20, 2012 that named Bodenmiller as the officer who shot Plaintiff. Nor did Plaintiff seek to amend the Complaint after conducting a deposition of Bodenmiller on July 10, 2013. Even after the County raised this issue in its summary judgment motion papers, Plaintiff did not seek to amend. Moreover, Plaintiff offers no explanation for his failure to amend the Complaint or seek an extension of the time in which to do so. Because Plaintiff learned the true identity of the John Doe Defendant prior to the expiration of the statute of limitations, he cannot invoke § 1024 to now add Bodenmiller as a defendant to this action. *See Strada,* 2014 WL 3490306, at \*6 (plaintiff did not exercise due diligence where, *inter alia,* defendant provided plaintiff with the names of the officers involved prior to the expiration of the statute of limitations, and plaintiff did not attempt to amend the Complaint). *Cf. Ceara,* 2014 WL 6674559, at \*5 (plaintiff acted with due diligence because plaintiff made efforts to ascertain defendant's full identity, apprised the court of his efforts, and promptly filed an amended complaint within thirty days of learning defendant's name).

**\*9** Accordingly, an amendment to substitute Bodenmiller for the John Doe Defendant would not relate back to the filing date of Plaintiff's Complaint under federal or state law. Given that the statute of limitations has run, amending the Complaint to add Bodenmiller would be futile. Regrettably, Plaintiff has buried his head in the sand, to his peril, with respect to this fatal flaw in his Complaint. The Court is thus constrained from granting Plaintiff leave to file an amended complaint, and Plaintiff's claim against the John Doe Defendant must be dismissed.

## II. *Plaintiff's Claims Against the County*

### A. Section 1983 Claim

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). In this action, Plaintiff's claims arise under the Fourth Amendment's prohibition against unreasonable seizures. [6]

Because municipalities may not be held vicariously liable for the actions of their employees, a § 1983 claim against a municipality must be premised on the theory that the municipality maintained a policy, practice, or custom that caused the plaintiff's constitutional injury. *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983."). Courts in this Circuit apply a two-prong test to § 1983 claims brought against a municipality. *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985). A "plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* (citation omitted). Next, a plaintiff must establish a " 'direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.' " *Hayes v. Cnty. of Sullivan,* 853 F.Supp.2d 400, 439 (S.D.N.Y.2012) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412(1989)); *accord Abreu v. City of New York,* 657 F.Supp.2d 357, 360 (E.D.N.Y.2009) (quoting *Canton,* 489 U.S. at 385).

A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or

(4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *See Parker v. City of Long Beach,* 563 F. App'x 39 (2d Cir.2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 62 (2d Cir.2014) (widespread and persistent practice); *Hines v. Albany Police Dep't,* 520 F. App'x 5, 7 (2d Cir.2013) (actions of policymakers); *Schnitter v. City of Rochester,* 556 F. App'x 5, 8 (2d Cir.2014) (failure to train or supervise); *Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545 (2d Cir.2009) (formal policy and act of a person with policymaking authority for the municipality).

 **\*10** Plaintiff alleges, in sum and substance, that the County was deliberately indifferent to his rights due to its failure to properly train or supervise its officers, including Bodenmiller. (Compl.¶¶ 10–11.) Plaintiff points to two alleged policies in support of his claims: (1) the Use of Force Directive, which Plaintiff contends is "so vaguely worded" that it provides no meaningful guidance on when officers may exercise deadly force, and (2) Bodenmiller's deposition statement that he was trained to fire two shots aimed at a subject's center mass. (Pl. Mem. at 12–13.) Plaintiff asserts that the combination of these two policies created "a situation where Bodenmiller was shooting to kill" with only a vague directive on when he should use deadly force, thereby causing a deprivation of Plaintiff's constitutional rights. (*Id.* at 13–14.)

Deliberate indifference with respect to the failure to train or supervise municipal employees exists where the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation' "; and (3) " 'the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Wray v. City of New York,* 490 F.3d 189, 195–96 (2d Cir.2007) (quoting *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)). The plaintiff must show the "policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Cash v. Cnty. of Erie,* 654 F.3d 324, 334 (2d Cir.2011) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 128 (2d Cir.2004)); *see Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 396 (S.D.N.Y.2009) ("To sustain a *Monell* claim based on a failure to supervise or discipline, the plaintiff must demonstrate that the decision-maker was on notice of a potentially serious problem of unconstitutional

conduct, that the need for corrective action was obvious, and that the decision-maker failed to investigate or take action in circumstances suggesting deliberate indifference to the rights of those being harmed.")

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626, (1997)). Without actual or constructive "notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Nevertheless, "in a narrow range of circumstances," a municipality can be found to be deliberately indifferent based on a single incident where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick,* 131 S.Ct. at 1360–61; *see Canton,* 489 U.S. at 390 n. 10. The violation of constitutional rights must be a "highly predictable consequence" of the failure to train or supervise. *Connick,* 131 S.Ct. at 1361 (internal quotation marks omitted).

 **\*11** Even construing the evidence in the record most favorably to Plaintiff, no rational jury could conclude that the standard for municipal liability, under a failure to train theory or any other theory, has been met. Plaintiff fails to proffer evidence sufficient to permit a trier of fact to find that the County has acted with deliberate indifference in designing its training program or that the deficiencies he cites led to the violation of his rights by Bodenmiller. Most significantly, Plaintiff points to no evidence of similar violations by purportedly untrained officers that may have notified the County of any deficiencies with the County's training of its officers with respect to the use of deadly force and civilian encounters. The record is devoid of evidence that before the events of August 4, 2010, the County knew of a pattern or even one incident involving use of excessive force or improper deadly force by Suffolk County police officers. *See Connick,* 131 S.Ct. at 1360 ("pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference" on a failure to train theory). Although Bodenmiller testified that he is a named defendant in another suit involving allegation of excessive force, there is no indication that that

event occurred before August 4, 2010. (Bell Decl. Ex. B at 10–11.) Plaintiff's submissions suggest that, to the contrary, the incident occurred afterwards on May 6, 2011. (Pl.St.¶ 27.) Nor is there any evidence indicating that the other alleged incident involved a use of force comparable or similar to the August 4, 2010 shooting. Thus, nothing suggests that the County condoned or ignored repeated constitutional violations.

To the extent Plaintiff relies on a single-incident theory of liability (*see* Pl. Mem. at 13), that claim also fails because Plaintiffs cannot show that the use of force training provided by the County to its police officers is tantamount to a lack of training. To make this showing, Plaintiffs must prove that the County's police officers have an "utter lack of an ability to cope with constitutional situations," *Connick,* 131 S.Ct. at 1363, and that "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights," *Canton,* 489 U.S. at 390. *Accord Breitkopf v. Gentile,* No. 12 Civ.1084 (JFB)(AKT), 2014 WL 4258994, at *23 (E.D.N.Y. Aug. 29, 2014). Here, it is uncontroverted that the County provided some use of force training to Bodenmiller and his fellow officers. (*See, e.g.,* Pl. St. ¶ 19; Bell Decl. Ex. B at 57–58.) Bodenmiller testified that he was trained at the police academy, and annual training thereafter at the precinct, on the use of deadly physical force. (Bell Decl. Ex. B at 88–89.) Bodenmiller also testified to his understanding that he was "allowed to use deadly force when [he] reasonably believe[d] that deadly force is being used against [him] or a third person." (*Id* . at 89.) Where, as here, a plaintiff challenges the adequacy of training rather than the failure to train at all, courts repeatedly have held that a plaintiff cannot rely on the single-incident theory of municipal liability. *See, e.g.,* O'Brien v. Barrows, 556 Fed. App'x. 2, 5 (2d Cir.2014) ("failing to provide an armed police officer with *any* training about the constitutional limitations on the use of deadly force could constitute deliberate indifference" (emphasis in original)); *Breitkopf,* 2014 WL 4258994, at *23 ("Since *Connick,* some courts have concluded that a plaintiff cannot rely on the single-incident theory where she challenges the adequacy and not the lack of the existence of training."); *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 391–93 (S.D.N.Y.2013) (collecting cases denying summary judgment based on lack of any training, and dismissing claims challenging adequacy of training).

**\*12** Plaintiff's contention that the Use of Force Directive evidences the County's deliberate indifference by failing to provide sufficiently specific guidance on the use of deadly force also fails for the reasons already stated. *See Yang Feng Zhao,* 656 F.Supp.2d at 394 (no triable issue of fact based on assertion that training was deficient in not providing guidance about when to believe a suspect's denial of guilt and when to avoid questioning). Furthermore, the Directive was issued in September 2011—over a year after Plaintiff was shot in August 2010—a fact seemingly overlooked by both parties. (Bell Decl. Ex. H at 24–1; *see* Reply at 4–7). It is difficult to see how any purported deficiency in the as-yet-unadopted Directive caused Bodenmiller to improperly implement deadly force against Plaintiff.

Lastly, even assuming *arguendo* that some iteration of the Use of Force Directive was in effect at the time of the shooting, such a policy, coupled with the training that Bodenmiller received about shooting twice at a subject's center mass, is still insufficient to establish the County's deliberate indifference. As previously discussed, Plaintiff has not presented any evidence tending to show that the improper use of force was a common problem in the County's police force. Nor has Plaintiff offered any evidence about deficiencies in the County's Use of Force Directive or training and how any additional or other training might have altered Bodenmiller's actions. Thus, Plaintiff cannot show that the shooting was caused by a County policy, as opposed to Bodenmiller's failure to follow the training he received. *See Amnesty Am.,* 361 F.3d at 129–30 ("The elements of an identified training deficiency and a close causal relationship, which together require the plaintiffs to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability.").[7] Accordingly, the County is entitled to summary judgment on Plaintiff's § 1983 claim.

### B. Plaintiff's State Law Claims

Plaintiff asserts various state law claims against the County and John Doe Defendant that appear to allege excessive force, assault and battery, and negligent hiring, training, and supervision of police officers. (Compl.¶¶ 17–31.) To the extent these claims allege negligent training or supervision by the County based on the same facts upon which the Plaintiff's Section 1983 claim against the County is based, the Court dismisses them, with prejudice, for the same reasons discussed above. *See Henry–Lee v. City of New York,* 746 F.Supp.2d 546, 566 (S.D.N.Y.2010) ("To prevail on a [state law] claim for negligent hiring, training, supervision, or

retention, a plaintiff must prove that a municipality's failure to properly train, hire, retain, or supervise 'its police officers in a relevant respect evidences a *deliberate indifference* to the rights of its inhabitants.' " (quoting *Jackson v. City of New York,* 192 A.D.2d 641, 596 N.Y.S.2d 457, 458 (1993)) (emphasis added)). As for the remaining state law claims against both Defendants, the Court declines to exercise supplemental jurisdiction over them under 28 U.S.C. § 1367, and dismisses them without prejudice.

**CONCLUSION**

**\*13**  The Court accordingly grants the County's motion for summary judgment in its entirety, and dismisses Plaintiff's Complaint. All of Plaintiff's claims, except his state law claims that do not allege negligent training and supervision by the County and his state law claims against the John Doe Defendant, are dismissed with prejudice. The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1321685

---

**Footnotes**

1      The Court declines Plaintiff's invitation to deny the County's motion based on the County's failure to comply with Local Rule 56.1. (*See* Pl. Mem. at 10.) Although the County's 56.1 Statement does not set forth undisputed material facts supported by citations to competent evidence (*see* Dkt. 24–1), as required by the Rule, the Court exercises its "broad discretion to ... to overlook a party's failure to comply with local court rules[,]" and conducts its own review of the record. *See* Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001). Accordingly, where relevant, the Court cites to supporting evidence in the record.

2      Plaintiff's account differs from the officers' in this regard; Price and Erdmann testified that Moran approached the officers "aggressively" or in a "slow run." (*See* Bell Decl. Exs. C. at 72 & D at 44, 58.) Bodemiller testified that Moran "was charging towards Officer Price." (*Id.* Ex. B at 44.) Plaintiff also denies having any object in his right hand. (Pl.St.¶ 39).

3      The acronym "n/k/a" refers to the phrase "now known as."

4      While there has been some debate over the continuing vitality of *Barrow* after the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010), the Court finds that *Barrow* remains good law, and that, unlike *Krupski, Barrow* is directly relevant to the facts presented here. *See, e.g., Morales v. Cnty. of Suffolk,* 952 F.Supp.2d 433, 437 (E.D.N.Y.2013) (finding that *Krupski* did not address the key issue in *Barrow, i.e.,* "whether a plaintiff's lack of knowledge as to the identity of 'John Doe' Defendants can be considered a 'mistake' or 'error' " and citing decisions concluding that "*Barrow* remains good law after *Krupski."* ).

5      In *Barrow,* the Second Circuit cited the example of this type of mistake contained in the Advisory Committee Notes for Rule 15(c): "when a defendant mistakenly sues an agency of the government without knowing that the cause of action requires the defendant to sue an agency head." 66 F.3d at 469.

6      Although Plaintiff also asserts claims under the due process clause and the Eighth Amendment, "[a]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see Taylor v. Nassau Cnty.,* 11 Civ. 0934(SJF), 2012 WL 5472554, at \*1 n. 2 (E.D.N.Y. Nov. 5, 2012) (addressing excessive force claim brought under Fourth and

Fourteenth Amendment under Fourth Amendment only). The Eighth Amendment, which applies to claims of excessive force brought by convicted prisoners, is also unavailable to Plaintiff. *See Graham,* 490 U.S. at 394; *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

7  Indeed, as discussed, Bodenmiller testified that he received use of force training when he first became a County police officer and annually thereafter and that his understanding of the County's use of force policy was that he was "allowed to use deadly force when [he] reasonably believe [d] that deadly force is being used against [him] or a third person." (Bell Decl. Ex. B at 89.)

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5089748
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert K. BROWN, Plaintiffs,
v.
The CITY OF NEW YORK et al., Defendants.

No. 12CV3146–LTS–GWG.
|
Signed Sept. 30, 2014.

*MEMORANDUM OPINION AND ORDER*

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Robert K. Brown ("Plaintiff") brings this action against Defendants the City of New York ("City of New York") and New York City Police Department ("N.Y.P.D.") Officers Marcus McCoy ("McCoy") and Stephen Janec [1] ("Janec," collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, asserting federal claims for false arrest, unlawful imprisonment and malicious prosecution, as well as state law claims for false arrest and intentional infliction of emotional distress, stemming from Plaintiff's December 13, 2010, arrest and subsequent imprisonment. [2] Defendants move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that there was probable cause to arrest the Plaintiff; that any search and/or imprisonment of the Plaintiff was lawful; that Plaintiff fails to state a claim for malicious prosecution; and that, to the extent that Plaintiff intends to bring any state law claims, those claims are meritless. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has considered carefully the parties' submissions and arguments and, for the following reasons, the Defendants' motion is granted in its entirety.

*BACKGROUND* [3]

Plaintiff was arrested on December 13, 2010, shortly after 1:00 p .m., in the vicinity of 84th Street and Park Avenue in Manhattan, New York. (Def. 56.1 St. ¶ 8.) Earlier that day, two men, identified as E.K. and O.M., had called the authorities to report that the van that they were using, which belonged

to Wynne Plumbing and Heating, had been broken into while it was parked on 85th Street. (*Id.* ¶ 6.) Defendants McCoy and Janec responded to the complaint, which they heard about over the police radio. (*Id.* ¶ 7.) [4]

The two complainants, E.K. and O.M., told Officer McCoy that they had seen Plaintiff in the driver's seat of the van, attempting to start the ignition in the van and that, when E.K. followed Plaintiff as he attempted to flee, the Plaintiff waved a hammer near E.K.'s face and said something to the effect of "wait a second." (Def. 56.1 St. ¶¶ 9–11.) Officer Janec's memo book indicates that he watched a surveillance video of the parked van at 1:25 p.m., after Plaintiff was arrested. (Lulich Decl., Ex. L.) In his opposition to Defendants' motion for summary judgment, Plaintiff repeatedly alleges that, because he cannot be seen in the video, it exonerates him, and that McCoy violated his rights and was complicit in a false arrest and malicious prosecution by suppressing or withholding the "exculpatory" video. The Court has reviewed the security video, a copy of which was provided to the Court by the Defendants. It shows only a partial view of the van and neither the passenger side door of the van, through which the Plaintiff is accused of having entered, nor pedestrian traffic approaching the door on that side of the vehicle is visible. (Lulich Decl., Ex. M.)

E.K. and O.M. identified Plaintiff as the person who had broken into their van and he was arrested near the scene of the crime, at 84th Street and Park Avenue. (Def. 56.1 St. ¶¶ 7–9.) When he was arrested, a backpack containing, among other things, a hammer, screwdrivers and a knife, was vouchered as evidence belonging to the Plaintiff. (Lulich Decl., Ex. H.) Plaintiff denies that the hammer, screwdrivers and knife were his, and asserts that they were actually plumbing tools belonging to E.K. and O.M. that were found on the ground. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. (ECF docket no. 43) at ECF p. 63.) Plaintiff also alleges that he had been "in a pizzaria[sic] having coffee-tea and pastries with a woman at 86th Street and the corner of Lexington Avenue," and then had walked up 84th Street to Park Avenue to pick up a car that he had borrowed, before he was arrested. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. at ECF p. 21.) Plaintiff contends that Defendants McCoy and Janec pulled up in the police car next to Plaintiff and jumped out of the car, and that one of the police officers had a gun in his hand and that they handcuffed the Plaintiff and forcefully searched him before putting him in the back seat of the police car. (Pl. Mem. in Opp at ECF p. 21.)

**\*2** Plaintiff alleges that he was then made to wait in the police car with the heater running full blast and that, as a diabetic with high blood pressure and asthma, he suffered from having his blood circulation restricted by the handcuffs with the heat running so high. (*Id.*) According to Plaintiff, when Defendants McCoy and Janec returned to the police car he told them that he was having breathing problems and heart palpitations and they arranged to have an ambulance meet them at the police station and take him to the hospital. (*Id.*) [5] Plaintiff states that he was returned to the police station six to eight hours later, after being treated at the hospital, and that Defendant McCoy, while processing Plaintiff's paperwork, made a comment to the effect of "what was being done to the plaintiff was not right and that this is not what he joined the police department for." (*Id.* at ECF p. 24.) Plaintiff further alleges that Detective Lisa Moran, who had been involved in an arrest of Plaintiff on November 3, 2010, told Plaintiff that "[y]ou will not be getting out of jail this time because I will be making sure of it." (*Id.*)

Plaintiff's arrest was processed at the 19th Precinct and his pants and shirt from the time of his arrest were vouchered as evidence. (Def. 56.1 St. ¶ 12.) Plaintiff alleges that he remained naked (or in his underwear) and handcuffed for approximately ten minutes, before he was given back his "Red, White and Blue Jacket, his underwear, undershirt, and tan boots along with hospital pajamas to wear." (Pl. 56.1 St. ¶ 12.) (*Compare* Pl. Mem. In Opp. at ECF p. 26 with Lulich Decl., Ex. B., Tr. 111:9–112:6 .)

At the time of his arrest, Plaintiff was on parole and was in violation of the conditions of his parole. [6] (Def. 56.1 St. ¶¶ 4–5, 8.) On November 3, 2010, Plaintiff had been arrested for, among other crimes, criminal possession of stolen property and unlawful use of a motor vehicle. (*Id.* ¶ 4.) The November 3, 2010, charges were pending in New York County Supreme Court under case number 2010–05448 at the time of the arrest that forms the basis of Plaintiff's allegations in this case. Plaintiff had not reported the November 3, 2010, arrest to his parole officer and had missed at least four mandatory check-ins with that officer by December 13, 2010. (*Id.* ¶ 5.) [7]

On December 14, 2010, Plaintiff was arraigned for attempted grand larceny in the fourth degree, menacing in the third degree, auto stripping in the third degree, criminal mischief in the fourth degree, and possession of burglar's tools under New York County Criminal Court number 2010NY091520. (*Id.* ¶ 13.) E.K. and O.M. identified the Plaintiff as the perpetrator of the break-in of their van and signed affidavits attesting

to this. Plaintiff's bail was set at $1.00 because there was a parole hold on Plaintiff. (Def. 56.1 St. ¶ 13.) [8] Following his arraignment, Plaintiff was remanded into custody of the New York City Department of Correction ("DOC") for violating his parole—not because of the criminal charges arising out of the December 13, 2010, incident. (*Id.* ¶ 14.)

**\*3** From December 13, 2010, until March 28, 2012, the charges under New York Supreme Court case no.2010–05448 and New York Country Criminal Court docket no. 2010NY091520 were both pending against the Plaintiff as separate actions. (*Id.* ¶ 15.) During the criminal proceedings in New York County Supreme Court case no.2010–0558, Plaintiff was evaluated by at least two mental health professionals and found to be unfit to proceed to trial. (*Id.* ¶ 16.) In July 2011, Plaintiff was transferred to the Mid–Hudson Psychiatric Center, upon an Order of Commitment, and was treated there until September 2011, when he was transferred back into custody at Riker's Island. (*Id.;* Pl. 56.1 St. ¶ 16.)

On March 14, 2012, following a bench trial, Plaintiff was convicted of criminal possession of stolen property in the fourth degree and unauthorized use of a vehicle in the second degree, under case number 2010–05448. (Pl. 56.1 St. ¶ 17; Def. 56.1 St. ¶ 17.) [9] On March 28, 2012, Plaintiff was sentenced to two to four years on each charge. (Def. 56.1 St. ¶ 17.) However, if Plaintiff had been tried and convicted of the charges brought under docket number 2010NY09150, any sentence would statutorily have been required to run concurrently with, and not have exceeded, the sentence already imposed under case 2010–05548. Therefore, on April 10, 2012, the charges relating to the instant arrest under case number 2010NY091520 were dismissed as covered by Plaintiff's conviction in case number 2010–05448. (Def. 56.1 St. ¶ 18.) [10] Neither Defendant McCoy nor Janec testified in any of Plaintiff's criminal proceedings. (*Id.* ¶ 19.) From December 14, 2010, to March 28, 2012, Plaintiff was incarcerated because he violated parole prior to the December 13, 2010, arrest and from March 28, 2012, he was incarcerated pursuant to his conviction in case number 2010–05448. (*Id.* ¶ 22.) The only period during which Plaintiff was held on account of the charges for which he was arrested on December 13, 2010, was from the time of the arrest until his December 14, 2010, arraignment on the charges.

*DISCUSSION*

Under Federal Rule of Civil Procedure 56(a), a Court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that it is entitled to summary judgment, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a "material fact" is one that might affect the outcome of a suit under governing law. *See Kinsella v. Rumsfeld,* 320 F.3d 309, 311 (2d Cir.2003). When reviewing the record, the Court must assess the evidence in "the light most favorable to the [non-moving party]" and resolve all ambiguities and draw all inferences in its favor. *Tufariello v. Long Island R. Co.,* 458 F.3d 80, 85 (2d Cir.2006). However, the party opposing summary judgment must put forth more than a "scintilla of evidence," *Anderson,* 477 U.S. at 252, and "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements." *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir.1986) (internal citation omitted). To defeat the motion, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial ." *Anderson,* 477 U.S. at 248.

**\*4** Where a plaintiff is proceeding pro se, the Court must read the plaintiff's papers liberally and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal citation omitted). However, a "pro se party's bald assertions cannot overcome a motion for summary judgment" and the plaintiff must provide the court with "some basis to believe that his version of relevant events is not fanciful." *Yearwood v. LoPiccolo,* No. 95 CV 2544, 1998 WL 474073, at \*3 (S.D.N.Y. Aug. 10, 1998) (internal quotation marks and citations omitted); *see also Saldana v. Local 32B–32J Serv. Emps. Int'l Union,* No. 03 CV 1853, 2005 WL 66895, at \*2 (S.D.N.Y. Jan. 12, 2005) ("[e]ven a pro se plaintiff [ ] cannot withstand a motion for summary judgment by relying merely on the allegations of a complaint").

*Individual Defendants McCoy and Janec*

*False Arrest Claim*

Defendants move for summary judgment on Plaintiff's false arrest claim, which is asserted as a Fourth Amendment violation claim pursuant to 42 U.S.C. § 1983, as well as under New York state law. Plaintiff opposes the motion, arguing that it should be denied because the evidence would support a finding that the arrest was illegal, for lack of probable cause. A section 1983 claim for false arrest is "substantially

the same" in all relevant respects as a claim for false arrest under state law. *See Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). Thus, in order to state a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); see also *Hart v. City of New York,* No. 11 CV 4678(RA), 2013 WL 6139648, at \*3 (S.D.N.Y. Nov.18, 2013).

"[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006). " 'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Torraco v. Port Authority of New York and New Jersey,* 615 F.3d 129, 139 (2d Cir.2010) (quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004)). "[T]he probable cause standard is far below that of reasonable doubt." *Husbands v. City of New York,* 335 F. App'x 124, 127 (2d Cir.2009). "The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir.2013) (internal quotation marks and citation omitted). Courts must look to the totality of the circumstances, keeping in mind that "probable cause does not require absolute certainty." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (internal quotation marks and citations omitted).

**\*5** Police officers do not have an affirmative duty to investigate allegations made by a complaining witness prior to effectuating an arrest. See *Jaegly,* 439 F.3d at 153. Police have probable cause to arrest if they receive "information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Miloslavsky v. AES Eng'g Soc'y Inc.,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), aff'd, 993 F.2d 1534 (2d Cir.1993). "The veracity of citizen complaints [sic] who are the very victims of the very crime they report to the police is assumed." *Id.* Finally, even "the fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause." *Waldron v. Milana,* —— F.App'x ——, 2013 WL 4733215, at \*3 (2d Cir.2013) (internal quotation marks and citation omitted).

Here, it is undisputed that Defendants McCoy and Janec responded to a report made by the two complaining victims, O.M. and E.K., regarding a vehicle break-in the vicinity of 85th Street and Madison Avenue. (Def. 56.1 St. ¶¶ 6–7.) O.M. and E.K. told Defendant McCoy that they saw the Plaintiff attempting to break into the van and E.K. told the police that the Plaintiff held up a hammer and told him to "wait a second." (*Id.* ¶¶ 8–11.) Plaintiff was arrested in the vicinity of Park Avenue and 84th Street, within half an hour of the time of the break-in, after having been identified by the victims. (*Id.* ¶ 8.) These circumstances are sufficient as a matter of law to establish the absolute defense of probable cause. *See, e.g., Bacci v. Fairway Mkt.,* No. 06 CV 2407(DAB), 2008 WL 2139132, at *6–7 (S.D.N.Y. May 19, 2008) (finding probable cause for petit larceny and possession of stolen property where police officers were informed by employee that the employee observed plaintiff attempting to leave with unpaid for items concealed on his person). Plaintiff's argument that probable cause was lacking turns principally on his contention that, having seen the surveillance video immediately after the arrest, Defendant McCoy should have understood that the complainants' accusations were baseless. As explained above, however, the surveillance video does not exonerate Plaintiff because, although he is not seen in it, the van door that he is alleged to have broken into and that side of the van are not visible. Plaintiffs' arguments thus have no evidentiary basis and are insufficient to frame a genuine factual dispute as to the existence of probable cause.

Defendants' motion for summary judgment on Plaintiff's federal and state law false arrest claims as against Defendants McCoy and Janec is granted. To the extent that Plaintiff also asserts claims of false imprisonment, they are dismissed as well, because false arrest and false imprisonment are synonymous under New York law. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991).

*Unlawful Search Claim*

Plaintiff appears to allege that he was subject to an unlawful strip search following his arrest, but he does not assert this cause of action as a separate claim. (See, e.g., Compl. ¶ 4; Pl. Mem. in Opp. at ECF p. 25.) Reading Plaintiff's papers in the light most favorable to him, however, the Court assumes that Plaintiff intends to assert such a claim. According to Plaintiff, after his arrest, while he was being processed, members of the N.Y.P.D.'s Emergency Services Unit collected his clothing and then left him alone and naked or with underwear only for approximately ten minutes before bringing him some hospital pajamas and telling the Plaintiff to put back on his socks, boots and heavy jacket. (Pl. Mem. in Opp. at ECF p. 26.) [11]

**\*6** Even drawing all inferences in Plaintiff's favor, the search of Plaintiff was justified as a matter of law, both as a search pursuant to a lawful arrest and as a reasonable penological measure to protect the safety of the other inmates. *See Illinois v. Lafayette,* 462 U.S. 640, 645–46, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification"; "[a]t the stationhouse, it is entirely proper for the police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."); see also *Florence v. Board of Chosen Freeholders of County of Burlington,* —— U.S. ——, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012) (holding that the practice of conducting a strip search on all arrestees, regardless of severity of the underlying offense or individualized suspicion of possession of contraband, does not violate the Fourth Amendment). "[I]f an arrestee is taken to the police station, that is no more than a continuation of the custody inherent in the arrest status.... The governmental interests underlying a stationhouse search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest." *Lafayette,* 462 U.S. at 645. However, the Fourth Amendment requires that searches of inmates be reasonable, see *Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983) (per curiam) (citing *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) and that "the need for a particular search [ ] be balanced against the resulting invasion of personal rights," *Florence,* 132 S.Ct. at 1516 (2012) (citation omitted). In determining whether a particular strip search is reasonable, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559 (collecting cases).

Here, there was a reasonable suspicion that Plaintiff was engaged in criminal activity as he was found with burglar's tools and a knife at the time of his arrest near the vicinity of the crime, and was identified by two complaining witnesses. After his arrest, it was reasonable to search Plaintiff when processing him, both for evidence from the alleged crime and for safety reasons. *Arnold v. Westchester Cnty.,* No. 09 CV 3727, 2012 WL 336129, at *11 (S.D.N.Y. Feb.3, 2012) ("prison officials have an obligation to take reasonable

measures to protect the safety of the prison's inmates."), *report & rec. adopted* by 2012 WL 841484 (S.D.N.Y. Mar 13, 2012). The approximately ten-minute delay in which Plaintiff was naked or wearing underwear that Plaintiff contends occurred while he was waiting for his clothing to be returned, while likely unpleasant for the Plaintiff, does not make the search unreasonable or unlawful. Defendants' motion for summary judgment is granted as to Plaintiff's unlawful search claim as against Defendants McCoy and Janec.

*Malicious Prosecution Claim*

**\*7** Plaintiff also asserts a section 1983 claim for malicious prosecution in violation of his Fourth Amendment rights. The law imposes "a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004) (citation omitted). To prevail on a section 1983 claim for malicious prosecution, a plaintiff must first establish the elements of a malicious prosecution claim under state law. See, e.g., *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989). "To recover on a claim of malicious prosecution under New York law, a plaintiff must establish four elements: that (1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Russo v. State of N. Y.,* 672 F.2d 1014, 1018 (2d Cir.1982) (internal citations omitted). In addition to satisfying the state law elements, for a section 1983 claim to succeed there must also be a showing of "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *See Rohman v. New York City Transit Authority (N.Y.CTA),* 215 F.3d 208, 215 (2d Cir.2000). Defendants are entitled to summary judgment dismissing Plaintiff's malicious prosecution claim for three principal reasons: there is no evidence that Defendants "initiated" the prosecution within the meaning of the relevant legal standards; there was probable cause to support the prosecution; and the prosecution was not terminated in Plaintiff's favor.

"Initiation in [the context of malicious prosecution] is a term of art," involving more than merely reporting a crime and giving testimony. "It must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act ... One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Rohman,* 215 F.3d at 217 (internal quotation marks and citations omitted). An arrest

alone "cannot serve as the predicate deprivation of liberty required by the Fourth Amendment because it occurred prior to [a defendant's] arraignment and without a warrant." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116–17 (2d Cir.1995). "Once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening acts of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *Jouthe v. City of New York,* No. 05 CV 1374(NGG), 2009 WL 701110, at \*11 (E.D.N.Y. March 10, 2009) (internal quotation marks and citation omitted).

Plaintiff argues that Defendant McCoy initiated the prosecution against the Plaintiff by signing the criminal complaint and that Defendant Janec helped to initiate the prosecution by signing the supporting affidavit. However, although McCoy swore out the criminal court complaint, the information regarding Plaintiff's alleged activities was obtained from the two complaining victims. Merely signing the criminal complaint and/or reporting the material information known to the officer does not override the independent prosecutorial judgment of the assistant district attorney in deciding whether to bring charges. Plaintiff also seems to allege that Defendants McCoy and Janec initiated the prosecution by withholding the security video from the District Attorney's Office Office, when the video would have allegedly exonerated him. However, there is no evidence in the record to support this contention. In fact, the Voluntary Disclosure Form, signed by the assistant district attorney, indicates that the District Attorney's Office was in possession of the video. (*See* Lulich Decl., Ex. N. "Voluntary Disclosure Form.") There is also no evidence to support Plaintiff's contention that the video exonerates him.

**\*8** Even if Defendants McCoy and Janec could be found to have "initiated" Plaintiff's prosecution, the "existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino,* 331 F.3d at 72 (2d Cir.2003). "The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, 'except that [a claim for malicious prosecution] must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest.' " *Danielak v. City of New York,* No. 02 CV 2349, 2005 WL 2347095 at \* 10 (E.D.N.Y. Sept.26, 2005) (internal quotation marks and citation omitted), aff'd, 209 F. App'x 55 (2d Cir.2006). "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v.*

*Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996). Here, no new facts came to light after Plaintiff's arrest, and both E.K. and O.M. remained consistent in their identification of plaintiff and their accusations against him. N.Y.P.D. records further show that Defendant McCoy vouchered evidence (e.g. screwdrivers, a hammer etc.) that supported the complaining victims' allegations following plaintiff's arrest, suggesting that the strength of the evidence against plaintiff increased after his arrest. Nor does the record support Plaintiff's allegation that the security video proves his innocence.

As Plaintiff has not established the first two elements of his malicious prosecution claim, the claim necessarily fails. However, there are also no facts from which the Court could infer that defendants were motivated by actual malice, see, e.g., *Fulton v. Robinson,* 289 F.3d 188, 198 (2d Cir.2002) (affirming grant of summary judgment for defendants after the plaintiff failed to present evidence of actual malice), or that the proceedings were terminated in Plaintiff's favor, which only occurs when the final disposition of the case: (1) involves the merits and (2) tends to indicate the accused's innocence as opposed to a dismissal of cumulative charges. See, e.g., *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton,* 289 F.3d at 196. As explained above, the record indicates that the charges were dismissed as duplicative for sentencing purposes of charges on which Plaintiff had already been convicted and sentenced. That outcome is not indicative of Plaintiff's innocence of the dismissed charges. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for malicious prosecution against Defendants McCoy and Janec and that claim is dismissed.

*Municipal Liability*

**\*9** Plaintiff also asserts a claim under 42 U.S.C. § 1983 against the City of New York. In order to state a claim against a municipality under section 1983, a plaintiff must adequately allege that a deprivation of his constitutional rights was caused by an official policy or custom of that municipality. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because Plaintiff has failed to present evidence that demonstrates that his constitutional rights were violated, the city is entitled as a matter of law to summary judgment dismissing Plaintiff's section 1983 claims against it. *See Askins v. Doe No. 1,*

727 F.3d 248, 253 (2d Cir.2013) ("[u]nless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable[;] *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy"). If a plaintiff fails to plausibly allege that municipal employees violated his or her constitutional rights, the plaintiff's *Monell* claim "necessarily fails as well" as against the municipal entity. *Kajoshaj v. New York City Dep't of Educ.,* —— F. App'x ——, 2013 WL 5614113, at \*4 (2d Cir. Oct 15, 2013). [12] Plaintiff's state law claims against the city based on respondeat superior or agency theories, for false arrest, false imprisonment and malicious prosecution are also dismissed, for lack of evidence indicating commission of the underlying violations.

*Remaining State Law Claim*

Plaintiff's papers may be read liberally to assert a state law claim for intentional infliction of emotional distress. As the Court is granting summary judgment dismissing all of Plaintiff's federal causes of action, the Court declines to exercise jurisdiction of any remaining state law claims. See 28 U.S.C. § 1367(c)(3); *see also, Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) ("where the federal claims are dismissed before trial, the state claims should be dismissed as well").

*CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's federal and state law claims for false arrest, false imprisonment, and malicious prosecution, and any federal claim for illegal search, are dismissed. The Court declines to exercise supplemental jurisdiction of any remaining state law claims, which are dismissed without prejudice to litigation in state court.

This Memorandum Order resolves docket entry number 30.

The Clerk of Court is hereby requested to enter judgment in Defendants' favor and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the

purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**All Citations**

**\*10**  SO ORDERED.

Not Reported in F.Supp.3d, 2014 WL 5089748

---

## Footnotes

1    Plaintiff refers to Defendant Janec as "Janee" in his papers.

2    In his Complaint and his opposition to Defendants' Motion for Summary Judgment, Plaintiff also appears to allege that he was subject to an unlawful search, although he does not assert this as a separate claim.

3    Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

4    Plaintiff argues that there was no 911 call made to the police officers. (Pl 56.1 St. ¶ 6; see also Pl. Mem. In Opp. (ECF docket entry no. 43) at ECF pp. 40, 55.) Although Plaintiff cites to a New York City Police Department "Stop, Question & Frisk Report," which indicates that the police officers were not on a radio run on the afternoon of Plaintiff's arrest (*see id.,* Ex. F); the New York City Police Complaint Report from the same incident indicates that the victims' complaint was received by the police over the radio (see Declaration of Aimee K. Lulich ("Lulich Decl."), Ex. E). For the purposes of the instant motion, it does not matter how the police officers first heard about the complaint, as the victims identified the Plaintiff once the officers had arrived on the scene.

5    The claims relating to the handcuffs are mentioned for the first time in his opposition and Plaintiff has not pleaded claims for excessive force in this case.

6    In 2007, Plaintiff had been convicted of unauthorized use of a motor vehicle in the second degree, and sentenced to two to four years in prison. Plaintiff was incarcerated from October 20, 2007, to August 31, 2010, when he was released subject to the conditions of parole. (Def. 56.1 St. ¶ 3.) As part of his parole conditions, plaintiff was required to report any arrest to his parole officer and to check-in with his parole officer once a week. (*Id.*)

7    In his opposition submission, Plaintiff contends that he did report the November 3, 2010, arrest to his parole officer (Pl. 56.1 St. ¶ 5), and denies that his parole was revoked, but his deposition testimony was to the contrary. *See* Lulich Decl., Ex. B., Tr. 78:121–22.

8    Plaintiff disputes that the bail was set at $1.00 because there was a parole hold on Plaintiff, but admits that it was set at $1.00. (Pl. 56.1 St. ¶ 13.)

9    Although the Certificate of Disposition proffered by Defendants refers to a conviction upon a plea, in the sentencing transcript proffered by Plaintiff in his opposition papers, the sentencing judge discusses a bench trial and the evidence presented therein. (*See* Pl. Mem. in Opp., Ex. A, at ECF pp. 90–97; ECF docket entry no. 43–1, at ECF pp. 1–3.)

10   Plaintiff disputes that the charges were dismissed as being "covered by his felony conviction and sentence" and proffers his own assertion that there was a final determination in his favor. (Pl. 56.1 St. ¶ 18.) Defendants'

version is, however, corroborated by the disposition documentation proffered by Plaintiff in his opposition and by Defendants in support of this motion—the Certificate of Disposition of the charges arising from the December 13, 2010, arrest notes "DISM–CONVICTION UNRELATED DKT 5448–2010" and a "Record of Court Action" reads in relevant part "Dismissed as covered by Ind. 5448/2010." (*See* Pl. Opp. Mem., Ex. R., ECF docket entry no. 44–10, at ECF pp. 14–15; Lulich Decl., Ex. J.)

11    Defendants argue that neither of the named Defendant officers conducted the search, but this is a disputed issue of fact, as Plaintiff claims that the Defendants were personally involved or, at the very least, failed to intervene.

12    Furthermore, aside from naked boilerplate allegations against the City of New York in his opposition, the Plaintiff has also not sufficiently demonstrated that the City of New York had a custom, policy, or practice of conducting unlawful arrests, searches, or engaging in malicious prosecution so as to sustain a section 1983 claim.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 24243989
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Salvatore OGNIBENE, Plaintiff,

v.

NIAGARA COUNTY SHERIFF'S DEPARTMENT,
Niagara County District Attorney's Office, Samuel
Novara, Esq., Town of Wheatfield Court, Niagara
County Court, Niagara County Supreme Court, New
York State Appellate Division, 4 TH Judicial Dept.,
and New York State Court of Appeals, Defendants.

No. 03–CV–0678E(SR).
|
Dec. 1, 2003.

**Attorneys and Law Firms**

Salvatore Ognibene, Niagara Falls, NY, pro se.

DECISION AND ORDER

ARCARA, J.

*INTRODUCTION*

**\*1** Plaintiff has filed this *pro se* action seeking relief under
42 U.S.C. § 1983 (Docket No. 1, 3) and has requested
permission to proceed *in forma pauperis* (Docket No.
2). Plaintiff claims that the defendants have violated his
constitutional rights in relation to an arrest that occurred on
July 10, 1997 for which plaintiff was given an Adjournment
in Contemplation of Dismissal ("ACD")[1] on November 17,
1997 in the Town of Wheatfield (New York) Town Court.
(Complaint, ¶ 5). Apparently, plaintiff later filed some type
of motion or appeal in the Town Court of Wheatfield seeking
to dismiss the ACD. (Docket No. 3, Table of Contents).[2]
This motion was denied and appeals ensued through the state
court system all the way to the New York Court of Appeals,
which denied plaintiff leave to appeal on or about September
17, 2003. (Complaint, ¶¶ 5–10; Table of Contents, ¶¶ 2–6).
For the reasons discussed below, plaintiff's request to proceed
as a poor person is granted and the complaint is dismissed
pursuant to 28 U.S.C. § 1915(e)(2)(B).

*DISCUSSION*

Because plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a), plaintiff is granted permission to proceed *in
forma pauperis*. Section 1915(e)(2)(B) of 28 U.S.C. provides
that the Court shall dismiss a case in which *in forma pauperis*
status has been granted if, at any time, the Court determines
that the action (i) is frivolous or malicious; (ii) fails to state
a claim upon which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from such
relief.

In evaluating the complaint, the Court must accept as true all
factual allegations and must draw all inferences in plaintiff's
favor. *See King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999).
Dismissal is not appropriate "unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of
his claim which would entitle him to relief." *Conley v. Gibson,*
355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "This
rule applies with particular force where the plaintiff alleges
civil rights violations or where the complaint is submitted *pro
se.*" *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

Based on its evaluation of the complaint, the Court finds that
plaintiff's claims must be dismissed pursuant to 28 U.S.C. §
1915(e)(2)(B)(ii) because they fail to state a claim upon which
relief may be granted.

*Plaintiff's Allegations*

Plaintiff alleges that his constitutional rights were violated
and therefore brings this action pursuant to 42 U.S.C. § 1983.
In order to state a claim under § 1983, plaintiff must allege
(1) that the challenged conduct was attributable at least in part
to a person acting under color of state law, and (2) that such
conduct deprived plaintiff of a right, privilege, or immunity
secured by the Constitution or laws of the United States.
*Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

Plaintiff names as defendants: (1) the Niagara County
Sheriff's Department ("Sheriff's Department"), the law
enforcement agency that responded to his daughter's "911"
telephone call, which occurred while plaintiff was admittedly
striking her in his home on July 10, 1997, and took plaintiff
into custody (Complaint, Statement of Claim, ¶¶ 1–3); (2)
the Niagara County District Attorney's Office ("DA's Office")

that, assumably, prosecuted plaintiff following this arrest;
(*id.,* ¶¶ 4–5); (3) Samuel J. Novara, plaintiff's defense
counsel in the proceedings in Town Court (*id.,* ¶ 6); (4)
the Town of Wheatfield Town Court ("Wheatfield Town
Court"), "Presiding" Town Justice Robert Cliffe, where
plaintiff was prosecuted and obtained an ACD on November
17, 1997 (*id.,* ¶ 5); (5) the Niagara County Court ("County
Court"), "Presiding" Judge, Hon. Peter Broderick, the court
to which plaintiff appealed on or about April 14, 2000
(Complaint; Table of Contents, ¶ 3); (6) the New York
Supreme Court, Niagara County ("State Supreme Court"),
"Presiding" Justice, Hon. John Lane, the court to which
plaintiff appealed on or about February 16, 2001 and which
denied his request for relief on or about June 13, 2001
(Table of Contents, ¶ 3); (7) the New York State Supreme
Court, Appellate Division, Fourth Department ("Appellate
Division"), "Presiding" Justice Pine, and Justices Hayes,
Hurlburt, Kehoe and Burns, the court to which plaintiff further
appealed and which dismissed plaintiff's appeal on April 23,
2002 for failure to prosecute (Complaint, Statement of Claim,
¶ 8; Table of Contents, ¶ 6 A—B); and (8) the New York
Court of Appeals ("Court of Appeals"), "Presiding" Justice,
Hon. Judith Kaye, which denied plaintiff leave to appeal on
or about September 17, 2003. (Complaint, ¶ 10; Table of
Contents, ¶ 7).

 **\*2**  The plaintiff's complaint, liberally construed, appears to
allege a violation of plaintiff's civil rights based upon claims
of false arrest and false imprisonment on July 10–11, 1997
arising out of his arrest (Complaint, Statement of Claim, ¶¶
2–4), and the "faulty procedures" of the prosecutor and the
courts. The complaint also alleges that the prosecutor and
the courts named as defendants failed to insure that plaintiff
obtained his *Miranda* warnings and his "right" to give a
statement, and that they failed to insure that he obtained his
various Sixth Amendment rights, such as the right to a speedy
public trial, the right to an impartial jury, the right to notice
of the charges against him, the right to confront witnesses,
the right to compulsory process, and the right to counsel.
(*Id.,* ¶¶ 4–10). The complaint also includes a claim of either
a violation of § 1983 or legal malpractice or both against
plaintiff's defense attorney. (*Id.,* ¶ 6).

### Claims against Sheriff's Department,
### DA's Office and Wheatfield Town Court

Plaintiff's claims against the Sheriff's Department, the DA's
Office and the Wheatfield Town Court must be dismissed.

First, plaintiff's § 1983 claims against these three defendants
accrued at the earliest on July 10, 1997 when he was arrested,
and at the latest either on November 17, 1997, when the
charges against him were resolved by means of an ACD
(Complaint, Statement of Claim, ¶¶ 3–5; Table of Contents,
¶¶ 1–2), or on March 28, 2000, when a motion plaintiff made
in the Town Court was denied. (Table of Contents, ¶ 2). The
statute of limitations for an action filed under 42 U.S.C. §
1983 in a federal court sitting in New York is three years.
*Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102
L.Ed.2d 594 (1989); *Jewell v. County of Nassau,* 917 F.2d
738, 740 (2d Cir.1990). Therefore, any and all claims against
these defendants are time barred.

Second, the claims against the Sheriff's Department, the
DA's Office, and the Wheatfield Town Court must also be
dismissed because there is no allegation that any of the
individual government officials, such as the Town Justice,
deputies or assistant prosecutors, were acting pursuant to
a policy or custom of the Town of Wheatfield or Niagara
County. In the absence of such an allegation, the complaint
fails to state a claim for relief and must be dismissed.
*See Monell v. New York City Dept. of Social Services,* 436
U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
Municipalities are not subject to § 1983 liability solely on the
basis of a respondeat *superior* theory. *Collins v. City of Harker
Heights,* 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261
(1992); *Monell,* 436 U.S. at 694.

Additionally, to the extent that the plaintiff may have intended
to sue the Town Justice individually (Complaint, Defendant's
Information), in addition to or instead of the Town Court, the
Town Justice would be entitled to absolute judicial immunity.
*See Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct.
1099, 55 L.Ed.2d 331 (1978) (internal quotations and citation
omitted). The same would be true with respect to the District
Attorney or any Assistant District Attorneys involved in the
prosecution of plaintiff. Prosecutors are entitled to absolute
immunity from suits brought under § 1983 "arising out of
[their] prosecutorial duties that are 'intimately associated
with the judicial phase of the criminal process.' " *Doe v.
Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996) (quoting *Imbler v.
Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128
(1976)), *cert. denied,* 520 U.S. 1115 (1997). Accordingly, the
claims against the Sheriff's Department, the DA's Office, the
Wheatfield Town Court and, to the extent he is a defendant
herein, the Town Justice, Robert B. Cliffe, are dismissed.

*Claims against County Court, State Supreme
Court, Appellate Division, and Court of Appeals*

**\*3** Plaintiff's complaint purports to allege that these courts
somehow violated his numerous Sixth Amendment rights.
In reality, however, what plaintiff is alleging is that these
courts were in error when they denied or dismissed his various
requests to overturn the ACD disposition of the charges
arising from the July 10, 1997 incident. These claims too must
be dismissed.

To the extent the plaintiff names various state courts as
defendants and seeks either legal or equitable relief against
them under § 1983, they are immune from such suit under
the Eleventh Amendment. *Papasan v. Allain,* 478 U.S. 265,
276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Pennhurst State
School & Hospital v. Halderman,* 465 U.S. 89, 98–100, 104
S.Ct. 900, 79 L.Ed.2d 67 (1984). As agencies or arms of the
State of New York, the courts are immune from suit under
the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S.
159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114; *see also Saint–
Fleur v. City of New York,* 2000 WL 280328, \*2 (S.D.N.Y.,
Mar.14, 2000) (collecting cases); *Fields v. Walthers,* No. 94–
CV–1659, 1997 WL 204308 at \*2 (N.D.N.Y. April 5, 1997)
("For Eleventh Amendment purposes, governmental entities
of the state that are considered 'arms of the state' receive
Eleventh Amendment immunity."). Accordingly, plaintiff's
claims against the County Court, the State Supreme Court,
the Appellate Division, and the Court of Appeals must be
dismissed.

*Claims against Samuel Novara*

The complaint names Samuel Novara, plaintiff's defense
counsel, as a defendant, and either alleges a § 1983 claim
or a state common law legal malpractice claim, or both,
against him. In any event, the claim or claims pled against this
defendant must be dismissed. First, assuming that plaintiff
intended to sue defense counsel under § 1983, such a claim
must be dismissed because criminal defense counsel are not
"state actors" for purposes of the "state action" requirement
of § 1983. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct.
445, 70 L.Ed.2d 509 (1981). Second, assuming that plaintiff
intended to sue his defense counsel for legal malpractice in
relation to the handling and disposition of his criminal matter,
this Court declines to exercise supplemental jurisdiction, 28
U.S.C. § 1367, over said claim because all the federal claims

have been dismissed at the initial stage of the litigation.
*See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d
Cir.2003); 28 U.S.C. § 1367(c)(3); *see also Giordano v. City
of New York,* 274 F.3d 740, 754 (2d Cir .2001) (noting that
dismissal of pendent state law claims is appropriate where all
federal claims have been dismissed and "it appears that the
state issues substantially predominate") (internal quotation
marks omitted). Accordingly, the complaint is dismissed
without prejudice as against defendant Novara.

*CONCLUSION*

Plaintiff has met the statutory requirements of 28 U.S.C.
§ 1915(a). Accordingly, plaintiff's request to proceed *in
forma pauperis* is granted and, for the reasons discussed
above, the complaint is dismissed with prejudice, pursuant
to 28 U.S.C. § 1915(e)(2)(B)(ii), except with respect to the
state common law legal malpractice claim against defendant
Samuel Novara, which is dismissed without prejudice.

**\*4** The Court hereby certifies, pursuant to 28 U.S.C. §
1915(a)(3), that any appeal from this Order would not be
taken in good faith, and leave to appeal to the Court of
Appeals as a poor person is denied. *Coppedge v. United
States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).
Further requests to proceed on appeal as a poor person should
be directed, on motion, to the United States Court of Appeals
for the Second Circuit, in accordance with Rule 24 of the
Federal Rules of Appellate Procedure.

*ORDER*

IT HEREBY IS ORDERED, that plaintiff's request to proceed
*in forma pauperis* is granted;

FURTHER, that the complaint is dismissed with prejudice,
except with respect to the state common law legal malpractice
claim against defendant Samuel Novara, which is dismissed
without prejudice; and

FURTHER, that leave to appeal to the Court of Appeals as a
poor person is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 24243989

---

### Footnotes

1    *See* N.Y.Crim. Proc. Law § 170.55. This disposition cannot be obtained without the consent of both parties and the court. *Id.*

2    Shortly after filing the complaint, plaintiff filed what he entitled a "Table of Contents" which outlines the dates of the various court filings and dispositions that are at issue in his complaint. This Court will treat this Table of Contents as a document attached to the complaint and incorporated by reference in the complaint. *Chance v. Armstrong,* 143 F.3d 698, 698 n. 1 (2d Cir.1998) ("the court may consider facts set forth in exhibits attached as part of the complaint as well as those in the formal complaint itself"); *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1832929
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Russell RILEY, Plaintiff,

v.

Andrew CUOMO, in his official capacity
as governor of the State of New York,
New York State Police, Defendant(s).

2:17-cv-01631 (ADS)(AYS)
|
Signed 04/16/2018

**Attorneys and Law Firms**

Christopher Joseph Cassar, 13 East Carver Street,
Huntington, NY 11743, By: Christopher J. Cassar, Esq., Of
Counsel, Attorney for the Plaintiff.

New York State Office of the Attorney General, Nassau
Regional Office, 200 Old Country Road, Suite 240, Mineola,
NY 11501, By: Christina H. Bedell, Assistant Attorney
General, Counsel for the Defendants.

**MEMORANDUM OF DECISION & ORDER**

ARTHUR D. SPATT, United States District Judge

**\*1** The Plaintiff Russel Riley (the "Plaintiff") brought this
federal civil rights action pursuant to 42 U.S.C. § 1983
("Section 1983") against the Defendants Andrew Cuomo, in
his official capacity of the Governor of the State of New
York ("Governor Cuomo," the "Governor," or "Cuomo") and
the New York State Police (the "NYSP") (collectively, the
"Defendants").

Presently before the Court is a motion by the Defendants
to dismiss the complaint pursuant to Federal Rule of Civil
Procedure ("FED. R. CIV. P.") 12(b)(1) and 12(b)(6). For the
following reasons, the Defendants' motion is granted in its
entirety.

**I. BACKGROUND**

**A. The Relevant Facts**

The following facts are drawn from the Plaintiff's complaint,
and for the purposes of the instant motion, are presumed to
be true.

The Plaintiff owned and had a valid license for ten firearms.
On January 9, 2017, members of the NYSP entered the
Plaintiff's home without a warrant and seized ten firearms.

The firearms have not been returned to the Plaintiff, and there
has been no hearing regarding the seizure of the firearms.

The Plaintiff makes broad references to the New York Secure
Ammunition and Firearms Enforcement Act of 2013 (the
"NY SAFE Act"), but does not explicitly state that his
firearms were confiscated as a result of that statute.

**B. The Relevant Procedural History**

On March 23, 2017, the Plaintiff filed his complaint. The
complaint alleges that the NY SAFE Act is unconstitutional
under the Fourth and Fourteenth Amendments to the United
States Constitution in that it fails to provide gun owners who
have had their firearms seized with a hearing. However, the
Plaintiff does not seek a declaratory judgment declaring that
the NY SAFE Act is unconstitutional. Furthermore, as stated
above, he does not explicitly state that his guns were seized
because of that statute; or, if they were, how that statute
caused his firearms to be seized.

The complaint alleges that the Plaintiff's Fourth, Fifth,
and Fourteenth Amendment rights were violated when the
Defendants seized his firearms without a warrant; failed to
provide him with a hearing; and illegally obtained statements
from him. In those ways, the Defendants allegedly violated
Section 1983.

The Plaintiff seeks declaratory relief in the form of an
order stating that the Defendants violated his constitutional
rights. He asks that the Court order that the firearms be
returned to him. Further, he seeks "a judgment ... requiring the
Defendants to conduct a prompt hearing following the seizure
of the property in all cases at which time the Defendants must
demonstrate probable cause for the seizure of the property and
that it was necessary that the property remain in the custody
of the Defendants." (Compl. Wherefore Clause ¶ 3).

The Plaintiff seeks injunctive and declaratory relief; and
a judgment requiring the Defendants to provide notice
and a hearing to any future victims of seizures similar to
the one experienced by the Plaintiff. The complaint does

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 102 of 183

Riley v. Cuomo, Not Reported in Fed. Supp. (2018)

not explicitly seek damages, but only reasonable attorneys' fees and costs. While the Court notes that the Plaintiff's memorandum in opposition to the motion to dismiss states that "the underlying complaint is not exclusively seeking an award of damages under § 1983," (Pl.'s Mem. in Opp. to Mot. to Dismiss at 4), a plaintiff is not permitted to amend his complaint by virtue of what is said in a memorandum of law, *Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) ("A plaintiff, however, is not permitted to interpose new factual allegations or a new legal theory in opposing a motion to dismiss...." (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) ) ). The complaint does not explicitly seek damages, and the Court cannot construe it otherwise.

**\*2** On September 25, 2017, the Defendants filed the instant motion to dismiss the complaint for lack of jurisdiction pursuant to Rule 12(b)(1), and for failure to state a claim pursuant to Rule 12(b)(6).

## II. DISCUSSION

### A. As to the Defendants' Motion to Dismiss Based on Sovereign Immunity

The Defendants have moved for dismissal based on sovereign immunity pursuant to Rule 12(b)(1).

As an initial matter, the Court first observes that within the Second Circuit, the question of whether a motion to dismiss made on sovereign immunity grounds should be reviewed under Rule 12(b)(1) or under Rule 12(b)(6) remains unresolved. *See Carver v. Nassau Cty. Interim Fin. Auth.,* 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit." (citing *Wisc. Dep't of Corr. v. Schacht,* 524 U.S. 381, 391, 118 S. Ct. 2047, 141 L.Ed. 2d 364 (1998) ) ); *see also Garcia v. Paylock,* 13-CV-2868 KAM, 2014 WL 298593, at \*2 n.3 (E.D.N.Y. Jan. 28, 2014) ("It is an open question in the Second Circuit whether the claims of sovereign immunity should be viewed as raising a question of subject matter jurisdiction, and thus be evaluated under \*339 Rule 12(b)(1), or as an affirmative defense analyzed under Rule 12(b)(6).").

This "distinction is significant," because "while [a district court] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under FED. R. CIV. P. 12(b)(6), ... in adjudicating a motion to dismiss for lack of subject-matter jurisdiction [pursuant to FED. R. CIV. P. 12(b)(1) ], a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 (2d Cir. 2007) (internal citations omitted). As such, in accordance with the approach taken by other district courts within this Circuit, the Court will apply the stricter standard set under Rule 12(b)(6) while analyzing Defendants' sovereign immunity arguments. *See Tiraco v. New York State Bd. of Elections,* 963 F. Supp. 2d 184, 191 n.6 (E.D.N.Y. 2013) (noting that "[t]his distinction [ ] does not alter the outcome" of the case because "the court [ ] considered only the pleadings and the relevant state and federal law and [drew] all inferences in Plaintiff's favor") (citations omitted); *McMillan v. N.Y. State Bd. of Elections,* No. 10-CV-2502 (JG)(VVP), 2010 WL 4065434, at \*3 (E.D.N.Y. Oct. 15, 2010) (looking "only to the pleadings and to state and federal law" to resolve questions regarding sovereign immunity).

### 1. The Rule 12(b)(6) Standard

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir. 2006); *Bold Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.,* 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

**\*3** Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second,

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 103 of 183

Riley v. Cuomo, Not Reported in Fed. Supp. (2015)

only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L.Ed. 2d 868 (2009) ).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

**B. The Eleventh Amendment**
The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *Rowland*, 494 F.3d at 95 (quoting U.S. CONST. AMEND. XI). The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. See *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90-100, 104 S. Ct. 900, 79 L.Ed. 2d 67 (1984); see also *Huminski v. Corsones*, 386 F.3d 116, 133 (2d Cir. 2004). Although the plaintiff generally bears the burden of proving subject matter jurisdiction, the entity claiming Eleventh Amendment immunity bears the burden to prove such. See *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006).

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71, 96 S. Ct. 598, 46 L.Ed. 2d 561 (1976) (quoting 42 U.S.C. § 1983). It is well-settled that states are not "persons" under section 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute. See *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L.Ed. 2d 45 (1989).

**1. Claims Against State Administrative Agencies**
Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction over plaintiffs' claims asserted against the State of New York and its agencies. When the state or one of its "arms" is the defendant, sovereign immunity bars federal courts from entertaining lawsuits against them "regardless of the nature of the relief sought." *Pennhurst*, 465 U.S. at 100.

**a. Application to the Plaintiff's Claims Against the NYSP**

**\*4** As the Eleventh Amendment bars all suits against administrative agencies of a state, the Plaintiff's claims against the NYSP cannot be sustained. Defendant New York State Police is a division in the executive department of New York—see section 210 of New York's Executive Law—and is therefore immune from all claims, both federal and state. Congress has not overridden states' sovereign immunity respecting constitutional claims brought under 42 U.S.C. § 1983. *Will*, 491 U.S. at 109. And it is well established that "New York State has not waived its sovereign immunity from Section 1983 claims." *Nolan v. Cuomo*, No. 11 CV 5827 (DRH)(AKT), 2013 WL 168674, at \*7 (E.D.N.Y. Jan. 16, 2013) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39-40 (2d Cir. 1977) ); see also *Mamot v. Bd. of Regents*, 367 Fed.Appx. 191, 192 (2d Cir. 2010) (summary order); *Dube v. State Univ. of New York*, 900 F.2d 587, 594-95 (2d Cir. 1990) (holding that the Eleventh Amendment precludes an action under Section 1983 against SUNY, an integral part of the State of New York). Therefore, the NYSP is entitled to sovereign immunity on the Plaintiff's claims.

Accordingly, the Defendants' motion to dismiss the Plaintiff's claims against the NYSP is granted.

**2. Claims Against State Officials in Their Official Capacity**
A suit for damages against a state official in his or her official capacity "is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); see also *Will*, 491 U.S. at 71; *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003). However, "the applicability of the Eleventh Amendment bar [to suits against individuals in their official capacities] depends on the form of relief sought." *Lee v.*

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 104 of 183

Riley v. Cuomo, Not Reported in Fed. Supp. (2015)

*Dep't of Children & Families,* 939 F.Supp.2d 160, 165-66 (D. Conn. 2013). Money damages cannot be recovered from state officers sued in their official capacities. *See e.g., Will,* 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against an official but rather is a suit against the official's office."); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L.Ed. 2d 662 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); *Goonewardena v. New York,* 475 F. Supp. 2d 310, 329 (S.D.N.Y 2007) ("[S]overeign immunity also extends to bar claims for monetary damages brought against state officers sued under section 1983 in their official capacities.").

Similarly, "judgments against state officers declaring that they violated federal law in the past" are also not permitted. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 146, 113 S. Ct. 684, 121 L.Ed. 2d 605 (1993) (citing *Green v. Mansour,* 474 U.S. 64, 73, 106 S. Ct. 423, 88 L.Ed. 2d 371 (1985) ). However, prospective injunctive relief is available against individuals being sued in their official capacities in order to correct an ongoing violation of federal law. *See Edelman,* 415 U.S. at 663; *Ex Parte Young,* 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908). In this regard, through the doctrine of *Ex Parte Young,* a party may bring "a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law." *CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.,* 306 F.3d 87, 98 (2d Cir. 2002) (internal quotation marks and alteration omitted); *see also Arthur v. Nyquist,* 573 F.2d 134, 138 (2d Cir. 1978).

In order to determine whether the *Ex parte Young* exception allows the Plaintiff to bring suit against state officials, this Court must first determine whether the complaint alleges an ongoing violation of federal law and second, whether the Plaintiff seeks relief properly characterized as prospective. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S. Ct. 1753, 152 L.Ed. 2d 871 (2002). "[T]o successfully avoid the Eleventh Amendment bar, a plaintiff must prove that a defendant's violation of federal law is of an ongoing nature as opposed to a case 'in which federal law has been violated at one time or another over a period of time in the past.' " *Papasan v. Allain,* 478 U.S. 265, 277-78, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986) (quotation omitted). The inquiry for determining whether an "ongoing violation" exists is, "does the enforcement of the law amount to a continuous violation of plaintiffs constitutional rights or a single act that

continues to have negative consequences for plaintiffs." *New Jersey Educ. Ass'n v. New Jersey,* No. 11-5024, 2012 WL 715284, at *4 (D.N.J. Mar. 5, 2012).

 **\*5** Furthermore, when a plaintiff seeks prospective relief against a state official in their official capacity where the plaintiff alleges that a particular statute is unconstitutional, "the state officer ... 'must have some connection with the enforcement of the act' " that includes "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Kelly v. New York State Civil Serv. Comm'n,* No. 14 CV 716 VB, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) (quoting *Ex Parte Young,* 209 U.S. at 157), *aff'd sub nom. Kelly v. New York Civil Serv. Comm'n,* 632 Fed.Appx. 17 (2d Cir. 2016); *see also CSX Transp.,* 306 F.3d at 99 (amenability to suit under Eleventh Amendment requires "both the power and the duty" to take challenged action).

### a. Application to the Plaintiff's Claims Against Governor Cuomo in His Official Capacity

As stated above, the complaint does not explicitly seek damages. However, even if it did, the Plaintiff would be unable to seek that relief against Governor Cuomo in his official capacity. *Ying Jing Gan,* 996 F.2d at 529 ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." (internal citations omitted) ).

As to his requests for declaratory and injunctive relief, the Court finds that the Plaintiff does not explicitly seek prospective relief. Instead, he seeks a declaration that the Defendants violated federal law in the past, and a return of his firearms. Courts have held that neither of these types of relief are prospective. *See Puerto Rico Aqueduct and Sewer,* 506 U.S. at 146 (stating that "judgments against state officers declaring that they violated federal law in the past" are not permitted under the *Ex Parte Young* doctrine); *Dotson v. Griesa,* 398 F.3d 156, 177 n.16 (2d Cir. 2005) (holding that Second Circuit precedent "preclude[s] a federal court from ordering affirmative action by either the state or federal government employees in their official capacities"); *Nat'l R.R. Passenger Corp. v. McDonald,* 978 F. Supp. 2d 215, 233 (S.D.N.Y. 2013) ("[C]ourts in this Circuit have [held] ... that the return of property taken by the state is barred by the

Riley v. Cuomo, Not Reported in Fed. Supp. (2015)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 105 of 183

Eleventh Amendment because that constitutes 'retrospective' relief." (collecting cases) ), *aff'd*, 779 F.3d 97 (2d Cir. 2015); *Dean v. Abrams*, No. 94 CIV. 3704 (LAK), 1995 WL 791966, at *2 n.5 (S.D.N.Y. Dec. 26, 1995) ("The only exception to the Eleventh Amendment's protection is for 'prospective injunctive relief,' but Dean's demand for ... the return of her property does not qualify for this exception." (collecting cases) ).

While the Plaintiff does ask for an order declaring that the Defendants must afford any future victims of such seizures a prompt and fair hearing, the Plaintiff has not plead sufficient facts to demonstrate that he has standing to request such relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S. Ct. 693, 706, 145 L.Ed. 2d 610 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.")

"In seeking prospective relief like an injunction, a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such judicial decree." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660, 75 L.Ed. 2d 675 (1983) ). A plaintiff cannot seek injunctive relief merely for past injury. *O'Shea*, 414 U.S. at 495-96, 94 S. Ct. 669; *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Instead, "the injury alleged must be capable of being redressed through injunctive relief 'at that moment.' " *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993) (quoting *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51, 111 S. Ct. 1661, 114 L.Ed. 2d 49 (1991) ).

**\*6** Here, the Plaintiff does not allege that his guns will again be seized in the future. Indeed, as stated above, the Plaintiff did not state why his guns were seized. He does not plead sufficient facts to demonstrate standing to seek an order forcing the state to afford any future victims of seizures a prompt and fair hearing because he has not alleged that he will be a victim of such a seizure in the future.

Therefore, the Plaintiff does not seek prospective relief for an ongoing violation of federal law, and cannot avail himself of the *Ex Parte Young* doctrine. Governor Cuomo therefore has sovereign immunity with respect to the Plaintiff's claims.

The Plaintiff contends that he should be permitted to proceed on his theory of supervisory liability until he is able, through discovery, to determine which subordinate officials should

be added to the complaint. This argument is completely unavailing.

First, "[a] defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983." *LaMagna v. Brown*, 474 Fed.Appx. 788, 789 (2d Cir. 2012) (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ); *Richardson*, 347 F.3d at 435 ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (citations and internal quotation marks omitted) ). Instead, "to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases). As the Second Circuit has stated, a supervisory defendant's personal involvement can be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (emphasis omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ).

Accordingly, "supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (quoting *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) ). The Plaintiff does not

allege that any of the above factual circumstances are present here.

Second, the Plaintiff does not even allege that the Governor supervises the NYSP. Indeed, the complaint does not contain any allegations that are specific to Governor Cuomo.

Furthermore, as to the Plaintiff's argument that he should be permitted to maintain suit against Governor Cuomo until he has been afforded an opportunity to identify subordinate officials who have personal liability, the Plaintiff does not meet that "exception" to the supervisory liability rule here. The case cited by the Plaintiff for this very proposition held "[p]ermitting plaintiffs to use discovery as a fishing expedition undermines the principle that only portions of a complaint which satisfy a plausibility standard, *i.e.,* more than possible and less than probable, should unlock the doors of discovery." *Dudek v. Nassau Cty. Sheriff's Dep't,* 991 F. Supp. 2d 402, 414 (E.D.N.Y. 2013) (internal citations and quotation marks omitted).

**\*7** The *Dudek* court relied on the fact that the complaint failed to contain a single factual allegation that any of the supervisory defendant's subordinates were personally involved in the action. Here too, the Plaintiff does not allege that Governor Cuomo supervises members of the NYSP, nor does he allege any specific acts by any individual John Doe officers of the NYSP. Nor would the Plaintiff be permitted to avail himself of the exception allowing discovery to go forward where a litigant raises colorable claims against supervisors because that exception only applies to *pro se* litigants. *See Davis v. Kelly,* 160 F.3d 917, 922 (2d Cir. 1998) ("We therefore hold that when a *pro se* plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur without an opportunity for additional discovery."); *Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 34 (2d Cir. 1996) (holding that where a pro se litigant mistakenly failed to name the individual corrections officers who might be liable, the pro se plaintiff would be afforded opportunity to amend his complaint after discovery); *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir. 1984) (same).

Finally, the Plaintiff is also unable to bring claims against Governor Cuomo based on his allegation that the NY SAFE Act is unconstitutional. The Court notes again that the Plaintiff does not seek an order stating that the NY SAFE Act is unconstitutional. He instead alleges that it is unconstitutional, and seeks an order requiring the Defendants to afford victims of gun seizures fair hearings.

In any event, the Plaintiff has not alleged that the Governor has any duty to enforce the NY SAFE Act. Nor does N.Y. PENAL LAW § 400, the only specific statute cited by the Plaintiff, afford any duty or power to the Governor. To the extent that the Plaintiff relies on the fact that the NY SAFE Act was signed by Governor Cuomo, which the Court notes that he did not allege, "[t]he well-settled doctrine of absolute legislative immunity ... bars actions against legislators or governors ... on the basis of their roles in enacting or signing legislation." *Warden v. Pataki,* 35 F.Supp.2d 354, 358 (S.D.N.Y. 1999), *aff'd sub nom. Chan v. Pataki,* 201 F.3d 430 (2d Cir. 1999). Furthermore, "the vast majority of courts ... have held ... that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." *Warden,* 35 F. Supp. 2d at 359.

Therefore, the Plaintiff has failed to allege that Governor Cuomo has the power or duty to take action regarding the NY SAFE Act, and the Governor has sovereign immunity over those claims.

Accordingly, the Defendants' motion to dismiss the Plaintiff's claims against Governor Cuomo is granted.

### III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the complaint based on sovereign immunity is granted in its entirety. The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 1832929

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4145456
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lawrence L. FINKELMAN, Plaintiff,
v.
NEW YORK STATE POLICE, Unknown Governmental
Entities-John Doe's-Jane Doe's 1-100, Defendants.

No. 06 Civ. 8705(JSR).
|
Nov. 15, 2007.

*ORDER*

JED S. RAKOFF, District Judge.

**\*1** On August 20, 2007, the Honorable Kevin Nathaniel
Fox, United States Magistrate Judge, issued a Report
and Recommendation in the above-captioned matter
recommending that plaintiff's claims against defendant New
York State Police be dismissed but that in all other respects
the defendant's motion to dismiss the complaint be denied.
Subsequently, on September 17, 2007, defendant New York
State Police submitted objections to certain portions of the
Report and Recommendation. Accordingly, the Court has
reviewed the motion and the underlying record *de novo.*

Having done so, the Court finds itself in complete agreement
with Magistrate Judge Fox's Report and Recommendation
and hereby adopts its reasoning by reference. Accordingly, the
Court dismisses the claims against the New York State Police,
with prejudice, but denies the motion to dismiss in all other
respects. The Clerk of the Court is directed to close document
number 4 in the Court's docket.

There is, however, an issue as to the remaining defendants
that was only raised now before this Court and that needs to
be addressed by the Magistrate Judge in the first instance,
viz., whether the remaining defendants have been actually
served and, if not, whether belated service at this point
would be untimely and prejudicial. Accordingly, the Court
remands the case to Magistrate Judge Fox to issue a Report
and Recommendation on the issue of whether defendants
"Unknown Governmental Entities-John Doe's-Jane Doe's
1-100" have been served in this action and whether, if they

have not been, the claims against those defendants should be
dismissed pursuant to Federal Rule of Civil Procedure 4(m)
or otherwise, and with or without prejudice.

SO ORDERED.

**REPORT & RECOMMENDATION**

KEVIN NATHANIEL FOX, United States Magistrate Judge.

TO THE HONORABLE JED S. RAKOFF, UNITED
STATES DISTRICT JUDGE

**I. INTRODUCTION**

Plaintiff Lawrence L. Finkelman ("Finkelman"), proceeding
*pro se,* commenced this action pursuant to 42 U.S.C. §§
1983, 1985, and 1986, against New York State Police
and "Unknown Government Entities-John Doe's-Jane Doe's
1-100" ("defendants"). He contends the defendants conspired
to violate his civil rights when, in 2001, without a warrant
or probable cause, they forced him from his vehicle by
threatening him with physical harm, arrest, and criminal
charges, and locked him in their patrol car, thus violating
both New York and federal penal laws. Finkelman alleges
the conspiracy continued when the defendants twice filed
false documents in New York State courts in the years that
followed.

Before the Court is the defendants' motion, made pursuant
to Rule 12(b)(1) of the Federal Rules of Civil Procedure, to
dismiss the claim against defendant New York State Police
because the Eleventh Amendment bars suit against a state
and its agencies. The defendants also contend Finkelman's
claims are barred by a three-year statute of limitations and,
as such, permitting him to amend the complaint would be
futile. [1] Finkelman opposes the defendants' motion to dismiss
and their contention that the applicable statute of limitations
has expired.

**II. BACKGROUND**

**\*2** Finkelman maintains that some time prior to November
28, 2001, the defendants, acting under the color of law,
conspired to kidnap and arrest him unlawfully in violation
of the Fourth, Fifth, Eighth and Fourteenth Amendments.
He contends the defendants' actions constitute violations of

federal and state criminal statutes: 18 § U .S.C. 1201 and New York Penal Law § 135.20. According to Finkelman, on November 28, 2001, the defendants lay in wait for him on Interstate Highway 87 and ordered him out of his car. Finkelman alleges the defendants acted without a warrant or probable cause to believe he had committed an offense. Finkelman recalls the defendants threatened to use deadly force and to arrest and charge him for acts he never committed. Finkelman also alleges that "[t]he defendants [,] upon learning that the plaintiff had the evidence from the [ ] grand larceny in his possession [,] locked the plaintiff up in the back [of] their patrol vehicle," and continued to threaten him while he was in their custody. Finkelman maintains the defendants destroyed the evidence he possessed and asked him if he was going to accuse them of grand larceny.

Finkelman alleges that, on November 3, 2004, "[d]efendants knowingly filed a fraudulent and perjurious complaint against the plaintiff" to further the goals of their conspiracy and to prosecute a "malicious, fradulent and perjurious lawsuit." According to the plaintiff, the defendants engaged in similar misconduct on October 31, 2005, December 28, 2005, and twice on December 29, 2005, when they filed documents related to him, which they knew to be false and perjurious.

Finkelman alleges the defendants "knowingly failed to disclose to the plaintiff, and actively took steps to conceal material information and criminal acts known only to the Defendants regarding the herein criminal violation of the Constitution and laws of the United States and New York," in order to "prevent the plaintiff from filing criminal complaints and making public the criminal acts [enumerated in the instant complaint] and corruption."

Finkelman contends the defendants violated his Sixth and Seventh Amendment rights by using their official positions to deny him the right to a speedy trial, a jury trial, and "compulsory process for obtaining witnesses." Finkelman also contends that the defendants had the opportunity and authority to stop the civil rights violations he alleges were perpetrated, but they declined to do so. According to Finkelman, all the defendants' acts were committed to shield them from prosecution and to intimidate him because the defendants knew he was "a plaintiff and witness in a felony criminal matter against them. [Therefore, t]he [d]efendants [ ] threatened and intimidated [him] to deter him from attending, testifying and initiating a criminal complaint and/or suit in a State Court of the United States and to interfere with judicial proceedings."

On October 26, 2006, Finkelman commenced the instant action. Thereafter, on November 2, 2006, he amended his complaint by removing, as defendants to the action: "State of New York;" "John Doe 1-20;" and "Jane Doe 1-20" and replacing them with the following defendants: "New York State Police" "Unknown Government Entities-John Doe's-Jane Doe's 1-100." Finkelman has also included, in his amended complaint, a request that the court direct the defendants to disclose to him documents which will enable him to learn the names of the individual defendants and, thereafter, serve them with process. Finkelman has asked, *inter alia,* that the court grant him injunctive relief and direct the defendants to avoid contacting any potential witnesses unless he is present.

### III. DISCUSSION

**\*3**  A court may dismiss an action pursuant to Fed.R.Civ.P. 12(b) (1), for lack of subject matter jurisdiction, only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Raila v. United States,* 355 F.3d 118, 119 (2d Cir.2004). In considering a motion made pursuant to Fed.R.Civ.P. (12)(b)(1), "[a] court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Id.* Further, "[o]n a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." *Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004) (quoting *Garcia v. Akwesasne Hous. Auth.,* 268 F.3d 76, 84 (2d Cir.2001).

"In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings." *See Makarova v. United States* 201 F.3d 110, 113 (2d Cir.2000). Additionally, where, as here, the plaintiff is appearing *pro se,* his or her pleadings "are [to be] held 'to less stringent standards than formal pleadings drafted by lawyers,' " *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 176 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595 [1972] ), and should be interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 [2d Cir.1994] ). This liberal pleading standard is particularly applicable where a *pro se* plaintiff alleges a violation of his

or her civil rights. *See Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005).

In their motion to dismiss, the defendants contend that the Eleventh Amendment bars suit against the state of New York and its agencies and, as a result, defendant New York State Police is immune from suit. Finkelman responds that states "must first be in compliance with the Constitution and the laws of the United States" before the Eleventh Amendment is to be applied.

Under the Eleventh Amendment, a state or an arm of a state may not be sued in a federal court absent the state's consent. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 687-88 (1993) (citations omitted). Defendant New York State Police is an arm of the state, and therefore an action brought against it is a suit against the state. *See, e.g., Morrongiello v. Ashcroft,* No. 01 Civ. 2524, 2004 WL 112944, at *2 (S.D.N.Y. Jan. 22, 2004). Sections 1983 and 1985 of Title 42 were not intended to abrogate the states' immunity. *See Degrafinreid v. Ricks,* No. 03 Civ. 6645, 2004 WL 2793168, at *5 (S .D.N.Y. Dec. 6, 2004). The state of New York has not consented to suit in federal court under: (a) 42 U.S.C. § 1983, *see Le Grand v. Evan,* 702 F.2d 415, 417 (2d Cir.1983); (b) 42 U.S.C. § 1985, *see Quirk v. City of New York,* No. 03 Civ. 0324, 2003 WL 1872714, at *1 (S.D.N.Y. Apr. 10, 2003); or (c) 42 U.S.C. § 1986, *see Gaspark v. Stony Brook University,* No. CV-05-3817, 2007 WL 2026612, at *4 (E.D.N.Y. July 9, 2007).

**\*4** Accordingly, Finkelman's claims against defendant New York State Police should be dismissed. However, the complaint contains claims against "John Does and Jane Does 1-100," which the defendants have not addressed. Therefore, dismissal of the entire complaint is not warranted at this time.

## IV. RECOMMENDATION

For the reasons set forth above, the defendants' motion to dismiss the complaint should be denied. The claims against defendant New York State Police should be dismissed.

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of the Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, United States District Judge, 500 Pearl St., Room 1340, New York, New York 10007, and to the chambers of the undersigned, 40 Centre St., Room 540, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Candair Ltd.,* 838 F .2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4145456

---

## Footnotes

1      The defendants have failed to make a proper motion addressing their statute of limitations defense. Therefore, the Court has determined not to analyze that defense in this writing.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4392422
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John SAGARIA, Plaintiff,
v.
ORANGE COUNTY JAIL, et al., Defendants.

No. 20-CV-2287 (KMK)
|
Signed 09/24/2021

**Attorneys and Law Firms**

Michael David Meth, Esq., Meth Law Offices, PC, Chester, NY, Counsel for Plaintiff.

Anthony Francisco Cardoso, Esq., Orange County Attorney's Office, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff John Sagaria ("Plaintiff") brings this Action pursuant to 42 U.S.C. § 1983 against the Orange County Jail (the "Jail"), the Orange County Sheriff's Department (the "Sheriff's Department"), and the County of Orange (the "County"; collectively "Defendants") for wrongful incarceration in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article 1 Section 6 of the New York State Constitution. (Compl. (Dkt. No. 1).) Before the Court is Defendants' Motion to Dismiss (the "Motion"). (Not. of Mot. (Dkt. No. 25).) For the following reasons, the Motion is granted.

I. Background

A. Factual Background
The following facts, drawn from Plaintiff's Complaint, are taken as true for the purpose of resolving the instant Motion.

Plaintiff is a businessman who has lived in Orange County, New York for over 25 years. (Compl. ¶ 12.) His primary source of income is the two businesses he owns, both of which he must be present to operate. (*Id*.) Plaintiff also

is the plaintiff in a contentious divorce proceeding in the Supreme Court of Orange County, New York (the "state court"). (*Id*. ¶ 13.) On December 14, 2018, during a custody hearing related to this divorce proceeding, Plaintiff's ex-wife's counsel, Barbara Strauss, Esq. ("Strauss"), raised the issue of Plaintiff's unpaid spousal support. (*Id*. ¶ 14.) The state court denied Plaintiff's request for a hearing and offer of proof on the non-payment issue. (*Id*. ¶ 15.) Plaintiff was held in summary contempt of court for non-payment of spousal support, and the state court ordered his immediate detention. (*Id*.) The state court remanded Plaintiff to the Jail pursuant to an order of commitment. (*Id*. ¶ 17.) Plaintiff alleges that the state court set $25,000 as the payment required for Plaintiff to purge his contempt. (*Id*. ¶ 16.) The Court takes judicial notice of the order of commitment, which states that Plaintiff could purge his contempt by "paying the partial sum of $25,889.64 to C[ynthia] S[agaria]," and orders Plaintiff to be imprisoned for 30 days, "or until the purge sum of $25,889.64 is paid." (*See* Decl. of Anthony F. Cardoso in Supp. ("Cardoso Decl.") Ex. B ("Order of Commitment") (Dkt. No. 26-2).) *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").[1]

On December 17, 2018, Plaintiff paid $25,000 to Strauss by credit card. (Compl. ¶ 19.) Strauss subsequently issued a Letter of Release to the state court and brought the letter and payment confirmation to the Sheriff's Department. (*Id*.) The Sheriff's Department refused to release Plaintiff because the release letter did not come from the state court. (*Id*. ¶¶ 19, 20.) The state court refused to sign the release order. (*Id*. ¶ 21.)

**\*2** On December 19, 2018, Plaintiff paid an additional $28,090.26 by credit card to the Sheriff's Department GOVPAY EXP Payment Service to satisfy the purge amount. (*Id*. ¶ 22.) This sum included $3,090.26 in fees. (*Id*. ¶ 23.) The Sheriff's Department charged Plaintiff's credit card. (*Id*.) Subsequently, the Sheriff's Department stated that it could accept only $10,000 via credit card. (*Id*. ¶ 24.) The Sheriff's Department stated that Plaintiff had to pay $25,000 in cash at the window of the Jail to be released. (*Id*. ¶ 26.) While Plaintiff's family and friends were gathering cash, he was advised by the state court that an additional $1,639.644 paid directly to Strauss would be required for release. (*Id*. ¶¶ 28, 30.) Plaintiff paid Strauss $1,639.44 in cash and was released on December 19, 2018 at 8:30 P.M. (*Id*. ¶¶ 30–31.) The

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 111 of 183

following day, GOVPAY EXP credited Plaintiff's credit card the $28,090.26 previously paid. (*Id.* ¶¶ 22, 33.)

Plaintiff seeks compensatory and special damages— including for emotional injury and loss of liberty, punitive damages, pre- and post-judgment interest, and attorneys' fees and costs. (*Id.* ¶ 34 & 10–11.) [2]

B. Procedural Background
Plaintiff filed his Complaint on March 13, 2020. (Compl.) On September 28, 2020, Defendants submitted a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss pursuant to Rule 12(b)(6). (Dkt. No. 21.) On October 8, 2020, the Court ordered Plaintiff to respond to Defendant's pre-motion letter by October 13, 2020, (Dkt. No. 22), which Plaintiff did, (Dkt. No. 23). On October 20, 2020, the Court adopted a briefing schedule. (Dkt. No. 24.) On November 20, 2020, Defendants filed their Motion To Dismiss. (Not. of Mot.; Cardoso Decl. (Dkt. No. 26); Not. of Mot. on Behalf of Defs. ("Defs.' Mem.") (Dkt. No. 27).) Plaintiff filed a memorandum of law in opposition to the Motion To Dismiss on December 18, 2020. (Mem. of Law in Opp'n ("Pl.'s Mem.") (Dkt. No. 28).) Defendants filed their Reply on January 5, 2021. (Reply Mem. of Law in Further Supp. of Mot. To Dismiss on Behalf of the Defs. ("Defs.' Reply") (Dkt. No. 29).)

II. Discussion

A. Standard of Review
When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (citation and quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff

has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *Twombly,* 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath,* 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, the "purpose of *Federal Rule of Civil Procedure 12(b)(6)* is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir. 2011) (citation and quotation marks omitted). To decide the motion, the Court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 64 (2d Cir. 2010) (citation and quotation marks omitted).

B. Analysis

1. Claims Against the Jail and the Sheriff's Department

**\*3** The Jail and the Sheriff's Department argue that they are administrative arms of the County and cannot be sued independently under New York law. (Defs.' Mem. 12.) The Court agrees.

The Orange County Sheriff's Department is a municipal department of the County of Orange, State of New York. Sheriff's Office, *Sheriff's Office: Orange County, New York,* https://www.orangecountygov.com/1650/Sheriffs-Office (last visited September 24, 2021). The Sheriff's Department is subdivided into multiple divisions. *Id.* The Orange County Jail is a subdivision of the Sheriff's Department. Orange County, *Corrections (Jail),* https://www.orangecountygov.com/511/Corrections-Jail (last visited September 24, 2021). The Jail is responsible for operating and maintaining the County's correctional system. *Id.* [3]

Pursuant to *Federal Rule of Civil Procedure 17,* federal courts must look to state law when deciding whether a government entity may be sued. *Fed. R. Civ. P. 17(b)(3)* (providing that capacity to be sued is determined "for all ... parties [except individuals or corporations] by the law of the state where

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 112 of 183

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

the court is located"); *see also Fanelli v. Town of Harrison*, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999) ("New York law governs the capacity of a police department to sue or be sued."); *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995) ("[T]he capacity of a governmental entity to sue or be sued is a question of state law."). "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *McCloud v. Dzurenda*, No. 20-CV-6393, 2021 WL 1924181, at *3 (E.D.N.Y. May 13, 2021) (quoting *Rose v. County of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012)); *see also Carr v. County of Sullivan*, No. 16-CV-06850, 2018 WL 3733952, at *2 n.6 (S.D.N.Y. Aug. 3, 2018) (noting that departments are "merely administrative arms of a municipality [that] do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued"); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) (holding that "municipal departments in this State ... are not amenable to suit, and no claims can lie directly against them"); *Hoisington v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) (finding that "municipal departments like the Department of Social Services are not amenable to suit"). Neither the Sheriff's Department nor the Jail exist separate and apart from the County and, as a result, neither can be sued. *See Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (finding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Carr*, 2018 WL 3733952, at *2 n.6 (holding that the Fallsburg Police Department cannot be sued because "[i]t is well-settled that departments that are merely administrative arms of a municipality do not have legal identity separate and apart from the municipality and, therefore, cannot sue or be sued"); *Campbell v. Sposato*, No. 15-CV-1958, 2015 WL 9267222, at *4 (E.D.N.Y. Nov. 17, 2015) (finding Nassau County Correctional Center was not a proper party because it was an arm of the Department of Sheriff, which was a Nassau County department), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015); *Joseph v. Nassau Cnty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at *3 (E.D.N.Y. Apr. 19, 2013) (same); *Polite*, 60 F. Supp. 2d at 216–17 (dismissing claims against the Clarkstown Police Department); *see also* N.Y. GEN. MUN. LAW § 2 (noting that counties are defined as "municipal corporations").

**\*4** Thus, Plaintiff's claims against the Sheriff's Department and the Jail are dismissed with prejudice. This outcome does not "subject ... Plaintiff to indefinite arbitrary detention." (Pl.'s Mem. 22.) Plaintiff may seek recourse against the County, which "has already been named as a defendant." *Umhey v. County of Orange*, 957 F. Supp. 525, 532 (S.D.N.Y. 1997).

## 2. Due Process

Plaintiff claims that the delay in his release violated his due process rights. (Compl. ¶¶ 49–51.) The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Plaintiff brings both substantive and procedural due process claims under the Fourteenth Amendment. To state a procedural due process claim, a plaintiff "must first establish that he enjoyed a protected liberty interest." *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998). If a plaintiff establishes such a protected interest, the next question is whether "the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). The Fourteenth Amendment guarantees " 'more than fair process'; it 'cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.' " *Hurd v. Fredenburg*, 984 F.3d 1075, 1087 (2d Cir. 2021) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). To state a substantive due process claim, Plaintiff must allege: (1) a valid liberty or property interest, (2) which Defendants infringed in an arbitrary or irrational manner. *See Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (quotation marks omitted).

Plaintiff alleges a valid liberty interest for both a procedural and substantive due process claim. Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action[,] ... commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citation and quotation marks omitted). Here, Plaintiff alleges that he was wrongfully detained for 30 additional hours. (Compl. ¶¶ 51–53.) The Court assumes

without deciding that improper detention for this amount of time can violate substantive due process. *See Lynch v. City of New York*, 335 F. Supp. 3d 645, 655 (S.D.N.Y. 2018) (holding unconstitutional the Department of Correction's practice of forcing detainees who had already paid bail to remain detained until a critical mass awaiting release formed). Thus, the key questions are (1) whether Plaintiff plausibly alleges that Defendants failed to use constitutionally sufficient procedures, and (2) whether Plaintiff's confinement was arbitrary or irrational. The Court concludes on both questions that Plaintiff has failed to state a claim.

### a. Procedural Due Process

Given that Plaintiff had a liberty interest in freedom from bodily restraint, the question is "whether the government deprived the plaintiff of that interest without due process," which examines "what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

### i. First Payment Attempt

**\*5** Plaintiff claims that Defendants failed to use constitutionally sufficient procedures in delaying his release after the Jail received a letter from Strauss consenting to Plaintiff's release. (Pl.'s Mem. 10–11.) The Court disagrees.

The Complaint acknowledges that Plaintiff was detained pursuant to a commitment order after a finding of contempt. (*See* Compl. ¶¶ 15, 17.) Plaintiff does not challenge the facial validity of this commitment order. (*See generally id.*) [4] Nor does he allege that he challenged the commitment order while he was detained. (*See generally id.*; *see also* Pl.'s Mem. 13 (stating that Plaintiff "never challenged the order").) Of course, Plaintiff was "free to raise ... legal challenges ... by seeking to have the commitment order vacated." *Ngemi v. County of Nassau*, 87 F. Supp. 3d 413, 419 (E.D.N.Y. 2015). [5] Absent such a challenge, Defendants were "bound to execute the valid order as it [was] written." *Id.* (citing *Tornheim v. Eason*, 363 F. Supp. 2d 674, 677 (S.D.N.Y. 2005) ("A sheriff is not empowered to review a facially valid court order; it is not within his scope of authority to question the legality of the provision in the [j]udgment."), *aff'd*, 175 F. App'x 427 (2d Cir.

2006)). As a result, to the extent they acted consistent with the commitment order, Defendants are entitled to quasi-judicial immunity. (*See* Defs.' Mem. 13.) *See Fludd v. Fischer*, No. 10-CV-6603, 2012 WL 3749652, at \*5 (W.D.N.Y. Aug. 28, 2012) ("Government officials carrying out a facially valid court order are entitled to immunity to suits for damages under § 1983."), *aff'd in part, vacated in part on other grounds, remanded*, 568 F. App'x 70 (2d Cir. 2014); *Tornheim*, 363 F. Supp. 2d at 677 (finding that a municipal official sued in his official capacity for executing a court order was "entitled to an absolute quasi-judicial immunity because his actions —undertaken in performance of his official duties—ha[d] an integral relationship with the judicial process"); *Respass v. N.Y.C. Police Dep't*, 852 F. Supp. 173, 177 (E.D.N.Y. 1994) (finding it "highly unlikely that the mere averment that the warden failed to look behind the facial validity of [the] plaintiff's commitment order would state a claim against the Department of Corrections"). [6]

**\*6** Plaintiff's claim thus turns on whether Plaintiff has plausibly alleged that Defendants acted beyond the scope of the commitment order. He has not. The commitment order allowed Plaintiff to purge his contempt by paying Cynthia Sagaria $25,889.64. (*See* Order of Commitment.) *See N.Y.C. Transit Auth. v. Transp. Workers Union of Am.*, 822 N.Y.S.2d 579, 589 (App. Div. 2006) (noting that a civil contemnor may end his or her incarceration by satisfying the purge conditions). Plaintiff's payment of $25,000 on December 17, 2019 was less than the required $25,889.64. (*See* Compl. ¶ 19; Order of Commitment.) Strauss's letter consenting to Plaintiff's release likewise did not require Plaintiff's release, because the commitment order did not specify that Plaintiff would be released upon consent by his ex-wife. (*See* Order of Commitment.) Because Plaintiff does not claim that Defendants violated the commitment order, he has not alleged that Defendants violated his due process rights by delaying his release after his first attempted payment. *See Ngemi*, 87 F. Supp. 3d at 419 (finding that where the sheriff was executing a facially valid commitment order by placing the plaintiff in custody, the plaintiff's complaint did not allege a valid procedural due process against any employee of the Sheriff's Office); *Pack v. Hynes*, Nos. 04-CV-574, 04-CV-2907, 2004 WL 3090592, at \*2 (E.D.N.Y. Aug. 18, 2004) ("The superintendents of various New York State correctional institutions had custody of [the] plaintiff under a sentence and judgment of convictions [that were] valid on their face. No valid claim is stated against them individually or together.").

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 114 of 183

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

Plaintiff cites *Town of Wilmurt v. Wright*, 171 N.Y.S. 230 (App. Div. 1918), to argue that Defendants would have been "entirely justified" in releasing Plaintiff due to his ex-wife's consent, (Pl.'s Mem. 10–11). However, *Wright* is consistent with the Court's reasoning. There, the parties were able "to agree upon [a] settlement, which would release the defendant from imprisonment." *Wright*, 171 N.Y.S. at 232. However, the defendant was released only because "an order was made discharging the defendant." *Id.* In other words, the defendant in *Wright* received a court order reversing a prior detention order. *See also First Mariner Bank v. Resol. L. Grp., P.C.*, No. 12-CV-1133, 2014 WL 1681986, at *3 (D. Md. Apr. 28, 2014) (ordering that the defendants had purged civil contempt). Defendants are not liable merely because Plaintiff failed to seek the same.

### ii. Second Payment Attempt

Plaintiff argues that the County violated his due process rights by refusing to release him after he attempted to pay the full purge amount via credit card. (Pl.'s Mem. 11–12.) The Court disagrees. [7]

Numerous courts have held that there is no "constitutional right to a certain type of bond." *Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998); *see also Guam v. Tuncap*, 2011 Guam 24 ¶ 12 (noting that "other courts have held that there is no established right to a certain type of bond"); *Campbell v. Johnson*, No. 06-CV-365, 2006 WL 3408177, at *2 (N.D. Fla. Nov. 27, 2006) (holding that "there is no established constitutional right to a certain type of bond"); *cf. Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2018) (finding it unlikely "that the Excessive Bail Clause guarantees a right to monetary bail"). The history of New York's bail law is consistent with this principle. New York's law was "intended to reform the restrictive bail scheme" and "improve the availability of pretrial release." *People ex rel. McManus v. Horn*, 967 N.E.2d 671, 674 (N.Y. 2012). This law allows a court to require that "bail be posted in any one of three or more ... forms." N.Y. CRIM. PROC. LAW § 520.10(2)(b). The statute lists nine possible bail forms, and "[c]redit card or similar device" is only one of the options. *Id.* § 520.10(1). Thus, even in a bail regime designed to improve the availability of pretrial release, a criminal defendant is not entitled to pay bail by credit card. *See, e.g., People v. Disimile*, 142 N.Y.S.3d 319, 322 (County Ct. 2021) (setting bail as "$30,000 cash, $60,000 insurance company bond or $200,000 partially secured appearance bond with a 10% cash component"). In light of this history, it is

unsurprising that courts have rejected claims that refusing to accept credit card payment for bail is unconstitutional. *See, e.g., Wells v. Ward*, 470 F.2d 1185, 1185 (10th Cir. 1972) (affirming summary judgment against a plaintiff who alleged that "the jailer refused to accept his bail bond credit card"); *see also Kinsey v. Ohio*, No. 20-3315, 2021 WL 1100494, at *1 (6th Cir. Jan. 11, 2021) (summary order) (affirming summary judgment against a plaintiff who claimed that he was "was not permitted to pay the bail with a credit card because cash was the only acceptable method of pay"); *cf. Keele v. City of St. John*, No. 10-CV-811, 2011 WL 453254, at *3, *4 (E.D. Mo. Feb. 4, 2011) (dismissing on statute of limitations grounds the plaintiff's constitutional claim that the defendants "refused to take checks or credit cards as payment for bail").

**\*7** Finally, the Sheriff's Department did not violate Plaintiff's constitutional rights by incorrectly advising him that he could pay the full purge amount via credit card. Simply put, such miscommunications do not qualify as constitutional fouls. *See Blackburn v. Wash. Dep't of Soc. & Health Servs.*, No. 11-CV-5385, 2011 WL 3563741, at *2 (W.D. Wash. Aug. 12, 2011) (finding that, where "a miscommunication occurred over the course of one weekend," this "regrettable mistake" did not "amount[ ] to a violation under ... the Constitution because it was unintentional and brief"), *aff'd*, 472 F. App'x 569 (9th Cir. 2012); *cf. Brown v. Strickland*, No. 09-CV-3248, 2009 WL 3414344, at *1 (S.D. Tex. Oct. 20, 2009) ("Neither simple negligence nor gross negligence is enough for constitutional liability. A simple mistake does not violate the Constitution." (citation omitted)).

Because Defendants' refusal to allow Plaintiff to pay more than $10,000 via credit card towards purging his contempt does not rise to the level of a constitutional violation, Plaintiff's procedural due process claim must be dismissed. [8]

### b. Substantive Due Process [9]

The Court considers whether Plaintiff's prolonged detention was arbitrary. *See Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trs.*, 660 F.3d 612, 626 (2d Cir. 2011) (citation omitted). "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human

dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (citation and quotation marks omitted).

**\*8** "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). An individual who has not been adjudged guilty of a crime, like Plaintiff, may therefore only be subjected to the restrictions of a detention facility so long as they "do not amount to punishment." *Fusco v. County of Putnam*, No. 15-CV-08132, 2018 WL 1889070, at \*7 (S.D.N.Y. Apr. 18, 2018) (citing *Bell*, 441 U.S. at 536). The Second Circuit has recognized that in assessing whether prison restrictions imposed on individuals without criminal convictions comport with substantive due process, "a court must decide whether the restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 61 (2d Cir. 2017) (alterations omitted) (quoting *Bell*, 441 U.S. at 538). [10]

When executive action "infringes a protected right, a plaintiff must show not just that the action was literally arbitrary, but that it was 'arbitrary in the constitutional sense.' " *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (citation omitted). In other words, only conduct that "shocks the conscience" will form the basis for a substantive due process violation for executive action. *Id.* In the Second Circuit, "whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken." *Id.*

Plaintiff claims that his release was delayed 30 hours. (Compl. ¶ 53.) This detention period is distinguishable from *Lynch*, which Plaintiff cites to argue that prolonged detention may violate due process. (Pl.'s Mem. 16–17.) In *Lynch*, the court found that a city violated the plaintiff's substantive due process rights with its practice of forcing detainees who had already paid bail to remain detained until a critical mass formed, with no justification other than convenience. 335 F. Supp. 3d at 655. Here, unlike in *Lynch*, Plaintiff has not alleged that Defendants have a formal policy of prolonging the release of incarcerated individuals by transferring them elsewhere. (*See generally* Compl.) Nor has Plaintiff alleged that Defendants deprived him of the ability to purge contempt. *See supra* (discussing the absence of a constitutional right to make bail payments via credit card). Therefore, the Sheriff Department's decision to delay Plaintiff's release after it mistakenly accepted his payment

does not rise to a level that is "arbitrary in the constitutional sense.' " *O'Connor*, 426 F.3d at 203. Nor does a credit card cap "shock[ ] the conscience." *Id.*; *see also Davidson v. City of Bridgeport*, 487 F. App'x 590, 592 (2d Cir. 2012) (summary order) (holding that to establish "egregious and conscience-shocking" behavior, the plaintiff must show that the municipality "engaged in deliberate malfeasance"). Thus, Plaintiff's Fourteenth Amendment substantive due process claim is dismissed.

### 3. Eighth Amendment

Next Plaintiff claims that the delay in release time violated his Eighth Amendment rights. (Compl. ¶¶ 49–51.) Because Plaintiff was incarcerated due to an official order of commitment for failure to pay spousal support and not a criminal conviction, his delayed release claim falls under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). While a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)), as discussed, Plaintiff has failed to allege a Due Process claim. Further, because Plaintiff was not a criminal defendant, it is unclear that he is protected by the Eighth Amendment Excessive Bail Clause. *See Kehl*, 456 F.2d at 868–69. Even if he were, Plaintiff alleges that the state court set his purge amount, (*see* Compl. ¶ 16; *see also* Order of Commitment), and Plaintiff does not name the state court as a defendant, *see supra* Footnote 5. Plaintiff's Eighth Amendment claim is therefore dismissed. [11]

### III. Conclusion

**\*9** For the foregoing reasons, Moving Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. Failure to file an amended complaint could result in dismissal of this case with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 25).

SO ORDERED.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 116 of 183

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4392422

---

### Footnotes

1    Plaintiff does not appear to contest this payment figure. (*See generally* Pl.'s Mem.) Indeed, he incorporates it into his brief. (*See id.* at 3, 12.)

2    Because the Complaint is not paginated, the Court refers where there are no paragraph numbers to the ECF-generated page numbers in the upper right-hand corner.

3    The Court may take judicial notice of the structure of the Orange County government because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 763 (S.D.N.Y. 2019) (citing *Kramer*, 937 F.2d at 774), *reconsideration denied in part*, No. 17-CV-9178, 2019 WL 2866113 (S.D.N.Y. July 2, 2019); *cf. Gjolaj v. Bureau of Citizenship & Immigr. Servs.*, 468 F.3d 140, 143 n.2 (2d Cir. 2006) (holding that a court may take judicial notice of "a fundamental change in the political structure and government of Albania").

4    The Court notes that the order of commitment provided "how much [Plaintiff] should pay ... in order to purge himself from contempt," which is one requirement for facial validity under New York law. *See Garenani v. County of Clinton*, 552 F. Supp. 2d 328, 333 (N.D.N.Y. 2008) (citing *Loeber v. Teresi*, 681 N.Y.S.2d 416, 419 (App. Div. 1998)); *see also* N.Y. JUD. LAW § 774(1) (requiring that a commitment order "specify the amount of the fine, and the duration of the imprisonment").

5    Plaintiff alleges that the state court refused to sign the release order, (*see* Compl. ¶ 21; Pl.'s Mem. 11), and arbitrarily changed the purge conditions, (*see* Compl. ¶ 30; Pl.'s Mem. 2, 4, 10, 14). The Court does not consider these claims because the state court is neither a defendant in this Action nor a County employee. *See* N.Y. JUD. LAW § 39(6) ("[A]ll justices, judges, and nonjudicial officers and employees of the courts and court-related agencies of the unified court system ... shall be employees of the state of New York ...."). For the same reason, the Court rejects Plaintiff's argument that the state court failed to allow the required ten-day notice before considering Plaintiff's ex-wife's contempt application. (*See* Pl.'s Mem. 9.)

6    Plaintiff briefs only the issue of qualified immunity, which is not relevant to the issue of quasi-judicial immunity. As such, the Court does not address it. (*See* Pl.'s Mem. 22–23.)

7    The Court assumes without deciding that Plaintiff enjoys due process protections equivalent to those provided by the Eighth Amendment Excessive Bail Clause, even though he was detained for civil contempt. *Cf. U. S. ex rel. Goodman v. Kehl*, 456 F.2d 863, 868–69 (2d Cir. 1972) ("How far, in light of the rather obvious thrust of the Eighth Amendment toward criminal prosecutions, these principles apply to orders for civil contempt whose purpose is not to punish but to secure obedience to a court's processes may be a different question.").

8    Plaintiff's false imprisonment claim, (*see* Compl. ¶ 52), is dismissed for the same reason. Federal courts look to New York law to determine the elements of a cause of action for false imprisonment. *See Tobias v. County of Putnam*, 191 F. Supp. 2d 364, 375 (S.D.N.Y. 2002). Under New York law, "where a facially valid order issued by a court with proper jurisdiction directs confinement, that confinement is privileged and everyone connected with the matter is protected from liability for false imprisonment." *Aponte v. Fischer*, No.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 117 of 183

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

14-CV-3989, 2020 WL 1911190, at *10 (S.D.N.Y. Aug. 20, 2020) (citing *Holmberg v. County of Albany*, 738 N.Y.S.2d 701, 703 (App. Div. 2002)).

9       While a plaintiff may simultaneously assert liberty interests based on procedural and substantive due process protection, if the Court finds that "the claim for substantive due process is subsumed by" the procedural due process claim, "it must be dismissed." *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013); *see also Cherry v. N.Y.C. Hous. Auth.*, 15-CV-6949, 2017 WL 4357344, at *29 (E.D.N.Y. Sept. 29, 2017) ("Plaintiff fails to state a claim for a violation of substantive due process because [that] claim is based on the same facts as his procedural due process claim."); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 147 (S.D.N.Y. 2016) (holding that "the overwhelming majority of [the plaintiff's] claims fall into ambit of other provisions of the Constitution," including the Due Process Clause, "thereby closing off [the plaintiff's] ability to seek relief by invoking the concept of substantive due process"); *Monko v. Cusack*, No. 11-CV-1218, 2013 WL 5441724, at *3 (N.D.N.Y. Sept. 27, 2013) (dismissing substantive due process claim where it "overlaps both his procedural due process claim and his retaliation claim" (citing *Rother*, 2013 WL 4774484, at *14)). Here, as Plaintiff relies on the same facts in both claims, Plaintiff's substantive due process claim is subsumed by his procedural due process claim, and is dismissed on this independent basis.

10      Although the Second Circuit was specifically addressing the substantive due process rights of pre-trial detainees in *Milling*, the reasoning appears to apply with equal force to Plaintiff. *See Fusco*, 2018 WL 1889070, at *5 n.3 (analogizing the due process analysis for pre-trial detainees to the due process analysis for incarcerated civil contemnors).

11      Because Plaintiff fails to allege a violation of his constitutional rights, he cannot maintain a *Monell* claim. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (listing as a requirement of a *Monell* claim that the plaintiff establish "deprivation of a constitutional or statutory right"); *see also Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) ("If [no individual defendant] inflicted a constitutional injury on [the plaintiff], 'it is inconceivable that the [municipality] could be liable to [the plaintiff].' " (alterations omitted) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))).

Even if he had pleaded a violation of his constitutional rights, Plaintiff could not establish a *Monell* claim because he has not alleged "that an official policy of the municipality caused [his] constitutional injury." *Roe*, 542 F.3d at 36. (*See generally* Compl.) This requirement for *Monell* liability reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). Here, the only valid defendant is the County. Absent an alleged policy or custom

**Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)**

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 118 of 183

that caused constitutional harm, Plaintiff cannot maintain a *Monell* claim against the County. *See Kinsey v. Ohio*, No. 17-CV-982, 2020 WL 1066633, at *1, *4 (S.D. Ohio Mar. 5, 2020), *aff'd*, No. 20-3315, 2021 WL 1100494 (6th Cir. Jan. 11, 2021) (dismissing the plaintiff's claim because his "amended complaint fail[ed] to allege that any ... [c]ounty custom or official policy led to a violation of his constitutional rights" where the plaintiff "offered to pay the ... bail amount by credit card, but ... [the] [c]ounty refused to accept any form of payment other than cash").

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Gazzola v. County of Nassau,   E.D.N.Y.,   June 23, 2022

2019 WL 4754326

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

John GLEESON in His Own Right and as Co-Administrator of the Estate of John P. Gleeson, Deceased, Margaret Gleeson in Her Own Right and as Co-Administrator of the Estate of John P. Gleeson, Deceased, Donna Dempsey on behalf of and as the Natural Parent and Guardian of (he Property of both E.A.G., an Infant, and J.P.G., an Infant, Plaintiffs, v.

COUNTY OF NASSAU, Nassau County Correctional Center, Nassau County Sheriff's Department, Michael J. Sposato Individually and as Sheriff of Nassau County, Armor Correctional Health Services, Inc., Armor Correctional Health Services of New York, Inc., Nassau County Corrections Officers, "John Does 1-10" in their Individual and Official Capacities, Armor Correctional Health Services, Inc. Employees and Agents, "John and Jane Does 11-20" in (heir Individual and Official Capacities, Defendants.

15-CV-6487 (AMD) (RL)
|
Signed 09/30/2019

**Attorneys and Law Firms**

James A. Pascarella, The Pascarella Law Firm PLLC, Mineola, NY, for Plaintiffs.

Christopher D. Clarke, JoAnne Filiberti, Peter James Johnson, Jr., Michael Gerard Dempsey, Leahey & Johnson, P.C., John J. Doody, Jamie Elizabeth Greenfield, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith, LLP, New York, NY, Liora M. Ben-Sorek, Nassau County Attorney's Office, Mineola, NY, for Defendants County of Nassau, Nassau County Sheriff's Department.

Christopher D. Clarke, JoAnne Filiberti, Peter James Johnson, Jr., Michael Gerard Dempsey, Leahey & Johnson, P.C., Jamie Elizabeth Greenfield, John J. Doody, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith LLP, New York,

NY, Liora M. Ben-Sorek, Nassau County Attorney's Office, Mineola, NY, for Defendants Nassau County Correctional Center, Michael J. Sposato.

Jamie Elizabeth Greenfield, John J. Doody, Kenneth G. Gerard, Dale Nicholson McLaren, Lewis Brisbois Bisgaard & Smith LLP, Cathleen Kelly Rebar, Frank V. Kelly, Stewart Bernstiel Rebar & Smith, New York, NY, for Defendants Armor Correctional Health Services, Inc., Armor Correctional Health Services, Inc. Employees and Agents, "John and Jane Does 11-20".

John J. Doody, Dale Nicholson McLaren, Jamie Elizabeth Greenfield, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith, LLP, Cathleen Kelly Rebar, Frank V. Kelly, Stewart Bernstiel Rebar & Smith, New York, NY, for Defendant Armor Correctional Health Services of New York, Inc.

Jamie Elizabeth Greenfield, John J. Doody, Kenneth G. Gerard, Lewis Brisbois Bisgaard & Smith LLP, New York, NY, for Defendant Nassau County Corrections Officers, "John Does 1-10".

**MEMORANDUM & ORDER**

ANN M. DONNELLY, District Judge.

**\*1**   The plaintiffs brought this action against Nassau County, Nassau County Correctional Center ("NCCC"), Nassau County Sheriff's Department, Nassau County Sheriff Michael J. Sposato (collectively the "County defendants"), Armor Correctional Health Services, Armor Correctional Health Services of New York (collectively the "Armor defendants"), and unnamed corrections officers and health services employees, in connection with the death of John P. Gleeson, who died while he was detained at the NCCC. (ECF No. 1.) The plaintiffs—surviving members of Mr. Gleeson's family—brought federal claims pursuant to 42 U.S.C. § 1983, alleging inadequate medical care under the Fourteenth Amendment, and state law claims for wrongful death and intentional infliction of emotional distress. (*Id.*) On November 19, 2018, the defendants moved for summary judgment. (ECF Nos. 57, 60.) For the reasons that follow, the defendants' motion is granted in part, and denied in part.

**BACKGROUND** [1]

1. *Medical Services at the NCCC*

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 120 of 183

**Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)**

The NCCC is a correctional facility operated by the Nassau County Sheriff's Department, an agency of Nassau County. (ECF No. 69), Pls.' 56.1 Counter-Statement in Response to County defendants ("Pls.' 56.1 (County)") ¶¶ 2-3.) [2] Between 1999 and 2000, the United States Department of Justice ("DOJ") investigated conditions at the NCCC. (*Id.* ¶¶ 20-21.) On September 11, 2000, the DOJ found that the NCCC was deliberately indifferent to its inmates' medical and mental needs, and that corrections officers at the NCCC had a practice of using excessive force. (*Id.* ¶ 22.) The DOJ sued Nassau County in this Court on April 22, 2002. (*Id.* ¶ 23.) The parties entered into a settlement agreement the same day, dismissing the case subject to the County's compliance with certain terms to improve conditions at the NCCC. (*Id.* ¶ 23-25.)

 **\*2** The settlement agreement included specific policies and programs that the NCCC would develop and implement to improve inmate health care, including: (i) written medical policies, procedures, and protocols relating to initial health assessments, sick calls, emergency care, and medical records (*Id.* ¶ 28); (ii) new inmate health screenings that included the inmates' input about their medical history, current medication, allergy information, and immunization history (*Id.* ¶ 29); (iii) a written chronic care disease management program (*Id.* ¶ 34); and (iv) a written functional quality improvement program that included self-evaluations, recommendations for clinical guidelines, and internal peer reviews (*Id.* ¶ 38). To implement the quality improvement program, the NCCC was required to establish a Quality Improvement Committee ("QIC") chaired by a physician. (ECF No. 74-1, ¶¶ 55-56.) The terms of the settlement required the QIC to have ten monthly meetings each year to "review the status of health care provided to inmates," and to report its work to the Sheriff each month. (*Id.*)

On May 5, 2008, the parties filed a stipulation to dismiss the case because of the NCCC's substantial compliance with the settlement agreement. (*Id.* ¶ 53.) The Honorable Leonard Wexler "so ordered" the stipulation of dismissal on March 20, 2008. (*Id.* ¶ 55.)

2. *The NCCC's Contract with Armor*
On July 20, 2009, the County sought proposals from third-party organizations to provide medical, behavioral, and dental health care at the NCCC. (*Id.* ¶ 56.) The County's request specified that bidders must meet the standards of all DOJ settlement agreements. (*Id.* ¶¶ 57-62.)

On October 13, 2009, the Armor defendants [3] submitted a bid in which they acknowledged and agreed to meet the standards of the settlement agreement, adding that Armor "had experience complying with DOJ requirements having inherited a situation ... in which the DOJ cited the facility and the former healthcare provider." (*Id.* ¶¶ 64, 67.) A committee that included representatives from the County's Office of Management and Budget, Department of Health, Office of Mental Health, the Sheriff's Department, and the County Attorney's Office evaluated Armor's proposal, and gave it the highest score of the six other proposals. (*Id.* ¶¶ 85-87.) Armor and the NCCC entered into a proposed contract on March 18, 2011. (*Id.* ¶ 88.)

Pursuant to the contract, Armor agreed to provide services consistent with the standards established by the settlement agreement. (*Id.* ¶ 90.) Armor agreed, for example, to "develop and maintain a chronic care disease management program, consistent with nationally accepted disease guidelines[,]" (*id.* ¶ 96), and to "perform medical and mental health intake screenings within four hours of an inmate's admission to the NCCC." (*Id.* ¶ 93.) The contract also expressly incorporated the services outlined in Armor's contract proposal (*id.* ¶ 90), which included plans to install an electronic medical records system (ECF No. 57-3, Armor Contract 2011-2013 ("2011 Armor Contract") at 92, 228-31) and a protocol for approving referrals to offsite specialists (*id.* at 194-97). In its cost proposal, Armor allocated $78,688 of the contract cost for the installation of the electronic medical records system in the first year of the contract. (*Id.* at 92.) Armor represented that it emphasized "medical necessity" when it screened requests for offsite treatment; according to Armor, its process reduced "unnecessary offsite trips" and resulted in "substantial savings in security costs and NCCC overhead." (*Id.* at 194-97.) Under Armor's protocol, an Armor clinician initiated the process by submitting a specialist's request form to Armor's Director of Utilization Management and Medical Director of Utilization Management, both of whom were in Florida. (*Id.*) The directors reviewed the request to determine whether it was a "medical necessity" and either approved it or deferred it to be reevaluated within 30 days. (*Id.*)

 **\*3** On April 18, 2011, the proposed contract was submitted to the Rules Committee of the Nassau County Legislature for approval. (Pls.' 56.1 (County) ¶ 106.) Michael Golio, Commanding Officer of the Sheriff's Department's Legal Unit at the NCCC, spoke in favor of the proposed contract, and

highlighted its accountability and high standards of care: "The second part of this contract is the care standards, and that's why we have the performance indicators, the performance measurements, and the financial penalties. We don't have anything of that sort currently with [the Nassau University Medical Center]." [4] (*Id.* ¶ 110.) The Rules Committee approved the contract and, on May 5, 2011, the Nassau County Executive signed the contract with Armor. (*Id.* ¶¶ 112-13.)

On June 11, 2011, only eleven days after Armor began providing medical care at the NCCC, an inmate, Roy Nordstrom, died of an acute myocardial infarction. (ECF No. 71-31.) On September 18, 2012, the New York State Commission of Correction's Medical Review Board [5] issued a report addressed to Sheriff Sposato and copied to Edward P. Mangano, who was the Nassau County Executive at the time. The Medical Review Board concluded that Mr. Nordstrom died as a result of "grossly incompetent" medical care, and issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(*Id.* at 9.)

The County's two-year contract with Armor expired on May 31, 2013. (Pls.' 56.1 (County) ¶ 114.) On August 1, 2013, the County extended its contract with Armor to run until May 31, 2015. (*Id.* ¶ 119.)

### 3. *John Gleeson's Medical History*

Mr. Gleeson, 40 years old at the time of his death, had a history of hereditary angioedema. He went to the hospital for swelling beginning in 2002, and was diagnosed with hereditary angioedema in 2007 or 2008. (ECF No. 57-11, Margaret Gleeson Dep. ("M.G. Dep."), 105:6-16, 107:8-11.) Hereditary angioedema, which typically results from a quantitative or functional deficiency of the C1 esterase inhibitor protein, is a disorder that causes recurrent, severe swelling in the extremities, gastrointestinal tract, face, throat, and airways. (ECF No. 71-6, ¶ 10.) Left untreated, the airway swelling can lead to asphyxia and death. (*Id.*)

Mr. Gleeson took prednisone (a steroid) and Benadryl (an antihistamine) for his angioedema. (M.G. Dep. 123:8-22.) If the swelling moved from his hands to his chest or neck—which was more serious—Mr. Gleeson went to the emergency room. (*Id.*) His mother estimated that he went to the emergency room about ten times for angioedema. (*Id.* 109:4-10.)

### 4. *John Gleeson's Incarceration and Death at the NCCC*

**\*4** In May of 2014, Mr. Gleeson was arrested for stealing scrap metal wire. On May 28, 2014, a Nassau County grand jury charged him with burglary in the third degree. (Pls.' 56.1 (County) ¶ 120.) Mr. Gleeson was admitted to the NCCC the following day, May 29, 2014, where he was held as a pretrial detainee until his death on July 14, 2014. (*Id.* ¶ 121.); *see also* (Pls.' 56.1 (Armor) ¶¶ 4, 9.) In a health assessment on the day he was admitted, Mr. Gleeson reported asthma as his only significant illness, and that Flexeril (a muscle relaxant) and Percocet (pain medication) were his only medications. [6] (ECF No. 62-1, Armor Medical Records, at 5.) [7] Mr. Gleeson did not disclose that he had hereditary angioedema during the assessment.

On June 10, 2014, Mr. Gleeson filled out a sick call request form, complaining that his arm was swollen and that he had "some kind of reaction." (*Id.* at 13.) A nurse visited him that night and noted on the call form that his swollen arm was "chronic." (*Id.*) A physician's assistant ("PA") saw Mr. Gleeson the next day; Mr. Gleeson had difficulty breathing,

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 122 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

pain and difficulty swallowing, and swelling in his left shoulder, neck, and throat. (*Id.* at 29.) The PA treated Mr. Gleeson with a nebulizer, prednisone, and Benadryl, and noted "R/O angioedema" on the urgent care assessment form. (*Id.*) On a chronic care clinic form completed the same day, the PA wrote the following in the section for assessing Mr. Gleeson's conditions: "asthma, HTN, ? angioedema." (*Id.* at 61.) (question mark in the original).

On June 17, 2014, Mr. Gleeson went to the medical unit, complaining of swelling in his hands, arms, trunk, legs, knees, and other parts of his body. (*Id.* at 28.) Dr. Sanchez saw him, and ordered a blood-draw to test for an "autoimmune disease" and the levels of C1 esterase inhibitor in his blood. (*Id.*) Mr. Gleeson returned to Dr. Sanchez a week later, on June 24, 2014, so that the doctor could examine swelling in his right upper extremity and to discuss the results of the blood tests. (*Id.* at 27.) Dr. Sanchez ordered a re-draw of the C1 Esterase test—the original specimen was not frozen as required by laboratory protocol [8]—and wrote "Rheumatology consult" on Mr. Gleeson's progress note. (*Id.*) On July 1, 2014, a PA saw Mr. Gleeson for an "Urgent Care Assessment" because of swelling on both sides of his neck; once again, the PA prescribed prednisone and Benadryl. (*Id.* at 26.) On the assessment form, under "known medical conditions of [the] patient," the PA listed "asthma, HTN, [and] recurrent episodes of edema ..." (*Id.*) A separate note on the form reads "Rheum consult." (*Id.*)

Mr. Gleeson spoke frequently with his mother throughout his incarceration. (*Id.* ¶ 126.) Although neither of them mentioned angioedema specifically, they did discuss his recurring problems with swelling. (*Id.* ¶¶ 128-132.) Ms. Gleeson had known of her son's angioedema diagnosis since 2007 (M.G. Dep. 105:6-16, 107:8-11), but did not mention the condition in conversations with her son, never urged him to discuss his condition with doctors, and never tried to speak with any officials at the NCCC about her son's condition. (Pls.' 56.1 (County) ¶¶ 132, 135); (Pls.' 56.1 (Armor) ¶ 11.) On July 1, 2014, Mr. Gleeson told his mother that his neck and throat "swelled up again ... huge today," and that he had been given Benadryl. (ECF No. 57-12, CD of Recorded Phone Calls, 710A20JQ, 4:36-5:06.) His mother replied, "Why don't they send you to the hospital for God's sake?" (*Id.*) Mr. Gleeson said that the doctor told him that he was "on the list to see a different doctor.... a rheumatologist." (*Id.*) Ms. Gleeson responded, "Ok good, just let them figure it out, let them worry about it." [9] (Pls.' 56.1 (County) ¶ 134.)

**\*5** On July 14, 2014, at 2:40 p.m., Mr. Gleeson complained to Corrections Corporal Carmine Accordino that his throat was swollen. (Pls.' 56.1 (County) ¶ 150.) Corporal Accordino relayed Mr. Gleeson's complaint to Nurse James in the medical unit, who responded that Mr. Gleeson should fill out a sick call sheet because the unit was busy. (*Id.* ¶¶ 151-52.) At 3:00 p.m., Mr. Gleeson complained again about his swollen throat. (*Id.* ¶ 153.) Corporal Accordino relayed his message to the medical unit. (*Id.*) This time, Nurse James directed Corporal Accordino to send Mr. Gleeson to the medical unit, where Mr. Gleeson checked in at 3:10 p.m. (*Id.* ¶¶ 153-55.) According to the urgent care assessment form, Mr. Gleeson had swelling on his left neck and left hand. (Armor Medical Records at 23.) Under a section of the form entitled "DX," the diagnosis is listed as "R/O hereditary angioedema (C1 esterase)." (*Id.*) Mr. Gleeson was again prescribed prednisone and Benadryl. (*Id.*) He returned to his cell between 3:45 and 4:00 p.m. (Pls.' 56.1 (County) ¶ 155.)

At 8:55 p.m., Mr. Gleeson told Corrections Officer Del Re that his throat was sore and that he needed to go to the medical unit. (*Id.* ¶ 156.) He got to the medical unit at 9:15 p.m., with redness in his throat and swelling of his left tonsil. (Armor Medical Records at 22.) The doctor prescribed an antibiotic, and sent Mr. Gleeson back to his cell at about 9:25 p.m. (Pls.' 56.1 (County) ¶ 158.)

When he returned to his cell, Mr. Gleeson's condition worsened, prompting fellow inmates to yell for help. (ECF No. 74-39, ¶ 4.) [10] Fifteen minutes later, at 10:16 p.m., Mr. Gleeson told Corrections Officer Rubeanau that he could not breathe. (Pls.' 56.1 (County) ¶ 159.) Officer Rubeanau saw that Mr. Gleeson had a significantly swollen throat and trouble breathing, and notified the medical unit of his condition. [11] (*Id.* ¶¶ 160-61.) Corrections Officer Cavanaugh escorted Mr. Gleeson to the medical unit, and Dr. Sanchez and R.N. Qui examined him at 10:20 p.m. (*Id.* at ¶¶ 163-64.) The progress note from that night states that Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (Armor Medical Records at 24.)

The Armor medical team believed that Mr. Gleeson was suffering from an exacerbation of asthma, and gave him albuterol with a nebulizer. (*Id.*) Minutes into the treatment, Mr. Gleeson stood up, said that he could not breathe, and collapsed. (*Id.* at 63.) The Armor medical staff administered an EpiPen, directed Officer Cavanaugh to call 911, and initiated CPR treatment until the EMT arrived fifteen minutes later, at approximately 10:45 p.m. (*Id.* at 62.) The paramedics

tried to intubate Mr. Gleeson twice, but were unsuccessful. (*Id.*) At 10:56 p.m., the paramedics took Mr. Gleeson to Nassau University Medical Center, where he died at approximately 11:20 p.m. (Pls.' 56.1 (County) ¶¶ 167-69.)

5. *County Response.*

The day after Mr. Gleeson died, July 15, Dr. Marilyn Martin-Naar, an Armor medical director, filled out a death summary report. (Armor Medical Records at 65.) Dr. Martin-Naar wrote that Mr. Gleeson had three diagnoses, including "R/O Acquired Angioedema." (*Id.*) Dr. Martin-Naar also noted that Mr. Gleeson's treatment plan included prednisone and Benadryl, and that "next steps" included referrals to a rheumatologist and allergist to address the patient's "history of recurrent swelling of body parts." (*Id.*) In her initial findings, Dr. Martin-Naar wrote "low esterase inhibitor level" and that the "impression was R/O acquired angioedema." (*Id.* at 66.)

**\*6** On October 31, 2014, the Nassau County Office of the Medical Examiner determined that Mr. Gleeson died from cardiorespiratory arrest due to laryngeal edema and angioedema. (Pls.' 56.1 (County) ¶ 174.) A year later, on September 15, 2015, the Commissioner of the New York State Commission of Corrections, Dr. Phyllis Harrison-Ross, published a final report of the Medical Review Board's investigation into Mr. Gleeson's death.[12] (*Id.* ¶ 175.) The report is addressed to Sheriff Sposato, and copied to Norma L. Gonsalves, the Presiding Officer of the Nassau County Legislature at the time. (*See* ECF No. 57-22, New York State Commission of Correction's Final Report: In the Matter of the Death of John Gleeson ("NYSCOC Report").) The Board's investigation included interviews with medical and prison personnel, and a review of the relevant medical records. (*Id.*) The Board was highly critical of the way that the Armor medical staff treated Mr. Gleeson:

> Gleeson had a history of Hereditary Angioedema that went unrecognized, misdiagnosed, and improperly treated by the medical providers from Armor Inc. The Medical Review Board has found that Armor Inc.'s delivery of healthcare in this matter was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication, and deficient medical

> knowledge by the physicians and midlevel clinicians. This was compounded by a healthcare record that was unorganized, incomplete, and in selected sections illegible. The Medical Review Board finds that Armor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates. Had John Gleeson been provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment, his death may have been prevented.

(*Id.* ¶ 1.)

The Board was especially critical of the Armor medical staff's failure to refer Mr. Gleeson to a specialist, once it became clear that its treatments were ineffective:

> After four separate clinical encounters with unresolved angioedema with an unknown etiology and refractory to provided treatment, a referral to a specialist (Rheumatologist) should have been of highest priority. The Medical Review Board finds that the medical providers of Armor Inc. at the NCCC lacked the clinical knowledge to recognize that Gleeson was symptomatic of Hereditary Angioedema and continued him on an ineffective course of treatment including antihistamines and steroids. Hereditary Angioedema will not respond to therapy including steroids and antihistamines ... Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 124 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

treatment, his terminal event may have been prevented.

(*Id.* ¶ 13.)

The Board ended the report with specific recommendations:

- that Armor establish an organized and uniform health record system for inmate health and mental care;

- that Armor utilize a system that assigns a single case manager for each inmate's care; and

- that Armor conduct a quality review of the care it gave Mr. Gleeson, with particular focus on "[w]hy a referral to a specialist (rheumatology) was not expedited for Gleeson ...?" "[w]hy medical staff did not consider an immediate transfer to a hospital for Gleeson after repeated complaints of edema ...?" and "[w]hy medical providers failed to recognize that the prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading ... and failed to recognize current medications may actually be trigger mechanism?"

**\*7**  (*Id.* at 7-8.)

The Board also directed the Nassau County Legislature to investigate whether Armor was fit to serve as a correctional medical care provider, with "[s]pecific attention ... to Armor's pattern of failing to properly manage patients' chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated." (*Id.*)

Nevertheless, in mid-2015, the County entered into another two-year contract extension with Armor, from June 1, 2015, to May 31, 2017. (Pls.' 56.1 (County) ¶ 211.)

On October 17, 2016, the Nassau County Office of the Comptroller issued a review of Armor's and the County's performance under the contract. (ECF No. 71-4, Comptroller Report.) [13] The Comptroller found that Armor's manual records system was inadequate, inefficient, and error prone, that it had high nursing and doctor turnover, and that it failed to document required background and reference checks. (*Id.* at ii.) The Comptroller underscored the Medical Review Board's finding that Armor was responsible for five inmate deaths at the NCCC from 2011 to 2015, and the

Board's direction in the last three reports that Armor pay "specific attention" to its "pattern of failing to properly manage patients' chronic medical needs ..." (*Id.* at 20-26.) The Comptroller recommended that Armor computerize its records and "strengthen its quality control process to assure medical forms are completed thoroughly and are signed, dated and legible." (*Id.* at ii.) The Comptroller also recommended that Armor "take immediate steps to hire and retain a quality medical staff." (*Id.*)

The Comptroller also found that the NCCC "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (*Id.*) The NCCC did not have a medical professional on staff to oversee Armor despite the contractual agreement for a Health Care Administrator, who was to "oversee administration and monitor compliance with this agreement on behalf of the County[.]" (*Id.* at 8-9) (quoting 2011 Armor Contract at 12.) The Sheriff's Department designated a registered nurse as the Health Contract Administrator; the nurse left in August of 2013, after which the position remained vacant until 2016. [14]  (*Id.*) Moreover, New York State Correction Law required that the Board of Supervisors of Nassau County appoint a "reputable physician authorized to practice medicine as physician" to the NCCC. (*Id.*) (citing N.Y. Correct. Law § 501 (McKinney 2019).) The "County Physician," like the Health Contractor Administrator, was to oversee "Armor's work and the medical care provided to the Correctional Center's patients." (*Id.*) The NCCC did not have a County Physician at any point during the Armor contract. (*Id.*) The contract also required Armor to submit monthly reports to the Health Contract Administrator measuring the quality and quantity of its services. (2011 Armor Contract § 4.) The Assistant Attorney General's affirmation, (ECF No. 71-17), discussed below, found that Armor's reports did not include data on approximately half of the twenty-four indicators required by the contract, including medical sick call statistics, mental health statistics, and initial assessment statistics. (*Id.* ¶ 33.)

**\*8**  Because of its lack of oversight, the NCCC failed "to assess performance indicators and assess associated penalties as provided for in the contract[.]" (Comptroller Report at ii.) Indeed, the County assessed no penalties on Armor during the contract period—despite negotiating for 27 different performance indicators and several tiers of penalties. (*Id.* at 16-17.) Most critically, the County did not fine Armor $155,000 (the highest penalty provided for in the contract) for its failure to achieve NCCHC accreditation. [15]  Instead, the

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 125 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

County waived the requirement, without seeking the County Executive's approval. (*Id.* at 16.)

In 2016, the State of New York sued Armor, alleging that it had provided substandard medical care to inmates at the NCCC and the Niagara County Jail. [16] *People v. Armor Correctional Health Medical Services*, Index No. 450835/2016. The parties eventually settled the case, and Armor agreed "not to bid on or enter into any contract with any municipality in New York State for the provision of jail health services" for a three-year period. (ECF No. 80-3, ¶ 13.) Dorothea Caldwell-Brown, an Assistant Attorney General, submitted the results of her investigation in a sworn affirmation. [17] (ECF No. 71-17, Affirmation of Assistant Attorney General Dorothea Caldwell-Brown ("AAG Affirmation").) The investigation "revealed that Armor did not meet its contractual obligations, as evidenced by its inadequate self-auditing and continuous quality improvement processes, deficient sick call, deficient medical and mental health services, inadequate referrals to specialists, failure to maintain accurate and complete medical records and inadequate staffing." (*Id.* ¶ 11.) According to the affirmation, the Medical Review Board had found that five deaths between 2011 and 2015 at the NCCC, including Mr. Gleeson's, involved "egregious lapses in medical care." (Id. ¶ 9.)

The affirmation cited Mr. Gleeson's death as emblematic of Armor's "clear reluctance to send inmates for outside specialty care even when the inmates' medical condition cries out for attention often as assessed by Armor's own clinicians at NCCC." (*Id.* ¶¶ 150-162.) According to the affirmation, Armor's medical records demonstrated that "an Armor clinician referred [Mr. Gleeson] to a rheumatologist on two separate occasions" but that "Armor never ensured that the rheumatologist referral actually take place." (*Id.* at ¶ 162.) Armor's self-audits, the investigation found, reflected "a consistent pattern of inappropriate and failed practices relating to referrals to off-site specialists," including frequent failures to render a decision to deny or approve the request. (*Id.* at ¶¶ 153-57.)

**\*9** The County paid Armor $49.7 million from June 1, 2011 through December 31, 2015. (Comptroller Report at i.) In March of 2016, the County issued a new RFP for medical services at the NCCC. (*Id.*)

**LEGAL STANDARD**

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (internal citations omitted). Once the moving party has met its burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

**DISCUSSION**

**I. The Plaintiffs' Section 1983 Claim**

To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing 42 U.S.C. § 1983). A municipality is subject to liability for damages under Section 1983 for the unconstitutional acts of its employees "where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

The essence of the plaintiffs' claims is that Mr. Gleeson died as a result of deliberate indifference on the part of medical staff and prison officials at the NCCC, and that the defendants are liable for Mr. Gleeson's death because they had a policy or custom of delivering inadequate healthcare to NCCC inmates, which caused Mr. Gleeson's death. In seeking summary judgment, the defendants argue that the NCCC medical staff and prison officials were not deliberately indifferent to Mr. Gleeson's health. They say that they cannot be held liable even if Mr. Gleeson's death resulted from

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 126 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

deliberate indifference because there was no policy or custom to provide inadequate healthcare.

### a. *Deliberate Indifference*

"To establish a constitutional claim arising out of inadequate medical care, an inmate must prove that prison or jail officials were deliberately indifferent to his serious medical needs." *Gomez v. County of Westchester*, 649 Fed. Appx. 93, 95 (2d Cir. 2016) (citing *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003)). A pretrial detainee's claims of inadequate medical care are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See generally Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted); *Iancovangelo v. Correctional Medical Care, Inc.*, 624 Fed. Appx. 10, 12 (2d Cir. 2015) (citation omitted).

 **\*10** Under the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-part test. "First, the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Grimmet v. Corizon Med. Asssocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at \*3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### i. Sufficiently Serious Deprivation

I first decide whether the Mr. Gleeson experienced a medical deprivation that was "sufficiently serious." There must be an actual "deprivation of adequate medical care," that is, a failure by prison officials "to take reasonable measures" in response to a medical condition. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)). Second, the deprivation must be "sufficiently serious." *Id.* at 280. Because "the objective component of an Eighth Amendment [or Fourteenth Amendment] claim is necessarily contextual and fact specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks and citation omitted). If the unreasonable medical care "is a failure to provide any treatment for an inmate's medical condition,

courts examine whether the underlying medical condition is sufficiently serious," *Salahuddin*, 463 F.3d at 280, such as the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at \*6 (S.D.N.Y. Apr. 6, 2018) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted)). If a plaintiff alleges that the prison provided inadequate care—rather than a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith*, 316 F.3d at 185 (citing *Chance v. Armstrong*, 143 F.3d 398, 702-03 (2d Cir. 1998)).

The defendants do not dispute that Mr. Gleeson suffered from a serious illness—hereditary angioedema—which causes recurrent attacks of severe swelling in the extremities, gastrointestinal tract, face, and airways. The disorder can be fatal when left untreated, particularly if the swelling has spread to the patient's neck and airway. Although the record does not show that Mr. Gleeson alerted the medical staff that he had hereditary angioedema, he made frequent complaints of his symptoms—including recurrent swelling and shortness of breath—to the medical staff. In four visits to the medical unit, Mr. Gleeson's symptoms of hereditary angioedema were progressively more serious, but the staff gave him the same treatment—a steroid and an antihistamine. Moreover, although the records reflect that medical personnel thought he should see a rheumatologist, Mr. Gleeson never saw a rheumatologist or any specialist. The New York State Commission of Corrections concluded that this treatment was plainly inadequate, criticizing Armor for continuing Mr. Gleeson on an "ineffective course of treatment including antihistamines and steroids" when "a referral to a specialist (Rheumatologist) should have been of highest priority." (NYSCOC Final Report, ¶ 13.)

 **\*11** In my view, the plaintiffs have raised a triable issue of material fact about whether medical officials at the NCCC responded adequately to Mr. Gleeson's serious medical needs. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation.") (quotation marks and citations omitted).

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 127 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

ii. Sufficiently Culpable State of Mind

The second element of a Fourteenth Amendment claim for inadequate medical care is that the defendant acted with "deliberate indifference" to the inmate's medical care. *Salahuddin*, 467 F.3d at 280 (citation omitted). In *Darnell v. Pineiro*, 849 F.3d 17, 32-36 (2d Cir. 2017), the Second Circuit held that a pretrial detainee need not demonstrate subjective awareness on the part of the official in a condition-of-confinement case. Since *Darnell*, district courts in this circuit have held that a pretrial detainee in a medical inadequacy case may establish deliberate indifference objectively.[18] *See Richardson v. Correctional Medical Care, Inc.*, No. 17-CV-0420, 2018 WL 1580316, at *4 (N.D.N.Y. Mar. 28, 2018) (collecting cases); *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 718-19 (S.D.N.Y. Mar. 31, 2017) ("After *Darnell*, deliberate indifference is now defined objectively ... rather than ask whether the charged official knew of and disregarded an excessive risk to inmate health or safety, courts are to instead determine whether the official knew, or should have known that his or her conduct posed an excessive risk to health or safety.") (quotation marks and citation omitted). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment, is "required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849, F.3d at 35). "As before, however, more than negligence is required to hold a defendant liable for violating" the Fourteenth Amendment. *Id.*

The plaintiffs have raised a triable issue of material fact about whether the medical officials knew or should have known about Mr. Gleeson's angioedema and the risks it posed to his health. Although Mr. Gleeson did not disclose that he had angioedema during his initial health assessment, doctors suspected almost immediately that angioedema was responsible for his swelling episodes. In fact, a physician's assistant noted angioedema as a possible diagnosis after Mr. Gleeson's first interaction with the medical staff. (Armor Medical Records at 61.) After his second visit to the medical unit, Dr. Sanchez ordered blood tests to measure Mr. Gleeson's levels of the C1 esterase inhibitor, a protein responsible for hereditary angioedema. (*Id.* at 27-28.) On the day of his death, Mr. Gleeson reported to the medical unit twice with neck swelling and redness in his throat; doctors again noted the possibility of hereditary angioedema, but sent him back to his cell with the same ineffective treatment

of steroids and antihistamines. (*Id.* at 23.) According to the progress note from that day, Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (*Id.* at 24.) Given their suspicions of hereditary angioedema, the doctors knew, or should have known, that Mr. Gleeson's symptoms were indicative of a potentially fatal condition. A reasonable jury could find that their failure to act amounted to deliberate indifference.

b. *Parties Responsible for the Deliberate Indifference*

**\*12** The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). However, a municipal government, or a private entity acting under color of state law, *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 432 (S.D.N.Y. 2012), can be liable for the unconstitutional acts of its employees if the plaintiff can prove the existence of a municipal policy or custom that caused the constitutional violation. *Monell*, 436 U.S. at 690-91.

The only individuals named by the plaintiffs are "John Does 1-10"—corrections officers at the NCCC (ECF No. 1 ¶ 52), "John and Jane Does 11-20"—physicians, nurses, physician's assistants, and nurse practitioners employed by Armor (*Id.* ¶ 53), and Sheriff Michael J. Sposato. The plaintiffs assert *Monell* liability against the County of Nassau, the NCCC, the Nassau County Sheriff's Department, Armor Correctional Health Services, Inc., and Armor Correctional Health Services of New York.

The Armor defendants argue that the plaintiffs cannot sustain a Section 1983 action against "John Doe" and "Jane Doe" defendants at this point in the case. The County defendants argue that the claims against Sheriff Sposato should be dismissed because the complaint does not include sufficient allegations about his personal involvement in the constitutional violation. The County defendants also argue that the Court should dismiss claims against the NCCC and the Sheriff's Department because both are non-suable, administrative arms of the County of Nassau. Finally, all defendants argue that they cannot be held liable for Mr. Gleeson's death because the plaintiffs have not demonstrated the existence of a policy or practice that caused the constitutional violation.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 128 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

### i. John Doe and Jane Doe Defendants

The defendants move for summary judgment as to the Section 1983 claims against the John Doe and Jane Doe defendants because they have not been identified, and any effort to name them now as defendants would be time-barred. The plaintiffs respond that the identities of the specific employees who personally inflicted the constitutional injuries are "irrelevant" because the entity defendants are responsible pursuant to *Monell.* (ECF No. 73 at 4.) In other words, the plaintiffs do not intend to press their claims against the individual doctors, nurses, corrections officers, and other staff at the NCCC responsible for Mr. Gleeson's constitutional injuries.

On January 17, 2017, Magistrate Judge Arlene R. Lindsay set a February 23, 2017 deadline for any request to join additional parties or amend the pleadings. Nevertheless, even though they learned the identities of relevant county and Armor employees through document discovery, (*see, e.g.*, Armor Medical Records), the plaintiffs have not sought to amend the complaint to name the "John Doe" corrections officers or the "John and Jane Doe" employees of Armor.

The applicable statute of limitations period in New York is three years for a Section 1983 action, *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (citation omitted), and the statute of limitations begins to run once the plaintiff knows of the injury on which its claim is based. *See Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). The plaintiffs learned of Mr. Gleeson's death on July 14, 2014. Because substituting a named party for a John Doe defendant does not "relate back" to the complaint under Rule 15(c)(3), *Sepulveda v. City of New York*, No. 01-CV-3117, 2003 WL 22052870, at *2 (S.D.N.Y. Sept. 2, 2003), the plaintiffs' Section 1983 claims against the "John Doe" and "Jane Doe" defendants are dismissed as time-barred. *See, e.g., Vineyard v. County of Nassau*, 329 F. Supp. 2d 364, 369-60 (E.D.N.Y. 2004); *Cantave v. New York City Police Officers*, No. 09-CV-2226, 2011 WL 1239895, at *8 (E.D.N.Y. Mar 28, 2011).

### ii. Sheriff Michael J. Sposato

**\*13** The defendants argue that the plaintiffs cannot sue Sheriff Sposato in his individual capacity because the complaint includes no allegations that Sheriff Sposato was personally involved in the constitutional deprivation. The plaintiffs respond that the record reveals numerous examples of Sheriff Sposato's personal involvement in failing to supervise Armor's performance. The question for the Court is whether the plaintiffs have raised a triable issue of fact about Sheriff Sposato's personal involvement in the constitutional violations.

A supervisory official will not be found liable under Section 1983 simply by virtue of his "high position of authority." *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *12, (S.D.N.Y. Aug. 22, 2017) (quoting *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)), *report and recommendation adopted*, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017). Rather, a plaintiff in a Section 1983 action must show that the supervisor was personally involved in a constitutional violation by either: (1) directly participating in the violation; (2) failing to remedy the wrong after it comes to his attention; (3) creating a policy or custom under which unconstitutional practices occur, or allowing the continuation of such custom and policy; (4) being grossly negligent in supervising subordinates who committed the wrongful acts; or (5) failing to act on information indicating that unconstitutional acts are occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). [19]

While there is no evidence that Sheriff Sposato participated directly in the violation (factor one), or was alerted to Mr. Gleeson's ongoing mistreatment and failed to intervene (factor two), there are issues of fact precluding summary judgment as to Sheriff Sposato's personal involvement under the third, fourth, and fifth factors. Indeed, as Sheriff, he was entrusted with supervisory responsibility for Armor. For example, the four final reports from the NYSCOC in the record are addressed to Sheriff Sposato, and each faults Armor for egregiously inadequate care. Sheriff Sposato received one report, before Mr. Gleeson's death, in which the Commission found that Armor "was grossly incompetent," and recommended that the Nassau County Executive "conduct an inquiry into the fitness of Armor ... as a correctional medical care provider." (ECF No. 71-31, at 9.) Furthermore, the Sheriff's Department—headed by Sheriff Sposato—did not appoint a doctor to be the Health Contract Administrator from 2011 to 2016, and the nurse who held the position left in 2013; the Sheriff's Department left the position completely vacant until 2016, when it appointed an interim HCA and published job postings for a permanent position. Finally, the contract required that Sheriff Sposato receive written reports from the Quality Improvement Committee. The Attorney General's investigation found that these reports

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 129 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

failed to include data on approximately half of the twenty-four indicators required by the contract.

A reasonable jury could find that Sheriff Sposato should have known about the risk of constitutional violations because he received the report questioning Armor's fitness as a medical care provider. [20] *Villafane*, 2017 WL 4179855, at \* 14 (to establish personal involvement under the fourth factor, "a plaintiff must demonstrate that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately ... but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk ...") A reasonable jury could also find that, in the aftermath of the NYSCOC report, Sheriff Sposato's failure to designate a Health Contract Administrator, or otherwise monitor or discipline Armor medical personnel through the tools available to him from the contract, allowed Armor's practice of inadequate medical care to continue unabated. Accordingly, the motion for summary judgment as to Sheriff Sposato in his personal capacity is denied. [21]

### iii. NCCC and NCSD

**\*14** It is well established that neither the Nassau County Correction Center nor the Nassau County Sheriff's Department are suable entities. *See Joseph v. Nassau Cty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at \*3 (E.D.N.Y. Apr. 19, 2013) (collecting cases). Rather, they are administrative arms of Nassau County without a separate legal identity from the County. *Campbell v. Sposato*, 15-CV-1958, 2015 WL 9267222, at \*5 (E.D.N.Y. Nov. 17, 2015) (interpreting the Nassau County Charter), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Accordingly, I grant summary judgment in favor of the NCCC and NCSD, and dismiss them from this action.

### iv. Armor

As noted above, a prerequisite to recovery under Section 1983 "is that the alleged constitutional violation be committed by one acting under color of law." *Bektic-Marrero*, 850 F. Supp. 2d at 426 (citing *West v. Atkins*, 487 U.S. 42, 48-50 (1988)). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter

how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citations and internal quotation marks omitted).

The parties agree that the Armor defendants "are considered to be state officials ... [d]espite being privately owned and operated entities[.]" (ECF No. 60-5, Armor Defs.' Br. at 9); *see also Ryan v. County of Nassau*, No. 12-CV-5343, 2016 WL 11500151, at \*7 (E.D.N.Y. Mar. 31, 2016) ("Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to Section 1983.") (citations and internal quotation marks omitted). "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal government and not to private entities acting under color of state law, case law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 WL 3501869, at \*24 (S.D.N.Y. July 28, 2011), *report and recommendation adopted*, 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). Therefore, a private entity acting under color of state law will be liable for the constitutional violations of its employees if they resulted from the entity's policies or customs. *Id.*

A plaintiff may satisfy the "policy or custom" requirement by establishing "(1) a formal policy; (2) action taken or decisions made by policymakers that caused the violation; (3) a practice so persistent and widespread that it constitutes a 'custom or usage;' or (4) a failure to properly train or supervise [entity] employees." *Byvalets v. New York City Hous. Auth.*, No. 16–CV–6785, 2017 WL 7793638, at \*14 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2018 WL 1067732 (E.D.N.Y. Feb. 23, 2018) (citing *White v. City of N.Y.*, 206 F. Supp. 3d 920, 937 (S.D.N.Y. 2016) (citation omitted)). The plaintiffs posit the existence of both a formal policy and informal practices at Armor.

For the formal policy, the plaintiffs point to Armor's requirement that an inmate could see a specialist or visit a hospital only after an official in Armor's Florida corporate offices approved the referral, in writing, and within thirty days of the request. According to the plaintiffs, Mr. Gleeson died while those necessary referrals were pending approval. (ECF No. 73, Pls.' Opp. Br. at 11) ("[Dr. Sanchez] made the request on two separate occasions for the decedent's referral to a rheumatologist, both well-before John Gleeson's death. The referral never happened."). Under the plaintiffs' theory,

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 130 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

Armor's referral policy prevented Mr. Gleeson from receiving adequate medical care and resulted in his death.

 **\*15**  It is undisputed that Armor followed a protocol that required clinicians at the NCCC to submit referral requests to Armor directors in Florida. The record also shows that Armor clinicians noted in medical records that Mr. Gleeson should see a rheumatologist for his recurrent swelling. Mr. Gleeson himself believed that he was "on the list to see a different doctor.... a rheumatologist." (ECF No. 57-12, 4:36-5:06.) It is not clear from the medical records whether doctors or PAs made a specific referral for Mr. Gleeson to see a rheumatologist; that is due in large part to the fact that the records are illegible. Certainly, there are multiple references to both hereditary angioedema and rheumatologists in the medical records. Drawing all reasonable inferences in favor of the plaintiffs, I find that there is a triable issue of fact as to whether Armor's referral request policy prevented Mr. Gleeson from seeing a rheumatologist, and caused his death. [22] Furthermore, a reasonable jury could find that Armor's woefully deficient record-keeping and its failure to install an electronic medical records system contributed to Armor's failure to ensure that the rheumatologist referral actually took place. [23]

The plaintiffs also argue that Armor had informal practices and customs that caused Mr. Gleeson's inadequate medical treatment. To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). The policy must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Byvalets*, 2017 WL 7793638, at \*16 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)). In other words, the relevant practice must be "so widespread as to have the force of law." *Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted).

The thrust of the plaintiffs' argument is that the Armor defendants had a widespread and well-settled custom of providing inadequate medical care to prison inmates. Judges have defined "widespread" to mean that the unconstitutional acts in question are "common or prevalent throughout the [entity]" and "well-settled" to mean that the unconstitutional acts "have achieved permanent, or close to permanent, status." *Fowler v. City of New York*, No. 13-CV-2372, 2019 WL 1368994, at \*14 (E.D.N.Y. Mar. 26, 2019) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 346

(S.D.N.Y. 2002)). "There is no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader [entity] policy of custom." *Id.* (citations and internal quotations omitted).

The Comptroller report, AAG affirmation, and NYSCOC reports about the treatment of inmates Kevin Brown (ECF No. 71-30), Roy Nordstrom (ECF No. 71-31), and Antonio Marinaccio (ECF No. 71-32) detail Armor's "egregious lapses in medical care" and its "pattern" of inadequate care. Accordingly, the plaintiffs have raised a genuine issue of material fact as to whether the Armor defendants have a widespread and well-settled custom of providing inadequate medical care to prison inmates *See Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity. It characterizes this custom as persistent, widespread, and emanating from top commanders, including the police commissioner. The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes and that the City's handling of the Eppolito matter was reflective of that policy.") (citations omitted).

 **\*16**  The cases in which other courts in this Circuit rejected the findings of a government report as evidence of a policy or practice involved events that were too far removed from the plaintiffs' case to be probative of a then-existing policy or practice. *See, e.g. Moses*, 2017 WL 4386362, at \*12 (DOJ report analyzing excessive force incidents from 2006 to 2007 is "too disconnected in time and personnel to plausible allege a policy, practice, or custom extant in 2000 so as to affect [the plaintiff]."); *Rodriguez v. City of Westchester*, No. 15-CV-9626, 2017 WL 118027, at \*7 (S.D.N.Y. Jan. 11, 2017) (DOJ report written more than six years before the events in question occurred, and involving different third-party contractors, was "too stale, and too disconnected in personnel, to plausibly allege a policy, practice, or custom extant in 2014 so as to affect [the plaintiff]."); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at \*15 (S.D.N.Y. Mar. 29, 2016) (DOJ letter was too remote in time because it was written more than four years before the events in question and involved a different third-party contractor).

This case is different. The Comptroller's report and the AAG's affirmation detail the same kinds of inadequate medical care,

Case 3:23-cv-01099-GTS-ML     Document 32     Filed 04/29/25     Page 131 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

the same party (Armor), and the same time frame (2011 to 2014), as the events alleged by the plaintiffs. In fact, the AAG affirmation cited Mr. Gleeson's death as emblematic of a subset of Armor's inadequate medical care. Accordingly, the reports are sufficient to create a jury question regarding whether Armor had a custom of providing inadequate medical care that resulted in Mr. Gleeson's death.

### v. Nassau County

The County argues as a threshold matter that it cannot be held liable for any inadequate medical care on the part of the Armor medical staff because the Armor medical team "made all the treatment decisions" as the "exclusive medical provider of the NCCC." (ECF No. 80 at 2.) Municipalities cannot shield themselves from liability by delegating inmate medical care to third-party, private entities. *See Gil v. Vogilano*, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001) ("[A] municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care.") (citations omitted). However, that does not mean that the County is automatically liable for Armor's inadequate medical care. Only a few courts in this district have held that *respondeat superior* is a viable theory of liability in cases involving the failure to provide adequate medical care. *See e.g. Covington v. Westchester County Jail*, No. 96-CV-7551, 1998 WL 26190, at *2-3 (S.D.N.Y. Jan. 26,1998); *McNeil v. Correctional Medical Care, Inc.*, No. 18-CV-0894, 2019 WL 4415528, at *10 (N.D.N.Y. Sept. 16, 2019). These courts follow *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700 (11th Cir. 1985), a decision that has not been adopted in this Circuit. I will follow the majority view that there is no *respondeat superior* liability for municipalities under Section 1983— including for inadequate medical care cases involving private vendors—and that the plaintiffs must identify a "policy" or "custom" to impose liability on a municipality.

Accordingly, as with the Armor defendants, the plaintiffs must identify a "policy" or "custom" that caused Mr. Gleeson's injury in order to impose liability on Nassau County. The plaintiffs are entitled to establish a "policy" or "custom" through one of the four methods set forth above. Here, the plaintiffs argue that the County failed to supervise Armor. [24]

**\*17** A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."

*Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To prevail on this theory, the plaintiffs must demonstrate that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2004) (citation omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a city policy or custom that is actionable under § 1983.'" *Id.* (quoting *City of Canton*, 489 U.S. at 388).

To prove such deliberate indifference, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious ... An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir 1995) (internal citation omitted).

The plaintiffs argue that the County's failure to address the "rash of inmate deaths at the NCCC since 2011" evinces deliberate indifference. (ECF No. 70 at 26.) The plaintiffs point to the NYSCOC reports, which were addressed to Sheriff Sposato and the Presiding Officer of the Nassau County Legislature, as evidence of policymakers' notice of recurring constitutional violations. The County responds that they were not on notice of Armor's inadequate treatment because the Comptroller's report and the AAG's affirmation were issued at least two years after Mr. Gleeson's death. This defense is not persuasive. The plaintiffs do not argue that those reports put the County on notice of a pattern of inadequate medical care at the NCCC. Rather, they argue that the NYSCOC reports provided the requisite notice, and that the Comptroller's report and the AAG's affirmation confirm the existence of repeated past issues involving Armor that the County knew of and ignored.

The record includes one report issued before Mr. Gleeson's death—*In the Matter of the Death of Roy Nordstrom* (ECF No. 71-31)—that faults Armor for an egregious lapse in medical care. The report is addressed to Sheriff Sposato and copied to Edward P. Mangano, who was then the Nassau County

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 132 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

Executive. The Medical Review Board concluded that Armor provided "grossly incompetent" care that contributed to the Mr. Nordstrom's death from acute myocardial infarction. The Board issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(ECF No. 71-31, at 9.)

A reasonable jury could find that the report about Mr. Nordstrom alerted Nassau County, through its policymakers Sheriff Sposato and Nassau County Executive Mangano, to a potentially serious problem of unconstitutional conduct, such that the need for supervision was "obvious." [25] *See also Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) (based on a single prior incident of sexual contact between a prisoner and prison guards, a jury could reasonably conclude that the municipality was on notice that its policies in that area were inadequate); *Carter v. Broome County*, No. 16-CV-422, 2019 WL 3938088, at *9 (N.D.N.Y. Aug. 21, 2019) ("[S]ummary judgment on a plaintiff's *Monell* claim is inappropriate if a fact-finder could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system *and* that a policy-making official knows about them and fails to correct them.") (citation and quotation marks omitted). Rather than address the obvious need for closer supervision, the County scaled back its

oversight. For example, the County left the Health Contractor Administrator position vacant beginning in August 2013, and assessed no penalties on Armor for contract violations, including Armor's failure to achieve NCCHC accreditation. The Comptroller found that the County "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (Comptroller Report at ii.) The plaintiffs have raised a genuine issue of material fact as to whether these failures to supervise Armor amount to deliberate indifference to the rights of inmates at the NCCC.

## II. The Plaintiffs' State Law Claims

### a. *Wrongful Death*

**\*18** The Armor defendants' motion for summary judgment on the plaintiffs' wrongful death claim is denied. As discussed above, there are genuine issues of material fact as to whether the Armor medical staff acted with "deliberate indifference," which is a standard akin to objective recklessness. *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849 F.3d at 35). Further, under New York law, "an employer will be vicariously liable for the acts of his employee when these acts are within the general scope of his employment, while engaged in the master's business, and with a view to the furtherance of that business and the master's interest." *Medley v. City of New York*, No. 94-CV-3708, 1998 WL 938731, at *3 (E.D.N.Y. Dec. 3, 1998) (citation omitted). Accordingly, summary judgment cannot be entered in favor of the Armor defendants because there are triable issues of fact as to whether the Armor employees acted negligently, and in the scope of their employment, in causing Mr. Gleeson's death. *See Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (N.Y. App. Div. 1981) (elements of wrongful death claim include: (1) death of a human being, (2) negligence of a defendant causing death, (3) survival of distributees suffering pecuniary loss because of the death, and (4) appointment of a personal representative of the decedent).

The County defendants' motion for summary judgment on the plaintiffs' wrongful death claim is also denied. Under New York law, an entity or hospital may be vicariously liable for the negligence of independent contractors in certain circumstances based on a theory of "agency or control in fact, or apparent or ostensible agency." *See Garofolo v. State*, 135 A.D.3d 1108, 1109 (N.Y. App. Div. 2016) (citations omitted). The "ostensible agency" theory imposes vicarious liability on an entity defendant for the negligence of an independent

contractor doctor "when an inmate has reasonably relied upon the appearance of the doctor's authority created by the words or conduct of [the entity]." *Id.* The availability of the theory depends on "whether the plaintiff could have reasonably believed, based upon all of the surrounding circumstances, that the treating physician was provided by the defendant or was otherwise acting on the defendant's behalf." *Id.* at 1110 (alteration omitted) (quoting *Soltis v. State of New York*, 172 A.D.2d 919, 920 (N.Y. App. Div. 1991)).

Here, the Armor medical staff treated Mr. Gleeson in the prison facility on multiple occasions. A reasonable jury could find that Mr. Gleeson could have reasonably believed that the County employed the Armor medical staff. *Compare Soltis*, 172 A.D.2d at 920 (the fact that the plaintiff was treated at the state facility, with the assistance of state officials, precluded summary judgment as to the state's vicarious liability for the negligence of the independent contractor), *with Garofolo*, 135 A.D.3d at 1110 (the plaintiff could not reasonably believe that the doctors were employed by the prison because the plaintiff's treatments "took place outside of the prison without the involvement of any prison employees.") Accordingly, summary judgment is denied.

#### b. *Intentional Infliction of Emotional Distress*

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239-40 (E.D.N.Y. 2015) (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115 (1993)). The "extreme and outrageous conduct" must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." *Greenaway*, 97 F. Supp. 3d at 239-40 (citations omitted). The tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citation and quotation marks omitted).

Even drawing all inferences in the plaintiffs' favor, the record does not sustain an intentional infliction of emotional distress claim. There is no evidence about the mindset of the defendants or their employees, in part because the plaintiffs did not depose them. Furthermore, no reasonable juror would find that the evidence on this record establishes

conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *See Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 56 (2016). As discussed above, there is a triable issue of fact as to whether the defendants acted with deliberate indifference or negligently. These traditional claims may provide relief at trial; accordingly, the plaintiffs' claim for intentional infliction of emotional distress is dismissed.[26]

### III. Damages

**\*19** The Armor defendants make three damages-related arguments in their motion for summary judgment. First, they claim that the plaintiffs cannot sustain a claim for attorneys' fees under 42 U.S.C. § 1988 because the plaintiffs "cannot be a prevailing party on any of the civil rights claims set forth in this litigation." (ECF No. 60-5, at 15.) As discussed above, the plaintiffs' civil rights claims will be tried before a jury. Accordingly, dismissing the plaintiffs' request for attorneys' fees is premature.

Second, the defendants claim that the plaintiffs cannot recover pecuniary losses beyond funeral expenses in connection with their wrongful death claims. Damages in a wrongful death action are limited to compensation for "pecuniary loss," which is defined as "the economic value of the decedent to each distributee at the time decedent died," and includes "loss of income and financial support, loss of household services, loss of parental guidance, as well as funeral expenses and medical expenses incidental to death." *Milczarski v. Walaszek*, 108 A.D.3d 1190 (App. Div. 2013) (internal citations omitted). "To recover on their wrongful death claims, plaintiffs must present an evidentiary basis for a reasonable expectation of pecuniary loss from decedent's death." *Datskow v. Teledyne Continental Motors Aircraft Products*, 807 F. Supp. 941, 945 (W.D.N.Y. 1992) (quoting *Public Administrator of Kings County v. U.S. Fleet Leasing of New York, Inc.*, 159 A.D.2d 331, 332 (N.Y. 1990)). Generally, "because it is difficult to provide direct evidence of wrongful death damages, the calculation of pecuniary loss is a matter resting squarely within the province of the jury." *Milczarski*, 108 A.D.3d at 1190 (quoting *Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (1980)).

The plaintiffs have raised an issue of triable fact as to whether the plaintiffs have a reasonable expectation of pecuniary loss from Mr. Gleeson's death that exceed funeral expenses. First, the plaintiffs established that Mr. Gleeson provided household services to his parents, ex-wife, and children. (*See,*

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 134 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

*e.g.*, M.G. Dep. 21:8-13; ECF No. 61-5, 326:6-12.) Second, the plaintiffs established that Mr. Gleeson provided financial support to his children pursuant to a divorce judgment, although he was in arrears at the time of his death, as well as contributions for vacations, holiday gifts, back to school clothing, sports equipment, and sports team fees. (ECF No. 61-5, 317:3-319:19.) Finally, the plaintiffs established that Mr. Gleeson had a relationship with his children. (M.G. Dep. 298:11-20.) In light of these facts, I will not find as a matter of law that the plaintiffs have suffered no pecuniary losses apart from funeral losses. *See, e.g. Ryan*, 2016 WL 11500151, at *8 ("Although the record concerning potential pecuniary loss is quite limited, the Court cannot find as a matter of law that Plaintiff suffered no pecuniary injury beyond the recovery of Ryan's funeral expenses.")

Third, the Armor defendants claim that they cannot be sued for punitive damages. Courts have held that entities acting under color of state law "are not afforded the same immunities from liability as are available to the municipality." *Phelan ex rel. Phelan v. Torres*, No. 04-CV-3538, 2005 WL 4655382, at *16 (E.D.N.Y. Sept. 20, 2005)[27] (non-for-profit corporation under contract with a municipality cannot be shielded from punitive damages). Punitive damages may be awarded only when the plaintiff has demonstrated that the defendants' conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56

(1983). Nevertheless, "[g]enerally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct.' " *Phelan*, 2005 WL 4655382, at *15 (citation omitted). Accordingly, the Armor defendants can be sued for punitive damages, and their motion for summary judgment on the issue of punitive damages is dismissed.

## CONCLUSION

**\*20** The Court grants summary judgment for Defendants "John Does 1-10," "John and Jane Does 11-20," the Nassau County Correctional Center, the Nassau County Sheriff's Department, and Michael J. Sposato in his official capacity as Sheriff of Nassau County, and dismisses them from the case. The defendants' motion for summary judgment on the intentional infliction of emotional distress claim is also granted as to all remaining defendants. The Court denies summary judgment to Sheriff Sposato in his individual capacity, Nassau County, and Armor on all remaining claims.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4754326

---

## Footnotes

1    In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the non-moving party, in this case, the plaintiffs. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).

2    On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible in evidence at trial. *Local Unions 20 v. United Brotherhood of Carpenters and Joiners of America*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I will disregard any arguments in the Rule 56.1 statements. *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

The parties' 56.1 submissions are not helpful in determining whether there are material disputes of fact. By way of example only, the parties spend far more time disputing the procedural history of this litigation than in

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 135 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

developing the chronology of Mr. Gleeson's treatment and death at the NCCC. Nevertheless, I have reviewed the entire record, including Mr. Gleeson's medical records, to determine the extent to which there are factual disputes.

3    The Armor defendants are foreign corporations authorized to conduct business in the state of New York. (ECF No. 72), Pls.' Counter-Statement in Response to Armor defendants ("Pls.' 56.1 (Armor)" ¶ 50)

4    The Nassau University Medical Center provided medical care to inmates at the NCCC before Armor. (ECF No. 71-4, Report of Nassau County Comptroller George Maragos ("Comptroller Report"), at i.)

5    The Medical Review Board consists of six members appointed by the governor, with the advice and consent of the senate. N.Y. Correct. Law § 43 (McKinney 2019). Three of the six members must be physicians. *Id.* Among its duties, the Board "investigate[s] and review[s] the cause and circumstances surrounding the death of any inmate of a correctional facility," and submits a report to the Commission of Correction and the administrator of the correctional facility. *Id.* § 47.

6    Mr. Gleeson also disclosed his alcohol and heroin use. (*Id.*)

7    The parties did not include in their 56.1 statements the details of Mr. Gleeson's treatment in the weeks leading up to his death. Accordingly, I have reviewed the handwritten medical records, which are difficult to read, and in some cases, completely illegible. The parties did not depose the medical personnel who authored the records.

8    ECF No. 57-22, ¶ 12.

9    Neither side includes the full details of the conversation, nor mentions Mr. Gleeson's reference to the rheumatologist.

10   The County defendants challenge the declaration of Morgan Smith, another inmate, as inadmissible hearsay. (ECF No. 80-1, § F.) Rule 56(c)(4) of the Federal Rules of Civil Procedure permits the Court to consider a declaration on summary judgment if it is made on personal knowledge and includes facts that would be admissible in evidence. While some of the statements in the Smith declaration may be inadmissible hearsay, the statement that he and other inmates were yelling for help is not offered for the truth of its content, but simply as evidence that the inmates called for help.

11   According to Mr. Smith, Mr. Gleeson's neck was "two times its normal size." (ECF No. 74-39, ¶ 4.)

12   In their reply to the plaintiffs' 56.1 counter-statement, the County defendants make a general challenge to the admissibility of some of the plaintiffs' evidence, but do not make a specific objection to the NYSCOC reports. In any event, the NYSCOC reports are admissible as public records under Federal Rule of Evidence 803(8)(A)(iii) because they contain factual findings from a legally authorized investigation, and the defendants have not suggested that the reports lack trustworthiness. *See Moses v. Westchester County Department of Correction*, No. 10-CV-9468, 2017 WL 4386362, at *10-11 (S.D.N.Y. Sept. 29, 2017).

13   None of the defendants challenge the admissibility of the Comptroller Report. The County defendants argue that I should disregard the Comptroller Report because it was "created in 2016 and has no bearing on the death of the decedent ..." (ECF No. 80-1, § F.) I address this argument in section I.b.iv of this Opinion.

14   In a letter responding to the Comptroller's report, Sheriff Sposato noted that an Interim Health Contract Administrator had been appointed in 2016, and that the Sheriff's Department had published a job announcement for a permanent replacement. (Comptroller Report at 53.) The Comptroller's views were unchanged: "[we] reiterate that this position was vacant from 2011 to 2016 and reemphasize the importance

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 136 of 183

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

of having a medical professional on site at the Correctional Center to oversee the medical care provided by the contractor." (*Id.* at 59.)

15    The National Commission on Correction Health Care ("NCCHC") establishes nationally recognized standards and benchmarks. (Comptroller Report at n. 27.)

16    I take judicial notice of the lawsuit filed in state court. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

17    The County defendants object to the admissibility of the affirmation because the settlement agreement provides that it is "not intended for use by any third party in any other action or proceeding[.]" (ECF No. 80 at 8) (quoting ECF No. 80-3, ¶ 10). The affirmation is admissible as a public record under Federal Rule of Evidence 803(8)(A)(iii) because it contains factual findings from a legally authorized investigation, and the defendants have not suggested that it lacks trustworthiness. *See Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 54-55 (2d Cir. 1986) (FBI reports prepared for related criminal action fall under the public records hearsay objection).

18    Before the Second Circuit's decision in *Darnell*, a pretrial detainee had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. In *Darnell*, the Second Circuit changed the culpability standard for conditions-of-confinement cases in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which applied an objective standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment. *Darnell*, 849 F.3d at 35.

19    *See generally Ramey v. Perez*, No. 13-CV-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("There has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent.... *Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment.").

20    The AAG affirmation references three other deaths—before Mr. Gleeson's—where the Medical Review Board found that Armor was responsible for egregious lapses in medical care. (AAG Affirmation ¶ 9.) These findings support the conclusion that Sheriff Sposato should have known about the risk of constitutional violations, a question that is ultimately for a jury.

21    The plaintiffs also have sued Sheriff Sposato in his official capacity. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "[T]hus, within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Stancati v. County of Nassau*, No. 14-CV-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (quotation marks and citation omitted). A suit against Sheriff Sposato in his official capacity will be treated and analyzed as a suit against Nassau County, and the claim against Michael J. Sposato as Sheriff of Nassau County is dismissed as duplicative and redundant.

22    There is substantial evidence in the record that Mr. Gleeson would not have died if he had been seen by a rheumatologist. (ECF No. 71-6 ¶ 22; NYCOC Report ¶ 13 ("Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper treatment, his terminal event may have been prevented.")).

23    Armor's proposed electronic medical records system, which it did not implement, could, for example, generate reports of "[p]atients' pending consultations with specialists." (2011 Armor Contract at 231.)

**Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)**

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 137 of 183

24    The plaintiffs also argue that the County's approval and renewal of its contract with Armor constitutes an official policy. (ECF No. 70 at 22.) A decision adopted by a municipal body is, of course, an officially promulgated policy for the purposes of *Monell* liability. *Monell*, 436 U.S. at 690. But the County's approval of the Armor contract is too far removed from Mr. Gleeson's treatment to support the requisite causal connection. *Pipitone*, 57 F. Supp. 3d at 194 ("Municipalities can only be liable under § 1983 when they are a 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

25    The AAG affirmation references three other deaths, before Mr. Gleeson's, in which the Medical Review Board found that Armor engaged in egregious lapses in medical care. (AAG Affirmation ¶ 9.) These repeated findings of civil rights violations buttress the conclusion that by the time of Mr. Gleeson's detention, the County had notice of serious problems of unconstitutional conduct requiring better supervision.

26    Even if the plaintiffs could sustain the intentional infliction of emotional distress claim, it would be dismissed as to the County defendants. *See J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017) ("It is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity.") (quoting *Lauer v. City of N.Y.*, 240 A.D.2d 543 (N.Y. 1997)).

27    The Honorable Edward Korman adopted the report and recommendation in an unpublished order on November 28, 2005.

---

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1906594

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Ellis Davon **DUDLEY**, II, Plaintiff,

v.

Governor Kathy **HOCHUL**, of New York; New York
State; Dr. James V. McDonald; Randal B. Caldwell;
Megan Johnson; Christina F. Dejoseph; Sandra Milner;
Jeffrey A. Domachowski; Karen Stanislaus; Arlene
Bradshaw; Julie A. Cecile; Onondaga County Sheriff;
Patricia L. DeRue; Sue Ottaviano; Julie A. Cerio;
Katie Boyea; David M. Primo; Martha E. Mulroy;
Michelle Pirro Baily; Unkown; Hiscock Legal Aid;
and Dep't of Health and Soc. Servs., Defendants.

5:



**24**

-

**CV**

-

**0048**

(DNH/ML)

|

Signed May **1**, **2024**

*** Start Section

...

**Attorneys and Law Firms**

ELLIS DAVON **DUDLEY**, II, Plaintiff, Pro Se, Post Office
Box 7124, Syracuse, New York 13261.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1**  The Clerk has sent this *pro se* Complaint (Dkt. No. **1**)
together with an application to proceed *in forma pauperis*
("IFP") (Dkt. No. 2) and a motion for permission to file
electronically in ECF (Dkt. No. 3) filed by Ellis Davon
**Dudley**, II ("Plaintiff") to the Court for review. For the
reasons discussed below, I (**1**) grant Plaintiff's IFP application
(Dkt. No. 2), (2) recommend that Plaintiff's Complaint (Dkt.
No. **1**) be dismissed in its entirety without leave to amend, and
(3) deny without prejudice Plaintiff's motion for permission
to file electronically (Dkt. No. 3).

**I. BACKGROUND**

Liberally construed, [1] Plaintiff's Complaint asserts that his
rights were violated by Defendants Governor Kathy **Hochul**,
New York State, Dr. James V. McDonald, Randal B.
Caldwell, Megan Johnson, Christina F. Dejoseph, Sandra
Milner, Jeffrey A. Domachowski, Karen Stanislaus, Arlene
Bradshaw, Julie A. Cecile, Onondaga County Sheriff, Patricia
L. DeRue, Sue Ottaviano, Julie A. Cerio, Katie Boyea, David
M. Primo, Martha E. Mulroy, Michelle Pirro Baily, Unknown,
Hiscock Legal Aid, and Department of Health and Social
Service (collectively "Defendants"), who were all involved in
Plaintiff's state court family proceedings. (*See generally* Dkt.
No. **1**.)

The Complaint is difficult to decipher (*id.*), but alleges that
Plaintiff has two minor children, whom Plaintiff refers to
as "blue child" and "pink child" throughout the Complaint.
(Dkt. No. **1** at 2.) The Complaint provides a timeline of
Plaintiff's experiences with the New York State Family Court
system dating back to July **9**, 2019. (*Id.*) The crux of
Plaintiff's grievance appears to be that (**1**) the court-ordered
child support is excessive, (2) Plaintiff and his family have
somehow "lost" their nationality because of the family court
proceedings, and (3) Plaintiff's wages were garnished to pay
his court-ordered child support and he did not consent to the
seizure of his property. (*See generally* Dkt. No. **1**.)

The Complaint appears to assert the following **nine** causes of
action: (**1**) a claim of racketeering, (2) a claim that Plaintiff's
rights pursuant to the First Amendment and 42 U.S.C. § 1983
were violated; (3) a claim that Plaintiff's rights pursuant to the
Second Amendment and 42 U.S.C. § 1983 were violated; (4) a
claim that Plaintiff's rights pursuant to the Fourth Amendment
and 42 U.S.C. § 1983 were violated; (5) a claim that Plaintiff's
rights pursuant to the Fifth Amendment and 42 U.S.C. § 1983
were violated; (6) a claim that Plaintiff's rights pursuant to the
Sixth Amendment and 42 U.S.C. § 1983 were violated; (7) a
claim that Plaintiff's rights pursuant to the Eighth Amendment
and 42 U.S.C. § 1983 were violated; (8) a claim that Plaintiff's
rights pursuant to the Thirteenth Amendment and 42 U.S.C.
§ 1983 were violated; and (**9**) a claim that Plaintiff's rights
pursuant to the Fourteenth Amendment and 42 U.S.C. §
1983 were violated. (Dkt. No. **1** at 6.) As relief, Plaintiff
seeks damages in the "amount of 20 million dollars or a
full disclosure of all contract terms for a consideration to
acceptance at the agreement of terms of competition. As

well [as] an immediate stop to the organization tasks with damaging and seizure [of Plaintiff's] property." (*Id.*)

**\*2** Plaintiff also filed an application to proceed IFP. (Dkt. No. 2.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [2] ...

*** Start Section

... a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at *1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v....*

*** Start Section

... seq., ("RICO") I recommend that it be dismissed. [4]

It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity. 18 U.S.C. § 1964. This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (**1**) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property 'by reason of a violation of section 1962.' " *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))), *vacated in part on other grounds by Weiss v. David Benrimon Fine Art LLC*, 20-CV-3842, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) (summary order). More specifically, to assert a civil RICO claim under Section 1962(c), a plaintiff must allege the following elements: "(**1**) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

**\*4** The Complaint fails to allege facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO. More specifically, Plaintiff fails to allege facts plausibly suggesting that Defendants constitute, control, or participate in any enterprise with a distinguishable existence or purpose. *See Mackin v. Auberger*, 59 F. Supp. 3d 528, 543 (W.D.N.Y. 2014) ("Plaintiff fails to allege that [the defendants] had a common or shared purpose or that they functioned as a continuing unit."). In addition, the Complaint fails to allege any facts plausibly suggesting that Defendants functioned as a continuing unit. "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail." *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at *13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at *3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff

failed to allege facts plausibly suggesting the existence of a RICO enterprise).

Moreover, the Complaint fails to allege facts plausibly suggesting a pattern of racketeering activity. 18 U.S.C. § 1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of each other); *Westester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* ... amount to or pose a threat of continued criminal activity.' "). The Complaint fails to allege any acts of racketeering activity and instead merely uses the word "racketeering" in a conclusory fashion without facts plausibly suggesting the commission of any predicate acts. (*See generally* Dkt. No. 1.)

For each of these alternative reasons, I recommend that Plaintiff's RICO claim be dismissed.

### B. Claims Pursuant to 42 U.S.C. § 1983

After carefully considering Plaintiff's claims pursuant to 42 U.S.C. § 1983, I recommend that they be dismissed for three reasons.

First, to the extent that there are final state court orders or judgments that Plaintiff asks this Court to overturn, those claims are barred by the *Rooker-Feldman* doctrine. *Porter v. Nasci*, 24-CV-0033, 2024 WL 1142144, at *4 (N.D.N.Y. Mar. 15, 2024) (Dancks, M.J.) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005); *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021)) ("Under the *Rooker-Feldman* doctrine, a federal district court lacks authority to review a final state court order or judgment where a litigant seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment."). "This includes when a litigant seeks relief that invites a federal district court to reject or overturn a final decision of a New York Family Court as to a child support dispute brought in that state court." *Porter*, 2024 WL 1142144, at *4 (citing *Sims v. Kaufman*, 23-CV-7927, 2024 WL 757338, at *4 (S.D.N.Y. Feb. 14, 2024)) (additional citation omitted); *see also Fernandez v. Turetsky*, 14-CV-4568, 2014 WL 5823116, at *4 (E.D.N.Y. Nov. 7, 2014) (collecting cases in support of the proposition that "[c]ourts have repeatedly invoked the

[*Rooker-Feldman*] doctrine in cases ... in which plaintiffs challenge family court decrees setting child support arrears."), *aff'd*, 645 F. App'x 103 (2d Cir. 2016). Therefore, to the extent Plaintiff seeks to challenge a final judgment of Onondaga County Family Court or the Oneida County Family Court, any such claim is barred by the *Rooker-Feldman* doctrine. *See, e.g., Phillips v. Wagner*, 22-CV-0833, 2022 WL 17406092, at *3 (N.D.N.Y. Nov. 4, 2022) (Lovric, M.J.) ("Plaintiff's claims, while not entirely clear, seem to challenge an order ... in which the Family Court determined that he owes child support .... Plaintiff's claims for relief are barred by the *Rooker-Feldman* doctrine ....") (citation omitted), *report and recommendation adopted*, 2022 WL 17403441 (N.D.N.Y. Dec. 2, 2022) (Hurd, J.), *appeal dismissed*, No. 23-68, 2023 WL 4445323 (2d Cir. Apr. 25, 2023).

**\*5** Alternatively, "in the event the underlying family court proceedings are pending, such claims are likely barred by the *Younger* abstention doctrine." *Walker v. O'Connor*, 22-CV-0581, 2022 WL 2341420, at *6 (N.D.N.Y. June 29, 2022) (Dancks, M.J.) (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Amato v. McGinty*, 21-CV-0860, 2022 WL 226770, at *11 (N.D.N.Y. Jan. 26, 2022) (Dancks, M.J.)), *report and recommendation adopted*, 2022 WL 2805462 (N.D.N.Y. July 18, 2022) (Hurd, J.). "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger*, 401 U.S. at 43-44). "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Const. Corp.*, 282 F.3d at 198 (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)). Courts in this circuit have found these conditions to be satisfied in matters involving child support issues. *See, e.g., Cogswell v. Rodriguez*, 304 F. Supp. 2d 350, 357 (E.D.N.Y. 2004) (applying the *Younger* abstention doctrine to dismiss claims which arose from "pending state court proceedings involving child support.") (citation omitted); *Tomczyk v. New York Unified Ct. Sys.*, 19-CV-2753, 2019 WL 2437849, at *3 (E.D.N.Y. June 10, 2019) (citing *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72-73 (2013) ("[T]his Court abstains under *Younger* from interfering in Plaintiff's ongoing state-court proceedings, involving divorce and child support issues and 'implicat[ing] a State's interest in enforcing the orders and judgments of

its courts.' ")). "Accordingly, to the extent that the child support issues are continuing in Family Court, the Court should abstain from interfering with that process." *Bowman v. Morris*, 19-CV-0097, 2019 WL 5150196, at *6 (N.D.N.Y. Apr. 10, 2019) (Stewart, M.J.) (citations omitted), *report and recommendation adopted*, 2019 WL 3759174 (N.D.N.Y. Aug. 9, 2019) (Sannes, J.).

Second, Plaintiff's claims are likely barred pursuant to the domestic relations exception to the jurisdiction of federal courts. *Dudley v. Montaque*, 24-CV-0223, 2024 WL 1464346, at *4 (N.D.N.Y. Apr. 4, 2024) (Dancks, M.J.) (citing *Marshall v. Marshall*, 547 U.S. 293, 308 (2006); *Oliver v. Punter*, 22-CV-3580, 2022 WL 3228272, at *3 (E.D.N.Y. Aug. 10, 2022) ("The domestic relations exception to federal jurisdiction divests the federal courts of power to issue divorce alimony and child custody decrees .... This exception also extends to child support determinations and the enforcement thereof.") (internal quotations and citations omitted)) ("under the domestic relations exception to the jurisdiction of federal courts, cases involving divorce, alimony, and child custody remain outside this Court's jurisdiction."). Accordingly, this Court lacks jurisdiction to adjudicate a claim involving issues of child custody and support. *See Rotondo v. New York*, 17-CV-1065, 2017 WL 5201738, at *4 (N.D.N.Y. Oct. 31, 2017) (Peebles, M.J.) ("[I]t is manifestly clear that plaintiff's claims implicate the domestic-relations exception to federal court jurisdiction. Plaintiff challenges a state-court's determination denying him relief from a family court's child support order, and plaintiff's requests for relief include removal of the family court proceeding to federal court."), *report and recommendation adopted*, 2017 WL 5198194 (N.D.N.Y. Nov. 9, 2017) (Sharpe, J.); *Cruz v. New York*, 17-CV-0510, 2017 WL 6021838, at *7 (N.D.N.Y. Oct. 27, 2017) (Dancks, M.J.), *report and recommendation adopted*, 2017 WL 6001833 (N.D.N.Y. Dec. 4, 2017) (Sannes, J.) (collecting cases in support of the proposition that "[c]laims involving child custody, support, and visitation brought in federal district court in this Circuit have regularly been dismissed for lack of subject matter jurisdiction based on the domestic relations exception to federal jurisdiction.").

Third, the claims against Defendants are not cognizable.

### 1. Claims Against Defendant Hochul

Sovereign immunity bars Plaintiff's claims for damages against Defendant Hochul in her official capacity. Sovereign immunity extends to "actions for the recovery of money from the state" against "state agents." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)). A lawsuit brought against officials of a government entity in their official capacities is "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Because Plaintiff's claims for damages against Defendant Hochul in her official capacity is effectively an "action[ ] for the recovery of money from the state," *Leitner*, 779 F.3d at 134, sovereign immunity bars them.

**\*6** Moreover, to the extent that Plaintiff's claims against Defendant Hochul in her official capacity seek prospective relief and to the extent that Plaintiff's claims are construed as against Defendant Hochul in her individual capacity, I recommend that they be dismissed for failure to allege Defendant Hochul's personal involvement in any constitutional violation. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *see Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) (holding that in order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted) ("[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."). The Second Circuit has made clear that "there is no special rule for supervisory liability," and a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Here, although Plaintiff names Defendant Hochul as a party, the body of the Complaint lacks any allegations of wrongdoing by her. (*See generally* Dkt. No. 1.) As a result, I recommend that Plaintiff's claims against Defendant Hochul be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 2. Claims Against Defendant New York State

As set forth above, sovereign immunity pursuant to the Eleventh Amendment bars individuals from suing states in federal court, unless Congress abrogates states' immunity or a state consents to suit. *See* U.S. Const. Amend. XI; *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). Accordingly, I recommend that Plaintiff's claims asserted against the New York State be dismissed pursuant to Section 1915(e)(2)(B)(i).

### 3. Claims Against Defendant McDonald

The Complaint identifies Defendant McDonald "as the commissioner of the Department of Health in New York State." (Dkt. No. **1** at **1**.) To the extent that the Complaint is construed as asserting claims against Defendant McDonald in his official capacity, he is immune from suit pursuant to the Eleventh Amendment.

Moreover, to the extent that the Complaint is construed as asserting claims against Defendant McDonald in his individual capacity, I recommend that they be dismissed for failure to assert his personal involvement in any constitutional violation.

### 4. Claims Against Defendant Caldwell

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. **9**, 11-12 (1991). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209. Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles* 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). However, "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff asserts claims that appear to arise from the efforts of Defendant Caldwell, in his capacity as a family court judge in Oneida County. (Dkt. No. **1** at 6.) Defendant Judge Caldwell is therefore immune from suit under the doctrine of

judicial immunity. As a result, I recommend that Plaintiff's claims against Defendant Caldwell in his individual capacity be dismissed based on the doctrine of judicial immunity.

Moreover, I recommend that Plaintiff's claims against Defendant Caldwell in his official capacity be dismissed pursuant to the Eleventh Amendment. *See Sundwall v. Leuba*, 28 F. App'x 11, 12 (2d Cir. 2001) (citing *K & A Radiologic Tech. Servs., Inc. v. Comm'r of the Dep't of Health*, 189 F.3d 273, 278 (2d Cir. 1999)) (holding that "state officers, if sued in their official capacities, are immunized from suit by private citizens under the Eleventh Amendment."); *King v. New York State*, 23-CV-3421, 2023 **WL** 5625440, at \*4 (E.D.N.Y. Aug. 31, 2023) (citing *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (affirming dismissal of *pro se* Section 1983 claims against the State of New York and a state court judge in his official capacity based on Eleventh Amendment immunity)) ("Eleventh Amendment immunity extends to state officials acting in their official capacities, including state court judges."); *Aron v. Becker*, 48 F. Supp.3d 347, 366-67 (**N.D.N.Y** 2014) (McAvoy, J.) (dismissing the plaintiff's claims against a state court judge in his official capacity based on the doctrine of Eleventh Amendment immunity).

### 5. Claims Against Defendants Johnson, Ottaviano, Boyea, and Primo

**\*7**  The Complaint alleges that Defendant Johnson was an "Onondaga Family Court attorney" who was tasked with conducting a "virtual meeting call for the Onondaga County family Courthouse." (Dkt. No. **1** at 2.) The Complaint alleges that Defendant Ottaviano was a court assistant who postponed a hearing that was scheduled for February 15, 2023. (Dkt. No. **1** at ¶ 18.) The Complaint alleges that Defendant Boyea was a "Secretary" who emailed a modified custody order signed by Defendant Cecile. (Dkt. No. **1** at ¶ 23.) Finally, the Complaint alleges that Defendant Primo is the Clerk of the Court in Onondaga County Family Court (Dkt. No. **1** at ¶ 10) and he notified the parties of a hearing scheduled on July 20, 2023 (*id.* at ¶ 22).

"As a general principle, a government attorney is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process." *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Judicial immunity has been extended to judicial law

clerks, the New York State Chief Administrative Judge, court attorneys, and the chief clerks of several state courts. *Jackson v. Pfau*, 523 F. App'x 736, 737-38 (2d Cir. 2013) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997)).

As a result, I recommend that Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo in their individual capacities be dismissed, because they are immune from suit. [5] *See Leftridge v. Judicial Branch*, 22-CV-0411, 2023 **WL** 4304792, at *9 (D. Conn. June 30, 2023) (dismissing the plaintiff's claims against the state court clerks of court based on the doctrine of quasi-judicial immunity where "their alleged actions arose out of or related to [plaintiff]'s child support and child custody proceedings."); *Braithwaite v. Tropea*, 23-CV-1431, 2023 **WL** 4207907, at *4 (E.D.N.Y. June 27, 2023) (citing *Jackson v. Pfau*, 523 F. App'x 736, 737-38 (2d Cir. 2013) (affirming dismissal pursuant to Section 1915(e)(2)(B) of pro se plaintiff's Section 1983 claims against the Chief Clerks of several state courts based on the doctrine of judicial immunity) (dismissing as frivolous the plaintiff's claims against the clerk of the court because he was entitled to absolute immunity); *Mendez v. Johnson*, 22-CV-6811, 2022 **WL** 3587600, at *2 (S.D.N.Y. Aug. 22, 2022) (citing *inter alia, Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA*, 17-CV-2164, 2018 **WL** 2138631, at *2 (D. Conn. May 9, 2018) (extending judicial immunity to a clerk of court); *Manko v. Ruchelsman*, 12-CV-4100, 2012 **WL** 4034038, at *2 (E.D.N.Y. Sept. 10, 2012) (same)) (noting that courts have routinely granted judicial immunity to "government officials, including clerks of court and other court employees, for their acts that assist a judge in the performance of his or her judicial duties.").

***8** Moreover, I recommend that Plaintiff's claims against Defendants Johnson, Ottviano, Boyea, and Primo in their official capacities as employees of the Onondaga Family Court be dismissed because the Onondaga Family Court is an arm of the New York state court system and New York State is immune from suit pursuant to the Eleventh Amendment. *Braithwaite*, 2023 **WL** 4207907, at *4 (collecting cases) (holding that the plaintiff's claims against the Chief Clerk of the Suffolk County Court in his official capacity are barred by the Eleventh Amendment).

### 6. Claims Against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily

Plaintiff's claims against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily relate to their capacities as Onondaga County Family Court judges. (*See generally* Dkt. No. **1**.) As set forth above in Part IV.B.4. of this Order and Report-Recommendation, Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily in their individual capacities are immune from suit pursuant to the doctrine of absolute judicial immunity. Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, claims against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily in their official capacities are essentially claims against New York State, which is immune from suit pursuant to the Eleventh Amendment.

### 7. Claims Against Defendants DeRue and Domachowski

Plaintiff's claims against Defendants DeRue and Domachowski relate to their roles as Onondaga County Family Court support magistrates. (*See generally* Dkt. No. **1**.) As set forth above in Part IV.B.4. of this Order and Report-Recommendation, Defendants DeRue and Domachowski in their individual capacities are immune from suit pursuant to the doctrine of absolute judicial immunity. *See Miller v. Primo*, 23-CV-1051, 2023 **WL** 6379325, at *6 (**N.D.N.Y.** Sept. 29, 2023) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against "Defendants DeRue and Domachowski, who acted as the support magistrate judges" and finding that such claims "are barred under the doctrine of judicial immunity"), *report and recommendation adopted by* 2023 **WL** 754323 (**N.D.N.Y.** Nov. 14, 2023) (Sannes, C.J.). Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, claims against Defendants DeRue and Domachowski in their official capacities are essentially claims against New York State, and are immune from suit pursuant to the Eleventh Amendment.

### 8. Claims Against Defendant Stanislaus

"The law is clear that court referees are entitled to absolute judicial immunity from liability with respect to acts taken in the scope of their duties." *Khrapko v. Splain*, 389 F. Supp. 3d 199, 205 (W.D.N.Y. 2019) (citing *Green v. Kadilac Mortg. Bankers, Ltd.*, 936 F. Supp. 108, 115 (S.D.N.Y. 1996); *Weiss v. Feigenbaum*, 558 F. Supp. 265, 272 (E.D.N.Y. 1982)); *accord Witcher v. Moriber*, 21-CV-6168, 2022 **WL** 1085297, at *2 (E.D.N.Y. Apr. 11, 2022) (citing *Wilson v. Wilson-Polson*, 446 F. App'x 330, 331 (2d Cir. 2011) (allegations that a New

York State Family Court referee violated plaintiff's procedural due process rights failed in light of the referee's absolute immunity to suit); *Topolski v. Wrobleski*, 13-CV-0872, 2014 WL 2215761, at *3 (**N.D.N.Y**. May 29, 2014) ("Judicial immunity is so broad that judges and referees 'are not liable to civil actions for their judicial acts, even when such acts ... are alleged to have been done maliciously or corruptly.' "); *Renner v. Stanton*, 13-CV-1676, 2013 WL 1898389, at *3 (E.D.N.Y. May 7, 2013) (dismissing claims against Family Court Referee based on judicial immunity)).

**\*9** As a result, I recommend that Plaintiff's claim against Defendant Stanislaus in her individual capacity be dismissed based on the doctrine of absolute judicial immunity. *See Miller Ex v. Primo*, 22-CV-0680, 2022 WL 16556060, at *5 (**N.D.N.Y**. Sept. 29, 2022) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against Defendant Stanislaus because she was entitled to absolute judicial immunity as a court attorney referee), *report and recommendation adopted by* 2022 WL 16551700 (**N.D.N.Y**. Oct. 31, 2022) (Sannes, C.J.).

Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, any claim against Defendant Stanislaus in her official capacity is essentially a claim against New York State, which is immune from suit pursuant to the Eleventh Amendment.

### 9. Claims Against Defendant Bradshaw

Based on the allegations contained in the Complaint, it appears that Defendant Bradshaw was an attorney appointed to represent **one** of Plaintiff's minor children. (Dkt. No. **1** at ¶ 16.) The Second Circuit has held that "law guardians who act as 'attorney[s] for the child' are not state actors for the purposes of suits filed pursuant to § 1983." *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015).

As a result, I recommend that Plaintiff's claims against Defendant Bradshaw be dismissed.

### 10. Claims Against Defendant Onondaga County Sheriff

Defendant Onondaga County Sheriff is merely a department of a municipality, and thus, is not amenable to suit. *See White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (**N.D.N.Y**. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v.*

*Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (**N.D.N.Y**. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (**N.D.N.Y**. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")) ("Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal ... department does not have the capacity to be sued as an entity separate from the municipality in which it is located."), *report and recommendation adopted*, 2019 WL 974824 (**N.D.N.Y**. Feb. 28, 2019) (Suddaby, C.J.). As a result, I recommend that Plaintiff's claims against Defendant Onondaga County Sheriff be dismissed because it is not an entity amenable to suit. [6]

### 11. Claims Against Defendant Hiscock Legal Aid

**\*10** The Complaint alleges that Defendant Hiscock Legal Aid and attorneys employed by it represented the mother of Plaintiff's minor children during the State Family Court proceedings. (Dkt. No. **1** at ¶ 5.) Notwithstanding the appointment of Defendant Hiscock Legal Aid as legal representation, it was not a state actor for purposes of 42 U.S.C. § 1983. "Although [Defendant Hiscock Legal Aid was] supplied and funded by the state, [it] act[ed] according to the best interests of [its] client with 'no obligation to the mission of the state.' " *Milan*, 808 F.3d at 964 (quoting *Meeker v. Kercher*, 782 F.2d 153, 155 (10th Cir. 1986)) (internal quotation omitted).

As a result, I recommend that Plaintiff's claims against Defendant Hiscock Legal Aid be dismissed.

### 12. Claims Against Defendant Department of Health and Social Service

It is unclear based on the allegations in the Complaint if Defendant Department of Health and Social Service is a division of New York State or Onondaga County. To the extent that it is a department of New York State, it is immune from suit pursuant to the Eleventh Amendment as set forth in Part IV.B.1 of this Order and Report-Recommendation. To the extent that Defendant Department of Health and

Social Service is a department of Onondaga County, it is not amenable to suit pursuant as set forth above in Part IV.B.10 of this Order and Report-Recommendation. [7]

### 13. Claims Against Defendants Milner and Unknown

"Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, 06-CV-0889, 2007 **WL** 607341, at *1 (**N.D.N.Y.** Feb. 20, 2007) (Kahn, J.) (citing *Gonzalez v. City of New York*, 97-CV-2246, 1998 **WL** 382055, at *2 (S.D.N.Y. July **9**, 1998)); *see also Crown v. Wagenstein*, 96-CV-3895, 1998 **WL** 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

The Complaint names Milner and Unknown as defendants, but the body lacks any allegations of wrongdoing by these individuals. (*See generally* Dkt. No. **1**.) As a result, I recommend that the claims against them be dismissed for failure to state a claim upon which relief may be granted.

For each of these alternative reasons, I recommend that the Complaint be dismissed in its entirety.

### V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown*

*v. Peters*, 95-CV-1641, 1997 **WL** 599355, at *1 (**N.D.N.Y.** Sept. 22, 1997) (Pooler, J.). [8]

**\*11** Here, better pleading could not cure the deficiencies described above. As a result, I recommend that Plaintiff's Complaint be dismissed without leave to replead.

### VI. PLAINTIFF'S MOTION TO OBTAIN ECF LOGIN AND PASSWORD

In light of the recommended disposition of this case, Plaintiff's motion for ECF login and password is denied without prejudice. (Dkt. No. 3.) "Because this court is recommending dismissal at this time, the court will deny [P]laintiff's motion to obtain ECF privileges without prejudice." *Amato v. McGinty*, 17-CV-0593, 2017 **WL** 9487185, at *11 (**N.D.N.Y.** June 6, 2017) (Baxter, M.J.), *report and recommendation adopted*, 2017 **WL** 4083575 (**N.D.N.Y.** Sept. 15, 2017) (D'Agostino, J.); *see Mahmood v. United States Gov't*, 20-CV-0207, 2020 **WL** 3965125, at *3 (**N.D.N.Y.** Mar. 17, 2020) (Stewart, M.J.) (same), *report and recommendation adopted*, 2020 **WL** 1808206 (**N.D.N.Y.** Apr. **9**, 2020) (D'Agostino, J.).

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion to obtain an ECF login and password (Dkt. No. 3) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the **COURT DISMISS WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND** Plaintiff's Complaint (Dkt. No. **1**) in its entirety pursuant to 28 U.S.C. § 1915(e); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of...*

*** Start Section
...

---

## Footnotes

1    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2    The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3    Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

4    Under General Order #14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint. Despite thirty days having elapsed since the filing of his Complaint, Plaintiff has failed to file a Civil RICO statement. (*See generally* docket sheet.) As a result, I recommend that, in the alternative, Plaintiff's RICO claim be dismissed. *See Poole v. Bendixen*, 20-CV-0697, 2021 WL 3737780, *12 (N.D.N.Y. Aug. 24, 2021) (Suddaby, C.J.); *Murphy v. Onondaga Cnty.*, 18-CV-1218, 2022 WL 819281, *6 (N.D.N.Y. Mar. 18, 2022) (Sharpe, J.).

5    In the alternative, I recommend that Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo be dismissed because the Complaint fails to allege the personal involvement of them in any alleged constitutional deprivation, which is a prerequisite to an award of damages under 42 U.S.C. § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Here, although Plaintiff names Defendants Johnson, Ottaviano, Boyea, and Primo as parties to the action, the body of the Complaint lacks any allegations of wrongdoing by them. (*See generally* Dkt. No. 1.) As a result, I recommend that, in the alternative, Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B).

6    Even if Plaintiff's claims against Defendant Onondaga County Sheriff were liberally construed as against Onondaga County, I would recommend that they be dismissed. There is no basis for municipal liability alleged in the Complaint. Plaintiff essentially complains of a discrete incident, during which an officer or individual employed by Defendant Onondaga County Sheriff did not act properly. (Dkt. No. 1 at 4.) There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Onondaga County.

7    Further, as set forth above in note 6, *supra*, to the extent that the Complaint is liberally construed as alleging a claim against Onondaga County, it fails to allege any basis for municipal liability.

8    *See also* *Carris v. First Student, Inc.,* 132 F. Supp. 3d 321, 340-41 n.1 (**N.D.N.Y**. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

9    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

...

2024 WL 2399913
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ellis Davon DUDLEY, II, Plaintiff,
v.
Governor Kathy HOCUL et al., Defendants.

5:24-CV-48
|
Signed May 23, 2024

**Attorneys and Law Firms**

ELLIS DAVON DUDLEY, II, Plaintiff, Pro Se, P.O. Box 7124, Syracuse, NY 13261.

**ORDER ON REPORT & RECOMMENDATION**

DAVID N. HURD, United States District Judge

 **\*1** On January 11, 2024, *pro se* plaintiff Ellis Javon Dudley, II ("plaintiff") filed this action alleging that the named defendants violated his civil rights in connection with certain family-court proceedings being conducted under New York State law. Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"), Dkt. No. 2, and for leave to file documents electronically, Dkt. No. 3.

On May 1, 2024, U.S. Magistrate Judge Miroslav Lovric granted plaintiff's IFP Application, denied his request to file electronically, and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed *without* leave to amend. Dkt. No. 5. As Judge Lovric explained, plaintiff's RICO claims were procedurally deficient and substantively meritless, while plaintiff's 42 U.S.C. § 1983 claims were barred by various claim-preclusion principles. *Id.*

Plaintiff has not filed objections, and the time period in which to do so has expired. *See* Dkt. No. 5. Upon review for clear error, the R&R is accepted and will be adopted. *See* FED R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED without leave to amend.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 2399913

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 149 of 183

2023 WL 6318280
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

George TARANTO, et al., Plaintiffs,
v.
PUTNAM COUNTY, et al., Defendants.

No. 21-CV-2455 (KMK)
|
Signed September 28, 2023

**Attorneys and Law Firms**

Thomas Martin Gambino, Esq., Law Office of Thomas M. Gambino & Associates PC, Poughkeepsie, NY, Counsel for Plaintiffs.

James A. Randazzo, Esq., Portale Randazzo LLP, White Plains, NY, Counsel for Defendants.

Drew William Sumner, Esq., Sumner Law LLP, White Plains, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiffs George Taranto ("Taranto"), Karen Taranto, and Christopher P. Taranto and Kerrianne Taranto-Garabo as Executors for the Estate of Taranto (altogether, "Plaintiffs") bring this Action, pursuant to 42 U.S.C. § 1983, against Putnam County ("County"), the Putnam County Sheriff's Office, Sheriff Robert L. Langley, Jr. ("Langley"), Deputy Sheriff Ronald C. Yeager ("Yeager"), Investigator Daniel Hunsberger ("Hunsberger"), Deputy Sheriff Ryan Diskin ("Diskin"), Deputy Sheriff Vincent Dalo ("Dalo"), Sergeant William Quick ("Quick"), and Officers John Does 1–10 (collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims. (*See generally* Second Am. Compl. (Dkt. No. 31).) Before the Court is Defendants' Motion To Dismiss (the "Motion") the claims in the Second Amended Complaint ("SAC") except for the Fourth Amendment excessive force claim, failure to intervene claims against the on-scene officers, state law claims for assault, battery, and wrongful death, and Karen Taranto's claims for loss of consortium, (*see* Notice of Defs.' Mot. To Dismiss (Dkt. No. 32)).[1] For the following reasons, Defendants' Motion To Dismiss is granted in part and denied in part.

I. Background

A. Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider the (1) Notice of 50-h Hearing attached to Defendants' Motion, (*see* Dkt. No. 34) or the (2) Langley Video Interview, New York Attorney General Complaint, Putnam County Daily Voice News Article, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler attached to Plaintiffs' Opposition (*see* Dkt No. 38) at this stage of the litigation.[2]

1. Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.,* 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted). However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *see also Bellin v. Zucker,* 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York,* 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504,* 992 F.2d 12, 15 (2d Cir. 1993))). Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 150 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

## 2. Application

**\*2**  "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Even if not incorporated by reference, a document on which the complaint "solely relies and which is integral to the complaint," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation, emphasis, and quotation marks omitted), or a document on which "the complaint relies heavily on upon its terms and effect," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quotation marks omitted), may also be considered by the Court on a motion to dismiss. Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (holding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint" (alterations in original) (citation omitted)). Additionally, "no serious question as to [the documents'] authenticity can exist," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and it must be "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," *DiFolco*, 622 F.3d at 111 (citation and quotation marks omitted).

Plaintiffs' Second Amended Complaint states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) That is Plaintiffs' sole reference to the 50-h Hearing. (*See generally id.*) No Party has attempted to explain how the Notice of 50-h Hearing, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler regarding Taranto's ability to testify were clearly referenced in or integral to the Second Amended Complaint. Indeed, the Second Amended Complaint makes no reference to these documents and Plaintiffs have not relied on these documents in framing the Second Amended Complaint. Accordingly, these documents are not considered by the Court at this stage. For the same reason, the New York Attorney General Complaint against the Putnam County Sheriff's Department, the Putnam County Daily Voice News Article regarding the DiPippo settlement, and the Langley Video Interview, which are not mentioned anywhere in the Second Amended Complaint, cannot be considered.

### B. Factual Background

The following facts are drawn from the SAC and materials attached thereto and are assumed to be true for the purpose of deciding the instant Motion.

## 1. Parties

The Putnam County Sheriff's Office was and remains an agency of Putnam County. (SAC ¶ 5.) Langley, Yeager, Hunsberger, Diskin, Dalo, Quick, and Officers John Does 1-10 were employed "by Putnam County, by and through the Putnam County Sheriff's Office and/or Fire Department personnel and/or Emergency Medical Technicians" and "were acting within the scope of their employment." (*Id.* ¶¶ 6–7.) Langley "at all relevant times herein was and still is employed by Putnam County and/or Putnam County Sheriff's Office as Sheriff of Putnam County" and "supervised the actions of all subordinate officers of the Putnam County Sheriff's Office complained of herein." (*Id.* ¶¶ 10, 13.) "John Doe 1 was a Fire Department supervisor present at the time [ ] Taranto encountered the remaining Defendants" and "John Doe 2-3 are Emergency Medical Technicians present at the time [ ] Taranto encountered the remaining Defendants." (*Id.* ¶¶ 14–15.)

**\*3**  "Taranto was born on December 25, 1943 and died on August 25, 2021. His estate was duly formed on November 4, 2021 in Connecticut where he resided with his wife at the time of his death. Christopher P. Taranto and Kerrianne Taranto-Garabo, the decedent's children, were appointed by the Connecticut Probate Court as co-executors for the Estate of [ ] Taranto and have been substituted herein in his place and stead." (*Id.* ¶ 17.)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 151 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2. Factual Allegations Giving Rise to the Current Action

On July 8, 2019 at approximately 2:00 AM while lawfully at his residence located at 202 Apple Tree Lane, Brewster, New York, Taranto heard noise outside his residence and saw flashlights by his window. (*Id.* ¶¶ 24–25.) Taranto exited his home and stood on his driveway with his lawfully possessed firearm at his side pointing downward towards the ground. (*Id.* ¶¶ 26–27.) Taranto heard multiple Defendants screaming at him to drop his firearm and raise his hands. (*Id.* ¶ 28.) Taranto complied with the orders and placed his firearm on the pavement and raised his hands. (*Id.* ¶ 29.) Taranto further complied with Defendants' orders to walk towards them. (*Id.* ¶ 30.)

Dalo then approached Taranto from behind and "violently threw him to the ground, banging his head on the ground, repeatedly striking him and smashing his face upon the pavement." (*Id.* ¶ 31.) "Thereafter, all Defendants continued to use force upon a prone and helpless [ ] Taranto as he lie face-down on the pavement experiencing difficulty breathing and chest pains." (*Id.* ¶ 32.) "Defendants, [ ] Yeager, [ ] Diskin, [ ] Dalo, [ ] Quick and/or John Does 1–10 proceeded to throw him to the ground, beat him about the face, head[,] and body with at least closed fists, grind his head and face on the ground and severely brutalize him." (*Id.* ¶ 40.)

During Taranto's arrest, Defendants believed Taranto to be emotionally disturbed and believed he was "verbally non-compliant." (*Id.* ¶¶ 33, 37.) Taranto was a 75-year-old, "frail man suffering from early dementia," and had recently had open heart surgery at the time of the incident. (*Id.* ¶¶ 33, 39.) Plaintiffs allege Defendants were aware of these facts at the time of the incident. (*Id.* ¶ 39.) Plaintiffs further allege that "[d]espite believing [ ] Taranto to be an emotionally disturbed person, Defendants failed to utilize a process or procedure to [e]nsure his safety." (*Id.* ¶ 34.) Plaintiffs additionally allege that "[d]uring the course of [ ] Taranto's arrest, the Defendants did not believe [ ] Taranto to have used deadly physical force against them." (*Id.* ¶ 35.) Defendants "eventually placed handcuffs" on Taranto while under the supervision of Quick. (*Id.* ¶ 41.) "As the supervisor in charge, [ ] Quick was responsible for the overall actions of the subordinate officers on scene, including the treatment of [ ] Taranto and the force used upon him." (*Id.* ¶ 42.)

"Taranto was detained in handcuffs in the rear seat of a police vehicle while pleading for help from law enforcement personnel on scene due to the excruciating pain caused by handcuffs placed on him that were fastened too tight." (*Id.* ¶ 44.) Taranto was removed from the scene while informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body." (*Id.* ¶ 45.) "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance." (*Id.* ¶ 46.) "Any first aid provided at the scene by Fire Department personnel or Emergency Medical Technicians present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶ 48.) Plaintiffs also allege that "[a]ny Fire Department personnel or Emergency Medical Technicians present on scene conspired with the remaining Defendants to conceal and/or cover up Defendants' excessive use of force utilized upon [ ] Taranto and the injuries caused to him." (*Id.* ¶ 49.) Taranto was eventually moved to Putnam County Hospital while in Defendants' custody unbeknownst to his family. (*Id.* ¶ 50.)

**\*4** Defendants entered Taranto's home without his or Karen Taranto's consent. (*Id.* ¶ 51.) Once inside the home, Defendants demanded Karen Taranto show them Taranto's pistol permit and stated "they almost killed her husband and would only tell her that he had been arrested." (*Id.* ¶¶ 52–53.) Defendants did not advise her that her husband was going to a hospital or that he was injured. (*Id.* ¶ 54.) Defendants left Taranto at the hospital after placing a criminal court summons in his pocket charging him with Menacing in the Second Degree "unattended and without notifying his family who several hours later received a phone call from a nurse at the hospital." (*Id.* ¶¶ 55–56.) Plaintiffs attach an appearance ticket for Taranto with the charge of Menacing in the Second Degree to the Second Amended Complaint. (SAC Ex. 4.) A nurse from Putnam Hospital called Karen Taranto to inform her that her husband was placed on life support after suffering cardiac and respiratory failure and pulmonary edema. (SAC ¶ 57.) Because Taranto was unable to breathe on his own, he was placed on a respirator—he remained unconscious for several days and was in critical condition. (*Id.* ¶¶ 58–59.) Taranto was removed to Danbury Hospital via ambulance given the critical nature of his injuries. (*Id.* ¶ 60.) After recovering consciousness and regaining the ability to breathe on his own, Taranto was released from the hospital. (*Id.* ¶ 61.)

On September 1, 2019, Taranto woke up and realized he was unable to walk. (*Id.* ¶ 62.) Taranto was taken to Danbury

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 152 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Hospital where a scan revealed that he had "brain bleeds as a direct result of the brutal attack." (*Id.* ¶ 63.) The following day, Taranto underwent surgery to relieve the bleeding and pressure on his brain. (*Id.* ¶ 64.) Taranto lost control of his bladder as a result of the surgery and had permanent reduced motor skills and cognitive ability. (*Id.* ¶¶ 66–67.) Taranto remained in the hospital for another seven days and then began physical rehabilitation treatment. (*Id.* ¶ 65.)

Plaintiffs allege that the "Defendants herein have covered-up Defendants' collective misconduct and violent tendencies of the Defendants, including but not limited to Defendant Quick." (*Id.* ¶ 72.) "After knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct" and "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce[d] them to falsely testify against [ ] Taranto in criminal court." (*Id.* ¶¶ 76–77.) "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions." (*Id.* ¶ 87.)

Plaintiffs additionally allege that "Defendants failed to disclose criminal discovery in a timely fashion and/or at all" and that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all." (*Id.* ¶¶ 82–83.) Defendants provided the Putnam County District Attorney's Office documents which have been provided to Taranto's criminal defense attorney which "came after various filings as part of this present litigation apparently in response to those filings." (*Id.* ¶¶ 88–89.) "Criminal Discovery was initially provided to defense counsel by the Putnam County District Attorney's Office on September 10, 2020, with Supplemental Disclosure being provided on November 16, 2020, April 6, 2021 and May 27, 2021"—the "May 27, 2021 Supplemental Discovery was made seven days after Plaintiffs' counsel filed his response to Defendants' pre-motion letter." (*Id.* ¶¶ 90–91.) "Other than document number 28, the disclosure presented as part of the May 27, 2021 Supplemental Discovery existed before the initial discovery response was made on September 10, 2020 but were not provided at that time." (*Id.* ¶ 92.) "One such document ... purports to be an internal investigation allegedly performed by Defendants pursuant to the arrest of George Taranto," which "is alleged to have started on July 8, 2019 and ended one-year later on July 9, 2020 resulting in

Defendant Langley condoning the actions of the Defendants herein." (*Id.* ¶¶ 93–94.) "This document, along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (*Id.* ¶ 95.) "[T]his report was not disclosed as part of the original criminal disclosure on September 10, 2020 or either Supplement disclosure on November 16, 2020 or April 6, 2021." (*Id.* ¶ 96.) Plaintiffs attach a list of materials disclosed to defense counsel on different dates, beginning in September 2020 and ending in May 2021. (SAC Ex. 9.)

**\*5** Plaintiffs point to "misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery." (SAC ¶ 84.) "In the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶ 85.) [3]

The complaint arrest report attached to Plaintiffs' Second Amended Complaint July 8, 2019, reported by Yeager and reviewed by Quick, states:

ON 07/08/2019 AT APPROXIMATELY 0310 HOURS, MEMBERS WERE INVESTIGATING A STOLEN VEHICLE INCIDENT AT 201 APPLE TREE LN IN THE TOWN OF SOUTHEAST. WHILE STANDING IN THE PARKING LOT OUTSIDE OF SAID RESIDENCE, AN OLD WHITE MALE, GEORGE C TARANTO DOB ... 1943, EXITED HIS RESIDENCE AT 202 APPLE TREE LANE AND WALKED UP TO INVESTIGATOR HUNSBERGER. INV HUNSBERGER TURNED TO ASK THE MAN TO GO BACK INTO HIS RESIDENCE WHEN MEMBER OBSERVED INV HUNSBERGER RUN TO COVER AND HEARD INV HUNSBERGER YELL "HES GOT A GUN".

DEPUTY DALO, DEPUTY DISKIN, SERGEANT QUICK AND MYSELF ALL DREW OUR SERVICE WEAPONS AND ORDERED MR. TARANTO NUMEROUS TIMES TO PUT DOWN HIS WEAPON AND PUT HIS HANDS IN THE AIR. MR. TARANTO DID NOT INITALLY COMPLY WITH ORDERS AND TOOK COVER BEHIND A VEHICLE. ALL MEMBERS CLEARLY STATED MULTIPLE TIMES THAT WE WERE POLICE FROM THE SHERIFF'S OFFICE. AFTER MULTIPLE ORDERS TO PUT DOWN HIS WEAPON, MR. TARANTO COMPLIED, PUT HIS WEAPON DOWN ON THE PAVEMENT,

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 153 of 183

AND LISTENED TO ORDERS TO WALK TOWARD DEPUTIES. AT THIS TIME DEPUTY DALO WAS ABLE TO SNEAK UP BEHIND MR. TARANTO AND BRING HIM TO THE GROUND. ALL MEMBERS THEN ASSISTED TRYING TO GET MR. TARANTO IN HANDCUFFS. MR. TARANTO WAS ORDERED NUMEROUS TIME TO PUT HIS HANDS BEHIND HIS BACK BUT CONTINUED TO KEEP THEM LOCKED UNDER HIS BODY. MEMBERS WERE ABLE TO FREE MR. TARANTO'S ARMS AND GET THEM BEHIND HIS BACK SO THAT HE COULD BE PLACED IN HANDCUFFS.

EMS WAS CALLED TO THE SCENE TO EVALUATE MR. TARANTO FOR ANY INJURIES. HE WAS TRANSPORTED BY AMBULANCE TO PUTNAM HOSPITAL CENTER FOR FURTHER EVALUATION. MEMBER FOLLOWED THE AMBULANCE TO PHC AND ISSUED MR. TARANTO AN APPEARANCE TICKET FOR THE TOWN OF SOUTHEAST COURT FOR THE CHARGE OF MENACING IN THE 2ND DEGREE (PL 120.14(1)) FOR 08/01/2019 AT 1800 HOURS AT WHICH TIME HE WILL BE ARRAIGNED. MEMBER ALSO CHARGED MR. TARANTO WITH CRIMINAL POSSESSION OF A WEAPON IN THE 4TH DEGREE (VTL 265.01(2)), RESISTING ARREST (PL 205.30) AND OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE 2ND DEGREE (PL 195.05).

THE COLT MUSTANG .380 PISTOL WITH A FULL MAGAZINE OF AMMUNITION

(SAC Ex. 3.) Additionally attached to the Second Amended Complaint is a use of force form prepared by Quick indicating that Taranto was emotionally disturbed, that he resisted through "Verbal Non Compliance," "Verbal Threats/ Gestures" and "Physically Uncooperative (Resisting)," that "verbal command," "physical direction," "impact weapon," and "hands" were used to control Taranto, and that "suspect was tackled then physically restrained" and sustained "laceration to head/shoulder pain." (SAC Ex. 5.)

Plaintiffs additionally attach a Putnam County Sheriff's Department Personnel Investigation conducted by Kevin McManus which lists personnel involved as Quick, Diskin, Dalo, Yeager, Hunsberger, and Investigator Ryan McMahon and states that:

**\*6**  On 07/08/2019, the aforementioned Sheriff's Office members were investigating a stolen vehicle complaint on Apple Tree Lane within Reed Farm, located in the T/O Southeast. During the investigation, the defendant exited his residence of 202 Apple Tree Lane holding a unholstered handgun. The defendant was ordered to drop his weapon multiple times over the course of 3 minutes. Upon the defendant finally placing his weapon on the ground, he was taken to the ground by Deputy Dalo and assisted by other members. The defendant continued to struggle while members attempted to handcuff him. As a result of being taken to the ground, the defendant sustained a small cut or rash to his head.

(SAC Ex. 8.) The Recommendation of Investigating Officer stated that:

All Sheriff's Office members on scene acted within the scope of their duties in assisting with effecting a lawful arrest of the defendant. Furthermore, all Sheriff's Office members acted within the scope of the New York State Penal Law as it pertains to Article 35 as well as within the rules and regulations of the Putnam County Sheriff's Department in effecting said arrest using the minimum force necessary. Since Sgt, Quick was directly involved in the incident, member believes any investigation should be conducted by his direct supervisor. Sheriff's Office Rules and Regulations Article 8.lA, in effect at the time of this incident states Any injury to a prisoner whether the injury occurred while the subject was being taken into custody or while the person was in custody of the Putnam

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 154 of 183

County Sheriff's Department shall be the subject of an internal investigation, Member observed video and spoke with Sgt, Quick and several of the Deputies involved after the incident and investigation determined that the there was no improper conduct on the part of any Sheriff's Office member on scene. Member used my discretion in determining there was no need for a detailed written report.

(*Id.*) The report is signed by Langley, among others, stating "no action needed, acceptable force used on combative subject was armed with a firearm which was still within reach." (*Id.*) Plaintiffs, citing to this document, allege Langley " 'rubber stamped' an approval of the treatment of [ ] Taranto while in police custody." (SAC ¶ 86.) "Defendant Langley's deliberate indifference to 'rubber stamp' his deputies['] misconduct during an election year is nothing more than an attempt to protect his position rather than addressing the misconduct of his deputies." (*Id.* ¶ 106.)

Finally, Plaintiffs attach Taranto's Information signed by Yeager for Menacing in the Second Degree, Criminal Possession of a Weapon in the Fourth Degree, Resisting Arrest, Obstructing Governmental Administration in the Second Degree, based upon the following facts, respectively:

The said defendant, at or about 03:10 hours on the aforesaid date, while in front of 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally place or attempt to place members of the Putnam County Sheriff's Office in reasonable fear of physical injury, serious physical injury or death. Specifically, your defendant placed Investigator Hunsberger, Deputy Diskin, Deputy Dalo, Deputy Yeager and Sergeant Quick in reasonable fear of physical injury, serious physical injury or death by displaying a Colt Mustang .380 pistol.

The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of southeast, County of Putnam, New York, was in possession of a Colt Mustang .380 pistol with intent to use the same unlawfully against another.

The said defendant, at or about 03:10 hours on the aforesaid date, while at 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from effecting an authorized arrest of himself, in that the defendant did physically struggle with members to avoid being handcuffed.

**\*7** The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from performing an official function by means of intimidation, physical force or interference, or by means of an independently unlawful act in that he menaced police officers with a firearm which interfered with an official police investigation.

(SAC Ex. 10.)

### C. Procedural History

Plaintiffs filed their original Complaint on March 19, 2021, (Dkt. No. 1), their Amended Complaint on July 12, 2021, (Dkt. No. 14), and their Second Amended Complaint on January 10, 2022, (Dkt. No. 31). Defendants filed their Motions to Dismiss and accompanying Memorandum of Law on January 21, 2022. (*See* Not. of Mot. (Dkt. No. 32); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 33).) Plaintiffs filed their Opposition on February 18, 2022. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 37).) Plaintiffs additionally filed a motion to amend that same day. (Dkt. No. 39).) Defendants filed their Reply (*see* Reply to Mot. ("Defs.' Reply Mem.") (Dkt. No. 40)), and their Opposition to Plaintiffs' motion to amend on March 4, 2022, (Dkt. No. 41). Plaintiffs filed their Reply to Defendants' Opposition to Plaintiffs' motion to amend on March 9, 2022. (Dkt. No. 42.)

### II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 155 of 183

*v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*8** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B. Analysis

1. False Arrest

A § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A §

1983 false arrest claim "is substantially the same as a claim of false arrest under New York law." *Id.* New York law requires a plaintiff to show "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. Cnty. of Westchester*, No. 21-CV-03817, 2022 WL 2834108, at \*5 (S.D.N.Y. July 20, 2022). "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ... under § 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at \*3 (S.D.N.Y. Sept. 28, 2022) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest ... will defeat a claim of false arrest under the Fourth Amendment."). "[A] claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006).

Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and alterations omitted). As the Second Circuit recently observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on 'a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest.' The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted).

Moreover, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Zalaski v. City*

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 156 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)). "[I]n the qualified immunity context, an officer invoking the probable cause defense need only establish that he or she acted with arguable probable cause[.]" *Schlaepfer v. City of N.Y.*, No. 20-CV-3339, 2022 WL 4484571, at *9 (S.D.N.Y. Sept. 27, 2022) (quotation marks omitted); *Kass*, 864 F.3d at 206 ("An officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged."). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *12 (S.D.N.Y. Mar. 26, 2021) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).

**\*9** Defendants argue there existed probable cause to arrest Taranto for, among other offenses, criminal possession of a weapon in the fourth degree. (Defs.' Mem. 4–9.) "A person is guilty of criminal possession of a weapon in the fourth degree when ... [h]e or she possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife[,] or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another[.]" N.Y. Penal Law § 265.01(2). "Crucially, for the charge of criminal possession of a weapon in the fourth degree, 'the element of intent to use a dangerous instrument unlawfully can be presumed from a finding that defendant possessed a dangerous instrument.' " *Curanaj v. Cordone*, No. 10-CV-5689, 2012 WL 4221042, at *11 (S.D.N.Y. Sept. 19, 2012) (quoting *People v. Campbell*, 450 N.Y.S.2d 210, 211 (App. Div. 1982)). Plaintiffs clearly alleged that Taranto was in possession of a firearm, (SAC ¶¶ 26–27), accordingly, at the least, Defendants had arguable probable cause to arrest Taranto. *See Curanaj*, 2012 WL 4221042, at *11 (holding that the "[d]efendants had arguable probable cause on the charge of Criminal Possession of a Weapon in the Fourth Degree" when the plaintiff clearly "possessed a dangerous instrument"—an ax—because "[f]rom that fact, the intent element is satisfied"); N.Y. Penal Law § 265.15 ("The possession by any person of any dagger, dirk, stiletto, dangerous knife or any other weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another."); *cf. Egan v. New York City*, No. 16-CV-1479, 2018 WL 4926445, at *9 (S.D.N.Y. Oct. 10,

2018) (holding that because the "criminal purpose of a laser pointer is not immediately apparent" possession of a laser pointer would not be "enough to provide probable cause in this case: there must be probable cause to believe that Plaintiff possessed the laser with the intent to use it unlawfully"); *Levy v. City of New York*, 935 F. Supp. 2d 575, 586 (E.D.N.Y. 2013) (noting in false arrest case for N.Y. Penal Law § 265.01(2) that "[b]ecause a kitchen knife is an inherently utilitarian utensil, the key inquiry is the manner in which the kitchen knife is used"). Thus, the Court grants the Motion to Dismiss the false arrest claim.

## 2. Denial of Fair Trial

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To state a fair trial right claim, a plaintiff must plausibly plead the following elements: "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

Probable cause is not a defense to a denial of fair trial claim. *See Heard v. City of New York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018); *Overby v. Fabian*, No. 17-CV-3377, 2018 WL 3364392, at *11 (S.D.N.Y. July 10, 2018). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett*, 838 F.3d at 278; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of [a plaintiff's] fair right to trial based on the same alleged fabrication of evidence").

Plaintiffs make many conclusory allegations regarding fabrication of evidence. For instance, Plaintiffs allege "[a]fter knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 157 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct," that "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce them to falsely testify against [ ] Taranto in criminal court," that "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions," that "[a]fter knowing that the original allegations concerning [ ] Taranto were false, Defendants engaged in a course of conduct to fabricate their claims concerning [ ] Taranto," and that Defendants "[f]abricat[ed] and contrive[d] criminal charges lodged against Plaintiff." (SAC ¶¶ 76–77, 87, 99, 123.) Plaintiffs' Opposition similarly states "[a]s discussed herein, Plaintiffs have demonstrated, before discovery has proceeded, the extent and nature of the fabrication of evidence by the Defendants pursuant to the arrest and prosecution of [ ] Taranto," which "includes the criminal discovery turned over by the Defendants to the prosecutor after pleadings were docketed pursuant to this litigation despite the documents provided during criminal discovery having been previously available based upon the dates of creation." (Pls.' Mem 15.) However, the Opposition, like the Second Amended Complaint does not specifically point to particular instances of fabrication of evidence. [4]

**\*10** Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial. *See Longo v. Ortiz,* No. 15-CV-7716, 2016 WL 5376212, at \*6 (S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where he alleged "he was denied the right to a fair trial ... when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements ... to be used against [the plaintiff] at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction" (internal quotation marks omitted)); *see also Harasz v. Katz,* 239 F. Supp. 3d 461, 493 (D. Conn. 2017) (holding that the plaintiff failed to state a denial of fair trial claim where he merely alleged that officers "did in fact participate in fabrication of evidence, ignored the truth when presented[,] and chose what to bring as the truth ... [and] did not want the truth to interfere with their witch hunt."). "Instead[,] plaintiffs must identify the actual fabrication," which Plaintiffs fail to do. *Hutchins v. Solomon,* No. 16-CV-10029, 2018 WL 4757970, \*16 (S.D.N.Y. Sept. 29, 2018); *see also Thompson v. City of New York,* No. 18-CV-04105, 2020 WL 2097622, at \*4 (S.D.N.Y. May 1, 2020) ("The [c]omplaint does not identify what evidence was fabricated; and the [c]omplaint fails to identify what, if any,

fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury."); *Cunningham v. City of New York,* No. 17-CV-5124, 2018 WL 4168964, at \*5 (S.D.N.Y. Aug. 30, 2018) (dismissing fair trial claim where the complaint failed to assert that arresting report contained a fabrication); *Waddlington v. City of New York,* 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) (dismissing fair trial claim, and noting that the "[p]laintiff at no point alleges with specificity what false information [defendant police officers] created or forwarded to the D.A.'s Office"); *cf. Long v. New York City,* No. 14-CV-9908, 2016 WL 4203545, at \*3 (S.D.N.Y. Aug. 8, 2016) ("[The p]laintiff claims specific sentences in specific documents were intentionally falsified by Officer Vazquez.").

Plaintiffs additionally allege that an investigation that ended on July 9, 2020 "along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (SAC ¶ 94–95.) Again, Plaintiffs have not identified any specific fabrication. Furthermore, Plaintiffs have not alleged a causal connection between any fabrication contained within the investigation, which concluded a year after Taranto was arrested, and any deprivation. "The manufacture of false evidence, in and of itself ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right ... the deprivation of liberty of which [a plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." *Zahrey v. Coffey,* 221 F.3d 342, 348–49 (2d Cir. 2000) (internal quotation marks omitted) (noting that plaintiff had alleged the "eight months he was confined, from his bail revocation (after his arrest) to his acquittal" was the result of "the manufacture of false evidence"). Without such an allegation, Plaintiffs claim cannot stand. *Cf. Ricciuti,* 124 F.3d at 126–27, 130 (holding qualified immunity is unavailable where plaintiffs alleged that a fabricated confession caused prosecutors to add another charge); *Harris v. City of New York,* No. 15-CV-8456, 2017 WL 6501912, at \*8 (S.D.N.Y. Dec. 15, 2017) ("[F]abricated evidence may cause a further deprivation if it adversely informs a prosecutor's charging and bail determinations."); *Long v. New York City,* No. 14-CV-9908, 2016 WL 4203545, at \*5 (S.D.N.Y. Aug. 8, 2016) ("[F]abrication of evidence leading to pre-trial detention can satisfy the causation element for a fair trial claim.").

3. Deliberate Indifference to Medical Needs

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 158 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Because Taranto was a pre-trial detainee at the time he was allegedly denied adequate medical care, Plaintiffs' claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quotation marks omitted).

To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care ... [was] 'sufficiently serious,' " and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.' " *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). The first element is objective and requires allegations that suggest that the detainee was subject to "conditions posing a substantial risk of serious harm." *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)). The second element, which is applied somewhat "differently to claims under the Eighth Amendment [than] the Fourteenth Amendment," also imposes an objective standard, whereas the Eighth Amendment imposes a "subjective standard." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citation omitted). That is, the law enforcement or prison official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

 **\*11** Plaintiffs contend in their Opposition that "Taranto was detained at the scene for such an extended period of time" which "begs further inquiry of ... why he was not immediately ... transported to a hospital." (Pls.' Mem. 18.) Plaintiffs allege that before he was transported for treatment, Taranto was detained in the rear seat of a police vehicle, however the Second Amended Complaint does not allege the length of the detention. (SAC ¶ 44.) Plaintiffs additionally allege that "Taranto was eventually removed from the scene while he informed the Defendants that he was experiencing chest pains and sustained physical injuries to his face, head, and body" and transported to a hospital to received care. (*Id.* ¶¶ 45, 50.)

"When the basis for a ... claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the [detainee's] *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support a[ ] ... claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citation and quotation marks omitted); *see also James v. Brown*, No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y. July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases). Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.' " *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

"Although in many cases, calling for medical assistance within an hour or so of the injury may have sufficed in meeting an official's duties, *see Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases), the Second Circuit has also noted that 'it's the particular risk of harm faced by a [detainee] due to the challenged deprivation of care' that is relevant to deliberate indifference claims, *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted)." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). Therefore, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." *Id.* (quoting *Smith*, 316 F.3d at 186). For instance, in

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 159 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*Maldonado*, this Court held that a pretrial detainee's estate plausibly alleged deliberate indifference to medical needs when the pretrial detainee was tasered, was not responding to NARCAN, and even though the defendant was told the pretrial detainee needed to be rushed to medical treatment immediately, there was a 20-minute delay in transporting the pretrial detainee to the emergency room. *Id.* at 389, 397. The pretrial detainee was pronounced dead at the hospital. *Id.* at 390. Here, Plaintiffs have not alleged how much time transpired between the incident and Taranto's arrival at the hospital—it is possible Taranto was transported to the hospital almost immediately after the alleged incident. *See Cooper v. City of New York*, No. 14-CV-3698, 2016 WL 4491719, at *1, 8 (E.D.N.Y. Aug. 25, 2016) (holding plaintiff who was attacked by police, became unconscious, and fell into a coma had not alleged deliberate indifference to medical needs when the "incident took place at 1:15pm, and it was reported at 1:32pm" and plaintiff was then admitted to the emergency room approximately 20 minutes later." Indeed, Plaintiffs allege that Taranto was removed from the scene "while" informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body"—indicating there was no delay between Taranto's complaints and his transport to the hospital. (SAC ¶ 45.) Additionally, Plaintiffs have not alleged any fact indicating that any delay worsened Taranto's medical condition. Without any sense of the time that transpired between Taranto's injury and the subsequent transport to the hospital or any allegations as to whether any delay worsened or posed any specific risk to Taranto's medical condition, Plaintiffs have not plausibly alleged any delay constitutes deliberate indifference to medical needs. *See Smith*, 316 F.3d at 186 ("[It is] the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant.").

**\*12** Plaintiffs additionally allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶¶ 46, 48.) "While Plaintiff[s] allege[ ] that 'all defendants' failed to provide adequate medical treatment, that allegation is insufficient because it is conclusory." *Sterling v. Akinyombo*, No. 20-CV-10804, 2022 WL 2657223, at *5 (S.D.N.Y. July 8, 2022) (citation omitted). Plaintiffs have not alleged which

Defendants were involved in any deprivations of care or what medical attention was or was not provided at the scene. Such conclusory allegations cannot withstand Defendants' Motion to Dismiss. *See Price v. Koenigsmann*, No. 19-CV-4068, 2022 WL 125818, at *5 (S.D.N.Y. Jan. 13, 2022) (holding that factual allegations plaintiff makes that reference "Defendants" and their deliberate indifference to his medical needs "are vague and conclusory" and therefore cannot support a plausible deliberate indifference claim).

### 4. 1985(3) Conspiracy

To state a claim for conspiracy in violation of § 1985(3), a plaintiff must allege (1) a conspiracy, (2) with the intent or purpose to deprive a person of equal protection of the law, (3) an act in furtherance of the conspiracy, (4) which results in an injury to a person, or a person's property, or the deprivation of a federal constitutional right. *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). "In order to maintain an action under [§] 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and internal quotation marks omitted). "In addition, a plaintiff must allege that she is a member of a protected class and that the conspirators acted with class-based discriminatory motivation." *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2019 WL 3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020).

Defendants argue that Plaintiffs failed to plead any specifics about the alleged conspiracy and failed to plead a factual basis supporting a meeting of the minds. (Defs.' Reply Mem. 4.) Plaintiffs argue that they have sufficiently pled a cause of action of conspiracy noting that the identities of the John Doe Defendants are unknown but that they were present on the scene at the time of Taranto's arrest and failed to intervene when Taranto was assaulted, failed to provide proper medical attention, and "covered-up the wrongdoing of the known Defendants." (Pls.' Mem. 15.) Plaintiffs also allege that "[i]n furtherance of the conspiracy, Defendants fabricated evidence against [Taranto], failed to provide evidence in a timely manner despite it being available during [ ] Taranto's criminal prosecution and engaged in acts to cover up the excessive use of force upon [ ] Taranto by the Defendants herein." (SAC ¶ 153.) However, Plaintiffs have not included any facts which support a plausible allegation that Defendants conspired together, let alone conspired to deprive Taranto's of

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 160 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

equal protection of the laws. Accordingly, the claim cannot stand. *See Ziglar v. Abbasi,* 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement—with one another."); *see also Arroyo-Horne,* 2019 WL 3428577, at *5 (dismissing 1985 conspiracy claim when the complaint "does not provide any allegations or include any facts from which the Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of the laws or equal privileges and immunities under the laws."); *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F. Supp. 2d 197, 308 (S.D.N.Y. 2013) (dismissing the plaintiff's section 1985(3) claim because the complaint did not "set forth any specific facts that indicate any sort of meeting of the minds ... let alone an agreement to violate [the plaintiffs' rights]" (emphasis omitted)); *Friends of Falun Gong v. Pacific Cultural Enter., Inc.,* 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (finding that the plaintiff failed to adequately plead a section 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

**\*13** However, even if Plaintiffs have plausibly alleged concerted action by Defendants, the claim still fails. Defendants additionally argue that Plaintiffs' § 1985(3) should fail as "Plaintiffs failed to plead membership in a protected class under § 1985(3)." (Defs.' Reply Mem. 4.) The Court agrees. To establish a violation of § 1985(3), a plaintiff must establish, among other elements, that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *McDaniel v. City of New York,* 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted,* No. 19-CV-11265, 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quotation marks omitted). Plaintiffs have not attempted to do so. (*See generally* SAC.) Accordingly, the section 1985(3) conspiracy claim fails on this ground as well. *McDaniel,* 585 F. Supp. 3d at 522 (dismissing claims pursuant to § 1985 when the complaint "provides no factual assertions that would establish the requisite discriminatory animus"); *see also Joyner v. Alston & Bird LLP,* No. 21-CV-8549, 2022 WL 6244417, at *10 (S.D.N.Y. May 13, 2022), *report and recommendation adopted,* No. 21-CV-8549, 2022 WL 4115954 (S.D.N.Y. Sept. 9, 2022) (dismissing claim § 1985(3) in part because plaintiff had not alleged "discriminatory animus aimed at depriving her of a federal constitutional right").

## 5. 1983 "Cover-Up" Claim

"In a section 1983 claim alleging a cover-up by government agents, the constitutional right at issue is the First Amendment right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Tavares v. New York City Health & Hosps. Corp.,* No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015) (citing *Christopher v. Harbury,* 536 U.S. 403, 413–14 & n. 11 (2002) (describing these claims as "backward-looking access claims")). "The Second Circuit has emphasized, however, that '[t]he viability of [such] claims is far from clear,' pointing out that the *Harbury* decision was careful not to endorse their validity." *Id.* (citing *Sousa v. Marquez,* 702 F.3d 124, 128 (2d Cir. 2012)).

Nevertheless, even assuming backward-looking access claims are actionable, Plaintiffs' fail. "[S]uch claims are available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." *Sousa,* 702 F.3d at 128 (quoting *Broudy v. Mather,* 460 F.3d 106, 120 (D.C. Cir. 2006)). Plaintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed—accordingly the claim is dismissed. *See Tavares,* 2015 WL 158863, at *7–8 (dismissing "cover-up" claim when plaintiff "has not alleged that the DOCCS [d]efendants' actions prevented him from litigating his underlying Eighth Amendment and state-law medical malpractice claims against the City [d]efendants—indeed, he is bringing those very claims in this action.").

## 6. Individual Liability

Defendants argue that Plaintiffs "impermissibly plead all causes of action against all named Defendants instead of bringing each cause of action against only the involved [D]efendants." (Defs.' Mem. 14.) Specifically, Defendants argue that Plaintiffs' "Fourth Amendment false arrest and excessive force claims" and failure to intervene claims against Langley "who was not present at the scene on July 8, 2019" must fail for lack of personal involvement. (*Id.*)

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sterling,*

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 161 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2022 WL 2657223, at *4 (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann,* 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte,* No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant). Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti,* 983 F.3d 616–18.

**\*14** The Court agrees that Plaintiffs have not alleged Langley's personal involvement in Plaintiffs' remaining constitutional claim, namely their excessive force claim. While Plaintiffs have pled that Langley "failed to intercede to terminate the aforementioned assault upon [ ] Taranto" they have not alleged he was present during the incident at issue or how he somehow permitted the use of force to occur. (SAC ¶ 71.) And while they allege Langley "was personally aware of the events complained of herein as they were occurring" they have not alleged any fact indicating this was the case. (*Id.* ¶ 73.) Such conclusory allegations do not sufficiently allege personal involvement. *See Falls v. Pitt,* No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation); *Lara-Grimaldi v. Cnty. of Putnam,* No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (holding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

Plaintiffs additionally state in their Opposition that dismissal of Langley is inappropriate at this stage because he "established policy, was responsible for the training and discipline of officers and the overall operation of the Defendant police department." (Pls.' Mem. 19.) "While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal

involvement." *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted by,* No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (citation omitted). Plaintiffs appear to only allege a single instance of excessive force in their Second Amended Complaint, namely the incident at issue. (*See generally* SAC.) "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Accordingly, this single alleged use of force is insufficient to plausibly allege personal involvement on the basis of a policy. *See Tubbs v. Venettozzi,* No. 19-CV-126, 2019 WL 2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was made aware of complaints about due process violations and allowed a custom of due process violations in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey v. Butler,* 43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part,* No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner Kelly "created or adopted" an unconstitutional policy were insufficient to plausibly allege personal involvement "[w]ithout more than the allegations related to the single incident in the station house"). Additionally, insofar as Plaintiffs seek to hold Langley liable on the basis of his supervisory position, the Second Circuit has made clear that in the wake of *Iqbal,* plaintiffs cannot rely on supervisory liability to establish personal involvement. *Tangreti,* 983 F.3d at 620 (holding it was insufficient to show that defendant "was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had" for the purposes of personal involvement); *see also Bridgewater v. Taylor,* 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) (holding personal involvement not established where the plaintiff made conclusory claims that a supervisory official failed to provide proper training and supervision or created a policy).

### 7. Putnam County Sheriff's Office

**\*15** Defendants argue that "claims against the Putnam County Sheriff's Office must be dismissed because the police department is a non-suable entity." (Defs.' Mem. 23.) The Court agrees. Under law of the State of New York, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington*

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 162 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999). "[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail*, No. 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.") Indeed, "Plaintiffs concede the Putnam County Sheriff's Office is not a suable entity." (Pls.' Mem. 26.)

### 8. *Monell* Claim

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

**\*16** "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (quotation marks omitted)); *Santana v. City of N.Y.*, No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.' ") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 163 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle,* 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of New York,* 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff "fails to state a *Monell* claim" because the plaintiff "has not

pled facts demonstrating a direct link between his injuries and the alleged municipal policy"); *Johnson v. City of New York,* No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Plaintiffs assert that the County is liable to Plaintiffs for the alleged constitutional deprivations based upon its maintenance of "a policy, practice or custom, officially or unofficially, of unconstitutional practices, including the use of force, the cover-up of police misconduct, the failure to maintain an independent police review board, the fabrication of evidence, the intimidation of witnesses, the failure to disclose discovery during criminal prosecution and the condoning of police misconduct." (SAC ¶ 161.) Plaintiffs further allege that the County "by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to emotionally disturbed persons and the use of weapons during police encounters." (*Id.* ¶ 162.)

 **\*17** Plaintiffs do not allege that the County maintains a formal policy officially endorsed by the municipality. (*See generally id.*)[5] Accordingly, the Court need only analyze whether Plaintiffs have plausibly alleged that there existed a sufficiently widespread practice to constitute a custom, whether policymakers failed to provide adequate training or supervision so grossly that it rises to gross indifference, or whether actions by final policymakers constituted official policy. *See Atadzhanov,* 2022 WL 4331304, at *11 (listing the four modes of proving a policy, custom, or practice under *Monell*).

### a. Widespread Practice

To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 164 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

**\*18** Plaintiffs allege that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all" and cite to *DiPippo v. County of Putnam*, No. 17-CV-7948, 2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019). (SAC ¶¶ 83–84.) In *DiPippo*, plaintiff Anthony DiPippo alleged in part that he was denied a fair trial and wrongfully convicted based upon fabricated evidence during his criminal trials in 1994 and 2012. 2019 WL 1004152, at *8. The court held that plaintiff had

> pleaded ample specific facts indicating that Defendants used extremely similar coercive investigative techniques on at least six witnesses within the [ ] investigation [at issue]. These techniques included: procuring testimony that implicated DiPippo in exchange for leniency, threatening witnesses with prosecutions against them if they did not provide inculpatory testimony, harassing and assaulting witnesses over extended periods of time, isolating witnesses and interrogating them for hours, forcing or attempting to force witnesses to sign false affidavits or other pre-written statements, administering sham polygraph examinations, failing to keep records of meetings with witnesses, using force on witnesses, and denying witnesses the opportunity to consult with counsel.

*Id.* at *9. Based on these allegations, and the fact that "DiPippo was wrongfully convicted twice and tried three times by a jury" and the plaintiff "alleged facts that indicated that the [Putnam County Sheriff's Department] officers used similar unconstitutional methods in every trial" the court held that, that the plaintiff had sufficiently pled a *Monell* claim under a widespread practice theory. *Id.* at *11.

Defendants argue that Plaintiffs' sole reliance on this case dooms their *Monell* claim as the case resolved by settlement without determination or admission of liability. (Defs.' Mem. 18–19.) Indeed, courts in this District have held that "citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, *particularly if the lawsuits did not result in an adjudication of liability.*" *Bethune v. Westchester County*, No. 18-CV-3500, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020) (emphasis added) (granting a motion to dismiss where the plaintiff premised *Monell* liability on, inter alia, citations to several filed lawsuits); *see also Barnett v. Westchester County*, No. 18-CV-2483, 2020 WL 1032445, at *5 (S.D.N.Y. Feb. 28, 2020) (same); *Vincent v. Winski*, No. 14-CV-7744, 2018 WL 1441370, at *17 (S.D.N.Y. Mar. 22, 2018) (granting the defendants' motion to dismiss *Monell* claims where "the only facts that [the] [p]laintiff identifie[d] in support of any pattern of mishandling situations because of a failure to train ... consist[ed] of other litigations resulting in settlements"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that "lawsuits cited by [the] [p]laintiff in the [proposed amended complaint], even when combined with [other] allegations ..., are insufficient to plausibly support an inference of a widespread custom" to establish *Monell* municipal liability). *DiPippo* was settled without an admission of liability. *See* Stipulation of Discontinuance with Prejudice, *DiPippo*, 2019 WL 1004152, Dkt. No. 98. Accordingly, Plaintiffs cannot allege a widespread practice on the basis of *DiPippo* alone. *See McDonald v. City of Troy*, 542 F. Supp. 3d 161, 175–76 (N.D.N.Y. 2021) (holding that while "Plaintiffs' eight settled [excessive force] lawsuits over eight years is not the best record for a small city like Troy to sport .... [B]ecause plaintiff has not pointed to a single related case that actually resulted in a finding of liability on the City's part, that showing falls woefully short of establishing *Monell* liability"); *An v. City of New York*, 230 F. Supp. 3d 224, 229–30 (S.D.N.Y. 2017) (granting a motion to dismiss where a complaint sought to establish *Monell* liability based on "cites [to] six lawsuits filed between 2012 and 2016 and one newspaper report" but failed to plausibly allege a custom

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 165 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

because "the Complaint fail[ed] to allege that any of the six lawsuits, which were filed over a course of four years, resulted in a finding that the NYPD officers violated the plaintiffs' First Amendment rights"). [6]


b. Failure to Train

**\*19** *Monell* liability can also exist " 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.' " *Fraser*, 2021 WL 1338795, at \*10 (quoting *Reynolds*, 506 F.3d at 192). One category of municipal acquiescence involves a failure to train public officials. However, a failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

To set forth a failure to train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379662, at \*22. Here, Plaintiffs' claim fails first and foremost because they have not alleged a specific training deficiency. Indeed, Plaintiffs' Second Amended Complaint does not "contain sufficient factual matter" to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Instead, Plaintiffs only broadly allege "Defendant Putnam County and/or Putnam County Sheriff's Office breached their duty to the public and the Plaintiff

specifically by deploying Deputies without first properly screening the hiring of and training of them," that the County failed to "train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters," and that "Langley has failed to train and/or retrain his deputies, including the Defendants herein, in the proper and lawful use of force," "the proper treatment of prisoners requiring medical attention," "proper response and/or treatment of emotionally disturbed persons," and the "requirement to timely transmit criminal discovery as part of a criminal prosecution." (SAC ¶¶ 108–111, 162, 201.) Simply put, the sum total of Plaintiffs' failure-to-train claim is based on a threadbare description of the County's training, and is the type of conclusory claim that courts routinely dismiss. *See, e.g., Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at \*12 (S.D.N.Y. Sept. 22, 2022) (dismissing *Monell* claim where plaintiff failed to "allege a specific deficiency in either the [c]ity or the [c]ounty's training for his failure-to-train theory"); *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at \*11 (S.D.N.Y. Nov. 21, 2016) (dismissing failure to train claim when a "[p]laintiff's new allegations regarding a supposed lack of training are too general and speculative to support a *Monell* claim"); *Triano*, 895 F. Supp. 2d at 539–40 (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at \*11 (S.D.N.Y. July 14, 2015) (dismissing failure to train claim where the plaintiff "neither cites to procedural manuals and training guides, nor highlights the pertinent aspects of police training in order to prove the claim").

Furthermore, in addition to identifying a specific training deficiency, a plaintiff must "establish that that deficiency caused the constitutional deprivation." *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at \*6 (S.D.N.Y. July 28, 2021) (citation omitted). Plaintiffs, however, only make conclusory assertions that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to properly train and/or supervise its officers resulting in the unlawful actions complained of herein." (SAC ¶ 115.) Plaintiffs' conclusory assertions do not suffice to plausibly allege that a deficiency in training caused Taranto's injury. *See King v. City of Beacon Police Dep't*, No. 20-CV-5815, 2021 WL 1550073, at \*3 (S.D.N.Y. Apr. 20, 2021) (dismissing *Monell* claims when a plaintiff's allegations that his injuries "resulted from a municipal policy or custom" were

Case 3:23-cv-01099-GTS-ML   Document 32   Filed 04/29/25   Page 166 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

"wholly conclusory"); *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused ... [the] alleged violations of [the] plaintiff's rights").

**\*20** In sum, Plaintiffs have not pled a plausible *Monell* claim under a failure to train theory.

### c. Failure to Discipline or Supervise

"In *City of Canton*, the Supreme Court established the 'deliberate indifference' standard in the context of a claim for failure to train, but 'the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims,' including claims for failure to supervise and failure to discipline." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) (quoting *Reynolds*, 506 F.3d at 192).

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester Cnty.*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman*, 2015 WL 1379652 at *21 (emphasis omitted). To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations ... if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari*, 530 F. Supp. 3d at 400.

"[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." *Tieman*, 2015 WL 1379652, at *21. Rather, a plaintiff must allege that "meaningful attempts to investigate repeated claims ... are absent." *Id.* (quoting *Hart v. City of Binghamton*, No. 10-CV-1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012)). In other words, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Hart*, 2012 WL 1565085, at *5. Plaintiffs do not make any such allegation, instead Plaintiffs allege that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to ... supervise its officers resulting in the unlawful actions complained of herein," failed "to discipline subordinates upon findings of misconduct," and that the "attack against [ ] Taranto could have been prevented had Putnam County and/or Sheriff Langley acted properly by removing Deputies who have demonstrated violent tendencies, failed to act within the boundaries of law, properly train its officers, properly supervise its officers and/or to discipline officer misconduct." (SAC ¶¶ 75, 115.) While the *DiPippo* case points to misconduct that occurred in the Putnam County Sheriff's Office, Plaintiffs make no specific factual allegations regarding any failures to investigate complaints or discipline officers involved in that matter by the Putnam County Sheriff's Office's in the Second Amended Complaint. (*See generally* SAC.) The only relevant allegations in the Second Amended Complaint are that "Plaintiffs are presently aware of similar misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery," and that "[i]n the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶¶ 84–85.) However, Plaintiffs have made no allegations regarding any prior lack of investigation into or disciplining of Quick, or any other officer for that matter, in the Second Amended Complaint, which dooms their claim. *See Esperanza v. City of New York*, 325 F. Supp. 3d 288, 309 (E.D.N.Y. 2018) ("Plaintiffs do not allege any specific facts regarding whether the [c]ity investigated or disciplined Lluka in response to the complaints of excessive force."); *Walker*, 2015 WL 4254026, at *11 (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or better supervision by listing the numerous lawsuits and complaints, he has not stated any facts to show that the [c]ity has acted with deliberate indifference" where "he does not specifically claim that the [c]ity *failed to investigate* the list of lawsuits"). Cases finding failures to supervise or discipline have required more. *See, e.g., Buari*, 530 F. Supp. 3d at 407–08 (ruling that the plaintiff sufficiently alleged failure to supervise when "in approximately 72 cases where courts had found prosecutorial

Case 3:23-cv-01099-GTS-ML   Document 32   Filed 04/29/25   Page 167 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

misconduct occurred [ ]including the use of and failure to correct false or misleading testimony and *Brady* violations[ ], officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect"); *Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing"). [7]

### d. Final Policymaker

**\*21** "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty*, 361 F.3d at 126 (internal quotation marks and citation omitted). When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126).

"An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony*, 339 F.3d at 139. When alleging policymakers caused the violation, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Guity v. Uniondale Union Free School Dist.*, No. 18-CV-04369, 2019 WL 3402280, at *7 (E.D.N.Y. July 26, 2019) (alteration omitted). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe*, 542 F.3d at 37.

Plaintiffs do allege in the Second Amended Complaint that "Defendant Langley is the final decision/policy maker of the Putnam County Sheriff's Department and in is familiar with, creates and implements his Department's practices and policies." (SAC ¶ 107.) However, Plaintiffs do not point to any support for this proposition, which they must do to sufficiently allege Langley was a final policymaker with respect to the particular conduct challenged in this lawsuit. *See Coppola v. Town of Plattekill*, No. 17-CV-1032, 2018 WL 1441306, at *10 (N.D.N.Y. Mar. 22, 2018) ("[M]inimal, conclusory statements fall far short of satisfying Plaintiff's burden to allege facts creating a plausible inference that either of these defendants were final policymakers. Plaintiff does not direct the Court to New York State law, municipal charters, or any other source that could support her claim."); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-8093, 2016 WL 1274587, at *12–13 (S.D.N.Y. Mar. 31, 2016) (dismissing a *Monell* claim where the plaintiffs "allege[d] that 'Coughlin, as an administrator for the District, possesses policy making authority,' " but "cite[d] no state or county law that actually vests Coughlin with final policymaking authority over the maintenance and protection of student records"); *Canner v. City of Long Beach*, No. 12-CV-2611, 2015 WL 4926014, at *6 (E.D.N.Y. Aug. 18, 2015) (noting a prior order where the court dismissed the plaintiffs' *Monell* claim where the "plaintiffs did not reference any state law supporting their claim that [an official] was a final policymaker"); *see also Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *Long v. Cnty. of Orleans*, 540 F. Supp. 3d 344, 352–53 (W.D.N.Y. 2021), *appeal dismissed* (Sept. 1, 2021) (holding at summary judgment that the "[p]laintiff's vague assertion of final policymaking authority by Sheriff Bower is simply insufficient to satisfy his burden" when the plaintiff "neither produced nor pointed to any evidence or legal authority supporting the conclusion that Sheriff Bower had final policymaking authority regarding the force to be used in effectuating an arrest or when probable cause for an arrest has been established" (quotation marks omitted)). Accordingly, the *Monell* claim cannot stand. [8]

### 9. State Claims

**\*22** Defendants move to dismiss all of Plaintiffs' state claims "except for state law claims for assault, battery and wrongful death, and Ms. Taranto's corollary claims for loss of consortium." (Defs.' Mem. 2.) [9]

### a. Defamation

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019) (quotation marks omitted). Under New York law, "spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print.").

**\*23** A plaintiff must plead the defamatory statements with some particularity. N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally."). Under Federal Rule of Civil Procedure 8's liberal pleading standards, this requires a plaintiff to "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Neal v. Asta Funding, Inc.,* 13-CV-2176, 2014 WL 3887760, at \*3 (S.D.N.Y. June 17, 2014).

Plaintiffs argue they have sufficiently pled a cause of action for defamation because the "filing of false criminal allegations sufficiently demonstrates libel/slander per se." (Pls.' Mem. 26.) More specifically, Plaintiffs allege that "Defendants, individually and/or collectively, have defamed [Taranto] by libel per se and/or slander per se, libel and/or slander, based upon the false arrest of Plaintiff and release of false information concerning said arrest, the sum and substance of which defamatory statements was that [Taranto] engaged in acts constituting the crime of Menacing in the Second Degree and other alleged criminal acts despite knowing them to be false." (SAC ¶ 206.)

However, "[o]fficers may not be held liable for any allegedly defamatory statements in their criminal complaints, because 'individuals participating in a public function such as judicial proceedings are afforded protection from liability by an absolute immunity.'" *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at \*11 (N.D.N.Y. Nov. 17, 2017); *Lockett v. City of Middletown*, No. 19-CV-08255,

2021 WL 1092357, at \*6 (S.D.N.Y. Mar. 22, 2021) (same). Accordingly, "[a] person filing a formal complaint charging another with a crime is ... entitled to absolute immunity from a civil suit for defamation." *Grant*, 2017 WL 5564605, at \*11 (citation omitted); *see also Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 488 (E.D.N.Y. 2016) ("[T]o the extent that Plaintiffs argue that the Felony Complaints and District Court Informations contained defamatory statements, the [Nassau County Police Department] officers who made those statements are protected from liability by an absolute immunity."); *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 282 (W.D.N.Y. 2001) (holding that absolute immunity shielded the defendant from liability for defamation where the "defendant's actions with respect to plaintiff's arrest and the bringing of the assault charge were clearly prosecutorial in nature, and were directly related to the decision to prosecute plaintiff"). Accordingly, Plaintiffs' defamation claim cannot stand.

### b. Negligence

The elements of a negligence claim under New York law are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino v. New York City Transit Auth.,* 639 N.Y.S.2d 784 (App. Div. 1996)).

Plaintiffs argue they "have sufficiently pled negligence as an alternate theory of liability," because Defendants "owned [sic] a duty of care to [ ] Taranto who was deprived of his liberties while in Defendants['] custody, care and control." (Pls.' Mem. 25.) "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Toure v. Air France*, No. 21-CV-1645, 2022 WL 4079592, at \*3 (E.D.N.Y. Sept. 6, 2022) ("[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.") (citation omitted); *Durr v. Slator*, 558 F. Supp. 3d 1, 40 (N.D.N.Y. 2021) ("When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." (citation and

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 169 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

quotation marks omitted)); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 238–39 (E.D.N.Y. 2019) ("New York does not, as a matter of public policy, recognize a claim for negligence arising out of an arrest or prosecution.... To the extent that a claim for negligence and/or NIED is based upon injury incident to an arrest, a plaintiff must resort to the traditional tort remedies of false arrest, false imprisonment, and malicious prosecution."); *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of negligence."). Accordingly, Plaintiffs cannot maintain a negligence claim insofar as that claim overlaps with excessive force, false arrest, false imprisonment, and malicious prosecution causes of action.

**\*24** "However, a plaintiff may proceed with negligence claims brought against law enforcement officials if such claims are not duplicative of false arrest, false imprisonment, or malicious prosecution." *Lalonde v. City of Ogdensburg*, — F. Supp. 3d ——, 2023 WL 2537626, at *29 (N.D.N.Y. Mar. 16, 2023). Accordingly, courts have allowed negligence actions pertaining to deprivations of adequate medical care to proceed. *See Durr*, 558 F. Supp. 3d at 40–41 (holding that plaintiff plausibly alleged both a deliberate indifference to medical claim needs claim and a negligence claim related to the failure to provide medical care upon his arrest).

"[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Maldonado*, 460 F. Supp. 3d at 400–01 (quotation and citation omitted). Accordingly, courts have found that when a plaintiff is injured during an arrest and the arresting officers fail to provide medical care upon arrest, a plaintiff may proceed with a negligence claim. *See Durr*, 558 F. Supp. 3d at 41 (holding negligence claim survived when the "complaint plausibly alleges that Plaintiff was seriously injured during the course of his arrest and that the City Defendants, knowing that Plaintiff was in severe pain, declined to take him to the Upstate Emergency Department for treatment, despite being instructed to do so by healthcare personnel").

Plaintiffs allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny

first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (SAC ¶¶ 46, 48.) Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Patrico v. Voya Fin., Inc.*, No. 16-CV-7070, 2017 WL 2684065, at *5 (S.D.N.Y. June 20, 2017) (quotation marks omitted). A complaint fails this standard when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct." *Id.* Plaintiffs have brought the claims against multiple Defendants, namely Putnam County Sheriff's Office employees, not all of whom were present at the scene, and possibly Fire Department personnel, and Emergency Medical Technicians. (*See generally* SAC.) It is unclear from Plaintiffs' pleadings which Defendants prevented Taranto from receiving proper medical attention or what medical attention Taranto was prevented from receiving, as Plaintiffs have simply pled that "Defendants" were responsible for such actions and have not provided a "plausible factual basis to distinguish the conduct of each of the defendants." *Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at *3 (S.D.N.Y. May 27, 2020). On that basis, the negligence claim must fail. *See Nesbeth v. N.Y.C. Mgmt. LLC*, 17-CV-8650, 2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes" under Rule 8 (quotation marks omitted)); *Medina v. Bauer*, No. 02-CV-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong.").

### c. Negligent Hiring, Supervision, and Training

**\*25** Defendants argue that Plaintiffs' negligent-hiring, retention, training, and supervision claims are not actionable under New York law because all Defendants were acting within the scope of their employment. (Defs.' Mem. 21.) Indeed, Plaintiffs allege that, at all relevant times, Defendants "were acting within the scope of their employment and in furtherance of the purposes and business of Putnam County and/or the Putnam County Sheriff's Office, and/or Fire Department personnel and/or Emergency Medical Technicians." (SAC ¶ 7.) "New York law provides that an

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 170 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

employer can be liable for the torts of an employee who acts within the scope of his or her employment under the theory of respondeat superior, but no claim may proceed against the employer for negligent hiring, retention, supervision or training." *Hurt v. City of New York*, No. 15-CV-7612, 2018 WL 4007639, at \*4 (S.D.N.Y. Aug. 22, 2018) (quotation marks omitted). An "exception to [this] general principle exists where the plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee." *Nesheiwat v. City of Poughkeepsie*, No. 11-CV-7072, 2013 WL 620267, at \*2 (S.D.N.Y. Feb. 13, 2013).

"It is [ ] well settled that 'the State and its political subdivisions [such as counties] are not subject to punitive damages ... [as] the goals of punishment and deterrence are not served when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished.' " *Martinez v. Cnty. of Suffolk*, 999 F. Supp. 2d 424, 433 (E.D.N.Y. 2014) (citing *Hubbard v. Town of Sand Lake*, 667 N.Y.S.2d 496, 498 (App. Div. 1998)); *see also Ogunkoya v. Cnty. of Monroe*, No. 15-CV-6119, 2020 WL 3791850, at \*8 (E.D.N.Y. July 7, 2020) (noting that municipalities are not subject to punitive damages). "Thus, the negligent hiring claim ... is dismissed." *Martinez,* 999 F. Supp. 2d at 433.

### d. Prima Facie Tort

To survive a motion to dismiss on a claim of prima facie tort, a plaintiff must allege: (1) the defendant's intentional infliction of harm; (2) special damages resulting from the defendant's actions; (3) a lack of "excuse or justification"; and (4) that the defendant's act or acts would otherwise be lawful. *NE Brands LLC v. Seattle Pac. Indus., Inc.*, No. 19-CV-7420, 2020 WL 4287989, at \*2 (S.D.N.Y. July 27, 2020) (quoting *U.S. for Use and Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996)). "Special damages" refers to an injury made up of a "specific and measurable loss." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985). Defendants argue that Plaintiffs have failed to allege any specific damages and their claim therefore fails. (Defs.' Mem. 22.) Plaintiffs have failed to respond to this argument. (*See generally* Pls.' Mem.)

Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers the

defendant's arguments for dismissing such a claim. *See, e.g.*, *Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue ... which provides an independent basis for dismissal." (citations omitted)), *aff'd*, 130 F.3d 1101 (2d Cir. 1997); *see also Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at \*10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation) (collecting cases). Because Plaintiffs have failed to address Defendants' argument for dismissing the prima facie tort claim, that claim is abandoned. *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at \*8 (E.D.N.Y. May 2, 2019) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." (alteration and quotation marks omitted) (collecting cases)); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at \*7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

### III. Conclusion

**\*26** For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Defendants' request that all of Plaintiffs' state causes of action be dismissed as a result of Plaintiffs' failure to comply with New York's General Municipal Law is denied. The remainder of Defendants' Motion is granted. Because this is the first adjudication of Plaintiffs' claims on the merits, Plaintiffs' claims are dismissed without prejudice. If Plaintiffs wish to file a third amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order. There will be no extensions. Plaintiffs are further advised that the third amended complaint will completely replace, not supplement, the instant Second Amended Complaint. The third amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiffs wish the Court to consider. If Plaintiffs fail to timely file a third amended complaint, the claims may be dismissed with prejudice.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 171 of 183

**Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)**

The Court will hold a status conference on October 3, 2023, at 12:15 P.M.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6318280

---

## Footnotes

1　Plaintiffs have withdrawn their malicious prosecution and Eighth Amendment claims. (Mem. of Law for Reply to Mot. to Dismiss. 14, 16.)

2　The Arrest Report, Use of Force Form, Appearance Ticket, Criminal Court Information, Criminal Court Discovery, Photograph Hospital, Photograph Surgery, and Personnel Investigation, attached to Plaintiffs' Opposition, are also attached to the Second Amended Complaint.

3　Defendants note that the defendant in *DiPippo v. County of Putnam* was actually Quick's father. (Defs.' Mem. 18.)

4　Plaintiffs in their Opposition also point to "the statements of [ ] Langley, which purport to have one of his subordinates change the Use of Force Form with respect to the use of an impact weapon upon [ ] Taranto." (Pls.' Mem 15.) Plaintiffs do not make any such allegations in the Second Amended Complaint.

5　Plaintiffs posit that the municipal liability lies because of "the failure to maintain an independent police review board." (SAC ¶ 161.) However, an alleged absence of a formal policy is not a policy: "the absence of a policy is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")). When a municipality "does not have an adequate policy ...*Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.*

6　Plaintiffs have not argued that they have plausibly alleged municipal liability on the basis of a widespread practice of excessive force. (Pls.' Mem. 22–24.) Indeed, Plaintiffs have not pointed to any other instances of excessive use of force beyond the incident described at hand. (*See generally* SAC.) This alone is fatal to Plaintiffs' *Monell* claim. *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148,

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 172 of 183

Taranto v. Putnam County, Not Reported in Fed. Supp. (2025)

2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case").

7    In *DiPippo*, the court noted that Plaintiff alleged that "Stephens and other supervisors purportedly knew about Castaldo and Quick's misconduct, personally participated in it, and failed to document or disclose it. Stephens and other supervisors also allegedly failed to prevent Castaldo and Quick from engaging in misconduct, participated in it, encouraged it, and affirmatively misrepresented to prosecutors that no misconduct had occurred ... Stephens updated Thoubboron about all major investigatory developments. Hence, Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick or willfully blind to it." 2019 WL 1004152, at *6. However, Plaintiffs have made no specific allegations in the Second Amended Complaint about any alleged failure to supervise or discipline.

Plaintiffs additionally allege that "[a]t all times mentioned herein and prior to the incidents described herein, Putnam County, by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters." (SAC ¶ 162.) Plaintiffs have not alleged any prior failures to supervise or discipline officers for use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters.

8    Furthermore, Plaintiffs do not specifically argue in their Opposition that *Monell* liability is predicated upon an act of a final policymaker or point to a specific to act in their briefing. (Pls.' Mem. 22–24.)

9    Defendants aver that Plaintiffs' state law claims are precluded due to their failure to comply with General Municipal Law § 50-h. (Defs.' Mem 20–21.) Section 50-h states:

> [w]herever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate .... The action ... may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.

N.Y. Gen. Mun. Law § 50-h(1);(5). In federal court, "a 'plaintiff's failure to attend a 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims[.]' " *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12–13 (S.D.N.Y. June 23, 2022) (citation omitted); *see also Misek-Falkoff v. Metro. Transit Auth. (MTA)*, 843 N.Y.S.2d 155, 156 (App. Div. 2007) ("A party who has failed to comply with General Municipal Law § 50-h is generally precluded from commencing an action against a municipality[.]"); *Baumblatt v. Battalia*, 520 N.Y.S.2d 571, 574 (App. Div. 1987) (dismissing a complaint against a town because "the plaintiff failed to appear for examination on his original notice of claim as requested by the town's attorney pursuant to General Municipal Law § 50-h and this failure bars the commencement of an action against the town"). Plaintiffs' Second Amended Complaint only states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) This Court cannot determine at this stage whether this was due to Taranto's failure to attend the hearing.

Defendants also moved to dismiss Plaintiffs' intentional infliction of emotional distress claims against the County. (Defs.' Mem 21.) Plaintiffs "concede that a cause of action for intentional infliction of emotional distress against Putnam County cannot be maintained." (Pls.' Mem. 25.)

**Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)**

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 173 of 183

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 174 of 183

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 175 of 183

Brown v. Peters, Not Reported in F.Supp. (1997)

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambric v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 177 of 183

Brown v. Peters, Not Reported in F.Supp. (1997)

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 178 of 183

Brown v. Peters, Not Reported in F.Supp. (1997)

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:23-cv-01099-GTS-ML    Document 32    Filed 04/29/25    Page 179 of 183

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

### Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 5077626
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

LaQuan WILLIAMS, Plaintiff,

v.

MDC BROOKLYN/FBOP, Defendant.

24-CV-7682 (AMD) (VMS)
|
Signed December 11, 2024

**Attorneys and Law Firms**

LaQuan Williams, Kearny, NJ, Pro Se.

### ORDER

ANN M. DONNELLY, United States District Judge:

**\*1** On October 4, 2024, the *pro se* plaintiff, a pretrial detainee at the Hudson County Correctional Center in New Jersey, filed this action in the United States District Court for the Southern District of New York alleging constitutional violations and seeking damages for injuries he sustained at the Metropolitan Detention Center ("MDC") in Brooklyn. (ECF No. 1.)[1] The action was transferred to this District on November 4, 2024. (ECF No. 3.) The Court grants the plaintiff's request to proceed *in forma pauperis*. As discussed below, the complaint is dismissed with leave to amend.

### BACKGROUND

The plaintiff alleges that the defendants failed to protect him while he was detained at the MDC in Brooklyn. (ECF No. 1 at 12.) He states that in June 2024, he was "walk[ing] out my cell" when "a[n] unknown male came from behind cut me multiple times on my face while another victim was stabbing me." (*Id.*) The plaintiff says that he "almost died," and that one "cut was a[n] inch[ ] away from [his] throat." (*Id.*) The wounds to the plaintiff's face and neck required 31 stitches. (*Id.* at 3–5.) He asserts that the defendants "failed to follow care custody control," and that he suffered "emotional distress[,] ear, neck, and face itch." (*Id.* at 12.) He is afraid to leave his cell for fear that "someone gonna harm me" (*id.* at 5), and is receiving psychiatric treatment (*id.* at 12).

The plaintiff acknowledges that he did not use the prison grievance procedures. (*Id.* at 7.) The plaintiff alleges that "they refuse to let me speak to my wife" and "they jus[t] box me and ship me." (*Id.* at 6). The plaintiff seeks $131 million in damages for "pain and suffering" from "tra[u]matic thought[s]" and "emotional distress." (*Id.* at 5.)

### STANDARD OF REVIEW

To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although "detailed factual allegations" are not required, a complaint that includes only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; Fed. R. Civ. P. 8. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up).

Because the plaintiff is proceeding *pro se*, the Court construes his complaint liberally and evaluates it by "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), to raise "the strongest arguments" that it suggests, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015) (cleaned up); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*, the court "remain[s] obligated to construe a *pro se* complaint liberally"). Nevertheless, the Prison Litigation Reform Act requires district courts to screen civil complaints brought by prisoners against a governmental entity and dismiss them if they are "frivolous, malicious, or fail[ ] to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b) (1). Additionally, a district court must dismiss an *in forma pauperis* action if the complaint "is frivolous or malicious," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief." *Id.* § 1915(e)(2)(B)(i)–(iii).

### DISCUSSION

**\*2**  The plaintiff brings a claim under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the defendants failed to protect him from a violent inmate attack.

A *Bivens* claim is brought against federal officials in their individual capacities. *See McGowan v. United States*, 825 F.3d 118, 123 (2d Cir. 2016). To state a *Bivens* claim, a plaintiff must plausibly allege "depriv[ation] of a constitutional right by a federal agent acting under color of federal authority," and that "the individual defendant[s were] personally involved in the constitutional violation." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006). The Supreme Court has limited the availability of *Bivens* remedies to three kinds of cases: a Fourth Amendment claim arising from an unlawful search and arrest, *Bivens*, 403 U.S. 388; a Fifth Amendment claim based on sex-discrimination in the workplace, *Davis v. Passman*, 442 U.S. 228 (1979); and an Eighth Amendment claim for failure to provide adequate medical treatment. *Carlson v. Green*, 446 U.S. 14 (1980). "[T]he Supreme Court has refused to extend *Bivens* to contexts beyond the specific clauses of the specific amendments for which a cause of action had been implied, or even to other classes of defendants facing liability under those same clauses." *Sanford v. Bruno*, No. 17-CV-5132, 2018 WL 2198759, at \*4 (E.D.N.Y. May 14, 2018). The Supreme Court has instructed lower courts that "[e]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

As a general matter, a litigant may not sue the United States or any of its agencies in federal court unless the United States has waived its sovereign immunity. *See Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."); *FDIC v. Meyer*, 510 U.S. 471, 483–86 (1994) (*Bivens* does not imply cause of action against the federal government or its agencies). Because the BOP and the MDC Brooklyn are federal agencies, the plaintiff's claims against them must be dismissed. 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B).

Moreover, a *Bivens* remedy is unavailable for a failure-to-protect claim. *See Ballard v. Dutton*, No. 23-6416, 2024 WL 4039606, at \*1 (2d Cir. Sept. 4, 2024) (holding that a *Bivens* remedy is not available for a failure-to-protect claim where the plaintiff asserted that a lieutenant failed to protect

him from an assault by another inmate). Accordingly, the plaintiff's claim that the defendants failed to protect him from a violent inmate attack must be dismissed.

The Court interprets the complaint to allege a claim for deliberate indifference not under the Eighth Amendment, but under the Due Process Clause of the Fourteenth Amendment, because the because the plaintiff is a pretrial detainee, not a convicted prisoner. *See Darnell v. Piniero*, 849 F.3d 17, 29 (2d Cir. 2017) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

**\*3**  "A detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021). The plaintiff does not sufficiently allege that the defendants were deliberately indifferent to his injuries. The plaintiff's Fourteenth Amendment claim is therefore dismissed. The plaintiff may amend his complaint within 45 days of this Order. He must name a federal official as a defendant. Additionally, because the plaintiff's failure-to-protect claim is not cognizable under *Bivens*, he must allege a different theory to state a claim under *Bivens*. For example, to the extent the plaintiff seeks to assert a Fourteenth Amendment claim for deliberate indifference to his medical needs, he must explain what he has done to request treatment, and how prison officials responded to his requests. In particular, the plaintiff should state whether he has attempted to file any formal grievances with the BOP regarding any denial of his requests for medical treatment and how the BOP responded to those attempts. He must also identify specific corrections officers to whom he spoke about his condition and provide all the relevant dates. If the plaintiff does not know the corrections officers' names, he may refer to them as John or Jane Doe.

The plaintiff might also be able to make a claim under the Federal Tort Claims Act ("FTCA") based on his allegation that corrections officers failed to protect him from a violent inmate attack. The FTCA "constitutes a limited waiver of sovereign immunity by the United States and permits a tort suit against it under specified circumstances." *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012) (citation omitted). The proper defendant for an FTCA claim is the United States of America. *See* 28 U.S.C. § 2679(d)(1).

However, before bringing a claim under the FTCA, the plaintiff must exhaust his administrative remedies. That means he must (1) file a claim for money damages with the BOP and (2) receive a final written determination from the BOP. *See* 28 U.S.C. § 2675(a); *Phillips v. Generations Fam. Health Ctr.*, 723 F.3d 144, 147 (2d Cir. 2013). An FTCA claim must be "presented in writing to the [BOP] within two years after such claim accrues" and an FTCA action in federal court must be commenced within six months of the BOP's decision. *Roberson v. Greater Hudson Valley Fam. Health Ctr., Inc.*, No. 17-CV-7325, 2018 WL 2976024, at *2 (S.D.N.Y. June 12, 2018) (citing 28 U.S.C. § 2401(b)). [2]

If the plaintiff brings a failure-to-protect claim under the FTCA in an amended complaint, the plaintiff should state whether he requested a grievance form or made other efforts to exhaust his administrative remedies, and how the corrections officer responded to those attempts. *See, e.g., Cruz v. Lee*, No. 14-CV-870, 2016 WL 1060330, at *5 (S.D.N.Y. Mar. 15, 2016) (holding that where the prisoner was denied access to the grievance procedure, he made reasonable efforts to exhaust by writing a letter to his counselor, speaking to a mental health doctor, and writing to the superintendent); *see also Hill v. Tisch*, No. 02-CV-3901, 2009 WL 3698380, at *5 (E.D.N.Y. Oct. 30, 2009) (holding that the corrections facility's policy does not permit grievances against other inmates, but that the plaintiff was not excused from his failure to exhaust because the "[p]laintiff allege[d] that his injuries resulted from the failure of the ... defendants to protect him ... and there is nothing in the record to suggest that such complaints are not grievable"). He must also identify specific corrections officers to whom he made the requests and provide all the relevant dates. If the plaintiff does not know the corrections officers' names, he may refer to them as John or Jane Doe.

**\*4** The plaintiff's amended complaint must be labeled "Amended Complaint" and bear the same docket number as this Order, 24-CV-7682 (AMD) (VMS).

### CONCLUSION

The plaintiff's complaint, filed *in forma pauperis*, is dismissed for failure to state a claim. 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B). The plaintiff may amend his complaint within 45 days of this Order if he cures the deficiencies discussed above. If the plaintiff does not file an amended complaint within that time or show good cause for an extension of time, the Court will direct the Clerk of Court to enter judgment and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 5077626

---

### Footnotes

1    The plaintiff names "MDC/FBOP" as the sole defendant. The Court construes "MDC/FBOP" as referring to the Federal Bureau of Prisons (the "BOP") and the MDC, a facility operated by the BOP.

2    There are limited circumstances in which a prisoner is not required to exhaust administrative remedies. "[P]risoners are exempt from the exhaustion requirement when administrative remedies are 'unavailable.' " *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 311 (2d Cir. 2020) (citation omitted). A remedy is unavailable when "(1) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that it becomes, practically speaking, incapable of use; or (3) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* (quotation marks omitted).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.